Marc Van Der Hout (CA Bar #80778)
Johnny Sinodis (CA Bar #290402)
Van Der Hout LLP
360 Post St., Suite 800
San Francisco, CA 94108
Telephone: (415) 981-3000
Facsimile: (415) 981-3003
Email: ndca@vblaw.com

Attorneys for Plaintiff
John Doe

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| John Doe,<br><br>    Plaintiff,<br><br>    v.<br><br>Donald J. TRUMP, in his official capacity, President of the United States of America, et al.<br><br>    Defendants. | Case Nos. 4:25-cv-03140-JSW<br><br>**DECLARATION OF JOHNNY SINODIS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br><u>Request for Declaratory and Injunctive Relief</u><br><br>Judge: Hon. Jeffrey White<br>Hearing Date: May 14, 2025<br>Hearing Time: 10:00 a.m. |
| Zhuoer Chen, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>Kristi NOEM, in her official capacity, Secretary of the U.S. Department of Homeland Security, et al.<br><br>    Defendants. | Case Nos. 4:25-cv-03292-JSW<br><br>**DECLARATION OF JOHNNY SINODIS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br><u>Request for Declaratory and Injunctive Relief</u><br><br>Judge: Hon. Jeffrey White<br>Hearing Date: May 14, 2025<br>Hearing Time: 10:00 a.m. |

*Doe v. Trump et al.,* No. 4:25-cv-03140-JSW
DECLARATION OF JOHNNY SINODIS

| | |
|---|---|
| S.Y., et al., | Case Nos. 4:25-cv-03244-JSW |
| Plaintiffs, | **DECLARATION OF JOHNNY SINODIS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| Kristi NOEM, in her official capacity, Secretary of the U.S. Department of Homeland Security, et al. | Request for Declaratory and Injunctive Relief |
| Defendants. | Judge: Hon. Jeffrey White<br>Hearing Date: May 14, 2025<br>Hearing Time: 10:00 a.m. |
| J.C., et al., | Case Nos. 4:25-cv-03502-JSW |
| Plaintiffs, | **DECLARATION OF JOHNNY SINODIS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| Kristi NOEM, in her official capacity, Secretary of the U.S. Department of Homeland Security, et al. | Request for Declaratory and Injunctive Relief |
| Defendants. | Judge: Hon. Jeffrey White<br>Hearing Date: May 14, 2025<br>Hearing Time: 10:00 a.m. |
| W.B., | Case No. 4:25-cv-03407-JSW |
| Plaintiff, | **DECLARATION OF JOHNNY SINODIS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| Kristi NOEM, in her official capacity, Secretary of the U.S. Department of Homeland Security, et al. | Request for Declaratory and Injunctive Relief |
| Defendants. | Judge: Hon. Jeffrey White<br>Hearing Date: May 14, 2025<br>Hearing Time: 10:00 a.m. |

*Doe v. Trump et al.,* No. 4:25-cv-03140-JSW
DECLARATION OF JOHNNY SINODIS

I, Johnny Sinodis, hereby declare as follows:

1. I am a partner at Van Der Hout LLP, which is located at 360 Post Street, Suite 800, San Francisco, California 94108. I have personal knowledge of the matters stated herein because I am Plaintiffs' attorney in the instant matter. I make this declaration in support of Plaintiffs in the above-captioned cases' consolidated Reply Brief in Support of their Motions for a Preliminary Injunction.

2. Attached as Exhibit A is a screenshot of a SEVIS record submitted in *Gunaydin v. Trump et al.*, 0:25-cv-01151, Dkt. 1-1 (D. Minn. March 30, 2025), showing Mr. Gunaydin's SEVIS record was terminated with the explanation "OTHERWISE FAILING TO MAINTAIN STATUS" on March 27, 2025.

3. Attached as Exhibit B is a Notice to Appear issued to Mr. Gunaydin on March 27, 2025, the same date on which his SEVIS record was terminated and on which he was arrested and detained by ICE officials. *Gunaydin*, 0:25-cv-01151, Dkt. 11-5 (D. Minn. Apr. 4, 2025).

4. Attached as Exhibit C is a declaration from attorney Matthew H. Green.

5. Attached as Exhibit D is a "Memo for ICE" from John L. Armstrong, Senior Bureau Official, United States Department of State, which was sent to Andre R. Watson, Assistant Director, National Security Division at ICE on March 23, 2025.

6. Attached as Exhibit E is a screenshot of a student's SEVIS record provided by another attorney, demonstrating that the termination notation and the reason for termination ("Individual identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated.") are still included in the record, along with the date of termination.

7. Attached as Exhibit F is a Notice of Decision from U.S. Citizenship and Immigration Services (USCIS) denying an individual's request to reinstate their F-1 student status, dated May 5, 2017, in which USCIS states that an individual is considered to be out of status during a period when their SEVIS record is terminated.

8. Several of the Plaintiffs in the above-captioned cases before this Court have informed undersigned Counsel that they were informed by their DSOs, following the April 25 hearing, that there still is a gap in their SEVIS records. We have heard this from Plaintiffs J.C., A.B.,

1

D.Y., and Y.Z., all of whom are plaintiffs in *J.C., et al. v. Noem et al.* (4:25-cv-03502-JSW). Attached as <u>Exhibit G</u> is a screenshot of Plaintiff D.Y.'s SEVIS record, demonstrating that their SEVIS was changed to active on April 26, 2025, and that Plaintiff D.Y. cannot determine whether the reactivation is *nunc pro tunc* from the record they are able to view. We are actively trying to obtain an update from their respective DSOs as to whether a gap still exists.

9.    Attached as <u>Exhibit H</u> is an email dated May 7, 2025, in which the U.S. Department of State informed a student that their F-1 visa had been revoked and that, *inter alia*, "[r]emaining in the United States without a lawful immigration status can result in fine, detention, and/or deportation."

10.    Attached as <u>Exhibit I</u> is a screenshot of one plaintiff's SEVIS portal, showing it was terminated on April 8, 2025, and then had a "manual data change" back to active on April 24, 2025.

11.    Attached as <u>Exhibit J</u> are several orders from district courts across the country granting preliminary injunctions to similarly situated plaintiffs, following the government's issuance of the new policy on April 30, 2025 (Dkt. 51-1):

-    *Gong v. Noem*, No. 2:25-cv-2115-CSB (C.D.Ill. May 7, 2025)

-    *Liu v. Noem*, No. 25-CV-133-SE, 2025 WL 1233892 (D.N.H. Apr. 29, 2025)

-    *Doe v. Noem*, No. 25 C 4188, 2025 WL 1341711 (N.D. Ill. May 8, 2025)

-    *Ortega Gonzalez v. Noem*, No. 6:25-CV-00622-MC, 2025 WL 1355272 (D. Or. May 9, 2025)

-    *Doe 1 et al. V. Bondi*, No. 1:25-cv-01998-VMC (N.D. Ga. May 2, 2025)

-    *Gao v. Noem*, No. 1:25-CV-419, 2025 WL 1318417 (W.D. Mich. May 7, 2025), *Isserdasani v. Noem*, No. 25-CV-283-WMC, 2025 WL 1330188, (W.D. Wis. May 7, 2025)

I declare under penalty of perjury that the foregoing statement is true and correct to the best of my own personal knowledge. Executed this 12th day of May 2025 at San Francisco, California.

<u>/s/ Johnny Sinodis</u>
Johnny Sinodis
Declarant

2

# EXHIBIT A

Enter the date range and click the button to filter by event date

Expand All

Search: [                    ]

From: [                    ] To: [                    ] [Filter]

| Event Name | Event Date | Resulting Status | Performed By |
|---|---|---|---|
| ISS Change of Student Status | 03/27/2025 16:24:01 | TERMINATED | DHS Official |
| ⊖ Terminate - User Termination | 03/27/2025 16:24:01 | TERMINATED | DHS Official |

| Field Changed | Old Value | New Value |
|---|---|---|
| Termination Reason | | OTHERWISE FAILING TO MAINTAIN STATUS |
| Explanation | | SEVIS record terminated pursuant to INA 237(a)(1)(C)(i) and/or 237(a)(4)(C)(i). |

| Event Name | Event Date | Resulting Status | Performed By |
|---|---|---|---|
| ⊕ Registration - Continuing | 01/22/2025 02:05:41 | ACTIVE | Lisa Ziegler |
| Program Information Updated | 09/10/2024 15:11:41 | ACTIVE | Nouchee Xiong |
| ⊕ Address Update - Physical | 09/04/2024 02:10:57 | ACTIVE | Lisa Ziegler |
| ⊕ Registration - Initial | 09/04/2024 02:10:57 | ACTIVE | Lisa Ziegler |
| Transfer Completed | 09/04/2024 02:10:57 | ACTIVE | Lisa Ziegler |
| Financial Information Updated | 08/26/2024 12:26:59 | INITIAL | Lisa Ziegler |
| ⊕ Education Level - Change | 07/11/2024 15:29:06 | INITIAL | Nouchee Xiong |
| ⊕ Program Dates - Update | 07/11/2024 15:29:06 | INITIAL | Nouchee Xiong |
| ⊕ Secondary Major Code Update | 07/11/2024 15:29:06 | INITIAL | Nouchee Xiong |
| ⊕ Primary Major Code Update | 07/11/2024 15:29:06 | INITIAL | Nouchee Xiong |
| ⊕ Address Add - Physical | 07/11/2024 15:28:07 | DRAFT | Nouchee Xiong |
| ⊕ Name Updated | 07/11/2024 15:28:06 | DRAFT | Nouchee Xiong |
| ⊕ Transfer In Initiated | 07/05/2024 03:06:08 | DRAFT | SEVIS Maintenance |
| Record Created | 07/03/2024 10:30:09 | INITIAL | Caitlin Lamont Kreienkamp |

Return

# EXHIBIT B

DEPARTMENT OF HOMELAND SECURITY
## NOTICE TO APPEAR

DOB: 01/05/1997

Event No: XMS2503000077

In removal proceedings under section 240 of the Immigration and Nationality Act:

Subject ID: 398303176

File No: 220 936 382

In the Matter of:

Respondent: DOGUKAN GUNAYDIN _____ currently residing at:

1 FEDERAL DRIVE SUITE 1640 FORT SNELLING,MINNESOTA,55111

(917) 834-1413

(Number, street, city, state and ZIP code)      (Area code and phone number)

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen and national of the United States.

2. You are a citizen of the Republic of Turkiye and national of the Republic of Turkiye.

3. You were admitted to the United States at Chicago, IL on or about January 13, 2022 as a F-1 Student nonimmigrant.

4. You have failed to maintain your status, to wit:in 2025 the United States State Department retroactively revoked the F-1 student visa based on your criminal history.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(1)(C)(i) of the Immigration and Nationality Act (Act), as amended, in that after admission as a nonimmigrant under Section 101(a)(15) of the Act, you failed to maintain or comply with the conditions of the nonimmigrant status under which you were admitted.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to:    ☐ 8CFR 208.30    ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

1 FEDERAL DR STE 1850 FORT SNELLING MN 55111. FORT SNELLING

(Complete Address of Immigration Court, including Room Number, if any)

on   April 8, 2025   at   8:30 AM   to show why you should not be removed from the United States based on the

(Date)      (Time)

charge(s) set forth above.      M 1466 HYLAND - Supervisory Special Agent

(Signature and Title of Issuing Officer)

Date:   March 27, 2025      Fort Snelling

(City and State)

GOVERNMENT
EXHIBIT

5

0:25-cv-01151-JMB-DLM

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at **www.uscis.gov/i-589**. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at **http://www.ice.gov/contact/ero**, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

---

## Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before:

_____
_(Signature and Title of Immigration Officer)_

_____
_(Signature of Respondent)_

Date: 03.27.2025

---

## Certificate of Service

This Notice To Appear was served on the respondent by me on <u>March 27, 2025</u>, in the following manner and in compliance with section 239(a)(1) of the Act.

☑ in person   ☐ by certified mail, returned receipt # _____ requested   ☐ by regular mail

☐ Attached is a credible fear worksheet.

☐ Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the <u>ENGLISH</u> language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

_____
_(Signature of Respondent if Personally Served)_

DAVID WHEREATT – SPECIAL AGENT
_____
_(Signature and Title of officer)_

DHS Form I-862 (6/22)

 **Privacy Act Statement** 

**Authority:**
The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**
You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**
For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**
Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

# EXHIBIT C

### DECLARATION OF MATTHEW GREEN

1. My name is Matthew H. Green.

2. My date of birth is March 17, 1975.

3. I am an attorney, licensed by the Supreme Court of Arizona, and authorized to practice law in the State of Arizona, the U.S. District Court for the District of Arizona, and the U.S. Court of Appeals for the Ninth Circuit.

4. My residence and principal place of business are in Tucson, Arizona. I am the managing partner of Green Evans-Schroeder, an immigration and criminal defense law firm.

5. Over the past six weeks, our firm has been overwhelmed with providing consultations to approximately fifty international students at Arizona State University (ASU), the University of Arizona (U of A), and other colleges and universities in Arizona, and around the United States, whose student visas have suddenly been revoked, and whose SEVIS records have been suddenly terminated.

6. We currently represent thirteen plaintiffs in three lawsuits in what is now colloquially known as "the SEVIS litigation." Our litigation is currently consolidated before Judge Jennifer Zipps, the Chief Judge of the U.S. District Court for the District of Arizona, in CV25-174, CV25-175, and CV25-183.

7. In addition, I also represent an international student who was detained and placed into removal proceedings in Florence, Arizona by Immigration and Customs Enforcement (ICE) on March 28, 2025. His SEVIS account was terminated within 24 hours of his detention, and to my knowledge, he was never notified by the Department of State as to whether his visa was revoked, although the Department of Homeland Security informed a school representative that it had been.

8. My client had minor criminal history that did not subject him to any criminal grounds of removal under 8 U.S.C. § 1227(a)(2). Moreover, his criminal history was 7-10 years old, and was well-known to the U.S. government, which issued him two additional F-1 visas after he disclosed all relevant information to consular officials who adjudicated his nonimmigrant visa applications.

9. After my client was detained in the Florence Detention Center (also known as the Florence Service Processing Center) in Florence, Arizona, he was issued a Notice to Appear (NTA) three days later, on March 31, 2025.  My client was charged with being removable under 8 U.S.C. § 1227(a)(1)(B) and was accused of remaining "in the United States for a time longer than permitted." However, my client had complied fully with the terms of his F-1 nonimmigrant status prior to being arrested and detained, and prior to the termination of his SEVIS account.

Declaration of Matthew H. Green

10. The NTA in my client's case also charged him with being removable under 8 U.S.C. § 1227(a)(1)(A), for allegedly being "within one or more classes of aliens inadmissible at the time of [his last] entry . . . by fraud or by willfully misrepresenting a material fact." More specifically, ICE alleged that my client failed to fully disclose certain derogatory information on his most recent F-1 visa application in 2024.

11. My client quickly decided that he wanted to leave the United States and, for that reason, he asked the immigration judge for voluntary departure and for release on bond. During his bond hearing and master calendar hearing, which were held at the same time on April 10, 2025, my client produced a copy of his most recent Department of State DS-160 application for his most recent F-1 visa. ICE also produced a copy of a record of sworn statement from an encounter that my client had with Customs and Border Protection (CBP) at a U.S. airport from 2018. During that encounter, my client admitted to certain conduct that resulted in his F-1 visa being revoked at that time and required him to withdraw his application for admission and to return to his country of origin.

12. The record that my client made in his recent removal proceedings clearly demonstrated that my client then spent approximately nineteen months back in his country of origin, and that he reapplied three times for an F-1 visa, and his application was rejected each time specifically because of the conduct that gave rise to the revocation of his visa in 2018. The fourth time he reapplied for an F-1 visa, the consular officer approved his F-1 visa, finding that sufficient rehabilitation had been established. My client then returned to the United States to finish his undergraduate degree.

13. After finishing his undergraduate degree, my client returned to this country of origin for several years before applying for a master's program at a university in Arizona. When he was accepted into the program, he filed yet another DS-160 application for an F-1 visa in 2023, which was also approved by the U.S. consulate in the same country of origin that had processed at least five of his previous F-1 visa applications.

14. In proceedings before the immigration court, my client was required to admit to the allegations, and to concede to the charges, in the NTA to receive voluntary departure. Although he did not contest removability for that reason (so he could accept voluntary departure), at the combined master calendar and bond hearing on April 10, 2025, my client nevertheless presented evidence and argument which established that, on his most recent DS-160 visa application, he disclosed his criminal history, in addition to the fact that his previous visa had been revoked due to the encounter in 2018 with CBP. As to this last point, my client even explained the nature of the conduct for which his visa was revoked by CBP in 2018.

15. I have been practicing removal defense in the Department of Justice, Executive Office for Immigration Review (EOIR) for over nineteen years. During that time, I have represented hundreds of clients in their removal proceedings, which includes

Declaration of Matthew H. Green

representing them in hearings where they contest the charges of removal against them.

16. For the reasons set forth above, I advised my client that, if he had chosen to contest the charges of removal against him, I expected that he would likely prevail in having the charges against him terminated for failure of the government to prove by clear and convincing evidence that my client was removable for violations of 8 U.S.C. § 1227(a)(1)(A), or 8 U.S.C. § 1227(a)(1)(B).  *See* 8 U.S.C. § 1229a(c)(3)(A) (placing the burden on the government to establish that an alien who has been admitted to the United States is deportable by clear and convincing evidence that is "reasonable, substantial, and probative"); *see also Mondaca-Vega v. Lynch*, 808 F.3d 413, 420-21 (9th Cir. 2015) (*citing Woodby v. INS*, 385 U.S. 276, 285 (1966)).

17. Notwithstanding my client's concession to the charges against him, at the relief (voluntary departure) and bond phases of his proceedings, the immigration judge considered the information and arguments referenced in ¶¶ 11-16 above. The immigration judge first granted my client's release on a $1,500 bond, which is the lowest amount authorized by statute. 8 U.S.C. § 1226(a)(2)(A). The immigration judge, who dictated an oral decision, also found the information set forth above at ¶¶ 11-16 to be persuasive and granted my client's application for voluntary departure.

18. My client was then released from ICE detention upon the posting of the bond, and about a week later, he departed the United States.

I declare under penalty of perjury that the foregoing is true and correct. (U.S. Code, Title 28, USC § 1746.)

May 11, 2025
Dated

*Matthew H. Green*
_____
Matthew H. Green
AZSB No. 020827
Green Evans-Schroeder
130 W. Cushing Street
Tucson, AZ  85701
Tel: (520) 639-7288

Declaration of Matthew H. Green

# EXHIBIT D



United States Department of State

Washington, DC  20520

<u>SENSITIVE BUT UNCLASSIFIED</u>                    March 23, 2025

**Memo for ICE – Andre R. Watson, Assistant Director, National Security Division**

FROM:        CA – John L. Armstrong, Senior Bureau Official

SUBJECT:     (SBU) Revocation of Visa – ███████████████

(SBU) On March 23, 2025, in response to a request from DHS/ICE and the information from DHS/ICE that ███████████████ has been charged by U.S. law enforcement officials with Aggravated Battery and now poses a threat to U.S. public safety, the Bureau of Consular Affairs approved revocation, effective immediately, of the F-1 visa of ████████ DPOB: █████ 1997, ██████████ Visa Foil ██████████ pursuant to authority in section 221(i) of the Immigration and Nationality Act, 8 U.S.C. 1201(i).  We understand that DHS/ICE intends to immediately pursue removal of ████████, and due to ongoing ICE operational security, this revocation will therefore be silent; the Department of State will not notify the subject of the revocation.

(U) The information in this record is confidential under INA 222(f) and specific biographical data about the alien cannot be shared in public statements.

(U) I am providing this notice to you with express authorization for use by DHS/ICE in immigration court, as needed.

John L. Armstrong
Senior Bureau Official
Bureau of Consular Affairs

# EXHIBIT E

Current Student: Main Screen

Reprint I-20

Print Draft I-20

**View:**
Event History

Request/Authorization Details

Employment Information

**Actions:**
Authorize To Drop Below Full Course

Change Education Level

Corrections

Complete Program

Disciplinary Action

Extend Program

Shorten Program

Terminate Student

Transfer Out

**Employment/Training:**
CPT Employment Authorization

Off-Campus Employment

OPT Request

# Student Information

F-1 STUDENT

Status: **ACTIVE**
Status Change Date: **April 24, 2025**
SEVIS ID:

Start Date: **August 20, 2023**    End Date: **August 15, 2025**

I-901 Fee Paid

I-20 ISSUE REASON: CONTINUED ATTENDANCE

Edit

## Personal / Contact

Gender
**MALE**
Date of Birth

City of Birth

Country of Birth
**INDIA**
Country of Citizenship
**INDIA**
U.S. Telephone

Foreign Telephone

Email Address

U.S. Address

Address Status
**Valid H – High-rise default address**
Foreign Address

## Overall Remarks

Edit

## Program

Education Level
**MASTER'S**
Major 1 and Name
**11.0103 – Information Technology**
Major 2 and Name
**00.0000 – None**
Minor and Name
**00.0000 – None**
Program Start Date
**August 20, 2023**
Program End Date
**August 15, 2025**

## Registration

Registration

Initial Session Start Date
**August 28, 2023**
Current Session End Date
**May 15, 2025**
Next Session Start Date
**August 25, 2025**
Length of Next Break/Vacation
**101**
Last Session

Study/Research Abroad
**No**



# Current Student: Event History

Collapse All          Search:          Enter the date range and click the button to filter by event date
From:          To:          Filter

| Event Name | Event Date | Resulting Status | Performed By |
|---|---|---|---|
| Manual Data Change | 04/24/2025 15:25:03 | ACTIVE | SEVIS Maintenance |
| Manual Data Change | 04/08/2025 10:21:53 | TERMINATED | SEVIS Maintenance |
| Terminate - User Termination | 04/08/2025 10:21:53 | TERMINATED | SEVIS Maintenance |

| | Old Value | New Value |
|---|---|---|
| Field Changed | | |
| Termination Reason | | OTHER |
| Explanation | | Individual identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated. |
| Remarks | Final Semester Reduced Course Load | |

| Authorized to Drop Below Full Course | 01/24/2025 01:27:19 | ACTIVE | |
|---|---|---|---|

| | Old Value | New Value |
|---|---|---|
| Field Changed | | |
| Authorization Reason | | TO COMPLETE COURSE OF STUDY IN CURRENT TERM |
| Authorization Start Date | | 13-JAN-25 |
| Authorization End Date | | 15-MAY-25 |
| Remarks | | Final Semester Reduced Course Load |

| Registration - Continuing | 01/24/2025 01:27:17 | ACTIVE | |
|---|---|---|---|

| | Old Value | New Value |
|---|---|---|
| Field Changed | | |
| Current Session End Date | 15-DEC-24 | 15-MAY-25 |
| Next Session Start Date | 13-JAN-25 | 25-AUG-25 |
| Length of Next Break/Vacation | 28 | 101 |
| Current Session Start Date | 26-AUG-24 | 13-JAN-25 |

| Registration - Continuing | 08/30/2024 01:38:24 | ACTIVE | |
|---|---|---|---|

| | Old Value | New Value |
|---|---|---|
| Field Changed | | |
| Current Session End Date | 15-MAY-24 | 15-DEC-24 |
| Next Session Start Date | 26-AUG-24 | 13-JAN-25 |
| Length of Next Break/Vacation | 102 | 28 |
| Current Session Start Date | 16-JAN-24 | 26-AUG-24 |

| Registration - Continuing | 01/30/2024 01:30:02 | ACTIVE | |
|---|---|---|---|

| | Old Value | New Value |
|---|---|---|
| Field Changed | | |
| Current Session End Date | 15-DEC-23 | 15-MAY-24 |
| Next Session Start Date | 16-JAN-24 | 26-AUG-24 |
| Length of Next Break/Vacation | 21 | 102 |

# EXHIBIT F

U.S. Department of Homeland Security
P.O. Box 10539
Laguna Niguel, CA  92607-1053



**U.S. Citizenship
and Immigration
Services**

Date: MAY 0 5 2017



Refer to file no. : ███████████

### NOTICE OF DECISION

This notice is in reference to the Form I-539, Application to Extend/Change Nonimmigrant Status, which you filed with U.S. Citizenship and Immigration Services (USCIS) on October 17, 2016, requesting reinstatement to F-1 student status under 101(a)(15)(F) of the Immigration and Nationality Act (INA).

In order to be reinstated to F-1 student status, an applicant must prove that he or she meets the following requirements:

Title 8 of the Code of Federal Regulations (8 C.F.R.) 214.2 (f)(16)(i) states:

Reinstatement to student status.

General. The district director may consider reinstating a student who makes a request for reinstatement on Form I-539, Application to Extend/Change Nonimmigrant Status, accompanied by a properly completed SEVIS Form I-20 indicating the DSO's recommendation for reinstatement (or a properly completed Form I-20A-B issued prior to January 30, 2003, from the school the student is attending or intends to attend prior to August 1, 2003). The district director may consider granting the request if the student:

(A) Has not been out of status for more than 5 months at the time of filing the request for reinstatement (or demonstrates that the failure to file within the 5 month period was the result of exceptional circumstances and that the student filed the request for reinstatement as promptly as possible under these exceptional circumstances);

(B) Does not have a record of repeated or willful violations of Service regulations;

(C) Is currently pursuing, or intending to pursue, a full course of study in the immediate future at the school which issued the Form I-20;

(D) Has not engaged in unauthorized employment;

(E) Is not deportable on any ground other than section 237(a)(1)(B) or (C)(i) of the Act; and

(F) Establishes to the satisfaction of the Service, by a detailed showing, either that:

(1) The violation of status resulted from circumstances beyond the student's control. Such circumstances might include serious injury or illness, closure of the institution, a natural

Form I-541                                                                    **www.uscis.gov**

> disaster, or inadvertence, oversight, or neglect on the part of the DSO, but do not include instances where a pattern of repeated violations or where a willful failure on the part of the student resulted in the need for reinstatement; or
>
> (2) The violation relates to a reduction in the student's course load that would have been within a DSO's power to authorize, and that failure to approve reinstatement would result in extreme hardship to the student."

8 C.F.R. 103.2(a)(1) state in pertinent part:

> Every benefit request or other document submitted to DHS must be executed and filed in accordance with the form instructions, notwithstanding any provision of 8 CFR Chapter 1 to the contrary, and such instructions are incorporated into the regulations requiring its submission...

The instructions for Form I-539 Instructions state in pertinent part the following about initial evidence for F-1 reinstatement requests:

> To request a change to F-1 status or apply for reinstatement as an F-1 student . . . Your application must include your original Form I-20, Certificate of Eligibility for Nonimmigrant Student issued by the school where you will study...

You seek reinstatement to F-1 student status to attend Madison Area Technical College. You submitted a Student and Exchange Visitor Information System (SEVIS) Form I- 20 for reinstatement signed by a Designated School Official (DSO) on September 14, 2016. Your SEVIS record shows that your status was terminated on September 8, 2014. Your application was not stamped as received and properly filed until October 17, 2016.

With your I-539 application you did not submit a statement explaining why you were out of status over five months at the time you filed this application. As such, USCIS requested that you submit, among other documentation a detailed explanation as to why you failed to file within the five month period. In response to the RFE, you submitted a statement explaining that you were out of status over five months at the time you filed this application because when you applied to attend Madison Area Technical College in September of 2014, you did not know that you needed a Form I-20. However, before attending Madison Area Technical College, in May of 2014, you applied to attend Florida Southern College and then you obtained a Form I-20. You did not obtain proper permission to withdraw from Florida Southern College to attend Madison Area Technical College.

You did not submit sufficient explanation for being out of status over five months at the time you filed this application or any documentary evidence to demonstrate that the failure to file within the five-month period was the result of exceptional circumstances and that you filed the request for reinstatement as promptly as possible under these exceptional circumstances.

Based on the evidence presented above, you do not appear to be eligible for reinstatement to F-1 student status due to your untimely filing of your reinstatement application. Pursuant to INA 291, the burden of proof in these proceedings rests solely with you, the applicant. As such, your application is denied for the above-stated reason.

This decision leaves you without lawful immigration status, and you are therefore present in the United States in violation of the law. You are required to depart the United States. Remaining in the United States without authorization may affect your ability to return to the United States in the future.

There is no appeal to this decision. However, pursuant to 8 CFR 103.5, a motion can be filed on Form I-290B. Such motion must be accompanied by the proper fee and filed within 30 days of this notice. In



Page 3

addition, pursuant to 8 C.F.R. 103. 8(b), three days shall be added to the prescribed 30-day period when a USCIS notice is served by mail.

For questions concerning immigration services and benefits, you may call 1-800-375-5283 or for TTY 1-800-767-1833.

Sincerely,

Kathy A. Baran
Director, California Service Center

# EXHIBIT G

Status: **ACTIVE**
Status Change Date: **April 26, 2025**
SEVIS ID: █████
I-20 ISSUE REASON: **CONTINUED ATTENDANCE**

Edit

Start Date: **January 6, 2023**   End Date: **June 15, 2028**

I-901 Fee Paid

# Student Information

F-1 STUDENT

## Personal / Contact

Gender

U.S. Address

# EXHIBIT H

 Gmail

---

## NOTICE OF VISA REVOCATION:

**Nonimmigrant Visa Inquiries XXXXX**<XXXX@state.gov> To:                    Wed, May 7, 2025 at XXXX

**May 8, 2025**

**F1**

Dear Visa Holder:

We are writing about an important and serious matter in reference to your nonimmigrant student (F-1) visa.

On behalf of the United States Department of State, the Bureau of Consular Affairs Visa Office hereby informs you that additional information became available after your visa was issued. As a result, your F-1 visa with expiration date XXXX was revoked in accordance with Section 221(i) of the United States Immigration and Nationality Act, as amended.

The Bureau of Consular Affairs Visa Office has alerted the Department of Homeland Security's Immigration and Customs Enforcement, which manages the Student Exchange Visitor Program and is responsible for removal proceedings. They may notify your designated school official about the revocation of your F-1 visa.

Remaining in the United States without a lawful immigration status can result in fines, detention, and/or deportation. It may also make you ineligible for a future U.S. visa. Please note that deportation can take place at a time that does not allow the person being deported to secure possessions or conclude affairs in the United States. Persons being deported may be sent to countries other than their countries of origin.

Given the gravity of this situation, individuals whose visa was revoked may wish to demonstrate their intent to depart the United States using the CBP Home App at https://www.cbp.gov/about/mobile-apps-directory/cbphome.

As soon as you depart the United States, you must personally present your passport to the U.S. embassy or consulate which issued your visa so your visa can be physically cancelled.

You must not attempt to use your visa as it has been revoked. If you intend to travel to the United States in the future, you must apply for another U.S. visa and a determination on your eligibility for a visa will be made at that time.

Regards,

Consular Information Unit
U.S. Embassy


SENSITIVE BUT UNCLASSIFIED

# EXHIBIT I

# RTI - ACCESS

An official website of the U.S. government    Skip Navigation



Student & Exchange Visitor
Information System



logout

1-800-892-4829
SEVIS Help Desk
ROLES: DSO, ARO

Get Plug-Ins

Main  Listing of Schools  Listing of Programs  Message Board
Change Password

Enter SEVIS ID

# Event History

RTI - ACCESS



F-1 Student

Start Date: 08/17/2022    End Date: 05/12/2023

**Status: ACTIVE**

SEVIS ID:

GENDER
DOB
PREFERRED NAME
PASSPORT NAME
COUNTRY OF BIRTH
CITIZENSHIP

EMAIL

U.S. ADDRESS

Return

SEVIS - Eligibility Level History

RTI - ACCESS

Enter the date range and click the button to filter by event date

Search: [        ]

| Expand All | | From: [        ] To: [        ] [Filter] |

| | Event Name | Event Date | Resulting Status | Performed By |
|---|---|---|---|---|
| | **I-20 Reprinted** | 04/24/2025 20:06:41 | ACTIVE | ███████ |
| | **Portal Updated with SEVIS Changes** | 04/24/2025 19:26:32 | ACTIVE | PORTAL |
| ⊖ | **OPT Correction Made** | 04/24/2025 18:18:21 | ACTIVE | SEVIS Maintenance |

| Field Changed | Old Value | New Value |
|---|---|---|
| Actual End Date | 08-APR-25 | 14-MAY-26 |

| | Event Name | Event Date | Resulting Status | Performed By |
|---|---|---|---|---|
| | **Manual Data Change** | 04/24/2025 18:18:21 | ACTIVE | SEVIS Maintenance |
| ⊕ | **Portal Status: Account Unlocked** | 04/09/2025 01:02:15 | TERMINATED | PORTAL |
| | **Portal Updated with SEVIS Changes** | 04/08/2025 13:08:13 | TERMINATED | PORTAL |
| | **Manual Data Change** | 04/08/2025 11:53:05 | TERMINATED | SEVIS Maintenance |
| ⊖ | **OPT Actual End Date Updated** | 04/08/2025 11:53:05 | TERMINATED | SEVIS Maintenance |

| Field Changed | Old Value | New Value |
|---|---|---|
| Actual End Date | 14-MAY-26 | 08-APR-25 |

| | Event Name | Event Date | Resulting Status | Performed By |
|---|---|---|---|---|
| ⊖ | **Terminate - User Termination** | 04/08/2025 11:53:05 | TERMINATED | SEVIS Maintenance |

| Field Changed | Old Value | New Value |
|---|---|---|
| Termination Reason | | OTHER |
| Explanation | | Individual identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated. |

| | Event Name | Event Date | Resulting Status | Performed By |
|---|---|---|---|---|
| | **Portal Updated with SEVIS Changes** | 11/01/2024 05:17:30 | ACTIVE | PORTAL |
| | **STEM OPT 6 Month Participation Reported** | 11/01/2024 03:21:27 | ACTIVE | ███████ |
| | **Portal Status: Account Unlocked** | 10/16/2024 02:16:08 | ACTIVE | PORTAL |
| ⊕ | **Portal Status: Account Unlocked** | 10/16/2024 02:16:07 | ACTIVE | PORTAL |
| | **Portal Status: Portal EMail Account Changed** | 10/16/2024 02:12:27 | ACTIVE | PORTAL |

| Event Name | Event Date | Resulting Status | Performed By |
|---|---|---|---|
| Portal Status: Portal EMail Account Changed | 10/16/2024 02:10:42 | ACTIVE | PORTAL |
| Portal Updated with SEVIS Changes | 10/16/2024 02:08:38 | ACTIVE | PORTAL |
| Portal Status: Portal EMail Account Changed | 10/16/2024 02:08:37 | ACTIVE | PORTAL |
| Address Update - Physical | 10/16/2024 01:23:31 | ACTIVE | |
| Personal Information Updated | 10/16/2024 01:23:31 | ACTIVE | |
| E-Mail Address Update | 10/16/2024 01:23:31 | ACTIVE | |
| Name Updated | 10/16/2024 01:23:31 | ACTIVE | |
| Portal Updated with SEVIS Changes | 09/28/2024 10:23:49 | ACTIVE | PORTAL |
| OPT USCIS Update for STEM | 09/28/2024 09:01:11 | ACTIVE | System Interface |
| Portal Updated with SEVIS Changes | 09/25/2024 10:28:23 | ACTIVE | PORTAL |
| OPT USCIS Update for STEM | 09/25/2024 09:01:12 | ACTIVE | System Interface |
| Portal Updated with SEVIS Changes | 09/23/2024 11:44:17 | ACTIVE | PORTAL |
| OPT USCIS Update for STEM | 09/23/2024 09:00:41 | ACTIVE | System Interface |
| Portal Updated with SEVIS Changes | 05/11/2024 10:31:29 | ACTIVE | PORTAL |
| OPT Extension Pending | 05/11/2024 09:00:38 | ACTIVE | System Interface |
| Portal Updated with SEVIS Changes | 05/10/2024 21:03:45 | ACTIVE | PORTAL |
| OPT Employer Added | 05/10/2024 20:20:32 | ACTIVE | |
| OPT Recommendation for STEM OPT | 05/10/2024 20:20:32 | ACTIVE | |
| OPT Employer Information Update | 05/10/2024 20:17:39 | ACTIVE | |
| OPT Employer Information Update | 05/10/2024 20:17:06 | ACTIVE | |
| Portal Updated with SEVIS Changes | 01/27/2024 20:25:55 | ACTIVE | PORTAL |
| Portal Updated with SEVIS Changes | 01/12/2024 02:13:41 | ACTIVE | PORTAL |

| | Event Name | Event Date | Resulting Status | Performed By |
|---|---|---|---|---|
| ⊕ | **OPT Employer Information Update** ▮▮▮▮▮▮▮▮▮ | 01/12/2024 01:28:44 | ACTIVE | ▮▮▮▮▮▮▮ RTI - ▮▮▮▮▮▮▮S |
| | **OPT Employer Added** ▮▮▮▮▮ ▮▮▮▮▮ | 01/12/2024 01:28:44 | ACTIVE | |
| | **Portal Updated with SEVIS Changes** | 12/11/2023 11:42:46 | ACTIVE | PORTAL |
| | **Portal Updated with SEVIS Changes** | 11/28/2023 02:16:32 | ACTIVE | PORTAL |
| ⊕ | **Portal Status: Portal EMail Account Changed** | 11/28/2023 02:16:31 | ACTIVE | PORTAL |
| ⊕ | **Address Update - Physical** | 11/28/2023 01:21:39 | ACTIVE | ▮▮▮▮▮▮▮ |
| | **Personal Information Updated** | 11/28/2023 01:21:39 | ACTIVE | |
| ⊕ | **E-Mail Address Update** | 11/28/2023 01:21:39 | ACTIVE | |
| | **Portal Updated with SEVIS Changes** | 08/09/2023 02:10:08 | ACTIVE | PORTAL |
| | **OPT Employer Added** ▮▮▮▮▮ ▮▮▮▮▮ | 08/09/2023 01:18:13 | ACTIVE | ▮▮▮▮▮▮ |
| | **Portal Updated with SEVIS Changes** | 08/05/2023 02:09:56 | ACTIVE | PORTAL |
| ⊕ | **Address Update - Physical** | 08/05/2023 01:18:22 | ACTIVE | ▮▮▮▮▮▮▮ |
| | **Personal Information Updated** | 08/05/2023 01:18:22 | ACTIVE | |
| ⊕ | **Telephone Information Updated** | 08/05/2023 01:18:22 | ACTIVE | |
| | **Portal Updated with SEVIS Changes** | 08/02/2023 01:13:11 | ACTIVE | PORTAL |
| | **Portal Updated with SEVIS Changes** | 05/20/2023 02:11:38 | ACTIVE | PORTAL |
| | **OPT Employer Added** ▮▮▮▮▮ ▮▮▮▮ | 05/20/2023 01:29:25 | ACTIVE | ▮▮▮▮▮ |
| ⊕ | **Telephone Information Updated** | 05/15/2023 08:01:47 | ACTIVE | PORTAL |
| ⊕ | **Portal Status: Student Has Account** | 05/15/2023 08:01:06 | ACTIVE | PORTAL |
| | **Portal Updated with SEVIS Changes** | 05/15/2023 02:10:05 | ACTIVE | PORTAL |
| ⊕ | **Portal Status: Student Notified To Create Account** | 05/15/2023 02:10:05 | ACTIVE | PORTAL |
| | **OPT Approve for Post-Completion OPT** | 04/24/2023 09:36:16 | ACTIVE | System Interface |

SEVIS - Eligibility Event History

RTI -
ACCESS

| Event Name | Event Date | Resulting Status | Performed By |
|---|---|---|---|
| OPT Approve for Post-Completion OPT | 04/14/2023 10:13:38 | ACTIVE | System Interface |
| OPT Employment Pending | 03/15/2023 10:00:51 | ACTIVE | System Interface |
| OPT Recommendation for Post-Completion OPT | 03/11/2023 01:26:49 | ACTIVE | |
| Registration - Continuing | 12/20/2022 01:34:49 | ACTIVE | |
| Program Information Updated | 08/25/2022 01:40:45 | ACTIVE | |
| Primary Major Code Update | 08/25/2022 01:40:45 | ACTIVE | |
| Registration - Initial | 08/19/2022 01:47:57 | ACTIVE | |
| Address Update - Physical | 08/17/2022 01:46:31 | INITIAL | |
| Personal Information Updated | 08/17/2022 01:46:31 | INITIAL | |
| ADIS Arrival | 08/15/2022 22:52:57 | INITIAL | System Interface |
| I-901 Payment | 08/11/2022 22:05:50 | INITIAL | System Interface |
| Address Add - Physical | 08/06/2022 01:27:43 | INITIAL | |
| Personal Information Updated | 08/06/2022 01:27:43 | INITIAL | |
| Telephone Information Updated | 08/06/2022 01:27:43 | INITIAL | |
| Name Updated | 08/06/2022 01:27:43 | INITIAL | |
| Record Created | 08/02/2022 01:08:53 | INITIAL | |

Return

EXHIBIT J

E-FILED
Wednesday, 07 May, 2025  04:44:29 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **ZIBO GONG,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 25-CV-2115** |
| | ) | |
| **KRISTI NOEM, Secretary of Homeland** | ) | |
| **Security, and TODD LYONS, Acting** | ) | |
| **Director of U.S. Immigration and** | ) | |
| **Customs Enforcement,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

On April 17, 2025, Plaintiff, Zibo Gong, filed a Petition for Declaratory Judgment and Injunctive Relief (#1). Plaintiff alleges therein that Defendants—U.S. Secretary of Homeland Security Kristi Noem and Acting Director of U.S. Immigration and Customs Enforcement ("ICE") Todd Lyons—unlawfully terminated his SEVIS[1] record, which is tantamount to the termination of his F-1 visa status.

Plaintiff contemporaneously filed a Motion for Temporary Restraining Order and Preliminary Injunction (#2), asserting, inter alia, that he would suffer irreparable harm—ranging from interruption of his course of study to potential deportation without notice—if injunctive relief was not granted.

---

[1] The Student and Exchange Visitor Information System.

On April 21, 2025, the court entered an Order (#6) issuing a Temporary Restraining Order ("TRO"), ordering, among other things, that Defendants restore Plaintiff's F-1 status in SEVIS.

Defendants filed their Response (#8) to Plaintiff's Motion on April 25, 2025. Plaintiff filed a Reply (#12) on April 30, 2025. A hearing on the matter was held on May 1, 2025. For the reasons set forth below, Plaintiff's Motion for a Preliminary Injunction (#2) is GRANTED.

## BACKGROUND

According to his Complaint (#1), Plaintiff is an international student enrolled in a master's degree program at the University of Illinois Urbana-Champaign. On April 4, 2025, Plaintiff was informed via email from the University that the U.S. Department of Homeland Security ("DHS") had "terminated [Plaintiff's] F-1 visa status." The email indicated that the "listed reason" for this action was "Otherwise Failing To Maintain Status: Individual identified in criminal records check and/or has had their VISA revoked." The email made clear that as a result of the termination Plaintiff no longer "hold[s] valid F-1 status within the United States." The email stated that Plaintiff was no longer authorized for employment and should make plans to exit the United States immediately.

Plaintiff asserts in his Complaint and in the Memorandum (#3) in support of his Motion that "the University informed Plaintiff via email that his SEVIS record was terminated by [DHS]." However, the email from the University, which Plaintiff attaches

as Exhibit A to his Complaint, makes no actual mention of a SEVIS record. Rather, it only states that Plaintiff's F-1 visa status was terminated. Nevertheless, Defendants concede that Plaintiff's SEVIS record was, in fact, terminated.

Plaintiff admits that he was arrested in September 2024 but maintains that no criminal conviction resulted and that he has not committed any other violation or action that would provide a basis for termination of his SEVIS record. He asserts that the unlawful termination "has put his education and career trajectory at immediate risk." He cites the money he has already invested in his education, the tuition he has paid for the current semester, and rent that he will be liable for next year "despite being unable to remain in the country." "Most critically," Plaintiff continues, "this termination prevents Plaintiff from completing his degree for which he has already invested substantial time and money." Finally, Plaintiff notes that "[t]his termination also creates a risk for Plaintiff in that ICE may use the termination of the SEVIS record as a basis to unlawfully detain and deport him—an outcome other students have already faced."

Plaintiff challenges the unlawful termination of his SEVIS record pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, the Fifth Amendment to the U.S. Constitution, and the Declaratory Judgment Act, 28 U.S.C. § 2201. He seeks, inter alia, a declaration that the termination of his SEVIS record was unlawful and injunctive relief enjoining Defendants' decision to terminate his SEVIS record and F-1 status and enjoining Defendants from "directly or indirectly enforcing, implementing, or otherwise taking any action or imposing any legal consequences—including causing Plaintiff's visa to be revoked or detaining or removing Plaintiff—as a result of that decision[.]"

The court entered a 14-day TRO on April 21, 2025. Therein, the court ordered the following:

(a) Defendants shall restore Plaintiff's F-1 student status in the Student and Exchange Visitor Information System.

(b) Defendants shall not terminate Plaintiff's student status under the Student and Exchange Visitor Information System absent (i) a valid ground as set forth in 8 C.F.R. § 214.1(d), and (ii) an adequate individualized pre-deprivation proceeding before an impartial adjudicator.

(c) Defendants are prohibited from arresting, detaining, or transferring Plaintiff out of this court's jurisdiction, or ordering the arrest, detention, or transfer of Plaintiff out of this court's jurisdiction, without first providing adequate notice to both this court and Plaintiff's counsel as well as appropriate time to contest any such action.

(d) Defendants are prohibited from initiating removal proceedings against or deporting Plaintiff on the basis of the termination of his F-1 student status.

Defendants state that, at some point following the issuance of the TRO, they "reinstated" Plaintiff's SEVIS record. Though Defendants themselves produced no evidence of that action, Plaintiff has provided a copy of his SEVIS record showing that he was restored to active status on April 23, 2025.

The reinstatement or reactivation of Plaintiff's SEVIS record has, understandably, shifted the parties' arguments. Defendants argue that because reinstatement of his SEVIS record (and his F-1 status) was the only relief ever requested by Plaintiff, reinstatement now renders the matter moot.[2] They also argue, more broadly, that "SEVIS does not control or even necessarily reflect whether a student has lawful

---

[2] Defendants state in their Response both that "Plaintiff's request for an injunction is moot" and that "Plaintiff's "claims are moot." As will be discussed below, the result is the same no matter Defendants' precise argument.

nonimmigrant status[.]" Thus, they maintain that the termination of Plaintiff's SEVIS record has no impact on his F-1 status and, and therefore Plaintiff has suffered no harm, or risk of future harm, as a result of Defendants' conduct.[3]

Plaintiff identifies two related issues that not only create a live controversy, but require preliminary injunctive relief. First, he argues that Defendants are unable to show that the termination of his SEVIS record cannot be reasonably expected to recur. In other words, he suggests that Defendants may simply re-terminate his SEVIS record upon expiration of the TRO. Second, Plaintiff argues that even with the reinstatement of Plaintiff's SEVIS record, Defendants' conduct has resulted in a "gap" in that record. He maintains that a gap in his SEVIS record puts him at risk of a number of potential consequences, including many of the same consequences he would face if his SEVIS record and F-1 status were still terminated.[4]

---

[3] Defendants also raise a number of arguments concerning the appropriateness of preliminary injunctive relief, which the court will set out elsewhere in this Order.

[4] Defendants suggested at the hearing on Plaintiff's Motion that Plaintiff made no mention of a "gap" issue in his Complaint or Motion, and raises it only in his Reply. To the extent that Defendants are suggesting some sort of waiver, that argument is rejected. Plaintiff could not have mentioned a gap in his SEVIS record in his Complaint, because there was no gap until Defendants reinstated his SEVIS record.

Defendants attached to their Response the declaration of Andre Watson, Senior Official within the National Security Division for Homeland Security Investigations.[5] Watson states therein that "[t]erminating a record in SEVIS does not terminate an individual's nonimmigrant status in the United States" and that "[t]erminating a record within SEVIS does not effectuate a visa revocation."

Plaintiff has attached to his Reply the declaration of Nusha Shishegar. Shishegar has more than 30 years' experience as a primary designated school official or a designated school official ("DSO"), roles in which she used SEVIS to monitor F-1 students and ensure compliance with the numerous student reporting requirements. She explains that where a student fails to comply with the terms of their F-1 status, a DSO is required to terminate that student's SEVIS record.

The remainder of Shishegar's declaration details the consequences of the termination of a SEVIS record. She states that "[t]ermination of a student's SEVIS record ends all of the benefits of F-1/M-1 status, including but not limited to all on- and/or off-campus employment authorization such as [curricular practical training] and [optional practical training]." Customs and Border Patrol ("CBP") "will not admit an F-1/M-1 student into the United States on a terminated SEVIS record." Further, United States

---

[5] Watson's declaration was originally entered in a different federal case; in fact, it retains the caption for that case. Thus, while Watson states in his declaration that he is "aware of the above-captioned lawsuit and the motion for temporary restraining order (TRO) filed by the Plaintiff [sic] in this matter[,]" that is a reference to the other case, not this one. He goes on to address the circumstances of the termination of SEVIS records of the seven plaintiffs in that case.

Citizenship and Immigration Services ("USCIS") "will consider a terminated record as a lack of status or failure to maintain status for the student, which renders the student out of status."

At bottom, Shishegar states that DHS, ICE, and CBP "have always considered a SEVIS termination as termination of F1/M-1 lawful status in the United States." To wit, Shishegar read and considered Watson's statement that termination of a record in SEVIS does not terminate an individual's nonimmigrant status. She responds: "In my experience, ICE has always taken the opposite position that terminating a record in SEVIS does result in the termination of an F-1/M-1 student's nonimmigrant status in the United States. The position of Mr. Watson is different than the public position of ICE and all previous statements and guidance I received during my career."

Plaintiff has also attached to his Reply a document circulated by Defendants and reflecting new SEVIS guidance. Per Plaintiff, the guidance first came to light when it was provided to the court by the Department of Justice in the case of *Patel v. Lyons*, No. 25-cv-01096 (D.D.C.), during a preliminary injunction hearing held on April 29, 2025. Defendants in this case raise no objection to Plaintiff's characterization of that document.

The guidance, dated April 26, 2025, states, inter alia:

When SEVP has objective evidence that a nonimmigrant visa holder is no longer complying with the terms of their nonimmigrant status for any reason, then the SEVIS record may be terminated on that basis. Information should be entered into in [sic] SEVIS that identifies the failure to comply. In its discretion, ICE may conduct further investigation or initiate removal proceedings pursuant to INA § 237(a)(1)(C)(i) based on evidence that a nonimmigrant student is not complying with the terms of their nonimmigrant status.

7

The guidance also includes a reminder that the Department of State may revoke an alien's visa at any time at the Secretary's discretion, and that such a revocation will be the basis for termination of the SEVIS record as well as a basis for removability.

Attorney Stephen Navarre testified at the hearing in this case. Navarre was originally disclosed by Plaintiff as an immigration law expert. Defendants objected to Navarre's testimony, arguing that expert legal testimony, as it were, was not appropriate. The court agreed with Defendants on that point, but allowed Navarre to testify as a fact witness, further noting that, to the extent Navarre put forth any legal theory, he was essentially acting as co-counsel for Plaintiff.

Navarre opined that the gap in Plaintiff's record was likely to cause issues similar to those he faced while in terminated status. For instance, Plaintiff and others in his position may face denials of certain future applications based on there being a gap in his legal status in his SEVIS record. Navarre also testified that he would advise those in Plaintiff's position to not travel outside of the country unless they did not plan to return, due to the likelihood that reentry would be denied based on the SEVIS record gap.

**ANALYSIS**

The standards for obtaining a preliminary injunction are the same as those for obtaining a TRO. *Cassell v. Snyders*, 458 F. Supp. 3d 981, 990 (N.D. Ill. 2020), aff'd, 990 F.3d 539 (7th Cir. 2021). Thus, to obtain a preliminary injunction, Plaintiff must once again demonstrate that (1) he has some likelihood of prevailing on the merits of his

claims; (2) without the requested injunctive relief he will suffer irreparable harm; and (3) traditional legal remedies would be inadequate. *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020).

Where the movant satisfies those elements, the court proceeds to a balancing analysis, wherein it "must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it." *Id*. "This balancing process involves a 'sliding scale' approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa." *Id*. "This weighing process . . . also takes into consideration the consequences to the public interest of granting or denying preliminary relief." *Abbott Lab'ys v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)

<u>Mootness and the Scope of Injunctive Relief</u>

Defendants argue as an initial matter that the restoration of Plaintiff's SEVIS record renders the instant dispute moot. The court rejects that argument for two reasons.

First, a defendant may not "'automatically moot a case'" by the simple expedient of suspending its challenged conduct after it is sued." *Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 241 (2024) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). Instead, Supreme Court precedent dictates that a defendant's "voluntary cessation of a challenged practice will moot a case only if the defendant can show that the practice cannot reasonably be expected to recur." *Id*. (cleaned up). "[A] defendant claiming that

9

its voluntary compliance moots a case bears a formidable burden." *Friends of the Earth,*

*Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000). As the Court has

explained:

> Were the rule more forgiving, a defendant might suspend its challenged conduct
> after being sued, win dismissal, and later pick up where it left off; it might even
> repeat this cycle as necessary until it achieves all of its allegedly unlawful ends.
> A live case or controversy cannot be so easily disguised, and a federal court's
> constitutional authority cannot be so readily manipulated. To show that a case is
> truly moot, a defendant must prove no reasonable expectation remains that it
> will return to its old ways. That much holds for governmental defendants no less
> than for private ones.

*Fikre*, 601 U.S. at 241.

Defendants in this case have failed to meet that "formidable burden."

Defendants have restored Plaintiff's SEVIS record—if not because of, then at least after

this court ordered them to do so. But Defendants have not stated, in their Response or

at the hearing, why the SEVIS record was terminated in the first place. They have not

stated whether it was a mistake or intentional. They have not even asserted that

termination will not happen again in these same circumstances, let alone produce any

evidence that might support such an assertion. In simple terms, Defendants appear to

have no interest in showing that their conduct will not recur.

Second, Plaintiff's request that the court "[e]njoin Defendants' decision to

terminate Plaintiff's SEVIS record and F-1 status" is but one aspect of his application for

injunctive relief. He has also requested that the court "[e]njoin Defendants from directly

or indirectly enforcing, implementing, or otherwise taking any action or imposing any legal consequences—including causing Plaintiff's visa to be revoked or detaining or removing Plaintiff—*as a result of that decision*." (Emphasis added).

The thrust of Plaintiff's argument in his Reply and at the hearing is that, Defendant's reinstatement of his SEVIS status notwithstanding, he is still at risk of suffering legal consequences as a result of the original decision to terminate his status, because the resulting gap in his SEVIS status will itself create a number of consequences. To be sure, Defendants have argued that termination of the SEVIS record does not actually impact F-1 status, and would presumably argue that a gap in a SEVIS record likewise does not carry a threat of legal consequences. But this is very much a live dispute, such that this matter cannot be deemed moot.

Legal Backdrop

The Immigration and Nationality Act ("INA") allows for the entry of a foreign national who "is a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study . . . at an established college, university, seminary, conservatory, academic high school, elementary school, or other academic institution or in an accredited language training program in the United States." 8 U.S.C. § 1101(a)(15)(F)(i). Congress has further required that the Secretary of Homeland Security shall "develop and conduct a program to collect from approved institutions of higher education, other approved educational institutions, and designated exchange visitor programs in the United States [certain information] with respect to aliens who have the status, or are

11

applying for the status, of nonimmigrants under subparagraph (F), (J), or (M) of section 1101(a)(15) of this title." 8 U.S.C. § 1372(a)(1). Accordingly, the Secretary of Homeland Security created SEVIS, "a web-based system that [DHS] uses to maintain information on Student and Exchange Visitor Program-certified schools, F-1 and M-1 students who come to the United States to attend those schools, U.S. Department of State-designated Exchange Visitor Program sponsors and J-1 visa Exchange Visitor Program participants." ICE, *Student and Exchange Visitor Information System*, https://www.ice.gov/sevis/overview (last visited May 6, 2025).

The many requirements for maintaining legal F-1 status are set out at 8 C.F.R. § 214.2(f). Additional bases for loss of status can be found at 8 C.F.R. § 214.1(e)-(g). Notably among these, "[a] nonimmigrant's conviction in a jurisdiction in the United States for a crime of violence for which a sentence of more than one year imprisonment may be imposed (regardless of whether such sentence is in fact imposed) constitutes a failure to maintain status[.]" 8 C.F.R. § 214.1(g).

An F-1 student who fails to maintain status must leave immediately or seek reinstatement and is not given a grace period to prepare for departure. See 8 C.F.R. § 214.2(f)(5)(iv) ("An F-1 student who has completed a course of study and any authorized practical training following completion of studies will be allowed an additional 60-day period to prepare for departure from the United States or to transfer in accordance with paragraph (f)(8) of this section . . . . However, an F-1 student who fails to maintain a full course of study without the approval of the DSO or otherwise fails to maintain status is not eligible for an additional period for departure."); see also 8

U.S.C. § 1184(a)(1) (directing that the Attorney General "insure that . . . upon failure to maintain the status under which he was admitted . . . such alien will depart from the United States").

While a student may seek reinstatement of his status in SEVIS, a student is not required to do so. Under the reinstatement guidelines, USCIS may consider reinstating, but is not required to reinstate, a student who demonstrates among other things that he "has not been out of [valid F-1] status for more than 5 months at the time of filing the request for reinstatement" or that "the failure to file within the 5 month period was the result of exceptional circumstances and that the student filed the request for reinstatement as promptly as possible under these exceptional circumstances." 8 C.F.R. § 214.2(f)(16)(i)(A). If USCIS does not reinstate the student's status, the student may not appeal that decision. 8 C.F.R § 214.2(f)(16)(ii).

Absent a failure to maintain status, for one of the enumerated reasons, ICE can only terminate SEVIS records under three circumstances: (1) a previously granted waiver under 8 U.S.C. § 1182(d)(3) or (4) is revoked; (2) a private bill to confer lawful permanent residence is introduced in Congress; or (3) DHS publishes a notification in the Federal Register identifying national security, diplomatic, or public safety reasons for termination. 8 C.F.R. § 214.1(d). DHS cannot otherwise unilaterally terminate nonimmigrant status.

<u>Likelihood of Success on the Merits</u>

"A likelihood of success on the merits" requires that Plaintiff's chance of success must be more than negligible. See *Brunswick Corp. v. Jones*, 784 F.2d 271, 275 (7th Cir. 1986). While Plaintiff insists he will prevail on all of his claims, the court, in its Order entering the TRO, only discussed Plaintiff's APA claim.

"The APA sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 16 (2020) (cleaned up). Under § 706 of the APA, courts may set aside agency action that is "not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; . . . [or] without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C)-(D). Only "final agency actions are reviewable under the APA." 5 U.S.C. § 704.

The APA also "requires agencies to engage in reasoned decisionmaking, and directs that agency actions be set aside if they are arbitrary or capricious." *Regents*, 591 U.S. at 16 (cleaned up). The district court's role "is simply to ensure that the [agency] made no 'clear error of judgment' that would render its action 'arbitrary and capricious.'" *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)). The requirement that agency action not be arbitrary and capricious requires the agency to "examine the relevant data and articulate a satisfactory explanation for its action" and explain its actions that will

14

enable the court to evaluate the agency's rationale at the time of decision. *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm*, 463 U.S. 29, 43 (1983); *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990).

Defendants put forth four arguments as to why Plaintiff is unlikely to prevail on his APA claims: (1) The Privacy Act (5 U.S.C. § 552a) controls Plaintiff's claim, not the APA, and the Privacy Act precludes review for a number of reasons; (2) the termination of Plaintiff's SEVIS record is not a "final agency action," as required to be reviewable under the APA; (3) Defendant's conduct in terminating Plaintiff's SEVIS record was not arbitrary and capricious; and (4) this court cannot enjoin a removal proceeding via an APA challenge.

**APA vs. the Privacy Act**

The APA waives sovereign immunity for actions in federal district court by "person[s] suffering legal wrong because of agency action." 5 U.S.C. § 702. But the "waiver does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought' by the plaintiff." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702).

Defendants argue that "the Privacy Act displaces Plaintiff's APA claims, as it is directly on point and allows only individuals to challenge data contained in a government system of records in federal court and establishes a comprehensive scheme for such claims." See 5 U.S.C. § 552a(g)(1). They point out that the Privacy Act specifically prohibits someone in Plaintiff's position from filing suit challenging records.

15

5 U.S.C. § 552a(a)(2) (defining "individual" as "a citizen of the United States or an alien lawfully admitted for permanent residence"). "As such," Defendants argue, "the United States has not waived its sovereign immunity here regarding SEVIS."[6]

As the District Court for the District of New Hampshire recently concluded: "The court need not address the defendants' arguments in depth because . . . they are based on a flawed premise. [Plaintiff] is not seeking to correct a factual error in his SEVIS record such that his claim could potentially implicate the Privacy Act." *Liu v. Noem*, 2025 WL 1233892, at *8 (D.N.H. Apr. 29, 2025) (citing *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024) (observing that the Privacy Act was "passed to protect the privacy of individuals identified in federal information systems" and "addresses the government's retention and disclosure of personal information" while allowing individuals to seek a court order requiring it to change "inaccurate information" and "correct its records")). As in *Liu*—and the myriad other identical cases arising across the country in the past month[7]—Plaintiff's APA claims are based on the allegation that his SEVIS record accurately reflects that DHS unlawfully terminated his F-1 student status. In other words, it is DHS's termination of his F-1 student status, as that action is manifested in the SEVIS database, that Plaintiff challenges here.

---

[6] Separately, Defendants argue that once Plaintiff's APA claims are construed as Privacy Act claims, this court would lack jurisdiction because the Privacy Act requires the exhaustion of administrative remedies.

[7] The court listed many of these cases in its previous Order at page 4.

16

Simply put, the Privacy Act is irrelevant to Plaintiff's claims. That Act "allows for amendment of factual or historical errors. It is not, however, a vehicle for amending the *judgments* of federal officials or others as those judgments are reflected in records maintained by federal agencies." *Kleiman v. Dep't of Energy*, 956 F.2d 335, 337-38 (D.C. Cir. 1992) (cleaned up) (emphasis in original); see also *Almahdi v. Lyons*, 2006 WL 751331, at *3 (D.D.C. Mar. 21, 2006) ("Fundamentally, the Privacy Act is not the way to challenge the ultimate agency determination."). And to the extent that Defendants argue the termination of Plaintiff's SEVIS record is a mere recordkeeping abnormality, bearing no actual relation to Plaintiff's F-1 status, that argument must be rejected. The unsupported statement from Watson to that effect is insufficient evidence in light of the statement from Shishegar, the conduct of the University in this case informing Plaintiff that he was out of status based on his SEVIS record, and similar conclusions drawn by universities nationwide in similar cases. See also *Liu*, 2025 WL 1233892, at *7-8 (rejecting the same argument). Plaintiff's claim, challenging the substantive determination of Defendants, is outside the scope of the Privacy Act.

**Final Agency Action**

As stated above, only "final agency actions are reviewable under the APA." 5 U.S.C. § 704. In order for an agency action to be considered "final" and subject to review under the APA, two conditions must be satisfied: "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely

tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (cleaned up).

In its prior Order, the court relied upon the Third Circuit case of *Jie Fang v. Dir. United States Immigr. & Customs Enf't*, 935 F.3d 172, 182 (3d Cir. 2019), for the proposition that, in that court's words, "[t]he order terminating these students' F-1 visas marked the consummation of the agency's decisionmaking process, and is therefore a final order." Defendants argue that this court's reliance on *Jie Fang* was misplaced because that decision is out of step with controlling precedent in the Seventh Circuit.

Specifically, Defendants direct the court's attention to *Dhakal v. Sessions*, 895 F.3d 532, 539 (7th Cir. 2018), a case in which the plaintiff challenged the denial of his asylum application via the APA. The Seventh Circuit concluded that the decision of the Director of the Chicago Asylum Office did not mark the consummation of the agency's decisionmaking process. *Id.* at 539. The court reasoned that "the statutory scheme for adjudication of asylum claims by the agency must be allowed to take its course." *Id.* at 534. Observing that a more complete factual record could be developed before an immigration court in the event that removal proceedings were initiated (and asylum asserted as a defense), the Seventh Circuit found that "the Director's decision is, in that respect, 'more like a tentative recommendation than a final and binding determination,' or 'the ruling of a subordinate official' when viewed in light of the intended, complete administrative process." *Id.* at 540 (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 798 (1992)).

18

Defendants also rely on *McBrearty v. Perryman*, 212 F.3d 985, 986 (7th Cir. 2000), in which the plaintiff challenged the decision of the District Director of Immigration and Naturalization Service ("INS") declining to adjust their status to that of lawful permanent residents of the United States. The Seventh Circuit concluded that the suit—which did not invoke the APA—was premature in that plaintiffs had failed to exhaust their administrative remedies. *Id.* at 987. Specifically, the court pointed out that the plaintiffs "could obtain review of the district director's decision by the Board of Immigration Appeals if and when the immigration service institutes removal (i.e., deportation) proceedings against them." *Id.*

Defendants argue that there has been "no 'consummation' of anything" because Plaintiff retains the ability to seek reinstatement through further administrative processes.  To wit, it argues: "[E]ven if Plaintiff's nonimmigrant status (rather than only his SEVIS record) was at issue in this case, he could administratively challenge the relevant agency decisions. See 8 C.F.R. § 214.2(f)(16)." That regulation, as described earlier, allows that, under select circumstances, "USCIS may consider reinstating a student who makes a request for reinstatement on Form I–539, Application to Extend/Change Nonimmigrant Status, accompanied by a properly completed Form I–20 or successor form indicating the DSO's recommendation for reinstatement." 8 C.F.R. § 214.2(f)(16)(i).

Initially, Defendants' argument relies on circular reasoning. On the one hand, they maintain that Plaintiff's dispute solely concerns the SEVIS record itself, which does not necessarily reflect one's F-1 status. Yet, at the same time, they assert that Plaintiff

should submit to the appeals process for reinstatement of F-1 status. Defendants have not identified any process for the reinstatement of the SEVIS record, to the extent they believe it is separate and apart from F-1 status.

Furthermore, neither case invoked by Defendants concerns SEVIS records or even F-1 status—as mentioned, *McBrearty* does not even involved the APA—such that neither can be considered directly controlling. As the Third Circuit observed, the USCIS review regulations invoked here by Defendants concern only reinstatement of status, as opposed to actual review of the original termination:

> We similarly hold that reinstatement proceedings are not a prerequisite to finality because reinstatement is not a mechanism by which the students can obtain review of DHS's decision to terminate their status for their alleged fraudulent enrollment. Despite the Government's argument to the contrary, there is nothing in the reinstatement provisions that permit the USCIS to review a prior termination order issued by DHS. . . . Even if the students are successfully reinstated by USCIS, they will have achieved that status without ever having undergone review of the initial termination and fraudulent enrollment decision.

*Jie Fang*, 935 F.3d at 183. That distinction is especially relevant here, given that a gap in Plaintiff's SEVIS record exists even after the reinstatement. Defendants have identified no mechanism by which Plaintiff may erase that gap or be relieved from the legal consequences it may cause.

Finally, the basis for a lack of finality asserted here by Defendants is altogether different from that raised by the court in *Dhakal*. Here, Defendants contend that an administrative appeal to USCIS is available to Plaintiff. But the *Dhakal* court reasoned that the plaintiff in that case could be heard by an immigration judge "[o]nce the Department seeks removal and asylum is asserted as a defense." *Dhakal*, 895 F.3d at 539.[8]

The Supreme Court has "recognized that the judicial doctrine of exhaustion of administrative remedies is conceptually distinct from the doctrine of finality[.]" *Darby v. Cisneros*, 509 U.S. 137, 144 (1993). "[T]he finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate." *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 193 (1985).

Defendants' argument seems more an attack on exhaustion than on finality. "An agency action is not final if it is only the ruling of a subordinate official, or tentative. The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin*,

___
[8] To be sure, the Third Circuit would disagree with this position. "[A]n order's finality cannot depend on the institution of removal procedures which may never occur. *Jie Fang*, 935 F.3d at 182.

505 U.S. at 797 (cleaned up). Nothing in the nature of the sudden termination of Plaintiff's SEVIS record suggests it was a preliminary, tentative, or temporary decision. See also *Chen v. Noem*, 2025 WL 1163653, at *8 (S.D. Ind. Apr. 21, 2025) (finding termination of SEVIS record to be final agency action).

To the extent that Defendants raise any argument concerning the second element of final agency action—that it creates legal consequences—it is merely a reiteration of its argument that the SEVIS record does not actually impact F-1 status. The court has already rejected that argument. Accordingly, the court finds that Plaintiff is reasonably likely to show that the termination of his SEVIS record is a final agency action.

### Arbitrary and Capricious

Defendants next argue, briefly, that the termination of Plaintiff's SEVIS record was not arbitrary and capricious. They argue, in full:

> Here, the only action at issue is DHS's change to Plaintiff's SEVIS records. This action was not arbitrary and capricious. SEVIS records may be set to terminated for numerous reasons by DHS and by a university. DHS received information of criminal history related to Plaintiff and set Plaintiff's SEVIS records to terminated as a result. Nevertheless, the SEVIS record has now been reinstated.

Defendants' argument actually serves to *highlight* the arbitrary and capricious nature of their conduct. DHS received information of criminal history "related to plaintiff," and as a result his SEVIS record was terminated. But an important middle step is clearly missing from this "explanation." Regulations plainly define the type of "criminal activity" than can be the basis for status termination—a crime of violence for which a sentence of more than one year imprisonment may be imposed. It is undisputed in this case that Plaintiff did not have such a conviction. So why was his

SEVIS record terminated? While it is true that "SEVIS records may be set to terminated for numerous reasons by DHS and by a university," surely Defendants are not suggesting this means they can be terminated for *any* reason. In short, Plaintiff is reasonable likely to show that Defendants acted arbitrarily and capriciously.

### Enjoinder of Removal Action

Defendants next argue that "[t]o the extent Plaintiff seeks an injunction barring the government from initiating removal proceedings, the Court lacks jurisdiction or authority to entertain such a claim" because the INA "expressly forecloses judicial review of a decision to execute an order of removal. 8 U.S.C. § 1252(g)." While this argument appears to concern the scope of potential injunctive relief, rather than the merits of an APA claim, the court will discuss it here.

In *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 486 (1999) ("*AADC*"), the Supreme Court instructed courts to read § 1252(g) narrowly. Heeding that instruction, the Seventh Circuit in *Fornalik v. Perryman*, 223 F.3d 523, 531 (7th Cir. 2000), stated that "almost every alien who brings a claim to federal court . . . does so because she is threatened with removal from the United States . . . . As the INS would have it here, the alien not only would be barred from raising virtually all claims *prior* to removal proceedings (because of exhaustion requirements), but then § 1252(g) would preclude jurisdiction of all claims brought *after* removal is threatened. Such a sweeping reading would be inconsistent with the narrow interpretation of § 1252(g) that *AADC* commands." (Emphases in original).

23

The plaintiff in *Fornalik* challenged the Attorney General's denial of his application for adjustment of status, but by the time the plaintiff filed a habeas petition, the government had threatened to commence removal proceedings, so the plaintiff requested a stay of his removal. *Id*. at 532. The Seventh Circuit "reject[ed] the [government's] argument that the district court properly invoked § 1252(g) to reject [the plaintiff's] claim" because "[h]is claim is not that the Attorney General is unfairly executing a removal order, but rather that a prior, unrelated error makes his removal improper. This makes our case entirely different from other decisions of this circuit that have applied *AADC*." *Id*. at 553.

In *Chen*, the District Court for the Southern District of Indiana found *Fornalik* controlling. It opined: "Here, Chen does not challenge a decision to commence removal proceedings and instead challenges Defendants' termination of his SEVIS record and F-1 status. Chen's request that the Court enjoin removal proceedings, as in *Fornalik*, 'comes into the case only incidentally.'" *Chen*, 2025 WL 1163653, at *9 (quoting *Fornalik*, 223 F.3d at 532). This court adopts that same reasoning.

Accordingly, the court finds that Plaintiff has demonstrated a reasonable likelihood that he will prevail on his APA claims. Once again, the court need not consider the merits of his other claims at this time.

<u>Inadequate Remedy at Law and Irreparable Harm</u>

In its prior Order, the court found as follows:

The harm that Plaintiff would suffer in the absence of a TRO is obvious, and it would be irreparable. Losing F-1 status places Plaintiff's education, research, financial stability, and career trajectory at imminent risk of irreparable harm. Worse yet, in the absence of a TRO, Plaintiff is facing a constant and pervasive threat of immediate detention or removal from the United States. These current and threatened consequences constitute a risk of irreparable harm for which an award of monetary damages would not be sufficient. Accordingly, the court finds these factors satisfied.

Defendants argue that this conclusion was incorrect. They argue that Plaintiff has not been detained and is not facing deportation proceedings. They maintain that the mere possibility of deportation is not a concrete harm. They also argue that the employment or educational ramifications with which Plaintiff is concerned are insufficient.

First, Plaintiff is plainly unable to recover money damages, as the APA does not waive the government's sovereign immunity with regard to a claim seeking money damages. See 5 U.S.C. § 702. Thus, his economic losses, which Defendants do not dispute he may suffer, "can be considered irreparable harm because he has no adequate remedy at law to recover for his damages." *Liu*, 2025 WL 1233892, at *11. Likewise, the interruption to Plaintiff's education and employment cannot be redressed and constitutes irreparable harm. See *id*.

Next, with respect to removal, Defendants cite to *Nken v. Holder*, 556 U.S. 418, 435 (2009), for the proposition that "the burden of removal alone cannot constitute the requisite irreparable injury." But Plaintiff does not rely on the burden of removal *alone*.

25

Whatever that burden may be, it is accompanied in this case by a number of collateral

but irreparable consequences. Removal would also threaten Plaintiff's educational and

career trajectories. It would prevent Plaintiff from completing his degree for which he

has already invested substantial time and money. As the *Liu* court observed, in finding

the plaintiff there had demonstrated a risk of irreparable harm:

> If Liu were indeed removed, that "would effectively eliminat[e] his ability to
> complete his degree program, causing him economic and reputational loss
> wherever he ultimately resides." Even if Liu were somehow able to repatriate,
> there is no guarantee that he could return to his program at Dartmouth—he may
> need to re-apply for admission, repeat courses, and restart research. The
> permanent disruption to Liu's education would render the past two years he has
> spent at Dartmouth significantly less valuable because they would not be
> attached to a degree. Further, were he to enroll at some other program, he may
> not be able to return to some of the research he started at Dartmouth and would
> need to start anew.

*Liu*, 2025 WL 1233892, at *11 (quoting *Doe v. Noem*, 2025 WL 1141279, at *8 (W.D. Wash.

Apr. 17, 2025)).

Finally, the court finds that the reinstatement of Plaintiff's SEVIS record does not

significantly change the analysis. For one, as addressed above in discussing mootness,

Defendants' arguments in this case provide little assurance that Plaintiff's SEVIS record

will not be terminated again at a moment's notice. Moreover, Plaintiff has shown that

the current gap in his SEVIS record may itself lead to legal consequences, such as

denials of future immigration-related applications or denial of entry into the country,

valid F-1 status notwithstanding. See *Parra Rodriguez v. Noem*, 2025 WL 1284722, at *10

(D. Conn. May 1, 2025) (noting that the plaintiff's "SEVIS record is still tarnished by a

17-day gap in her lawful status," and describing some consequences of that gap); see

also 8 C.F.R. § 214.2 ("An F–1 student who is unable to meet the program completion date on the Form I–20 or successor form may be granted an extension by the DSO if the DSO certifies that the student has *continually maintained status* and that the delays are caused by compelling academic or medical reasons, such as changes of major or research topics, unexpected research problems, or documented illnesses.") (emphasis added)).

Accordingly, the court finds that Plaintiff has sufficiently demonstrated, absent injunctive relief, he will suffer irreparable harm for which there is no adequate remedy at law.

<u>Balancing Analysis</u>

Plaintiff having satisfied the initial elements for a preliminary injunction, the court must now "weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it." *Mays*, 974 F.3d at 818. The balance of equities includes consideration of whether injunctive relieve is in the public interest. *Abbott Lab'ys*, 971 F.2d at 12.

Defendants argue that the public interest militates against injunctive relief in this case. They assert that "it is ICE's database that Plaintiff wishes for this Court to superintend," and argue that such a position creates "separation-of-powers concern[s] that Plaintiff is oblivious to." Defendants maintain that control over immigration is a sovereign prerogative "reserved for political branches and not the courts," and that "this is also why the public interest in enforcement of immigration laws is significant."

Defendants' argument is rejected. While they assert that the public interest in enforcement of immigration laws is significant, they fail to show that DHS has complied with any immigration law or regulation in this case or that Plaintiff's status was revoked due to his failure to comply with any immigration law or regulation. While they reference "false claims that Defendants are engaging in 'unlawful' conduct," they have made absolutely no effort to argue that what they did was lawful. "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *Parra Rodriguez*, 2025 WL 1284722, at *10 ("[T]here is substantial public interest in ensuring government agencies abide by federal laws and regulations.").

Finally, Defendants' argument that immigration issues are matters of "sovereign prerogative" in which courts cannot or should not play a role is undermined by centuries of case law, a very small sampling of which has been cited in this Order. The argument is also undermined by the very case Defendants rely on in support of that position, *El Rescate Legal Services., Inc. v. Executive Office of Immigration Review.*, 959 F.2d 742, 750 (9th Cir. 1991). That court did indeed state that "[c]ontrol over immigration is a sovereign prerogative." *Id*. But in the very next sentence it wrote: "Once we determine that the Attorney General's construction of the statute is not arbitrary, capricious, or manifestly contrary to the statute, we cannot impose procedures that merely displace policy choices made by the sovereign." *Id*.; see also *D.B. v. Trump*, 2025 WL 1203232, at *3 (S.D. Ohio Apr. 23, 2025) ("On Defendants' side of the scale, there is literally nothing. The public has no interest in permitting federal officials to act outside the law. So the

argument that a TRO would impede the Government's sovereign prerogative (made and rejected elsewhere) falls flat here, too."); *Arizona Student Doe #1 v. Trump*, 2025 WL 1192826, at *8 (D. Ariz. Apr. 24, 2025) (rejecting "sovereign prerogative" argument); *Doe v. Noem*, 2025 WL 1134977, at *8 (E.D. Cal. Apr. 17, 2025) (same).

Defendants have identified no discrete harm that they might suffer as a result of injunctive relief in this case. On the other hand, the potential harm Plaintiff may suffer is well-established. The court therefore finds that the balance of hardships, including the public interest, favors the granting of a preliminary injunction in this case. Accordingly, Plaintiff's Motion for a Preliminary Injunction (#2) is GRANTED.

IT IS THEREFORE ORDERED THAT:

(1) Plaintiff's Motion for a Preliminary Injunction (#2) is GRANTED. Defendants Kristi Noem and Todd Lyons are hereby enjoined as follows:

(a) Defendants shall set aside their termination decision so there are no gaps in Plaintiff's SEVIS record

(b) Defendants shall not terminate Plaintiff's student status under SEVIS absent (i) a valid ground as set forth in 8 C.F.R. § 214.1(d), and (ii) an adequate individualized pre-deprivation proceeding before an impartial adjudicator.

(c) Defendants shall not take any adverse immigration action against Plaintiff as retaliation for the present litigation, such as issuing a Notice to Appear in Removal Proceedings, detaining Plaintiff pursuant to his immigration status, or otherwise transferring of Plaintiff out of this court's jurisdiction.

(2) This Preliminary Injunction shall remain in place until a final order is entered in this case.

29

(3) This matter is referred to the magistrate judge for further proceedings.

ENTERED this __7th__ day of ___May___ , 2025.

<u>s/Colin Stirling Bruce</u>
COLIN S. BRUCE
U.S. DISTRICT JUDGE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Xiaotian Liu

      v.

Kristi Noem et al.

Case No. 25-cv-133-SE
Opinion No. 2025 DNH 057

**O R D E R**

On April 7, 2025, Plaintiff Xiaotian Liu brought suit against Kristi Noem, the Secretary
of the Department of Homeland Security (DHS), and Todd Lyons, the Acting Director of
Immigration and Customs Enforcement (ICE), alleging that DHS unlawfully terminated his F-1
student status in the Student and Exchange Visitor (SEVIS) system. He alleges, among other
things, that DHS violated his due process rights under the Fifth Amendment and violated the
Administrative Procedure Act when it terminated his status in the system. Before the court at this
juncture is Liu's motion for a preliminary injunction "(i) enjoining Defendants from terminating
Plaintiff's F-1 student status under the Student and Exchange Visitor (SEVIS) system and (ii)
requiring Defendants to set aside their termination determination." Doc. no. 10 at 1.

With his complaint, Liu filed a motion for a temporary restraining order, requesting a
TRO providing the same relief he now requests in the form of a preliminary injunction. The
court held two hearings on Liu's motion, during which counsel for Liu and the defendants
appeared. Although the defendants were given notice and an opportunity to be heard, the
defendants' counsel acknowledged at the latter hearing that he had not had adequate time to
investigate certain of Liu's factual allegations or evaluate properly the legal bases on which Liu's
motion rested. Therefore, the court construed Liu's motion as a request for the provisional

remedy of a TRO with notice, which essentially sought to avoid irreparable harm until the defendants were able to review the factual record and develop their legal arguments sufficiently to address the request for preliminary relief.

The court granted Liu's motion, enjoining the defendants from terminating Liu's F-1 student status under the SEVIS system and requiring them to set aside their termination determination. Liu immediately filed the present motion for a preliminary injunction and the court ordered the parties to meet and confer regarding an appropriate briefing and argument schedule for the preliminary injunction hearing. The parties agreed on a schedule and submitted additional filings related to the motion. The court held a hearing on Liu's motion on April 22, 2025. At the conclusion of the hearing, the court extended the TRO until April 25, 2025, to allow it time to consider fully the arguments offered.

On April 25, 2025, counsel for the defendants confirmed that ICE had announced a new policy generally applicable to F-1 nonimmigrant students and their SEVIS records. He could not, however, confirm that the new policy would apply to Liu or that Liu's student status and SEVIS record would be active under the new policy. The court further extended the TRO until April 29, 2025, to give the parties an opportunity to determine whether the ICE policy affected this case.

On April 29, 2025, Liu filed an addendum to his preliminary injunction motion in which he asserts that resolution of his motion remains necessary. Doc. no. 23. He offers three reasons. First, the defendants have not confirmed that ICE's new policy regarding F-1 nonimmigrant students and their SEVIS records applies to Liu. Second, even if they did, Liu still faces irreparable harm absent injunctive relief because the defendants have argued in this case that a student's SEVIS record does not have any bearing on his actual F-1 student status. And third, the

voluntary cessation doctrine shows that he still faces irreparable harm regardless of ICE's new policy.

The defendants have indicated an intention to respond to Liu's addendum but have not yet responded as of the time of this order. The court would be remiss if it failed to acknowledge the uncertainty surrounding the record before the court as it pertains to Liu's preliminary injunction motion. As discussed further below, since Liu filed this action: (1) DHS has changed its proffered reason for terminating Liu's F-1 student status in the SEVIS system, (2) the defendants have argued that the web-based system which has the purpose of accurately reflecting an international student's F-1 status is, in effect, meaningless because it is wholly divorced from a student's actual F-1 status, and (3) ICE has announced a new policy generally applicable to F-1 nonimmigrant students and their SEVIS records, which the defendants have not yet been able to confirm applies to Liu. This constantly shifting ground has made it difficult to weigh the defendants' arguments in opposing preliminary relief. The court would prefer to grant the defendants additional time to respond in the hope that this decision could rest on a more definitive record or that the parties could come to a temporary resolution on Liu's request for preliminary relief. Nevertheless, the court is loath to extend the TRO again, a remedy designed to provide relief for an extremely short duration. The court therefore analyzes Liu's motion for a preliminary injunction based on the current record and may very well need to reconsider its analysis or the relief granted herein in light of new information or argument. If appropriate, the defendants are free to file for reconsideration.

Background

I.      F-1 and SEVIS[1]

      The Immigration and Nationality Act, 8 U.S.C. § 1101(a)(15)(F), permits noncitizens to enroll in government-approved academic institutions as F-1 nonimmigrant students. See 8 C.F.R. § 214.1(a)(2). Only academic institutions that have obtained formal approval from DHS can sponsor F-1 students. See id. § 214.3. The Designated School Official (DSO) at each school sponsoring F-1 students monitors, advises, and oversees the students attending that school, including updating and maintaining certain records. In order to enter the country, an admitted international student must secure an F-1 nonimmigrant visa from the United States Department of State, though the visa does not govern how long an F-1 student may stay in the United States.

      When the student enters the United States, the student is granted F-1 student status and is permitted to remain in the United States for the duration of status as long as the student continues to meet the requirements established by the regulations governing the student's visa classification in 8 C.F.R. § 214.2(f). "Duration of status" is defined, in general, as "the time during which an F-1 student is pursuing a full course of study at an educational institution certified [ ] for attendance by foreign students, or engaging in authorized practical training following completion of studies[.]" Id. § 214.2(f)(5)(i).

      ICE, a subagency of DHS, is responsible for the Student and Exchange Visitor Program (SEVP), which keeps records on F-1 students. See 8 U.S.C. §§ 1372(a), (c) (requiring program to

---

[1] The following tracks, with some alterations, both the content and language of the thorough overview provided in Madan B K v. Noem, Case No. 1:25-cv-419, 2025 WL 1171572, at *5 (W.D. Mich. Apr. 23, 2025).

4

collect information). SEVP manages the SEVIS system, "the web-based system that [DHS] uses to maintain information regarding: . . . F-1 . . . students studying in the United States[.]"[2]

F-1 students fail to maintain their status when they do not meet certain regulatory requirements, such as failing to maintain a full course of study without prior approval or other violations of the requirements set forth in the Code of Federal Regulations at 8 C.F.R. § 214.2(f). DSOs at the students' schools are required to report to SEVP, via SEVIS, when a student fails to maintain status. 8 C.F.R. § 214.3(g)(2).

F-1 students are also subject to the requirements for "maintenance of status" set forth in 8 C.F.R. § 214.1 that apply to several nonimmigrant classes, including F-1 students. These requirements include "obedience to all laws of United States jurisdictions which prohibit the commission of crimes of violence and for which a sentence of more than one year imprisonment may be imposed." Id. § 214.1(g). Section 214.1(g) adds that a "nonimmigrant's conviction in a jurisdiction in the United States for a crime of violence for which a sentence of more than one year imprisonment may be imposed (regardless of whether such sentence is in fact imposed) constitutes a failure to maintain status[.]" Id.

Further, an agency may terminate a student's F-1 status for the reasons stated in § 214.1(d). That section provides that "[w]ithin the period of initial admission or extension of stay, the nonimmigrant status of an alien shall be terminated [1] by the revocation of a waiver authorized on his or her behalf under section 212(d)(3) or (4) of the Act; [2] by the introduction of a private bill to confer permanent resident status on such alien; or, [3] pursuant to notification

---

[2] About SEVIS, Department of Homeland Security, https://studyinthestates.dhs.gov/site/about-sevis (last visited April 29, 2025).

in the Federal Register, on the basis of national security, diplomatic, or public safety reasons."
Id. § 214.1(d).

      An F-1 student who fails to maintain status must leave immediately or seek reinstatement and is not given a grace period to prepare for departure. See id. § 214.2(f)(5)(iv) ("An F-1 student who has completed a course of study and any authorized practical training following completion of studies will be allowed an additional 60-day period to prepare for departure from the United States or to transfer in accordance with paragraph (f)(8) of this section . . . . However, an F-1 student who fails to maintain a full course of study without the approval of the DSO or otherwise fails to maintain status is not eligible for an additional period for departure.").

      While a student may seek reinstatement of his status in SEVIS, a student is not required to do so. Under the reinstatement guidelines, United States Citizenship and Immigration Services (USCIS) may consider reinstating, but is not required to reinstate, a student who demonstrates among other things that he "has not been out of [valid F-1] status for more than 5 months at the time of filing the request for reinstatement" or that "the failure to file within the 5 month period was the result of exceptional circumstances and that the student filed the request for reinstatement as promptly as possible under these exceptional circumstances." Id. § 214.2(f)(16)(i)(A). If USCIS does not reinstate the student's status, the student may not appeal that decision. Id. § 214.2(f)(16)(ii).

II.    <u>Liu's F-1 Status</u>

      Liu is a 26-year-old student at Dartmouth College who has been pursuing a Ph.D. in computer science since September 2023. Liu is a citizen and national of the People's Republic of China. He first came to the United States in August 2016 as an F-1 student to pursue

an undergraduate program at Wake Forest University. He graduated with a Bachelor of Science in Mathematics and Computer Science in May 2020. That September, he continued his studies at Wake Forest to pursue a Masters in computer science.

In May 2021, Liu returned to China to renew his F-1 visa, but the application went into administrative processing. Due to the extended visa application process and the ongoing COVID-19 pandemic, he decided to take a gap semester with the approval of Wake Forest. In late September 2021, after successfully receiving his renewed F-1 visa, Liu informed several Wake Forest administrators, including his academic advisor, the Computer Science department chair, and the Computer Science department administrator, that he intended to return to the United States for the Spring 2022 semester.

Although Liu submitted a detailed graduation plan, he was unaware that he also needed to contact Wake Forest's DSO, who was in charge of updating his F-1 status, to request the reinstatement of F-1 student status in the SEVIS system. Therefore, his SEVIS status remained inactive in the system. On January 2, 2022, Liu arrived at the Detroit Metropolitan Wayne County Airport. U.S. Customs and Border Patrol (CBP) officers took him for secondary inspection. During that inspection, Liu was able to connect a CBP officer with Liu's department chair at Wake Forest. The officer confirmed Liu's student status but was unable to approve his entry without an active SEVIS record. The Wake Forest DSO proposed granting temporary entry while reactivation paperwork was processed, but CBP declined the request. Liu spent the night at the CBP facility and returned to China the next day.

Due to China's 28-day mandatory quarantine, Liu applied for another gap semester and began researching computer science with other researchers in China. Liu returned to Wake

7

Forest on July 23, 2022, to resume his studies. He graduated with a Master of Science in Computer Science in May 2023.

In September 2023, Liu began his Ph.D. program in Computer Science at Dartmouth College. He returned to China in June 2024 for a routine F-1 visa renewal and came back to the United States in August 2024 to continue his doctoral studies without any issues. Most recently, in December 2024, Liu traveled to Vancouver, Canada, to attend an academic conference and returned without any issues.

On April 4, 2025, Dartmouth informed Liu via email that his F-1 student status in the SEVIS system was terminated. According to the email, Dartmouth "discovered this evening that your F-1 record in SEVIS has been terminated by the Department of Homeland Security." Doc. no. 10-5 at 2. Dartmouth explained that the notation in Liu's SEVIS record read: "OTHERWISE FAILING TO MAINTAIN STATUS – Individual identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated." Doc. no. 10-5 at 2.

On April 8, 2025, after Liu filed this lawsuit, Dartmouth notified Liu that his SEVIS termination record had changed to: "OTHER – Individual identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated." Doc. no. 10-15 at 2. Liu submitted evidence that he has not committed any crime, and the defendants do not contend otherwise. Further, the defendants represent that Liu's visa has not been revoked.

For obvious reasons, most notably as the defendants admitted at the hearing that SEVIS's purpose is to reflect accurately information regarding SEVP schools and F-1 students, both Liu and Dartmouth have interpreted DHS's termination of Liu's F-1 status in SEVIS to mean that

8

DHS terminated his actual F-1 status.[3] That termination is having significant consequences for Liu and will continue to do so in the near future. Specifically, without F-1 student status Liu is no longer authorized to work as a research assistant or receive his stipend from his Ph.D. program. Anything more than a minor delay in Liu's progression with his research will affect his ability to complete his studies and obtain a Ph.D. In addition, Liu fears he may be at risk of immigration detention and deportation, and he may be accruing time out of F-1 student status, which may make it more difficult or impossible to reinstate his status in the future.

Standard of Review

"'A preliminary injunction is an extraordinary remedy never awarded as of right.'" Capen v. Campbell, --- F.4th ---, 2025 WL 1135269, at *4 (1st Cir. Apr. 17, 2025) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008)). "In determining whether to grant a preliminary injunction, the district court must consider: (i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." Id. (quotations omitted). "The first of these factors is a necessary condition: If the movant fails to demonstrate a likelihood of success on the merits, the remaining elements are of little consequence." Id. (quotations omitted). "[A] court's conclusions as to the merits of the issues presented on preliminary injunction are to be understood as statements of probable outcomes."

---

[3] As discussed further below, the defendants dispute the implications of DHS's termination of Liu's F-1 status in SEVIS. That dispute is at the heart of the defendants' objection to Liu's preliminary injunction motion.

Id. (quotations omitted). When, as here, the defendants are government officials sued in their

official capacities, the balance of the hardships and the public interest factors merge. Does 1-6 v.

Mills, 16 F.4th 20, 37 (1st Cir. 2021).


Discussion

Liu requests a preliminary injunction "(i) enjoining Defendants from terminating

Plaintiff's F-1 student status under the Student and Exchange Visitor (SEVIS) system, and (ii)

requiring Defendants to set aside their termination determination." Doc. no. 10 at 1. The

defendants object, arguing that Liu cannot show that any of the four preliminary injunction

factors weighs in his favor.


I.      F-1 Student Status v. F-1 Student Record in SEVIS

At bottom, the defendants' arguments on each factor under consideration turn on the

answer to a seemingly straightforward question: What does Liu challenge in this case? On the

face of Liu's pleadings, the answer seems obvious; Liu challenges DHS's termination of his F-1

student status. He learned of that termination when Dartmouth saw that DHS had terminated his

F-1 student status in SEVIS, the database that exists to track and document the continuing status

of noncitizen students who are authorized to study in the United States.

The defendants say otherwise. They argue repeatedly that DHS has not changed Liu's F-1

student status. Importantly, as discussed below, they refuse to present competent evidence to

support that argument or stipulate to that fact on the record. Instead, they merely argue that DHS

only terminated the record of Liu's F-1 student status in the SEVIS database, an action that they

assert is divorced entirely from Liu's actual F-1 student status. To the defendants, this is an act of

simple record-keeping, one which they argue Liu cannot challenge in this court for many
reasons.

The implications of the defendants' arguments are troubling. They conceded at the
hearing, as they must, that SEVIS's purpose is to reflect accurately an international student's
status. Yet they contend that they purposefully terminated Liu's F-1 status in SEVIS despite
purportedly not terminating his actual F-1 status, with the result that the former no longer reflects
the latter. The only justification they offered for such an action was that DHS has broad authority
to manage its web-based systems as it sees fit.

The potential repercussions of the defendants' position are notable but ultimately
irrelevant in this case. Instead, the relevant point is that defendants' argument suffers from a
fundamental and fatal flaw: all of the evidence in the record at this stage of the litigation supports
Liu's allegation that DHS terminated his actual F-1 student status when it terminated his record
in SEVIS.

To begin, although the defendants stated several times during the hearing that DHS did
not terminate Liu's actual F-1 student status, they repeatedly declined the opportunity to offer
any evidence to support that assertion. They did not accept Liu's offer to confirm in a declaration
that he retained his F-1 student status. They refused the court's suggestion that they stipulate that
Liu's F-1 student status remained active. Instead, they pointed only to the declaration of Andre
Watson, the Senior Official within the National Security Division for Homeland Security
Investigations. Doc. no. 15-1. Watson's declaration, included as an exhibit to the defendants'
objection to Liu's motion, states: "Terminating a record in SEVIS does not terminate an
individual's nonimmigrant status in the United States. The statute and regulations do not provide
SEVP the authority to terminate nonimmigrant status by terminating a SEVIS record, and SEVP

11

has never claimed that it had terminated [Liu's] nonimmigrant status." Id., ¶ 11 (emphasis added). This language is not evidence that Liu's F-1 student status remains active, and the defendants' refusal to stipulate that it remains active only underscores the equivocal language of Watson's statement.

For his part, Liu presents several pieces of evidence to support his allegation that his SEVIS record accurately reflected DHS's termination of his F-1 student status. On April 4, 2025, DHS terminated Liu's F-1 record in SEVIS and added the following notation: "OTHERWISE FAILING TO MAINTAIN STATUS – Individual identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated." Doc. no. 10-5 at 2. As discussed above, there are various ways that an F-1 student may fail to maintain his F-1 status. DHS states on its website that a designation in SEVIS of "OTHERWISE FAILING TO MAINTAIN STATUS" means that "[t]he student has not maintained status."[4] Thus, on April 4, 2025, DHS's notation in Liu's SEVIS record showed that DHS had terminated Liu's record because he had not maintained his F-1 student status.

It is worth noting that the defendants attempted to distance themselves from the April 4, 2025 SEVIS entry by highlighting that DHS subsequently changed the entry. Specifically, on April 8, 2025, after Liu instituted this action, DHS changed the notation to read: "OTHER – Individual identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated." Doc. no. 10-15 at 2. To the extent that the defendants believe that this

---

[4] SEVIS SELF HELP HUB, Department of Homeland Security, https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/termination-reasons (last checked Apr. 29, 2025).

belated change somehow demonstrates that DHS terminated only Liu's record in SEVIS and not his actual F-1 student status, that argument is unpersuasive.

The State Department's own guidance document further supports the conclusion that a student's SEVIS record is a manifestation of a student's F-1 status. The Foreign Affairs Manual, an "authoritative source" for State Department polices that "convey[s] codified information to Department staff and contractors,"[5] explains that "the SEVIS record is the definitive record of student or exchange visitor status and visa eligibility." 9 F.A.M. 402.5-4(B).

Indeed, the evidence before the court at this stage demonstrates that DHS officials and agencies follow this directive and construe a student's SEVIS record as the equivalent of his actual F-1 student status. For example, Liu submitted a letter from USCIS regarding a petition for a student to be classified as a temporary worker. The letter notes that "[a]ccording to the [student's] SEVIS record . . . their F-1 nonimmigrant status was terminated on April 10, 2025 because of the criminal records check and the revocation of their F-1 visa." Doc. no. 18-1 at 3. Though the specific facts surrounding that student's immigrations status were distinguishable from Liu's, USCIS construed the termination of the student's F-1 status in the SEVIS system as the termination of his actual F-1 student status. Specifically, USCIS stated that in light of the student's SEVIS record, "[i]t appears that the [student] is not in valid F-1 nonimmigrant status" and concluded that the student has "failed to maintain [his] nonimmigrant status." Id.

Liu's January 2, 2022 encounter with CBP officials at the airport in Detroit is further evidence that DHS agencies equate the termination of his F-1 status in the SEVIS system with the termination of his actual F-1 status. Despite confirmation from Liu's department chair at

---

[5] Foreign Affairs Manual, U.S. Department of State, https://fam.state.gov (last accessed Apr. 29, 2025).

Wake Forest that his student status was active, CBP officials would not allow Liu to enter the country because he did not have an active F-1 status in the SEVIS database. Liu was able to return to the United States to continue his studies only after the DSO at Wake Forest successfully updated his F-1 status in the SEVIS database.

The evidence in the record at this stage of the litigation leads to only one conclusion. DHS terminated Liu's F-1 student status when it terminated his record in SEVIS. The fact that Liu learned of and began suffering consequences of the termination because the action was reflected in the SEVIS database does not transform his claims into a record-keeping challenge. Liu's claims are clear — he challenges DHS's termination of his F-1 student status as it is manifested in the SEVIS database.

II.      Likelihood of Success on the Merits

Liu argues that he can show a likelihood of success on his claims that the defendants violated his Fifth Amendment Due Process Rights (Count 1) and his rights under the APA (Count 2) when DHS terminated his F-1 student status in the SEVIS system. Because the parties devote the bulk of their briefing to Liu's likelihood of success on his APA claim in Count 2, the court begins by discussing that claim.

"The APA 'sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts.'" Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 16 (2020) (quoting Franklin v. Massachusetts, 505 U.S. 788, 796 (1992)). "It requires agencies to engage in 'reasoned decisionmaking,' Michigan v. EPA, 576 U.S. 743, 750 (2015), and directs that agency actions be 'set aside' if they are 'arbitrary, capricious,'" an abuse of discretion, or otherwise not in accordance with law. Id. (quoting 5

14

U.S.C. § 706(2)(A)) (cleaned up). In making that determination, the court must "assess only whether the decision was 'based on a consideration of the relevant factors and whether there has been a clear error of judgment[.]'" Id. (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)).

Liu argues that he is likely to succeed on his APA claim because "DHS's ability 'to terminate an F-1 student status is limited by 8 C.F.R. § 214.1(d).'" Doc. no. 10-1 at 8 (quoting Jie Fang v. Dir. U.S. Immigr. & Customs Enf't, 935 F.3d 172, 185 n. 100 (3d Cir. 2019) (brackets omitted)). As discussed above, § 214.1(d) provides three specific circumstances under which DHS can terminate a nonimmigrant's F-1 student status. Liu argues that it is undisputed that none of the conditions that would have allowed DHS to terminate his F-1 student status under § 214.1(d) occurred. Therefore, according to Liu, DHS has not complied with the regulation and its actions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

The defendants argue that Liu has failed to show a likelihood of success on the merits of his APA claim for several reasons. They contend first that there is no case or controversy here. Second, that the APA's waiver of sovereign immunity does not extend to Liu's claim because the Privacy Act of 1974, 5 U.S.C. § 552a, exclusively governs any claim related to information in SEVIS. Third, that even if the Privacy Act does not preclude APA review of Liu's claim, the act Liu complains of is not a final agency action. And finally, that DHS's termination of Liu's SEVIS status was not arbitrary or capricious.

A.    Case or Controversy

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III § 2. The defendants argue that there is no case or controversy here because Liu's status in the SEVIS system is distinct from his actual F-1 student status. The defendants contend that because Liu's claims do not relate to his actual F-1 student status, and because there is no evidence to support the allegation that his F-1 student status has changed, there is not a justiciable case or controversy.

The court rejects the defendants' argument in light of its conclusion above. The evidence at this stage of the litigation supports the conclusion that DHS terminated Liu's F-1 student status. Therefore, the defendants' argument that there is no case or controversy is misplaced.


B.    Privacy Act

The APA waives sovereign immunity for actions in federal district court by "person[s] suffering legal wrong because of agency action." 5 U.S.C. § 702. But the "waiver does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought' by the plaintiff." Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 215 (2012) (quoting § 702).

The defendants argue that Liu is not likely to succeed on the merits of his APA claim because the APA's waiver of sovereign immunity does not extend to his claim. They contend that instead, the Privacy Act exclusively governs his claim seeking to "amend the status field contained in his SEVIS record" and "forecloses relief," doc. no. 15 at 20, because it limits remedies to any individual who is "a citizen of the United States or an alien lawfully admitted for permanent residence," id. at 15.

16

The court need not address the defendants' arguments in depth because, as discussed above, they are based on a flawed premise. Liu is not seeking to correct a factual error in his SEVIS record such that his claim could potentially implicate the Privacy Act. See Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz, 601 U.S. 42, 63 (2024) (noting that the Privacy Act was "passed to protect the privacy of individuals identified in federal information systems" and "addresses the government's retention and disclosure of personal information" while allowing individuals to seek a court order requiring it to change "inaccurate information" and "correct its records"). To the contrary, Liu's APA claim is based on the allegation that his SEVIS record accurately reflects that DHS unlawfully terminated his F-1 student status. In other words, it is DHS's termination of his F-1 student status, as that action is manifested in the SEVIS database, that Liu challenges here.

The Privacy Act is thus irrelevant to Liu's claim because it is not "a vehicle for amending the judgments of federal officials as those judgments are reflected in records maintained by federal agencies." Barnett v. United States, 195 F. Supp. 3d 4, 7 (D.D.C. 2016) (quoting Kleinman v. Dep't of Energy, 956 F.2d 335, 337–38 (D.C. Cir. 1992)) (ellipses omitted); Almahdi v. Lyons, No. CIV.A. 05-0218 RMC, 2006 WL 751331, at *3 (D.D.C. Mar. 21, 2006) ("Fundamentally, the Privacy Act is not the way to challenge the ultimate agency determination."). Therefore, Liu's claim, which challenges DHS's substantive determination, is outside of the Privacy Act's reach.

Even if the court were willing to accept the incongruity between the SEVIS record and Liu's F-1 student status pressed by the defendants, the Privacy Act would not bar Liu's APA claim because his SEVIS record is not a "record" under the Privacy Act for the same reason that the defendants argue that the Privacy Act would foreclose relief—Liu is not an "individual"

under the Act. See § 552a(a)(2) (defining "individual" as "a citizen of the United States or an alien lawfully admitted for permanent residence"). Because he is not an "individual," his SEVIS record is not a "record" under the Privacy Act. See § 552a(a)(4) (defining "record" as "an item, collection, or grouping of information about an individual that is maintained by an agency") (emphasis added).

The court notes for the sake of completeness that even if Liu's claim could come under the Privacy Act, he would not be precluded from pursuing his APA claim. "Congress did not intend for the Privacy Act to be an 'exclusive' source of claims or remedies for alleged mishandling of records about individuals that impliedly forbids other relief under the APA." All. for Retired Ams. v. Bessent, No. CV 25-0313 (CKK), 2025 WL 740401, at *19 (D.D.C. Mar. 7, 2025); see Madan B K, 2025 WL 1171572, at *5. Thus, the Privacy Act does not displace relief under the APA.

### C.    Final Agency Action

Courts may not review agency actions under the APA unless they represent a "final agency action for which there is no other adequate remedy in a court." Harper v. Werfel, 118 F.4th 100, 116 (1st Cir. 2024) (quoting 5 U.S.C. § 704). An agency action is final when it satisfies two conditions: (1) the action "must mark the consummation of the agency's decisionmaking process"; and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." Id. (quoting Bennett v. Spear, 520 U.S. 154, 178 (1997) (further quotations omitted)).

Again basing their argument on a misunderstanding of Liu's claim, the defendants argue that DHS's change to Liu's SEVIS record is not a final agency action. They contend that the

18

change does not mark the consummation of any decision-making process because it is, in effect, a meaningless action. And they argue that legal consequences do not flow from the mere termination of a SEVIS record because it does not have any bearing on a student's nonimmigrant status.

As with their other positions, the defendants' arguments are misplaced. Liu challenges DHS's termination of his F-1 student status, not his SEVIS record. Further, the evidence already discussed establishes that significant consequences flow from the termination of Liu's SEVIS record and F-1 student status. Even if Liu seeks reinstatement of his status, which is not mandatory, USCIS is not required to grant reinstatement and Liu is not entitled to appeal that decision. Liu challenges a final agency action under the APA. See Jie Fang, 935 F.3d at 179–85; Madan B K, 2025 WL 1171572, at *6 (collecting cases).


D.      Violation of the APA

Because the defendants construe Liu's claim as one challenging his SEVIS records, they do not address directly whether DHS's act of changing Liu's F-1 student status was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. § 706(2)(A). But they submit, however briefly, that Liu could not meet that standard. They note that § 214.1(d) "provides three mandatory scenarios in which nonimmigrant status 'shall' be terminated without review. It does not, however, suggest that nonimmigrant status cannot be terminated for other reasons." Doc. no. 15 at 26 (citations omitted). In other words, because § 214.1(d) does not explicitly limit DHS's ability to terminate a nonimmigrant student's F-1 status to only the three reasons listed in that regulation, DHS did not violate the APA by failing to comply with that regulation.

Assuming that the defendants' interpretation of § 214.1(d) is correct—and there is authority holding that it is not, see Jie Fang, 935 F.3d at 176—that interpretation does not undermine Liu's APA claim. "An agency's decision is arbitrary and capricious if the agency relied on improper factors . . . or when a reasonable explanation for the agency's decision cannot be discerned." Gulluni v. Levy, 85 F.3d 76, 82 (1st Cir. 2023); see Motor Vehicle Ass'n v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983) (agency action is considered arbitrary and capricious if the agency "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise").

Section 214.1(d) allows DHS to terminate a student's F-1 status for three reasons. Students can also fail to maintain their F-1 status if they do not comply with certain regulatory requirements, such as failing to maintain a full course of study or other violations of their requirements under § 214.2(f). In addition, 8 C.F.R. § 214.1(e)-(g) outlines specific circumstances in which certain conduct by any nonimmigrant visa holder, such as engaging in unauthorized employment or being convicted of a crime of violence subject a potential sentence of more than a year, "constitute a failure to maintain status." When, as here, DHS terminates a student status and denotes in SEVIS that the reason is "OTHERWISE FAILING TO MAINTAIN STATUS," it must "clearly explain how the student failed to maintain status."[6]

The defendants do not argue that DHS terminated Liu's status under § 214.1(d) or that Liu failed to maintain his status under any applicable regulation. Their briefing fails to identify

---

[6] SEVIS SELF HELP HUB, Department of Homeland Security, https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/termination-reasons (last checked Apr. 29, 2025).

any regulation to support DHS's ability to terminate Liu's F-1 student status. The closest the defendants come to an explanation is the statement in Watson's declaration that DHS terminated Liu's F-1 student status because he sought admission into the United States on January 2, 2022, but was denied entry. Doc. no. 15-1, ¶¶ 7-8. Unsurprisingly, the defendants do not attempt to suggest that this encounter is a lawful justification for terminating Liu's F-1 student status. And they admit that they changed the reason for termination in the SEVIS database after this litigation began.

At oral argument, the court inquired whether the defendants intended to argue that any law or regulation authorized them to terminate Liu's status. They offered only the general authority Congress conferred under 8 U.S.C. § 1372 to develop and conduct a program to collect information regarding nonimmigrant students seeking F-1 student status and approved institutions. They offered no argument connecting the authority to collect information to the decision to terminate Liu's status.

To survive judicial review under the APA, an agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." State Farm, 463 U.S. at 43 (quotation omitted). Based on the record before the court at this stage of the litigation, the defendants are unable to meet that standard.

For these reasons, Liu has shown a likelihood of success on the merits of his claim under the APA in Count 2.[7]

---

[7] Because the court finds that Liu has shown a likelihood of success on the merits of his APA claim in Count 2, it does not address at this time his claim in Count 1 that DHS violated his due process rights under the Fifth Amendment when it terminated his F-1 status in the SEVIS system.

III.    Irreparable Harm

Liu claims that he will suffer irreparable harm absent a preliminary injunction in several

ways. First, because DHS terminated his F-1 status, he is no longer authorized to work as a

research assistant or eligible to receive any stipend from his Ph.D. program. These are his only

sources of income, and he is neither seeking nor able to recover money damages in this suit.

Second, his inability to continue his research will delay his academic timeline and may threaten

his ability to receive any departmental funding. Third, every day that he does not have F-1

student status makes it less likely that he would be able to reinstate his status in the future.

Fourth, Liu may face possible detention and deportation because of his status.

Turning first to Liu's inability to recover money damages in this case, there is no dispute

that he is neither seeking nor able to recover monetary damages in this case. The APA does not

waive the government's sovereign immunity with regard to a claim seeking money damages. §

702. And monetary damages are unavailable for Fifth Amendment violations brought against

federal officials in their official capacity. See Rosario v. Boyer, 23-cv-258-JL-AJ, 2024 WL

5202622, at *4 n.5 (D.N.H. Nov. 21, 2024) (citing Egbert v. Boule, 596 U.S. 482, 498-99

(2022)), report and recommendation approved 2024 WL 5200634 (D.N.H. Dec. 23, 2024)).

Economic losses such as Liu's loss of stipend can be considered irreparable harm because he has

no adequate remedy at law to recover for his damages. See, e.g., N.H. Hosp. Ass'n v. Burwell,

No. 15-CV-460-LM, 2016 WL 1048023, at *17-18 (D.N.H. Mar. 11, 2016) (holding that the

plaintiffs showed that they would suffer irreparable harm from economic losses absent a

preliminary injunction because they could not recover monetary damages under the APA); Chef

Time 1520 LLC v. Small Bus. Admin., 646 F. Supp. 3d 101, 115–16 (D.D.C. 2022) (citing cases

supporting the conclusion that the lack of availability of money damages for APA claims weighs

in favor of a finding of irreparable harm); Nat'l Mining Ass'n v. Jackson, 768 F. Supp. 2d 34, 52 (D.D.C. 2011) ("[I]f a movant seeking a preliminary injunction will be unable to sue to recover any monetary damages against a government agency in the future because of, among other things, sovereign immunity, financial loss can constitute irreparable injury." (quotations omitted)). Here, the economic losses stemming from Liu's inability to work as a research assistant or receive his stipend if his F-1 student status remains terminated constitute irreparable harm.

In addition, Liu's inability to continue his research because of DHS's termination of his F-1 status has significant and irreparable consequences for his academic trajectory. Dartmouth policy states that departmental funding is generally not guaranteed beyond a student's fifth year in the Ph.D. program. Doc. no. 10-16 at 3. Further, students who have not completed the program by the end of their seventh year usually face removal from the program. Id. at 4. Moreover, at this stage of his program, Liu is required to participate in at least two terms of research per year. Id. This delay and threat to Liu's ability to complete his Ph.D. program cannot be redressed and constitute irreparable harm in light of the facts of this case. See Doe v. Noem, No. 2:25-CV-00633-DGE, 2025 WL 1141279, at *8 (W.D. Wash. Apr. 17, 2025) (holding that the plaintiff had demonstrated that he would suffer irreparable harm absent injunctive relief because he "is currently unable to continue in his academic work, and should that condition persist, he faces loss of grants and an inability to complete his degree").

Further, absent injunctive relief, Liu may accrue time during which he is considered out of F-1 status as a result of DHS's actions, which may make it impossible for him to reinstate his status. Absent exceptional circumstances, the USCIS may consider a student's request to reinstate his F-1 status only if he has "not been out of status for more than 5 months at the time

23

of filing the request for reinstatement." 8 C.F.R. § 214.2(f)(16)(i)(A). Thus, Liu's daily accrual

of time out of F-1 status increases the risk that he will be unable to reinstate his status, which

would in turn mean that he would never be able to continue his research at Dartmouth. Such

harm is irreparable. See, e.g., Patel v. Bondi, No. 1:25-CV-00101, 2025 WL 1134875, at *2

(W.D. Pa. Apr. 17, 2025).

       Finally, the termination of Liu's F-1 status and SEVIS record exposes him to the

possibility of removal.[8] The threat of removal constitutes irreparable harm in this case because of

the interplay between Liu's immigration status and his academic and professional development.

If Liu were indeed removed, that "would effectively eliminat[e] his ability to complete his

degree program, causing him economic and reputational loss wherever he ultimately resides."

Doe, 2025 WL 1141279, at *8. Even if Liu were somehow able to repatriate, there is no

guarantee that he could return to his program at Dartmouth—he may need to re-apply for

admission, repeat courses, and restart research. See id. The permanent disruption to Liu's

education would render the past two years he has spent at Dartmouth significantly less valuable

because they would not be attached to a degree. Further, were he to enroll at some other

program, he may not be able to return to some of the research he started at Dartmouth and would

need to start anew.

       For these reasons, Liu has shown that he is likely to suffer irreparable harm absent a

preliminary injunction.

---

[8] SEVIS HELP HUB Terminate a Student, Department of Homeland Security,
https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-
terminations/terminate-a-student (last visited April 29, 2025). ("When an F-1/M-1 SEVIS record
is terminated, the following happens: . . . Immigration and Customs Enforcement (ICE) agents
may investigate to confirm the departure of the student").

IV.    <u>Remaining Factors</u>

The remaining factors weigh in Liu's favor. "The public has a vested interest in a federal government that follows its own regulations." Doe, 2025 WL 1141279, at *9. The defendants argue that the "public interest in enforcement of United States immigration laws is significant," doc. no. 15 at 33, but they fail to show that DHS has complied with any immigration law or regulation in this case or that Liu's status was revoked due to his failure to comply with any immigration law or regulation. Further, Liu has shown the likely significant hardship that he will endure absent preliminary injunctive relief, and the defendants have shown none.

V.    <u>Bond</u>

Under Federal Rule of Civil Procedure 65(c), in granting a preliminary injunction, the court must require a movant to pay security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The court has discretion to waive Rule 65(c)'s bond requirement. <u>See</u> Crowley v. Local No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen, & Packers, 679 F.2d 978, 1001 (1st Cir. 1982), rev'd on other grounds, 467 U.S. 526 (1984).

The defendants request that Liu post a security bond, though they do not request a specific amount or explain any costs they will incur by complying with the preliminary injunction, much less any damages they will have sustained if the court later determines that it erred in granting Liu's motion. Therefore, the court exercises its discretion to waive the bond requirement.

25

Conclusion

For the foregoing reasons, the plaintiff's motion for a preliminary injunction (doc. no. 10) is granted. All defendants are (i) enjoined from terminating Mr. Liu's F-1 student status under the SEVIS [Student and Exchange Visitor] system, and (ii) required to set aside their determination that Liu's F-1 student status is terminated. This order shall remain in effect until further order of the court.

SO ORDERED

_____
Samantha D. Elliott
United States District Judge

April 29, 2025

cc: Counsel of Record.

26

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

STUDENT DOE #1,                  )
STUDENT DOE #2,                  )
STUDENT DOE #3,                  )
STUDENT DOE #4,                  )
STUDENT DOE #5,                  )
STUDENT DOE #6,                  )
STUDENT DOE #7, and            )
STUDENT DOE #8,                  )
                                     )

       Plaintiffs,             )

                                     )     No. 25 C 4188
       v.                       )
                                     )     Judge Sara L. Ellis
DONALD J. TRUMP, U.S. DEPARTMENT   )
OF HOMELAND SECURITY, KRISTI     )
NOEM, and TODD LYONS,         )
                                     )
       Defendants.          )

## OPINION AND ORDER

In April 2025, the United States Immigration and Customs Enforcement ("ICE"), a subagency of the United States Department of Homeland Security ("DHS"), abruptly and without warning terminated the student records of thousands of international students in the Student and Exchange Visitor Information System ("SEVIS")—including the records of Plaintiffs Student Does #1–8.[1]  Plaintiffs then sued Defendants President Donald J. Trump, Kristi Noem, the Secretary of Homeland Security, and Todd Lyons, the Acting Director of ICE, in their official capacities, and DHS for violating the Administrative Procedure Act ("APA") and the Fifth Amendment's Due Process Clause, seeking declaratory judgment and immediate injunctive relief.  On April 21, the Court issued a temporary restraining order ("TRO") directing Defendants to reinstate Plaintiffs' SEVIS records, retroactive to March 31, 2025, and enjoining

---

[1] For reasons stated on the record, the Court allowed Plaintiffs to proceed by pseudonym, *see* Doc. 17. Plaintiffs have disclosed their identities under seal.

Defendants from arresting, detaining, or removing Plaintiffs from the United States [18].

Plaintiffs now move for a preliminary injunction [23]. Because Plaintiffs have demonstrated a likelihood of success on the merits of their APA claim, irreparable harm, and that the balance of hardships and equities weighs in their favor, the Court grants Plaintiffs' motion and converts the TRO into a preliminary injunction.

**BACKGROUND**

## I.    SEVIS and F-1 Status[2]

The Immigration and Nationality Act, 8 U.S.C. § 1101(a)(15)(F), permits noncitizens to enroll in government-approved academic institutions as F-1 nonimmigrant students. *See* 8 C.F.R. § 214.1(a)(2). The Designated School Official ("DSO") at each school sponsoring F-1 students monitors, advises, and oversees the students attending that school. To enter the United States, an admitted international student must secure an F-1 nonimmigrant visa from the U.S. Department of State, although the visa does not govern how long an F-1 student may stay in the country.

When a student enters the United States, DHS grants the student F-1 student status and permits the student to remain in the United States for the duration of status if the student continues to comply with the requirements established by the regulations governing the student's visa classification in 8 C.F.R. § 214.2(f). DHS defines "duration of status" as "the time during which an F-1 student is pursuing a full course of study at an educational institution certified [ ] for attendance by foreign students, or engaging in authorized practical training following completion of studies." 8 C.F.R. § 214.2(f)(5)(i). Authorized practical training includes optional practical training ("OPT") and curricular practical training ("CPT"). OPT is temporary

---

[2] The Court takes this thorough explanation of SEVIS and F-1 status, with some alterations, from the preliminary injunction order in *Liu v. Noem*, No. 25 C 133, 2025 WL 1233892, at *2–3 (D.N.H. Apr. 29, 2025).

2

employment that is directly related to an F-1 student's major area of study.  U.S. Citizen and

Immigration Services, Optional Practical Training (OPT) for F-1 Students,

https://www.uscis.gov/working-in-the-united-states/students-and-exchange-visitors/optional-

practical-training-opt-for-f-1-students (last visited May 5, 2025).  Some F-1 students also may

qualify for a Science, Technology, Engineering, and Mathematics ("STEM") OPT extension.  *Id.*

Separately, CPT is alternative work-study, cooperative education, or any other type of required

internship or practicum that sponsoring employers offer through cooperative agreements with

schools.  U.S. Citizen and Immigration Services, Policy Manual, Volume 2, Part F, Chapter 5 –

Practical Training, https://www.uscis.gov/policy-manual/volume-2-part-f-chapter-5 (last visited

May 5, 2025).

ICE, a subagency of DHS, oversees the Student and Exchange Visitor Program

("SEVP"), which maintains records on F-1 students.  *See* 8 U.S.C. §§ 1372(a), (c).  Specifically,

SEVP administers SEVIS to ensure that government agencies have essential data related to

nonimmigrant students and exchange visitors to preserve national security.  *See* Background:

SEVP and SEVIS, U.S. Immigration and Customs Enforcement, https://www.ice.gov/sevis.

SEVIS is a web-based system for maintaining information on nonimmigrant students and

exchange visitors in the United States.  *Id.*  The regulations require DSOs to report to SEVP

through SEVIS when a student fails to maintain status, which can result in termination of that

student's SEVIS record.  *See* 8 C.F.R. § 214.3(g)(2).

F-1 students fail to maintain status when they do not meet certain regulatory

requirements, such as failing to maintain a full course of study without DSO approval or other

violations set forth in 8 C.F.R. § 214.2(f).  Separately, 8 C.F.R. § 214.1 subjects several

nonimmigrant classes, including F-1 students, to requirements for their "maintenance of status."

For example, a "nonimmigrant's conviction in a jurisdiction in the United States for a crime of violence for which a sentence of more than one year imprisonment may be imposed (regardless of whether such sentence is in fact imposed) constitutes a failure to maintain status." 8 C.F.R. § 214.1(g).

Further, DHS may terminate a student's F-1 status for the reasons stated in § 214.1(d). That section provides that:

> [w]ithin the period of initial admission or extension of stay, the nonimmigrant status of an alien shall be terminated [1] by the revocation of a waiver authorized on his or her behalf under section 212(d)(3) or (4) of the Act; [2] by the introduction of a private bill to confer permanent resident status on such alien; or, [3] pursuant to notification in the Federal Register, on the basis of national security, diplomatic, or public safety reasons.

8 C.F.R. § 214.1(g).

Typically, when F-1 students complete their studies or training, they must leave the United States within a 60-day grace period. 8 C.F.R. § 214.2(f)(5)(iv). And the government gives F-1 students who voluntarily withdraw from classes a 15-day grace period to depart from the United States. *Id.* But an F-1 student who fails to maintain status must leave the country immediately or seek reinstatement, without any grace period for departure. *Id.* ("[A]n F-1 student who fails to maintain a full course of study without the approval of the DSO or otherwise fails to maintain status is not eligible for an additional period for departure."). The United States Citizenship and Immigration Services ("USCIS"), also a subagency of DHS, may consider reinstating a student's status. But the regulations do not require USCIS to reinstate the status of a student who demonstrates, among other things, that they have "not been out of [valid F-1] status for more than 5 months at the time of filing the request for reinstatement" or that "the failure to file within the 5 month period was the result of exceptional circumstances and that the

student filed the request for reinstatement as promptly as possible under these exceptional circumstances."  8 C.F.R. § 214.2(f)(16)(i)(A).  If USCIS decides against reinstating a student's status, the student may not appeal that decision.  8 C.F.R. § 214.2(f)(16)(ii).

## II.    Doe Plaintiffs

The eight Plaintiffs in this case are international students attending various academic institutions or working under the OPT program across the country.  Without advance notice or explanation, ICE abruptly terminated Plaintiffs' SEVIS records between April 4 and April 11, 2025.  As a result, Plaintiffs' schools and employers removed them from their programs and jobs.  Because neither ICE nor DHS provided any individualized explanation for their decisions, Plaintiffs cannot definitively know the reason behind their terminations.  However, Plaintiffs believe ICE may have terminated their SEVIS records for various minor contacts with law or immigration enforcement.  Three Plaintiffs think their terminations result from traffic or driving-related conduct (Student Does #1–3), one Plaintiff points to a non-criminal immigration history (Student Doe #4), and the remaining three Plaintiffs suggest minor criminal conduct as the cause (Student Does #6–8).  Separately, six Plaintiffs (Student Does #1, 2, 4, 6, 7, and 8) received notification that the State Department revoked their F-1 visas.[3]

### A.    Student Doe #1

Student Doe #1 is a resident of Indiana who completed a master's degree in information science with a 3.83 GPA and was working under the Science, Technology, Engineering, and Mathematics ("STEM") OPT.  Recently, USCIS selected him in the H-1B lottery.[4]  ICE

---

[3] Plaintiffs do not challenge the revocation of their F-1 visas.

[4] USCIS uses the H-1B visa lottery system to award visas to foreign workers seeking temporary employment in the United States.  *See* U.S. Citizenship and Immigration Services, H1-B Specialty Occupations, https://www.uscis.gov/working-in-the-united-states/h-1b-specialty-occupations (last visited

terminated his SEVIS record on April 10, 2025.  He believes that his termination may result from a 2023 reckless driving charge, where he was driving 70 mph in a 45-mph zone.  He resolved this charge by completing a driving safety course and paying a $10 fine.  His wife gave birth to their first daughter on April 13, 2025, just days after his SEVIS termination.  He now faces unpaid leave and the loss of H-1B eligibility, and he fears detention and family separation.  Since ICE terminated his SEVIS record, Student Doe #1 has experienced severe anxiety and distress.

### B.     Student Doe #2

Student Doe #2 is a resident of New York pursuing a master's degree in pure mathematics with a 3.88 GPA.  ICE terminated his SEVIS record on April 10, 2025.  He believes that his termination relates to a traffic misunderstanding involving a temporary license plate that a judge ultimately dismissed.  Since the termination, he has experienced significant distress and financial instability, and his elderly parents have suffered health declines due to stress.  Although he was competing for a lucrative summer internship, he can no longer pursue this opportunity and fears derailment of his long-planned path towards a Ph.D.

### C.     Student Doe #3

Student Doe #3 is a resident of Illinois pursuing a master's degree with a 4.0 GPA and working as a research assistant on a federally funded project.  He previously earned a bachelor's degree in the United States and completed OPT employment as a utility forester.  ICE terminated his SEVIS record on April 10, 2025.  He believes that his termination relates to either a dismissed traffic citation or a resolved trespass charge.  He was on track to graduate in May 2025 and thereafter begin a Ph.D. program but now has lost his monthly stipend and lives in fear of detention.  Since ICE terminated his SEVIS record, he has experienced intense anxiety, financial

May 6, 2025).  Because a cap exists that limits the number of foreign workers whom United States employers can hire each year, there is no guarantee that a lottery applicant will receive an H-1B visa.  *Id.*

hardship, and emotional distress.  He has borrowed money to cover his basic expenses and legal fees.

### D.    Student Doe #4

Student Doe #4 is a resident of Indiana who completed his academic program with a 3.96 GPA and was working on-campus and planning to apply to OPT positions.  ICE terminated his SEVIS record on April 10, 2025.  He thinks his termination relates to a traffic citation issued shortly after his arrival in the United States that he fully resolved.  Since ICE terminated his SEVIS record, he lost his on-campus job and can no longer apply for OPT positions or maintain volunteer leadership roles.  He also has experienced financial instability, anxiety, and uncertainty about his future in the United States.

### E.    Student Doe #5

Student Doe #5 is a resident of North Carolina who earned a master's degree and was working under STEM OPT in his field.  He recently married his longtime partner.  ICE terminated his SEVIS record on April 4, 2025.  He believes the termination results from a prior airport encounter with immigration officials who informed him that his SEVIS record was inactive upon arrival to the country, although he fully resolved this issue through reinstatement and lawful reentry.  After ICE terminated his SEVIS record, Student Doe #5's employer placed him on unpaid leave, and he fears permanent job loss due to the company's policy prohibiting the rehire of individuals with immigration status issues.  He also has experienced acute emotional distress, sleeplessness, and anxiety as he fears losing his job permanently and forced separation from his spouse.

**F.      Student Doe #6**

Student Doe #6 is a resident of Texas who earned a master's degree in advanced data analytics, began working under OPT in 2023, and received a STEM OPT extension in 2024. Recently, USCIS selected him in the 2025 H-1B lottery. ICE terminated his SEVIS record on April 8, 2025. He thinks the termination relates to a 2021 public intoxication citation that a court dismissed in 2022. After ICE terminated his SEVIS record, Student Doe #6's employer placed him on leave. His employer maintains a policy that prohibits rehiring after termination. He has experienced severe emotional distress, including anxiety and physical symptoms of stress.

**G.      Student Doe #7**

Student Doe #7 is a resident of Chicago, Illinois who is pursuing a degree and working under curricular practical training ("CPT") authorization as an intern. She also had secured a job offer for this summer. ICE terminated her SEVIS record on April 11, 2025. She believes the termination results from a low-amount retail theft citation that she resolved. Since ICE terminated her SEVIS record, Student Doe #7 has experienced significant emotional distress and physical illness, and she fears having to repeat the academic year, which would create a substantial financial burden.

**H.      Student Doe #8**

Student Doe #8 is a resident of Texas who earned a degree and was working under OPT in her field. ICE terminated her SEVIS record on April 4, 2025. Resultingly, she lost her job. She thinks the termination relates to two shoplifting-related arrests, neither of which resulted in convictions. A court dismissed one case, and the other remains unresolved with no formal charges. Since ICE terminated her SEVIS status, Student Doe #8 has experienced severe

8

emotional distress requiring therapy, and she feels constant anxiety about possible detention and deportation.

## III.    Watson Materials

Attached to their opposition to the preliminary injunction, Defendants provided the Court with a declaration from Andre Watson, the Assistant Director of the National Security Division for Homeland Security Investigations at DHS.  In his declaration, Watson stated that "[t]erminating a record in SEVIS does not terminate an individual's nonimmigrant status in the United States."  Doc. 25-1 at 4.  In their reply, Plaintiffs provided the Court with emails and testimony from Watson in a similar case pending before a different district court.  The emails and Watson's testimony support that, pursuant to a "student criminal alien initiative," ICE ran the names of each student in the F-1 program through the National Crime Information Center ("NCIC") database and passed the names of the F-1 students that ICE identified in the NCIC database on to the State Department.  *See* Doc. 28-3 at 6–7.  Watson acknowledged that the NCIC contains not only the names of individuals convicted of crimes, but also individuals who were not convicted of any crime and missing persons.  Watson claimed that his staff of ten to twenty federal employees engaged in a case-by-case review of the F-1 students identified in NCIC.  However, Watson's explanation of the case-by-case review was that in two to three weeks, his team of ten to twenty federal employees ran 1.3 million names through the NCIC system, and then if the name of a F-1 student matched a name in the NCIC, his team would attempt to validate whether the F-1 student was the same individual as the person named in the NCIC system.  Watson next explained that after his team finished this review, they sent the names to the State Department who in turn advised his team whether the F-1 students had valid visas and requested terminating students' SEVIS records.

None of the produced emails suggest that DHS attempted to engage in even a minimally meaningful individual review of each F-1 student to determine whether they were convicted of a crime, much less a crime of violence for which a sentence of more than one year imprisonment may be imposed, before DHS terminated their SEVIS records.  In fact, the emails do not name any individual F-1 student or at all indicate any individualized assessment.  Rather, these emails demonstrate a shockingly hasty timeline wherein the SEVP division chief decided only fifteen minutes after receiving a list of F-1 students' names to "terminate everyone in SEVIS."  Doc. 28-3 at 26

## LEGAL STANDARD

The party seeking a preliminary injunction must show that: "(1) he has some likelihood of success on the merits of his claim; (2) traditional legal remedies are inadequate; and (3) he would suffer irreparable harm without preliminary injunctive relief."  *Finch v. Treto*, 82 F.4th 572, 578 (7th Cir. 2023) (citation omitted).  If the movant satisfies these factors, the Court then conducts a balancing test, "weigh[ing] the harm of denying an injunction to the plaintiff against the harm to the defendant of granting one."  *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021) (citation omitted).  The Court also considers the "public interest, meaning the consequences of granting or denying the injunction to non-parties."  *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021) (citation omitted).  The Court conducts the balancing test using a "sliding scale" where "if the plaintiff is likely to win on the merits, the balance of harms need not weigh as heavily in his favor."  *Life Spine*, 8 F.4th at 539 (quoting *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020)).

## ANALYSIS

### I.     Mootness

"A case becomes moot when a court can no longer grant any redress for the alleged

wrong." *Lauderdale-El v. Ind. Parole Bd.*, 35 F.4th 572, 575 (7th Cir. 2022) (citing *Eichwedel v.*

*Curry*, 700 F.3d 275, 278 (7th Cir. 2012)).  Although Defendants did not raise mootness in their

briefing, prompted by certain actions taken by the government after the Court's issuance of the

TRO, the parties discussed the issue of mootness at the preliminary injunction hearing.

Specifically, on April 25, 2025, in at least one similar case pending before a different court, DHS

and ICE filed a notice (the "Notice"), stating that:

> ICE is developing a policy that will provide a framework for
> SEVIS record terminations.  Until such a policy is issued, the
> SEVIS records for plaintiff(s) in this case (and other similarly
> situated plaintiffs) will remain Active or shall be reactivated if not
> currently active and ICE will not modify the record solely based on
> the [National Crime Information Center] finding that resulted in
> the recent SEVIS record termination.  ICE maintains the authority
> to terminate a SEVIS record for other reasons, such as if the
> plaintiff fails to maintain his or her nonimmigrant status after the
> record is reactivated or engages in other unlawful activity that
> would render him or her removable from the United States under
> the Immigration and Nationality Act.

Doc. 28-2 at 3.  One day later, on April 26, 2025, SEVP promulgated a "broadcast message"

entitled "Policy Regarding Termination of Records" (the "SEVP Policy").  Doc. 28-1 at 2.  The

SEVP Policy includes a list of reasons SEVP can terminate SEVIS records, including "Evidence

of a Failure to Comply with the Terms of Nonimmigrant Status Exists" or "U.S. Department of

State Visa Revocation (Effective Immediately)."  *Id.*  Further, the SEVP Policy states that it is

"not a substitute for applicable legal requirements, nor is it itself a rule or final action by SEVP."

*Id*. at 3.  The SEVP Policy and Notice raise a question of whether Plaintiffs' claims are now

moot.

The Court finds that the Notice and SEVP Policy do not moot this case. By their terms, the Notice and SEVP Policy do not apply to Plaintiffs. The Notice states that ICE will restore SEVIS records and not modify them again until ICE develops a policy on SEVIS record terminations. The next day, SEVP issued the SEVP Policy. Assuming the SEVP Policy is the policy DHS and ICE referenced in the Notice, then any representation by Defendants that they would not terminate students' SEVIS records is no longer in effect. Further, at the time that DHS and ICE filed the Notice, this Court had already issued its TRO, requiring Defendants to restore Plaintiffs' SEVIS records. Moreover, Defendants in this case have not claimed that the Notice or SEVP Policy applies to Plaintiffs or made any representation that in the absence of the Court's order, Defendants would not terminate Plaintiffs' SEVIS records. Finally, even if the Notice applied to Plaintiffs, which neither party claims, some Plaintiffs still report a gap in their SEVIS records from when ICE terminated their records to when the Court's TRO restored them. While the Court accepts Defendants' representations that the gap is inadvertent, the Court believes the gap may result in Plaintiffs' loss of F-1 status or the termination of their SEVIS records in the future. In the absence of this Court's order requiring the retroactive restoration of Plaintiffs' SEVIS records, ICE may view the gap as a period where Plaintiffs failed to maintain proper F-1 status, as evidenced by the language of the SEVP Policy. The Court can redress this outstanding issue.[5]  *See Baumgartner v. City of Chicago*, 759 F. Supp. 3d 868, 876 (N.D. Ill. 2024) (finding that a claim for injunctive relief was not moot when the government was "free to

---

[5] Plaintiffs brought to the Court's attention that some of plaintiffs' SEVIS records reflect a gap between the time ICE terminated their SEVIS records and when this Court issued a TRO requiring Defendants to restore Plaintiffs' SEVIS records. The Court's TRO required Defendants to "fully reinstate Plaintiffs' Student and Exchange Visitor Information System ('SEVIS') records, *retroactive* to March 31, 2025." Doc. 18 at 1 (emphasis added). This Court's preliminary injunction order requires the same. For the sake of clarity, the Court specifies that by retroactive, it means that there should be no gap in Plaintiffs' SEVIS records. Rather, Plaintiffs' SEVIS records should reflect that Plaintiffs were active in SEVIS for the duration of April 2025. Defendants have agreed to remedy the gap and to provide the Court with a status update on its efforts to eliminate the gap in Plaintiffs' SEVIS records no later than May 8, 2025.

return to its old ways" and the plaintiff still maintained "'a legally cognizable interest in the outcome' of the Court's ruling" (citations omitted)).

The Court also notes "the principle that a party should not be able to evade judicial review . . . by temporarily altering questionable behavior." *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 285 n.1 (2001). In many ways, Defendants' arguments and actions here have attempted to create a Catch-22[6] situation. Defendants have endeavored to create a scheme where the government (1) revokes a student's F-1 status without meeting the normal requirements for such a revocation, (2) makes it impossible for a student to maintain compliance with their F-1 status such that, even if the SEVIS termination is remedied, the student cannot keep their F-1 status; and (3) insulates its actions from normal legal process and judicial review.

In this attempt, Defendants have ignored the facts and caused tremendous uncertainty for thousands of students lawfully present in the United States. First, Defendants terminated Plaintiffs' SEVIS records and argued such an action is merely clerical and not judicially reviewable. As discussed further below, Defendant's position willfully ignores the reality that SEVIS is not simply a clerical database operating independently of F-1 status. Defendants' argument appears all the more absurd because their own manuals and websites contradict this position. *See* U.S. Dep't of Homeland Sec., *Schools: Maintaining Accurate SEVIS Records– Terminations*, https://studyinthestates.dhs.gov/schools/report/maintaining-accurate-sevis-records

---

[6] "Borrowed from the title of Joseph Heller's classic war novel *Catch-22*, a 'Catch-22' is a problem where the only solution to the problem is denied by a circumstance of the problem." *Sater v. Republic Servs. of Ind. Trans. LLC*, No. 3:23-CV-403-CCB, 2024 WL 4344883, at *5 n.4 (N.D. Ind. Sept. 30, 2024); *see also* Joseph Heller, *Catch–22* 60 (1961). In *Catch-22*, "Yossarian wants to stop serving as a bombardier during World War II. Insanity is a reason for being grounded, and Yossarian tries to convince Doc Daneeka that he is insane—but to ask proves sanity, because an insane person would want to fly more missions." *Davis v. Humphreys*, 747 F.3d 497, 498 (7th Cir. 2014). It follows basic principles of fairness and logic that the Court should avoid placing parties in such a position. *See id.* ("The federal judiciary should avoid using Catch-22.").

(last visited May 5, 2025); U.S. Dep't of Homeland Sec., *SEVIS Help Hub: Terminate a Student–Effects of Termination* (Nov. 7, 2024), https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/terminate-a-student (last visited May 5, 2025).  SEVIS operates as a critical tool for the F-1 status program, enabling students to obtain work authorization, enroll in classes, and otherwise maintain their status.

Next, when courts began issuing orders finding fault with Defendants' actions, ICE then promulgated the Notice and SEVP Policy.  Defendants used the Notice to attempt to backtrack on their actions and avoid further negative judicial pronouncements, while making no lasting commitment to refrain from similar behavior or even necessarily remedying some of the issues created by terminating students' SEVIS records.  Defendants shortly thereafter issued the SEVP Policy, ostensibly nullifying the Notice and listing reasons SEVP can terminate SEVIS records.  However, the SEVP Policy purports to not be a "a rule or final action" such that it could be subject to judicial review.  *See* Doc. 28-1 at 3.

Under the language of the SEVP Policy, SEVP can terminate a student's SEVIS record if the State Department revokes their visa, a decision that is generally not subject to judicial review.  *See, e.g.*, *Yafai v. Pompeo*, 912 F.3d 1018, 1020 (7th Cir. 2019) ("Congress has delegated the power to determine who may enter the country to the Executive Branch, and courts generally have no authority to second-guess the Executive's decisions.").  The State Department has notified six Plaintiffs here that it revoked their F-1 visas.  If the SEVP Policy applied to these Plaintiffs, absent the Court's intervention, Defendants could terminate their SEVIS records again and then argue that judicial review of these decisions is inappropriate under the APA due to agency policy.  Further, even if the State Department had not revoked many of Plaintiffs' visas, the SEVP Policy says that SEVP can terminate SEVIS records of individuals when evidence

14

exists that they failed to comply with their nonimmigrant status. Doc. 28-1 at 2. Because SEVIS

contains the record of an individual's compliance with their nonimmigrant status, Defendants

could use the gap in students' records from when Defendants previously terminated their SEVIS

records, absent retroactive reinstatement, to support further terminations. The SEVP Policy

makes Defendants' tactics obvious: if the first attempt to take action without being subject to

normal legal constraints and judicial review fails, alter approaches and try again.[7] For these

reasons, the Court cannot find that the government's use of the Notice and SEVP Policy moots

Plaintiffs' challenges to the termination of their SEVIS records and so proceeds to the merits of

their claims.

## II.    Joinder

Defendants first argue that the Court should deny Plaintiffs' motion for a preliminary

injunction because many of the Plaintiffs are misjoined. For the Court to properly join plaintiffs

together in one case, plaintiffs' claims must (1) arise out of the same transaction, occurrence, or

series of transactions and occurrences, and (2) contain a common question of law or fact. Fed.

R. Civ. P. 20(a)(1). In determining whether plaintiffs' claims arise out of the same transaction or

occurrence, courts generally use a "case-by-case approach." *Birdo v. Gomez*, 214 F. Supp. 3d

709, 722 (N.D. Ill. 2016) (citation omitted). Further, "[c]ourts interpret 'transaction or

occurrence' as 'comprehending a series of many occurrences, depending not so much upon the

immediateness of their connection as upon their logical relationship.'" *Id.* (quoting *Adkins v. Ill.

Bell Tel. Co.*, No. 14-CV-1456, 2015 WL 1508496, at *7 (N.D. Ill. Mar. 24, 2015)). Courts

---

[7] It appears Defendants take their inspiration from the adage "If at first you don't succeed, try, try again," popularized by William Edward Hickson, *The Singing Master* (1836). The full lyrics include: "Once or twice though you should fail, if you would at last prevail, try again. If we strive, 'tis no disgrace though we did not win the race – what should you do in that case? Try again." *Id.* While this may make a memorable maxim, it is a poor substitute for the appropriate administration of over a million students simply wanting to study in the United States, who rely upon consistent and readily ascertainable rules governing their ability to study, work, and create lives for themselves in this country.

consider factors such as whether the conduct occurred during the same time period, whether the claims involve the same people and similar conduct, whether the conduct implicates a system of decision-making or policy, and whether trying the cases separately would lead to inconvenience, expense, or delay due to "the likelihood of overlapping proof and duplication in testimony."  *Id.* (quoting *McDowell v. Morgan Stanley & Co.*, 645 F. Supp. 2d 690, 694 (N.D. Ill. 2009)).

Here, the Court has discretion and an ample basis to find that joinder of Plaintiffs is proper.  *See UWM Student Ass'n v. Lovell*, 888 F.3d 854, 863 (7th Cir. 2018) ("These rules are broad, giving district courts considerable flexibility in managing and structuring civil litigation for fair and efficient resolution of complex disputes.").  Plaintiffs attached to their reply a transcript of testimony that Andre Watson, the Deputy Director of Homeland Security, provided in a similar pending case in the District of Columbia, *Patel v. Lyons*, No. 25-cv-1096 (D.D.C. Mar. 30, 2025).  In short, Watson discussed that the termination of students' SEVIS status was part of a coordinated initiative conducted by DHS, ICE, and the State Department; however, government personnel allegedly individually reviewed each student's record.  *See, e.g.*, Doc. 28-3 at 6–7, 10.  Plaintiffs' declarations support that Defendants terminated their SEVIS status at approximately the same time in similar manners.  *See, e.g.*, Doc. 7-1 at 2; Doc. 7-2 at 2; Doc. 7-3 at 2.  Although there may have been some individual determinations regarding each Plaintiff, taken as a whole, the evidence suggests that Defendants' conduct occurred around the same time, in a similar manner, and as part of the same decision or policy.  The Court thus finds that these Plaintiffs' claims are logically related, involving the same or similar legal questions and key facts regarding due process, the APA, and the operation of SEVIS.  Finally, it would be inefficient to require each Plaintiff to file separate cases as their claims will involve significant overlapping proof and duplication in testimony because they each involve factual questions

concerning SEVIS.  In sum, the Court finds that joinder is proper and denies Defendants' request to deny the preliminary injunction on that basis.  *See*, *e.g.*, *Doe 1 v. Bondi*, 25 C 1998, Doc. 43 at 15-16 (N.D. Ga. May 2, 2025).

## III.   Likelihood of Success

To obtain injunctive relief, "a plaintiff must demonstrate that '[her] claim has some likelihood of success on the merits,' not merely a 'better than negligible' chance."  *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020) (quoting *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381 (7th Cir. 2018)).  To do so, a plaintiff must make a strong showing of success.  *Nken v. Holder*, 556 U.S. 418, 434 (2009).  However, a "strong" showing is not "proof by a preponderance . . . [because] that would spill too far into the ultimate merits for something designed to protect both the parties and the process while the case is pending.  But it normally includes a demonstration of how the applicant proposes to prove the key elements of its case."  *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020).

### A.   Privacy Act

Before delving into the merits of Plaintiffs' APA claim, the Court must address Defendants' argument that the Privacy Act precludes the APA claim—meaning that Plaintiffs cannot succeed on the merits of their APA claim.  The APA waives sovereign immunity for actions in federal district court by "person[s] suffering legal wrong because of agency action."  5 U.S.C. § 702.  But the "waiver does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought' by the plaintiff."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702).  Defendants contend that the Privacy Act—not the APA—controls agencies' procedures

concerning governmental records.  As a result, Defendants argue that the Privacy Act precludes

Plaintiffs' APA claim and waiver does not apply.

Preclusion does not operate here because, as Defendants note, Plaintiffs cannot sue under

the Privacy Act because they are nonimmigrant students.  5 U.S.C. § 552a ("[T]he term

'individual' means a citizen of the United States or an alien lawfully admitted for permanent

residence"); *see also Doe v. Noem*, No. 25 C 1103, 2025 WL 1134977, at *5 (E.D. Cal. Apr. 17,

2025) (citing 5 U.S.C. § 552a to conclude that "the Privacy Act clearly does not provide plaintiff

another adequate remedy, as plaintiff's ability to seek relief under the Privacy Act is not even

'doubtful,' but nonexistent.").  Moreover, Defendants wrongly frame Plaintiffs' claim as one that

would fall under the Privacy Act.  The Privacy Act was "passed to protect the privacy of

individuals identified in federal information systems" and the Act "addresses the government's

retention and disclosure of personal information" while allowing individuals to seek a court

order requiring the government to change "inaccurate information" and "correct its records."

*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024).  But Plaintiffs

here do not allege a flaw in their SEVIS records and seek to amend governmental records as

allowed by the Privacy Act.  Instead, Plaintiffs' APA claim rests on the premise that their SEVIS

status *accurately* reflects that DHS unlawfully terminated their F-1 student status.  *See Douglas*

*v. Agric. Stabilization & Conservation Serv.*, 33 F.3d 784, 785 (7th Cir. 1994) ("[T]he Privacy

Act does not permit a court to alter documents that accurately reflect an administrative action, no

matter how contestable the conclusion may be.").  Plaintiffs challenge Defendants' SEVIS

termination determinations and seek to have Defendants reinstate their SEVIS records without

gaps in authorized student status, which is relief appropriately sought under the APA.  *See id.*

("If an agency errs, the right response is not to rewrite history, changing the record in Orwellian

18

fashion to pretend that it reached some other conclusion.  The right response to error is to correct the disposition under the Administrative Procedure Act.").  Accordingly, the Court finds the Privacy Act irrelevant here.[8]

**B.    Final Agency Action**

A court can only review a "final" agency action under the APA.  5 U.S.C. § 704.  For an agency's action to be "final", the Supreme Court has stated that it must satisfy two conditions: "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).  Here, Defendants challenge both conditions.

Defendants first argue that no final agency action exists because Plaintiffs can administratively challenge DHS's decision to terminate their SEVIS records.  Defendants cite two Seventh Circuit cases to support their assertion, but the Court finds the factual circumstances in both cases distinguishable from the present case.  In *McBrearty v. Perryman*, the plaintiffs brought action seeking review of the decision of the District Director of the Immigration and Naturalization Service's decision denying adjustment of status to that of lawful permanent residents.  212 F.3d 985 (7th Cir. 2000).  The court found the suit premature because the plaintiffs "could obtain review of the district director's decision by the Board of Immigration Appeals if and when the immigration service institutes removal (i.e., deportation) proceedings against them."  *Id.* at 987.  In *Dhakal v. Sessions*, the court found that the Director of the Chicago Asylum Office of USCIS's decision denying the plaintiff's asylum application was not a final

---

[8] Additionally, the Court notes that even if Plaintiffs could bring a claim under the Privacy Act, the Privacy Act does not preclude them from pursuing their APA claim.  *See All. for Retired Ams. v. Bessent*, No. 25-0313, 2025 WL 740401, at *19 (D.D.C. Mar. 7, 2025) ("[T]he availability of a Privacy Act suit for damages does not take this case outside the scope of the waiver of sovereign immunity in § 702 of the APA and does not affect this Court's subject-matter jurisdiction over Plaintiffs' APA claims.").

agency action because once DHS initiated removal proceedings against the plaintiff, an

immigration judge would adjudicate his asylum application, after which the plaintiff could

appeal any decision to the Board of Immigration Appeals.  895 F.3d 532, 539–40 (7th Cir. 2018).

In both cases, robust statutory and regulatory schemes provided the plaintiffs with opportunities

to have any officer's original decision reviewed by the Board of Immigration Appeals.  *See*

*Dhakal*, 895 F.3d at 539 (concluding that "the executive branch process for review of asylum

claims is carefully drafted and detailed . . ." and that "Congress created a systemic scheme for

processing asylum claims that was motivated by a desire to revise and regularize the procedures

governing the admission of refugees . . . [and] to eliminate the piecemeal approach." (citation

omitted) (internal quotation marks omitted)); *McBrearty*, 212 F.3d at 987 (holding the plaintiff's

suit premature because the plaintiffs could still seek review under 8 U.S.C. § 1252(a)(1) and 8

C.F.R. §§ 240.15, 245.2(a)(5)(ii), and because Congress passed a door-closing statute to prevent

judicial review of any judgment under the relevant statute).

    Because Defendants argue that *McBrearty* is controlling, they resultingly assert that

Plaintiffs mistakenly rely on the Third Circuit's decision in *Jie Fang v. Director of ICE*, 935

F.3d 172 (3d Cir. 2019) to contend that the termination of a SEVIS record is a final agency

action.  However, Defendants fail to offer any explanation or analysis to support this assertion

beyond stating that "the relevant issue in *Jie Fang* was not a SEVIS record; it was the revocation

of lawful immigrant status."  Doc. 12 at 10.  However, for the reasons discussed above, the Court

finds *McBrearty* distinguishable from the present facts, and, for reasons discussed below,

Defendants' distinction between a student's SEVIS record and F-1 status is a distinction without

a difference.

In fact, the *Jie Fang* court's conclusion is directly applicable to this case. The court determined that "terminating [ ] students' F-1 visas marked the consummation of the agency's decisionmaking process" because "there is no statutory or regulatory requirement that a student seek reinstatement" and "even if the students attempt to pursue the administrative procedures for reinstatement, there is no mechanism to review the propriety of the original termination order." *Jie Fang*, 935 F.3d at 182. Here, Defendants point to no statute or regulation that *requires* Plaintiffs to appeal ICE's SEVIS record termination decision. And even if a student attempts to pursue the administrative procedure for SEVIS reinstatement to which Defendants cite, there is no "mechanism to review the propriety" of the original termination. *Doe v. Noem*, No. 25 C 633, 2025 WL 1141279, at *3 (W.D. Wash. Apr. 17, 2025) (citing, in pertinent part, 8 C.F.R § 214.2(f)(16)(ii) ("The adjudicating officer will update SEVIS to reflect USCIS' decision. If USCIS does not reinstate the student, the student may not appeal the decision.")). "Because neither immigration judges nor the Board of Immigration Appeals (BIA) have the authority to review SEVIS termination or a USCIS denial of reinstatement, there is no proceeding in which a student can contest the agency action at issue here." *Mandan B K v. Kristi Noem*, No. 25 C 419, 2025 WL 1171572, at *6 (W.D. Mich. Apr. 23, 2025). This Court joins other courts to preliminarily conclude that the SEVIS terminations are not merely tentative or interlocutory in nature. *See*, *e.g.*, *Patel v. Bondi*, No. 25 C 101, 2025 WL 1134875, at *2 (W.D. Pa. Apr. 17, 2025) ("The SEVIS termination is a final agency decision susceptible to judicial review."); *Doe*, 2025 WL 1141279, at *3 (reaching the same conclusion for the reasons stated herein); *Hinge v. Lyons*, No. C 25-1097, 2025 WL 1134966, at *1 (D.D.C. Apr. 15, 2025) ("[T]he record at this stage seems to indicate that final agency action has occurred[.]").

Defendants next argue that even if the Court determines that their actions consummate the agency's decision-making process, no legal consequences flow from the termination of Plaintiffs' SEVIS record. Relevant to this argument, Defendants claim that they terminated only Plaintiffs' SEVIS records, not Plaintiffs' F-1 status. Neither party disputes that Defendants terminated Plaintiffs' SEVIS records; but Plaintiffs contend that a SEVIS record termination constitutes a *de facto* F-1 status termination. Defendants disagree. *See* Doc. 25 at 2 ("And the SEVIS record itself does not equate to a determination of whether a foreign student still retains F-1 status."). Although Defendants have argued repeatedly that termination of a student's SEVIS record and F-1 status are separate and distinct occurrences, they have only offered Andre Watson's declaration to support this claim. He states:

> Terminating a record in SEVIS does not terminate an individual's nonimmigrant status in the United States. The statute and regulations do not provide SEVP the authority to terminate nonimmigrant status by terminating a SEVIS record, and SEVP has never claimed that it had terminated an alien's nonimmigrant status simply by terminating a SEVIS record.

Doc. 25-1 at 4. Yet the State Department and DHS's own manual and website contradict Mr. Watson's declaration. The State Department's Foreign Affairs Manual ("FAM") states that "the SEVIS record is the definitive record of student or exchange visitor *status* and visa eligibility." 9 FAM 402.5-4(B) (emphasis added). Further, according to DHS's "Study in the States" website, "[o]nce you terminate a student's SEVIS record, the student is no longer in an authorized period of stay in the United States." U.S. Dep't of Homeland Sec., *Schools: Maintaining Accurate SEVIS Records–Terminations*, https://studyinthestates.dhs.gov/schools/report/maintaining-accurate-sevis-records (last visited May 5, 2025). That same website also lists other consequences of SEVIS record termination:

When an F-1/M-1 SEVIS record is terminated, the following
happens:
- Student loses all on- and/or off-campus employment
  authorization.
- Student cannot re-enter the United States on the terminated
  SEVIS record.
- Immigration and Customs Enforcement (ICE) agents may
  investigate to confirm the departure of the student.
- Any associated F-2 or M-2 dependent records are
  terminated.[9]

U.S. Dep't of Homeland Sec., *SEVIS Help Hub: Terminate a Student–Effects of Termination*

(Nov. 7, 2024), https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-

terminations/terminate-a-student (last visited May 5, 2025).  Broadening the last bullet, DHS

explains that "[i]n SEVIS, the status of a dependent record follows the status of the F-1 [ ]

student," and "[w]hen a dependent is terminated in SEVIS, it means that dependent is no longer

eligible for F-2 [ ] status."  U.S. Dep't of Homeland Sec., *SEVIS Help Hub: Terminate or*

*Reactivate a Dependent Record* (March 17, 2023), https://studyinthestates.dhs.gov/sevis-help-

hub/student-records/dependents/terminate-or-reactivate-a-dependent-record (last visited May 5,

2025).

Defendants have proclaimed persistently to this Court and courts around the country that

the termination of a student's SEVIS record is a simple clerical action that does not also

terminate their F-1 status.  But this assertion disregards reality.  When schools or ICE terminate a

student's SEVIS record, the student is unauthorized to work, unauthorized to stay in the United

States, and loses F-2 status for any dependent.  The Court cannot blindly accept Defendants'

current characterization of SEVIS termination and ignore the evidence before it.  The State

Department, DHS, and sponsoring schools all follow the agencies' guiding sources and consider

---

[9] F-2 or M-2 dependents are a F-1 or M-1 student's spouse or unmarried children under the age of 21 who
may accompany the F-1 or M-1 student to the United States.  *See* U.S. Citizenship and Immigration
Services, Policy Manual, Volume 2, Part F, Chapter 9 – Dependents, https://www.uscis.gov/policy-
manual/volume-2-part-f-chapter-9 (last visited May 6, 2025).

the termination of a student's SEVIS record equivalent to the termination of that student's F-1

status.  The Court moves forward with that same understanding.  *See Liu*, 2025 WL 1233892, at

*5–6 ("The evidence in the record at this stage of the litigation leads to only one conclusion.

DHS terminated Liu's F-1 student status when it terminated his record in SEVIS.").

      Defendants' termination of Plaintiffs' SEVIS records, therefore, seemingly resulted in a

myriad of significant legal consequences, including the students' loss of employment, inability to

remain in the United States, prohibited reentry into the United States, and the ability of ICE

agents to investigate the student to confirm their departure from this country.  At this stage, the

Court therefore finds that Plaintiffs will be able to show that Defendants' termination of

Plaintiffs' SEVIS records, and by effect Plaintiffs' F-1 student status, is a final agency action

because the action is the consummation of the agency's decisionmaking process and one from

which legal consequences will flow.  *See Hinge*, 2025 WL 1134966, at *1 (granting the

plaintiff's request for a TRO in part because of "the lack of verifiable information offered by the

defendant rebutting his argument in regards to [ ] the effect of ICE's termination of the plaintiff's

SEVIS record on the plaintiff's lawful nonimmigrant status in the United States" when analyzing

whether a final agency action has occurred).

### C.    Arbitrary and Capricious

      Pursuant to the APA, a court reviewing an agency's decision "shall . . . hold unlawful and

set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(a)(2)(A).  An agency's

decision is arbitrary and capricious under the APA when it:

> has relied on factors which Congress has not intended it to
> consider, entirely failed to consider an important aspect of the
> problem, offered an explanation for its decision that runs counter
> to the evidence before the agency, or is so implausible that it could

> not be ascribed to a difference in view or the product of agency
> expertise.

*Awad v. Kerry*, 257 F. Supp. 3d 1016, 1020 (N.D. Ill. 2016) (quoting *Nat'l Ass'n of Home
Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007)).  "To survive arbitrary and capricious
review, an agency action must be the product of a reasoned decisionmaking." *Id.* (quoting *Fox v.
Clinton*, 684 F.3d 67, 74–75 (D.C. Cir. 2012)).  This means an agency must "articulate a
satisfactory explanation for its action including a rational connection between the facts found and
the choice made."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463
U.S. 29, 43 (1983) (citation omitted) (internal quotation marks omitted).  A court reviewing an
agency's decision "should not attempt itself to make up for . . . deficiencies" in the agency's
reasoning and "may not supply a reasoned basis for the agency's action that the agency itself has
not given."  *Id.* (citation omitted) (internal quotation marks omitted).

Defendants first argue that DHS's termination of Plaintiffs' SEVIS records was not
arbitrary and capricious because DHS and schools may terminate students' SEVIS records for
numerous reasons not listed in any regulation or statute.  In support, Defendants link an ICE
website that lists termination reasons available in SEVIS to DSOs.  First, the Court notes that the
webpage's title only references reasons DSOs—not ICE—may terminate students' SEVIS
records.  Even assuming ICE may terminate students' SEVIS records for the same listed reasons,
Defendants do not direct the Court to any specific reason listed on the page that supports
Plaintiffs' terminations.[10]  And, from the Court's independent review of the webpage, it does not

---

[10] *See* U.S. Immigration and Customs Enforcement, Student Termination Reasons Available in SEVIS to
DSOs, https://www.ice.gov/factsheets/f-and-m-student-record-termination-reasons-sevis (last visited May
6, 2025).  Some examples of reasons for SEVIS termination include the student's absence from the
country for five months or longer, USCIS approved the student's change of status out of F or M status,
death, expulsion, suspension, failure to enroll, and "otherwise failing to maintain status." *Id.*

include the specific reasons for which ICE terminated Plaintiffs' records (traffic or driving-related conduct, non-criminal immigration contact, or minor criminal conduct).

As explained in the background section, Section 214.1(d) allows DHS to terminate a student's F-1 status for three reasons: (1) by the revocation of a waiver authorized on his or her behalf under section 212(d)(3) or (4) of the Act; (2) by the introduction of a private bill to confer permanent resident status on such alien; or, (3) pursuant to notification in the Federal Register, on the basis of national security, diplomatic, or public safety reasons. Defendants contend that, even accepting that ICE's actions terminated Plaintiffs' F-1 student status (rather than just their SEVIS records), the terminations were still not arbitrary and capricious because § 214.1(d) does not indicate that "those three events are the *only* reasons to terminate a nonimmigrant's status." Doc. 12 at 11.[11] Instead, Defendants argue that the regulation provides three baseline reasons for terminating a nonimmigrant's status, but that other legitimate reasons exist elsewhere in the statutes and regulations. However, even if the Court were to accept this argument, the statute and regulation that Defendants cite to support ICE's "other legitimate reasons" to terminate students' SEVIS record or F-1 status do not encompass the reasons for which Defendants' terminated Plaintiffs' SEVIS records here. *See* 8 U.S.C. § 1201(i) (discussing revocation of visas or other documentation by the consular officer or the Secretary of State); 8 C.F.R. § 214.2(f) (describing the circumstances for how a student may fail to maintain their F-1 status).

While students can fail to maintain their F-1 status if they do not comply with certain regulatory requirements under § 214.2(f), Defendants do not argue that Plaintiffs failed to

---

[11] Defendants also argue that 8 C.F.R. § 214.1(d) only regulates ICE's termination of F-1 students' status, not ICE's ability to update F-1 students' SEVIS records. But as discussed above, the Court does not find this argument persuasive because the termination of a student's SEVIS record is equivalent to the termination of that student's F-1 status.

comply with these requirements.[12]  In sum, Defendants do not argue that ICE's terminations or Plaintiffs' conduct fell under one of the three categories of § 214.1(d), nor do they direct the Court to § 214.1(f) or any other relevant authority to justify their actions.  Defendants altogether have failed to suggest any lawful grounds for the termination of Plaintiffs' SEVIS records.

The Court therefore finds that Plaintiffs are likely to succeed on the allegation that Defendants' termination of their SEVIS record is arbitrary and capricious because Defendants have failed to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," *Motor Vehicle*, 463 U.S. at 43.  *See Liu*, 2025 WL 1233892, at *10 (finding that the plaintiff has shown a likelihood of success on the merits of his APA claim in part because the defendants offered no law or regulation that authorized them to terminate the plaintiff's status).

For these reasons, the Court holds that Plaintiffs have demonstrated a likelihood of success on the merits of their APA claim.[13]

---

[12] The Court notes that 8 C.F.R. § 214.1(e)-(g) lists specific conduct, if committed by any nonimmigrant visa holder, that constitutes a failure to maintain status.  However, Defendants do not suggest Plaintiffs committed any such conduct.

[13] Because the Court finds that Plaintiffs' APA claim has a high likelihood of success on the merits and provides an adequate basis to issue the preliminary injunction, the Court does not address Plaintiffs' due process claim.  *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of USA*, Inc., 549 F.3d 1079, 1096 (7th Cir. 2008), *abrogated on other grounds by Nken*, 556 U.S. at 434 ("Because [the plaintiff] surpasses the [likelihood of success on the merits] threshold on at least one of its causes of action, we do not discuss [the plaintiff]'s likelihood of success on its remaining nine claims.").

The Court does note, however, that its analysis of the APA claim does not apply to Defendant Trump, as Defendants argue that Plaintiffs' APA claim against the President is erroneous because the President is not an "agency" under the statute.  The Court agrees and accordingly does not enjoin Defendant Trump. *See Dalton v. Specter*, 511 U.S. 462, 469 (1994) (holding that the President's actions are not reviewable under the APA because the President is not an "agency" within the meaning of the APA but noting that the "President's actions may still be reviewed for constitutionality").  But because the Court does not address the due process claim, and Defendants have not yet filed a motion to dismiss, the Court will not dismiss Defendant Trump at this time.

**IV.    Adequacy of Traditional Remedies and Irreparable Harm**

The other elements of the preliminary injunction's balancing test are the adequacy of legal remedies and whether the movant would suffer irreparable harm in the absence of an injunction. *Treto*, 82 F.4th 572, 578. In the Seventh Circuit, these elements essentially mirror each other: "[h]arm is irreparable if legal remedies are inadequate to cure it." *Life Spine, Inc.*, 8 F.4th at 545. Essentially, the analysis looks to whether monetary compensation will make the movant whole. *See Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020) ("This takes us to irreparable harm, which we have defined as harm that cannot be repaired and for which money compensation is inadequate." (citation omitted) (internal quotation marks omitted)).

Plaintiffs claim that they have suffered educational, professional, reputational, and personal irreparable harm absent a preliminary injunction. They describe educators and employers who have revoked academic or program enrollment and job or internship offers because of Defendants' actions. For example, some Plaintiffs allege that after Defendants terminated their SEVIS records, their expected graduation and employment is uncertain. *See*, *e.g.*, Doc. 1 ¶ 18 ("As a result [of her SEVIS record termination], [Student Doe #7] is unable to complete her academic program"); Doc. 1 ¶ 66 ("[Student Doe #2 can no longer pursue the internship necessary for advancement in his field, and fears complete derailment of his long-planned path toward a Ph.D."). These are clearly irreparable harms not addressed by money damages. *See Doe v. Middlebury Coll.*, No.15 C 192, 2015 WL 5488109, at *3 (D. Vt. Sept. 16, 2015) (finding irreparable harm where the plaintiff's job offer was contingent on his successful completion of his degree from his college and "[w]hile Plaintiff may recover money damages to compensate for lost wages, money damages cannot compensate for the loss of his senior year in college with his class, the delay in the completion of his degree, or the opportunity to begin his

career in July 2016 with this particular employment."); *King v. DePauw Univ.*, No. 14 C 70,

2014 WL 4197507, at *13 (S.D. Ind. Aug.22, 2014) (finding irreparable harm where plaintiff

would "forever have either a gap or a senior-year transfer on his record," noting the inevitability

of questions by future employers or graduate schools for which "any explanation is unlikely to

fully erase the stigma").

 The Court finds that the loss of some Plaintiffs' ability to complete their degrees, coupled

with their and other Plaintiffs' allegations of loss of present and future employment opportunities

and potential removal, place their claims within the realm of irreparable harm with no adequate

remedy at law. *See Isserdasani v. Noem*, No. 25 C 283, 2025 WL 1118626, at *5 (W.D. Wis.

Apr. 15, 2025) ("Given the amount of Isserdasani's educational expenses and potential losses

from having to leave the United States without obtaining his degree, the court concludes that

Isserdasani credibly demonstrates that he faces irreparable harm for which he has no adequate

remedy at law in the absence of injunctive relief."); *Oruganti v. Noem*, No. 25 C 409, 2025 WL

1144560, at *5 (S.D. Ohio Apr. 18, 2025) (citing *Isserdasani* and four other similar cases finding

irreparable harm and granting TROs); *Doe*, 2025 WL 1141279, at *8 ("[I]n this case, the

ordinary harms of removal would compound the other harms Plaintiff faces by effectively

eliminating his ability to complete his degree program, causing him economic and reputational

loss wherever he ultimately resides.").

## V.   Balance of Harms and Equities

 Because the Court has found that Plaintiffs have met the threshold requirements, the

Court now "weigh[s] the harm the denial of the preliminary injunction would cause the

plaintiff[s] against the harm to the defendant[s] if the [C]ourt were to grant it." *Mays*, 974 F.3d

at 818. "This balancing process involves a 'sliding scale' approach: the more likely the plaintiff

is to win on the merits, the less the balance of harms needs to weigh in [her] favor, and vice versa." *Id.*  Here, Plaintiffs have shown significant harms that they will suffer absent a preliminary injunction, including loss of access to education, employment opportunities, and lawful status.  Defendants argue that a preliminary injunction will harm DHS's authority to enforce a statute that directs the agency to collect information relating to the nonimmigrant foreign students.  *See* 8 U.S.C. § 1372.  The Court fails to see how a preliminary injunction would interfere with this data collection ability, and Defendants do not further explain this argument.  Accordingly, Defendants have demonstrated no harm.

"When the government is a party, the balance of equities and the public interest factors merge." *Nken*, 556 U.S. at 435.  And "the public has a strong interest in having a [government] that conducts itself fairly and according to its stated regulations and policies." *Cooney v. Dalton*, 877 F. Supp. 508, 515 (D. Haw. 1995); *see also Eight N. Indian Pueblos Council, Inc. v Kempthorne*, No. CV 06-745, 2006 WL 8443876, *5 (D.N.M. Sept. 15, 2006) ("It is in the public interest that federal agencies comply with their own policies and with federal statutes."). Here, Defendants argue that the public interest factors favor them because "the public interest in enforcement of immigration laws is significant."  Doc. 12 at 14.  Yet, as discussed above, Defendants have failed to show thus far that their decision-making complied with any immigration law or regulation.  The balances of equities, therefore, favors Plaintiffs' interest in the government's compliance with its own laws and regulations.

## VI.    Bond

Rule 65(c) provides that, "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or

restrained." Fed. R. Civ. P. 65(c).  However, "the case law has somewhat weakened the force of the 'no order shall issue' language" in Rule 65(c).  *Reinders Bros., Inc. v. Rain Bird E. Sales Corp.*, 627 F.2d 44, 54 (7th Cir. 1980); *see also Wayne Chem., Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 700 (7th Cir. 1977) ("Under appropriate circumstances bond may be excused, notwithstanding the literal language of Rule 65(c)"); *Scherr v. Volpe*, 466 F.2d 1027, 1035 (7th Cir. 1972) (the district court retains discretion to determine if a bond must be posted despite the mandatory language in Rule 65(c)).

Defendants request that Plaintiffs post a security bond, though the only reason they assert in favor of this request is that "[t]he risk of harm to [D]efendants here is not insubstantial."  Doc. 25 at 11.  Defendants offer no support for this statement, nor do they suggest a bond amount.  In fact, the record does not indicate that Defendants will suffer any monetary damages due to the preliminary injunction.  Having considered the facts and circumstances of this case, the Court follows the decision of other courts and declines in its discretion to require Plaintiffs to post a bond for the preliminary injunction.  *See*, *e.g.*, *Rodriguez v. Noem*, No. 25 C 616, 2025 WL 1284722, at *12 (D. Conn. May 1, 2025) (waiving Rule 65(c)'s bond requirement because the plaintiff "brings strong claims against Defendants and the likelihood of harm to Defendants is almost nonexistent.").

## CONCLUSION

For the foregoing reasons, the Court grants Plaintiffs' motion for a preliminary injunction [23]. The Court converts its previously issued TRO [18] into a preliminary injunction.[14]

Dated: May 8, 2025

_____
SARA L. ELLIS
United States District Judge

---

[14] For the reasons stated earlier in this Opinion, the preliminary injunction does not apply to Defendant Trump.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

JANE DOE 1, et al.,

     Plaintiffs,

v.

PAM BONDI, in her official capacity
as Attorney General of the United
States, et al.,

     Defendants.

Civil Action No.
1:25-cv-01998-VMC

## PRELIMINARY INJUNCTION ORDER AND OPINION

On April 18, 2025, the Court granted Plaintiffs' Amended Motion for a Temporary Restraining Order ("TRO"). (Docs. 19, 23). Among other things, the Court directed Defendants to reinstate Plaintiffs' student status and SEVIS authorization, retroactive to March 31, 2025. (Doc. 23 at 15). Pursuant to the Court's Order, Defendants filed a Notice of Compliance confirming that U.S. Immigration and Customs Enforcement ("ICE") manually entered a system change in each Plaintiff's SEVIS record stating the following: "Status changed per court order and ICE direction. Retroactive to March 31, 2025." (Doc. 29). After careful consideration of the Parties' arguments and submissions, the TRO is converted into a preliminary injunction as to all 133 Plaintiffs.

I.     **Background**

A.     **The F-1 Visa Program and SEVIS**

The Immigration and Nationality Act ("INA") "sets the terms on which consular officers at U.S. embassies and consulates abroad may issue visas to both prospective 'immigrants' and 'nonimmigrants.'" *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 50 F.4th 164, 169 (D.C. Cir. 2022) (citing 8 U.S.C. § 1201(a)(1)). "'Immigrant' visas are issued to foreign nationals intending to move to the United States permanently." *Id.* '"Nonimmigrant' visas are for foreign nationals seeking to come into the country temporarily for an identified purpose." *Id.* Under the INA, a foreign student may enter the United States in a nonimmigrant status to complete a course of study at an approved educational institution. 8 U.S.C. § 1101(a)(15)(F)(i); 8 C.F.R. § 214.2(f). If approved, the State Department will issue a visa allowing the student admission to the United States to pursue a course of study. *See* 22 C.F.R. § 41.61(b)(1). If admitted, the Department of Homeland Security ("DHS") may administratively classify the student as an F-1 nonimmigrant. 8 C.F.R. § 214.1(a)(2). One prerequisite to admission as an F-1 nonimmigrant student is the presentment of Form I-20, which is "issued in the student's name by a school certified by the Student and Exchange Visitor Program (SEVP) for attendance by F-1 foreign students." 8 C.F.R. § 214.2(f)(1)(i)(A). The F-1 student's Form I-20 is endorsed at the time of entry into the United States and

2

the F-1 student is expected to "retain for safekeeping the initial Form I-20 or successor form bearing the admission number and any subsequent Form I-20 issued to them." 8 C.F.R. § 214.2(f)(2).

Once admitted to the United States, an F-1 student is granted permission to remain in the United States for the duration of status (noted as D/S on the relevant document)[1] as long as they continue to meet the requirements established by the regulations governing their visa classification in 8 C.F.R. § 214.2(f), such as maintaining a full course of study and avoiding unauthorized employment. 8 C.F.R. § 214.2(f)(6). Students who complete their course of study are entitled to apply for optional practical training ("OPT") directly related to their major area of study, which if approved, enables them to remain for an additional year, or in cases of STEM degrees up to three years.[2] 8 C.F.R. § 214.2(f)(10)(ii).

Congress required that DHS "develop and conduct a program to collect from approved institutions of higher education . . . in the United States [certain information] with respect to aliens who have the status, or are applying for the

---

[1] Duration of status is defined as the time during which an F-1 student is pursuing a full course of study at an educational institution certified by SEVP for attendance by foreign students, or engaging in practical training following completion of studies, except that an F-1 student who is admitted to attend a public high school is restricted to an aggregate of 12 months at any public high school(s). 8 C.F.R. § 214.2(f)(5)(i).

[2] Additionally, some degree programs also allow students to work in their field of study during their course of study under CPT.

3

status, of [F-1] nonimmigrants . . . ." 8 U.S.C. § 1372(a)(1)(A). As a result, the Department of Homeland Security's Student and Exchange Visitor Program ("SEVP") created an online database known as SEVIS. SEVIS is a centralized database maintained by the SEVP and it is used to manage information on nonimmigrant students and exchange visitors to track their compliance with the terms of their status. Under 8 C.F.R. § 214.2(f)(6), Designated School Officials ("DSOs") must report through SEVIS to the SEVP when a student fails to maintain status as described in the Code of Federal Regulations, such as engaging in unauthorized employment, providing false information to DHS, or being convicted of a crime of violence with a potential sentence of more than one year. 8 C.F.R. § 214.1(e)-(g). A student who fails to maintain status is removable. 8 U.S.C. § 1227(a)(1)(C)(i).

Separately, the Code of Federal Regulations permits the termination of nonimmigrant status in three specific circumstances: (1) a previously granted waiver under section 212(d)(3) or (4) of the Act is revoked; (2) a private bill to confer lawful permanent residence is introduced in Congress; or (3) DHS published a notification in the Federal Register identifying national security, diplomatic, or public safety reasons for termination. 8 C.F.R. § 214.1(d); *see also Jie Fang v. Dir. U.S. Immigr. & Customs Enf't*, 935 F.3d 172, 185 n.100 (3d Cir. 2019).

Accordingly, the revocation of an F-1 visa does not constitute failure to maintain status pursuant to the relevant regulations and does not provide a basis to terminate F-1 student status under the SEVIS registration system.[3] Instead, if the visa is revoked, the student is permitted to continue to pursue their course of study in school, but upon departure from the United States, the SEVIS record is terminated, and the student must obtain a new visa from a consulate or embassy abroad before returning. *See* Guidance Directive 2016-03, 9 FAM 403.11-3 — VISA REVOCATION (Sept. 12, 2016). Put differently, F-1 student status and F-1 student visas are not one in the same. The F-1 student visa refers only to the document that nonimmigrant students receive to enter the United States, whereas F-1 student status refers to the students' formal immigration classification once they enter the country.

### B.    Defendants Terminate Plaintiffs' Records in SEVIS

Here, Plaintiffs are all F-1 student visa holders actively enrolled in colleges and universities throughout the United States, or who have obtained lawful OPT to work under the terms of their student status. (Doc. 15 ¶¶ 6, 9–27). Between April 1, 2025 and April 14, 2025, Plaintiffs received notification from their schools' DSOs informing them that SEVP terminated their SEVIS record and marked Plaintiffs as

---

[3] *See* ICE Policy Guidance 1004-04—Visa Revocations (June 7, 2010) ("[v]isa revocation is not, in itself, a cause for termination of the student's SEVIS record.").

either "OTHER – Individual identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated" or, "Otherwise Failing to Maintain Status" with a narrative citing deportability provisions under 8 U.S.C. § 1227(a)(1)(C), for failure to maintain status, and 8 U.S.C. § 1227(a)(4)(C)(i), for foreign policy grounds. (Doc. 1 ¶ 2).

In the absence of clear communication from Defendants regarding the reason for their SEVIS record termination, Plaintiffs have been left to speculate that their terminations stem from arrest records relating to various misdemeanors, dismissed charges, and traffic citations and as such, have produced evidence relating to the status of those infractions.[4] (*See* Docs. 19-2-19-5). Many of the charges against Plaintiffs were dismissed. Regardless of the conduct alleged, Plaintiffs do not have any criminal history that would warrant their SEVIS records being terminated. Nonetheless, many of the emails from Plaintiffs' DSOs direct Plaintiffs to leave the United States with little notice to prepare to do so. Without a current SEVIS record, Plaintiffs effectively have no legal status and therefore face

---

[4] A sample of Plaintiffs' records include: driving with a suspended or expired license, use of false identification, speeding, driving without insurance, underage alcohol consumption, petty shoplifting or retail theft, driving on a learner's permit, failing to yield, illegal parking, reckless driving, misdemeanor domestic battery or assault, misdemeanor battery, public intoxication, trespass in the second degree, simple assault, disorderly conduct, improper turning, failure to maintain a lane, larceny. (*Id.*). At least one Plaintiff suspects the termination is the result of a mental health crisis where emergency services were called. (*Id.*).

uncertainty about being able to attend classes, graduate, obtain and maintain employment, and keep housing and insurance.

In some, but not all of these cases, the State Department has revoked the student's visa. But as the Court previously explained, the revocation of a visa does not necessarily impact the person's lawful presence in the country. As such, Plaintiffs allege that it is the SEVIS record termination that has rendered them vulnerable to devastating immigration outcomes such as detention and deportation, as well as irreparable harm.

### C.     Procedural Background

On April 11, 2025, seventeen Plaintiffs filed this action. (Doc. 1). Four days later, Plaintiffs amended their Complaint to add 116 Plaintiffs, bringing the total number of Plaintiffs to 133. (Doc. 11). In their four-count Complaint, Plaintiffs seek declaratory and injunctive relief that Defendants violated the Administrative Procedure Act ("APA") when they terminated their records on improper grounds, without prior notice, without an articulated basis for their decision, and without providing Plaintiffs an opportunity to respond. (*Id.* ¶¶ 180-182). Plaintiffs contend that Defendants acted in an arbitrary and capricious manner, inconsistent with the intent and plain language of the Immigration & Nationality Act and its associated regulations, as well as in violation of the Due Process Clause of the Fifth Amendment to the United States Constitution. (*Id.* ¶¶ 183-195). The original 17

7

Plaintiffs moved for a TRO and expedited preliminary injunction to temporarily enjoin Defendants from terminating their student status in the SEVIS system and to require Defendants to set aside their termination decisions. (Doc. 4). Plaintiffs amended their motion seeking a TRO and injunction for all 133 Plaintiffs. After considering the briefing and the arguments raised by the Parties at the hearing, the Court granted the TRO on April 18, 2025. (Doc. 19). A hearing on Plaintiffs' request for a preliminary injunction was held on April 24, 2025. In advance of that hearing, Plaintiffs provided two supplemental affidavits. (Doc. 31). Defendants did not submit any additional evidence. The Court also held a status conference wherein the Parties confirmed that there had been no discussions between them regarding Plaintiffs' requested relief, and that the Court needed to rule on the preliminary injunction. (Doc. 39).

## Discussion

### II.     Venue

In its Order granting the TRO, the Court noted that it would consider Defendants' argument on venue, and if appropriate, dissolve the TRO as to the nonresident plaintiffs. Accordingly, the Court will first address the issue of venue.

Defendants argue that venue is improper in this district as to the claims by Plaintiffs who are located in states other than Georgia.[5] (Doc. 24). As such, Defendants request that the Court deny the non-Georgia Plaintiffs' request for relief and dismiss them without prejudice or, in the alternative, transfer their claims pursuant to 28 U.S.C. § 1404(a) to an appropriate district court.[6] Defendants contend that since Plaintiffs are nonresident aliens, no plaintiff can establish residence in Georgia. Thus, the venue provision that Plaintiffs rely upon, 28 U.S.C. § 1391(e)(1)(C), does not apply because it provides that a case may be brought in any judicial district in which at least one plaintiff "resides." 28 U.S.C. § 1391(e)(1)(C). Defendants do not, however, contest the venue for the 27 plaintiffs that are physically present in Georgia. (Doc. 24 at 3 ("Defendants' position is that venue is not proper as to the 106 Plaintiffs who are located outside of Georgia.")).

The Court will treat Defendants' response as a 12(b)(3) motion to dismiss based on "improper venue." Federal Rule of Civil Procedure 12(b)(3) allows a defendant to challenge the propriety of the venue selected by a plaintiff by filing a motion to dismiss on the ground of improper venue. *See* Fed. R. Civ. P. 12(b)(3).

---

[5] Defendants' argument on venue was made in response to supplemental briefing the Court requested from Plaintiffs addressing the same. (Docs. 9, 12).

[6] During the TRO hearing, Defendants suggested that the nonresidents' claims would be appropriately transferred to the District of Columbia. Or, alternatively, that individual plaintiffs should seek to join in the ongoing litigation throughout the nation in the state where they are physically present.

When venue is challenged by a Rule 12(b)(3) motion, the plaintiff has the burden of showing that venue in the forum is proper. *See Delong Equip. Co. v. Wash. Mills Abrasive Co.*, 840 F.2d 843, 845 (11th Cir. 1988) (stating that plaintiff must make a prima facie showing of venue). As with a motion to dismiss in general, a court must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff. *Wai v. Rainbow Holdings*, 315 F. Supp. 2d 1261, 1268 (S.D. Fla. 2004). "If an allegation in the complaint is challenged, 'the court may examine facts outside of the complaint to determine whether venue is proper' and 'may make factual findings necessary to resolve motions to dismiss for improper venue.'" *In re Blue Cross Blue Shield Antitrust Litig.*, 225 F. Supp. 3d 1269, 1290 (N.D. Ala. 2016) (quoting *Bryant v. Rich*, 530 F.3d 1368, 1376 (11th Cir. 2008)). "Where conflict exists between the allegations in the complaint and evidence outside the pleadings, the court 'must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff.'" *Capital Corp. Merch. Banking, Inc. v. Corp. Colocation, Inc.*, No. 6:07-cv-1626-Orl-19KRS, 2008 WL 4058014, at *1 (quoting *Wai*, 315 F. Supp. 2d 1261, 1268 (S.D. Fla. 2004)).

Typically, venue for civil actions in federal courts is governed by 28 U.S.C. § 1391, "except as otherwise provided by law." 28 U.S.C. § 1391(a). In actions against the United States, including agencies or officers, venue is proper "in any judicial district in which (A) a defendant in the action resides, (B) a substantial part

10

of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1). For venue purposes, a federal agency or officer resides where it "performs its official duties." *Brahim v. Holder*, No. 13-23275-CIV, 2014 WL 2918598, at *2 (S.D. Fla. June 26, 2014); *A.J. Taft Coal Co. v. Barnhart*, 291 F. Supp. 2d 1290, 1307 (N.D. Ala. 2003).

Generally speaking, improper venue is a waivable defense. Fed. R. Civ. P. 12(h)(1). "In a typical waiver scenario" this defense is abandoned when a defendant fails to raise it in either a responsive pleading or a Rule 12 motion. *Matthews v. Brookstone Stores, Inc.*, 431 F. Supp. 2d 1219, 1223 (S.D. Ala. 2006) (citing *Stubbs v. Wyndham Nassau Resort and Crystal Palace Casino*, 447 F.3d 1357, 1364 (11th Cir. 2006)); *Lipofsky v. N.Y. State Workers Comp. Bd.*, 861 F.2d 1257, 1258 (11th Cir. 1988)). However, a defendant may also waive an improper venue defense "by express waiver, by conduct amounting to waiver as a matter of law, or by failure to interpose a timely and sufficient objection." *United States for use and benefit of NetPlanner Sys. v. GSC Constr., Inc.*, No. 4:16-CV-150 (CDL), 2017 WL 3000027, at *1 (M.D. Ga. Apr. 3, 2017) (citing *Manley v. Engram*, 755 F.2d 1463, 1488 (11th Cir. 1985)).

Here, Defendants expressly assent to venue in this district in their briefing. (*See* Doc. 24 at 5 (noting that "Defendants, therefore, do not contend that venue in

11

this judicial district is improper for the Plaintiffs located in Georgia" even though

six Plaintiffs are located outside of this judicial district)). Defendants reiterated this

during the April 24 hearing when they stated: "In this case, we've not opposed to

having anyone that's within the state . . . Everyone within a state would logically

be . . . grouped together for venue purposes." As such, the Court finds that venue

in the Northern District of Georgia is proper.[7]

---

[7] In the absence of Defendants' waiver of venue, the Court would have still determined that venue was proper in this district pursuant to 28 U.S.C. § 1391(e)(1)(B), which permits a civil action in which a defendant is an officer or employee of the United States where "a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(e)(1)(B). Transactional venue under 28 U.S.C. § 1391(e)(1)(B) is assessed as it is in the general venue statute, 28 U.S.C. § 1391(b)(2). *E.V. v. Robinson*, 200 F. Supp. 3d 108, 113 n.2 (D.D.C. 2016) ("Because § 1391(e)(1)(B) is identical to 28 U.S.C. § 1391(b)(2), cases construing that general venue provision are 'helpful in construing this provision.'"(quoting 14D Charles Alan Wright et al., Federal Practice and Procedure § 3815 (4th ed. 2013))). The Eleventh Circuit has explained that "[o]nly the events that directly [gave] rise to [the] claim [were] relevant. And of the places where the events [took] place, only those locations hosting a 'substantial part' of the events [were] to be considered." *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371 (11th Cir. 2003). The events considered relevant are only those acts and omissions that have a close nexus to the wrong. *Id.* at 1372. The Eleventh Circuit underscored that the inquiry should "focus on relevant activities of the defendant, not of the plaintiff." *Id.* at 1371–72.

In this case, Plaintiffs assert causes of action for violations of the Fifth Amendment to the United States Constitution and the Administrative Procedure Act stemming from the termination of their SEVIS records. Plaintiffs argue that because SEVIS terminations were communicated through Georgia-based DSOs and because Defendants notified some DSOs of the terminations, a substantial part of the events giving rise to the claims took place in this district. Defendants devote little time to rebutting Plaintiffs' claim that a substantial part of the events or omissions giving rise to Plaintiffs' claim occurred in Georgia. And when asked by the Court where the events giving rise to Plaintiffs' claims took place, Defendants could not

The Court also finds that permissive joinder of the remaining non-Georgia Plaintiffs is appropriate because Plaintiffs assert claims that arise out of a series of transactions common to the action of the parties where venue is proper with this Court. Fed. R. Civ. P. 20. A party seeking joinder of claimants under Rule 20 must establish two prerequisites: 1) a right to relief arising out of the same transaction or occurrence, or series of transactions or occurrences, and 2) some questions of law or fact common to all persons seeking to be joined. Fed. R. Civ. P. 20(a). The Eleventh Circuit has explained that the central purpose of Rule 20 is to promote trial convenience and expedite the resolution of disputes, thereby eliminating unnecessary lawsuits. *Alexander v. Fulton Cnty.*, 207 F.3d 1303, 1323 (11th Cir. 2000), *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003). Additionally, the Supreme Court has instructed lower courts to employ a liberal approach to permissive joinder of claims and parties in the interest of judicial economy: "Under the Rules, the impulse is towards entertaining the broadest

---

provide an answer because Defendants do not know. Therefore, venue is proper pursuant to 28 U.S.C. § 1391(e)(1)(B).

Finally, Defendants' reliance on the recent decision from the District Court for the Western District of Wisconsin is misplaced. There, the court explained that plaintiffs included no facts to show that venue was proper for the claims brought, which, as explained above, is not the case here. *See Isserdasani v. Noem*, No. 3:25-CV-283, 2025 WL 1118626, at *4 (W.D. Wisc. Apr. 15, 2025). There is ample evidence from Plaintiffs that a substantial part of Defendants' actions giving rise to their claims took place in this district. Thus, venue would be proper even without Defendants' express waiver.

13

possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." *Id.* (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 724 (1966)).

To determine whether Plaintiffs' claims arise out of the same series of transactions under Rule 20(a)(1)(A), the Court applies the "logical relationship" test. *Alexander*, 207 F.3d at 1323. There is a logical relationship among claims where "the same operative facts serve as the basis" for the joined claims. *Republic Health Corp. v. Lifemark Hosps. of Fla., Inc.*, 755 F.2d 1453, 1455 (11th Cir. 1985). Here, as the basis for their claims, Plaintiffs challenge Defendants' systemic termination of their SEVIS records in April 2025. These terminations were all executed through the same DHS system (SEVIS) and used nearly identical and vague termination statements, indicating a uniform administrative action instead of individualized determinations tailored to each student. The uniformity and timing of these actions demonstrate that Plaintiffs' claims stem from a common series of transactions or occurrences.[8] Therefore, the Court finds that Plaintiffs have satisfied the first prong for permissive joinder under Rule 20(a)(1)(A).

---

[8] In fact, the Court has learned through public hearings in a related case that the actions taken by Defendants in this case can be traced to a single department action, overseen by Andre Watson, an official with ICE's Counter Thread Lead Development Unit. The initiative, dubbed by immigration officials as the "Student Criminal Alien Initiative," describes a process by which 10 to 20 ICE officials ran 1.3 million names of foreign students through the National Crime Information Center ("NCIC"), a federal database that tracks criminal histories, missing

Rule 20(a)(1)(B) "does not require that *all* questions of law and fact be raised by the dispute be common." *Alexander*, 207 F.3d at 1324. Thus, claims are properly joined so long as they present "*any* question of law or fact common to all plaintiffs." Fed. R. Civ. P. 20(a)(1)(B) (emphasis added). Here, all Plaintiffs argue that their SEVIS records were terminated without individualized notice or process. Further, all Plaintiffs contest whether Defendants had the authority to terminate their SEVIS record without prior notice, whether visa revocation alone justified such termination, and whether due process protections apply to these actions. And the requested relief—reinstatement of the SEVIS record—is also commonly shared.

Defendants cite a number of cases to dispute the propriety of joinder. *See Parson v. Allstate Ins. Co.*, No. 22-cv-3962, 2023 WL 4999900, at *4 (N.D. Ill. Aug 4, 2023); *Ahmad v. Keisler*, 1:07-CV-2760-CC, 2008 WL 11337699 (N.D. Ga. July 21, 2008); *Sanders v. Callender*, No. DKC 17-1721, 2018 WL 337756, at *13 (D. Md. Jan. 9, 2018); *Ahmed v. Miller*, 452 F. Supp. 3d 721, 726 (E.D. Mich. 2021). These cases,

---

persons, and other brushes with the law, over the course of two to three weeks. The search returned an estimated 6,400 names, which were exchanged with the State Department. ICE testified to using this data to terminate the students' records in SEVIS. Kyle Cheney and Josh Gerstein, *Feds reveal how immigration squad targeted thousands of foreign students*, Politico (April 29, 2025 8:15 PM), https://www.politico.com/news/2025/04/29/immigration-foreign-students-00317437.

however, are easily distinguishable. For example, in *Ahmad v. Keisler*, the plaintiffs,

lawful permanent residents from Iraq, sought to have the court adjudicate their

naturalization applications and grant them United States citizenship because of

the defendants' delay. *Ahmad*, 2008 WL 11337699, at *1. In ordering some of the

plaintiffs' claims to be severed, the court explained that "the length of the delays

and the reasons for the delays associated with the [] Plaintiffs' naturalization

applications do not appear to be the same." *Id.* at *2. As such, joinder of plaintiffs

in that action was not proper.

Similarly, in *Ahmed v. Miller*, plaintiffs challenged the delays and denials of

their visa applications for I-130 petitioning relatives in a consular office in Yemen.

*Ahmed*, 452 F. Supp. 3d at 723. There, the court explained that although "the

plaintiffs identified an issue that is common to their claims, [] each plaintiff family

has a separate case to plead." *Id.* at 728. Specifically, the court found that each

group's claim will stand or fall on each one's individual circumstances and as such

would "do very little to secure the just, speedy, and inexpensive determination of

each plaintiff's individual claim." *Id.* (internal quotations omitted).

Conversely, Plaintiffs' claims here stem from a seemingly uniform action

taken by Defendants without individualized notice, affecting their academic

standing and immigration status. (Doc. 28 at 11). Plaintiffs' experiences present

common legal questions such as the legality of Defendants' actions and the

16

applicability of due process protections. Thus, joinder under Rule 20 is proper and promotes judicial efficiency.

## III.  Preliminary Injunction

The standard for obtaining a TRO is identical to that of obtaining a preliminary injunction. *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1332 (N.D. Ga. 2018) (citing *Windsor v. United States*, 379 F. App'x 912, 916–17 (11th Cir. 2010)). Therefore, to convert the TRO into a preliminary injunction, Plaintiffs, as the moving party, must establish that they have a: (1) substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs the damage to the opposing party; and (4) that granting the injunction would not be adverse to the public interest. *Id*. (citing *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003)). The balance-of-the-harms and public interest elements merge when the government is the party opposing the injunctive relief. *Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020).

### A.  Likelihood of Success on the Merits

The Eleventh Circuit instructs district courts to consider the question of whether a plaintiff has a substantial likelihood of success on the merits as "generally the most important" factor in the analysis. *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005). "A substantial likelihood of success

on the merits requires a showing of only *likely* or probable, rather than *certain*, success." *Id.* Plaintiffs claim that Defendants' termination of their SEVIS record was unlawful for multiple reasons. First, it constitutes agency action not in accordance with law and in excess of statutory authority under the Administrative Procedure Act (Count 1); second, it violates the Due Process Clause of the Fifth Amendment to the Constitution (Count 2); third, it violates the APA by infringing upon constitutional rights protected by the Fifth Amendment (Count 3); and fourth, it is arbitrary and capricious under administrative law (Count 4). (*See* Doc. 19-1 at 67).

The Court finds that based on the allegations in the Amended Complaint and the specific facts in Plaintiffs' 133 declarations, Plaintiffs have demonstrated a substantial likelihood of success on the merits of their claim in Counts 1 and 4: that Defendants' termination of the SEVIS registration exceeds the bounds of statutory and regulatory authority and is therefore unlawful under 5 U.S.C. § 706(2)(A), (C), and (D). The Court makes no findings as to Plaintiffs' other claims.

### 1. SEVIS Record Termination is Final Agency Action

According to the APA, "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704. For agency action to be deemed final, it must "mark the consummation of the agency's decision-making process" and "the action must be one by which rights or

18

obligations have been determined or from which legal consequences will flow."
*Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Though Defendants argue that there
"are no legal consequences to the termination of a SEVIS record," that is not borne
out by the evidence before the Court. (Doc. 16 at 12).

Plaintiffs provided the Declaration of Nusha Shishegar, a Primary
Designated School Official, as supplemental evidence. (Doc. 31-1). In the
Declaration, Ms. Shishegar explained that the termination of SEVIS has several
consequences, legal or otherwise, for F-1 students. (*Id.*). For example, if SEVIS is
terminated due to any violation of status, the student must either apply for
reinstatement or the student and dependents must leave the United States
immediately. (*Id.* ¶ 13). In addition, USCIS will not approve an OPT employment
authorization document (EAD) if a SEVIS record is terminated. (*Id.* ¶ 11).[9]

Further, "there is no statutory or regulatory requirement that a student seek
reinstatement" of student status in SEVIS, and even if a student attempts to pursue
the administrative procedure for SEVIS reinstatement, there is no mechanism to
review the propriety of the original termination. *Jie Fang*, 935 F.3d at 182; *see* C.F.R.
§ 214.2(f)(16)(ii) ("The adjudicating officer will update SEVIS to reflect USCIS'
decision. If USCIS does not reinstate the student, the student may not appeal the

---

[9] *See also* Department of Homeland Security, *Study in the States*,
https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-
and-terminations/terminate-a-student (last visited May 1, 2025).

decision."). Therefore, the termination of Plaintiffs' SEVIS record was not "of merely tentative or interlocutory nature," but rather a unilateral determination with immediate legal consequences over which Plaintiffs have no ability to seek administrative review. *Bennett*, 520 U.S. at 177–78. Accordingly, termination of the SEVIS registration constitutes a final decision reviewable under the APA. *See Jie Fang*, 935 F.3d at 182 ("The order terminating these students' F-1 visas marked the consummation of the agency's decisionmaking process, and is therefore a final order[.]").

### 2. The Privacy Act Does Not Apply

In their opposition, Defendants argue that although the APA generally waives the government's immunity, that waiver is not applicable here. (Doc. 16 at 6). Specifically, Defendants point to APA section 702, which "preserves 'other limitations on judicial review' and does not 'confer[] authority to grant relief if any other statute . . . expressly or impliedly forbids the relief which is sought.'" (Doc. 16 at 6–7 (citing *Cohen v. United States*, 650 F.3d 717, 724–25 (D.C. Cir. 2011))). Although Plaintiffs have not asserted a claim under the Privacy Act, Defendants contend that Plaintiffs' claims "clearly" implicate the Privacy Act, and that the Privacy Act provides an alternative, adequate remedy to the APA. (*Id.*).

However, Plaintiffs are not merely seeking to correct a factual error in their SEVIS records. *See Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42,

20

63 (2024) (explaining that the Privacy Act was passed "to protect the privacy of individuals identified in federal information systems" and "addresses the government's retention and disclosure of personal information" while allowing "individuals to seek a court order requiring it to correct its records"). Plaintiffs allege that DHS unlawfully terminated their F-1 student status by terminating their SEVIS records for an improper reason. Their allegations challenging DHS's action go well beyond seeking to correct a record that is "inaccurate, irrelevant, untimely or incomplete." *See* 5 U.S.C. § 552a(d)(2)(B). Plaintiffs are instead challenging the decision that led to the unlawful termination of their SEVIS records.

Even if there is some overlap, the United States Supreme Court has stated that "we approach federal statutes touching on the same topic with a 'strong presumption' they can exist harmoniously" and "[o]nly by carrying a 'heavy burden' can a party convince us that one statute 'displaces' a second." *Kirtz*, 601 U.S. at 63. Relying on *Kirtz*, one appellate court has determined that the "availability of a Privacy Act suit . . . does not take [the] case[] outside the scope of the waiver of sovereign immunity in § 702 of the APA and does not affect this Court's subject-matter jurisdiction over Plaintiffs' APA claims." *All. for Retired Ams. v. Bessent*, No. CV 25-0313 (CKK), 2025 WL 740401, at *19 (D.D.C. Mar. 7,

2025). Therefore, the Court agrees with Plaintiffs that Defendants' argument that the Privacy Act supplants their APA claims is a red herring.

Moreover, as Defendants point out, Plaintiffs do not have the ability to seek relief under the Privacy Act. (Doc. 16 at 8). The Privacy Act provides that an "individual" is "a citizen of the United States or an alien lawfully admitted for permanent residence." (*Id.* (citing 5 U.S.C. § 552a(a)(2))), but Plaintiffs are neither U.S. citizens nor lawful permanent residents, and therefore fall outside of the purview of the Privacy Act. Without more authority, the Court declines to find that the only statute Plaintiffs can use to seek relief is one that they are not covered by.

Finally, the relief available under the Privacy Act is actual damages. *Williams v. U.S. Citizenship & Immigr. Servs.*, No. 23-cv-61124, 2023 WL 8079947, at *6 (S.D. Fla. Nov. 21, 2023) (quoting *Stewart v. Kendall*, 578 F. Supp. 3d 18, 23 (D.D.C. 2022)); *FAA v. Cooper*, 566 U.S. 284, 298 (2012). Plaintiffs' Complaint seeks only declaratory and injunctive relief. (Doc. 11 at 67–68). As such, Defendants' argument that Plaintiffs can't seek relief under the APA fails.

### 3. The SEVIS Terminations Were Arbitrary and Capricious and Not in Accordance with the Law

Finally, because Defendants argue that the SEVIS terminations did not constitute final agency action, they fail to address Plaintiffs' substantive claim regarding whether DHS's act of terminating their record was actually "arbitrary,

22

capricious, an abuse of discretion, or otherwise not in accordance with the law." §
706(2)(A).

Agency action is considered arbitrary and capricious if "the agency has
relied on factors which Congress has not intended it to consider, entirely failed to
consider an important aspect of the problem, offered an explanation for its
decision that runs counter to the evidence before the agency, or is so implausible
that it could not be ascribed to a difference in view or the product of agency
expertise." *Motor Vehicle Mfrs. Ass'n of U.S, Inc. v. State Farm Mut. Auto Ins. Co.*, 463
U.S. 29, 43 (1983). "The 'arbitrary-and-capricious standard' requires that agency
action be reasonable and reasonably explained.'" *Bidi Vapor LLC v. FDA*, 47 F.4th
1191, 1202 (11th Cir. 2022) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414,
423 (2021)). "It follows that agency action is lawful only if it rests 'on a
consideration of the relevant factors.'" *Michigan v. EPA*, 576 U.S. 743, 750 (2015)
(quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).

Defendants have had ample opportunity to provide the Court with
additional information about the SEVIS terminations but have consistently failed
to do so. In the two hearings the Court has had to address this issue, Defendants
have not been able to articulate, clearly or otherwise, any reason why Plaintiffs'
SEVIS records were terminated beyond the vague language provided in the notice
given through SEVP. When asked whether Defendants could provide the Court

23

with any additional information about what actually happened with Plaintiffs'

SEVIS records, Defendants conceded that they could not complete the necessary

factfinding to determine what took place as to each individual Plaintiff, or even as

to the entire group of Plaintiffs. Further, Defendants' briefing fails to identify any

regulation to support DHS's ability to terminate Plaintiffs' SEVIS record in the

manner it was done here.

Defendants have altogether failed to suggest any lawful grounds for

termination of Plaintiffs' SEVIS record. *Motor Vehicle Mfrs.*, 463 U.S. at 50.

Defendants' failure to provide a single plausibly lawful explanation for its action

is the exact circumstance contemplated by the arbitrary and capricious standard.

*Id.* Accordingly, Plaintiffs are likely to prevail on the claim that the agency action

is arbitrary and capricious for failing to articulate a satisfactory explanation for its

action including a rational connection between the facts found and the choice

made. *Id.* at 43.

The Court concludes that Plaintiffs are likely to show that DHS's authority

to terminate F-1 student status is narrowly circumscribed by regulation to three

circumstances: by the revocation of a waiver authorized on his or her behalf under

section 212(d)(3) or (4) of the Act; by the introduction of a private bill to confer

permanent resident status on such alien; or, pursuant to notification in the Federal

Register, on the basis of national security, diplomatic, or public safety reasons. 8

C.F.R. § 214.1(d); *see also Jie Fang*, 935 F.3d at 185 n.100 (explaining that the ability to terminate F-1 status is limited by § 214.1(d)). And since none of those conditions are applicable here, Plaintiffs are likely to show that Defendants' termination of their SEVIS records and F-1 status was not in compliance with 8 C.F.R. § 214.1(d) and was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A).

### B. Substantial Threat of Irreparable Injury

Plaintiffs must establish there is a threat of irreparable harm if injunctive relief is not granted, and that such harm is "harm that could not be sufficiently compensated by money damages or avoided by a later decision on the merits." *Canon, Inc. v. GCC Int'l, Ltd.*, 263 F. App'x 57, 62 (Fed. Cir. 2008).

Given the number of Plaintiffs, the Court will not include a description of each harm described by Plaintiffs in the Amended Complaint and the declarations accompanying the Amended TRO Motion. (*See* Docs. 11, 19). Nonetheless, Plaintiffs have demonstrated that they face several forms of irreparable harm in the absence of temporary relief. Plaintiffs declare that as a result of the SEVIS terminations, they will lose scholarships, career opportunities, research grants, access to education, and the ability to apply for OPT. (*See* Doc. 4-2). Plaintiffs fear that they will abruptly have to leave behind family, cancel marriage plans, and abandon their communities in order to avoid detention or being labeled a national

security or foreign policy threat. Many Plaintiffs are mere weeks away from attaining their degrees. (Doc. 4-2 at 34, 40). The loss of timely academic progress alone is sufficient to establish irreparable harm. Additionally, all Plaintiffs report high levels of stress and anxiety resulting from the uncertainty around their futures. If Plaintiffs cannot work or study, they cannot remain in the United States legally and will therefore be subjected to removal proceedings or forced to return to their native countries on their own.

Plaintiffs' fears are not speculative, as DHS's own public-facing guidance states that a person whose SEVIS record is terminated faces the following consequences: "loses all on- and/or off-campus employment authorization," the student "cannot re-enter the United States on the terminated SEVIS record," "Immigration and Customs Enforcement (ICE) agents may investigate to confirm the departure of the student," and "[a]ny associated F-2 or M-2 dependent records are terminated."[10]

In addition, Plaintiffs have shown that as a result of the termination of their SEVIS records, they will be unable to continue their classes, research programs, and/or Ph.D. programs. This threat to Plaintiffs' ability to complete their degrees cannot be redressed and constitutes irreparable harm in light of the facts in this

---

[10] *See* Dep't of Homeland Security, *SEVIS Help Hub: Terminate A Student*, https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/terminate-a-student (last visited May 1, 2025).

case. *See Gegas v. St. Matthew's Univ. School of Med.*, No. 6:22-cv-2299-PGB-EJK, 2023 WL 6294410, at *5 (M.D. Fla. Sept. 4, 2023) (collecting cases where various courts have found that a forced delay in graduation can demonstrate irreparable harm); *Doe v. Noem*, No. 2:25-CV-00633-DGE, 2025 WL 1141279, at *8 (W.D. Wash. Apr. 17, 2025) (finding that the plaintiff had demonstrated that he would suffer irreparable harm absent injunction because he "is currently unable to continue in his academic work, and should that persist, he faces loss of grants and an inability to complete his degree."); *Liu v. Noem*, No. 25-cv-133-SE, 2025 WL 1233892, at *11 (D.N.H. Apr. 29, 2025) (finding that plaintiff's "inability to continue his research because of DHS's termination of F-1 status" has significant and irreparable consequences for his academic trajectory and thus constitutes irreparable harm).

Some courts have specifically held that loss of opportunity to participate in post-secondary education programs is an irreparable harm. *See Maria v. Loyola Univ. of Chi. Strict Sch. Of Med.*, No. 24 C 1698, 2025 WL 96482, at *8 (N.D. Ill. Jan. 14, 2025) (accepting that loss of opportunity to participate in psychiatry residency is an irreparable harm, but denying injunction on other grounds); *Lujan v. U.S. Dep't of Educ.*, 664 F. Supp. 3d 701, 721 (W.D. Tex. 2023) (finding that erroneous loss of even one point on Fulbright scholarship application grading would be an irreparable harm, due to loss of opportunity to obtain scholarship). Under these unique circumstances where Plaintiffs' continued work and lawful immigration

status are interlinked, the prospect of Plaintiffs losing their grant-funded work as doctoral candidates or otherwise are likewise irreparable. *Doe*, 2025 WL 1141279, at *7 (citing *Karakozova v. Univ. of Pittsburgh*, No. 09CV0458, 2009 WL 1652469, at *4 (W.D. Pa. June 11, 2009) for the proposition that a research assistant on an H-1B visa could show irreparable harm from loss of position due to its link to her immigration status).

Further, the evidence establishes that Plaintiffs have suffered and will continue to suffer significant monetary losses, including loss of scholarships traceable to the termination of their SEVIS records, that are not recoverable, which constitutes irreparable harm. *See Georgia v. President of the United States*, 46 F.4th 1283, 1302 (11th Cir. 2022) (stating that "unrecoverable monetary loss is an irreparable harm"); *Alabama v. U.S. Sec'y of Educ.* No. 24-12444, 2024 WL 3981994, at *4 (11th Cir. Aug. 22, 2024) (same). Further, economic losses such as Plaintiffs' can be considered irreparable harm because there are no adequate remedies at law to recover for their damages. *See, e.g.*, *Chef Time 1520 LLC v. Small Bus. Admin.*, 646 F. Supp. 3d 101, 115–16 (D.D.C. 2022) (collecting cases supporting the conclusion that the lack of availability of money damages for APA claims weighs in favor of a finding of irreparable harm); *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 52 (D.D.C. 2011) ("[I]f a movant seeking a preliminary injunction will be unable to sue to recover any monetary damages against a government agency in the future

because of, among other things, sovereign immunity, financial loss can constitute irreparable injury." (quotations omitted)).

Finally, Plaintiffs will accrue unlawful presence as long as they lack lawful F-1 status and face possible detention or deportation as a result.[11] (Doc. 19-1 at 72). Once it reaches a certain point, unlawful presence time will bar future admission and re-entry to the United States. *See* 8 U.S.C. § 1182(a)(9)(B). Other courts have found that the accrual of unlawful presence time under these circumstances is an irreparable harm because it may subject a person to lengthy re-entry bars that are not judicially reviewable. *Doe*, 2025 WL 1141279, at *8 (collecting cases).

These harms could not be sufficiently compensated with monetary damages or avoided by a later decision on the merits. *See Isserdasani*, 2025 WL 1118626, at *6 (granting a motion for a temporary restraining order on an APA claim based on the termination of an F-1 international student's record in SEVIS); *Roe v. Noem*, No. 25-40-BU-DLC, 2025 WL 1114694, at *4 (D. Mont. Apr. 15, 2025) (same);

---

[11] In related cases, Government defendants have taken the position that individuals with F-1 status are not out of status once the SEVIS record has been terminated. However, as described previously, the Government's own website states that there is no grace period for individuals who are out of status. *See* Dep't of Homeland Security, *SEVIS Help Hub: Terminate A Student*, https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/terminate-a-student (last visited May 1, 2025). Though it may not be the policy of Defendants at this moment to consider a nonimmigrant with a terminated SEVIS record unlawfully present, policies change. The Court cannot say with certainty that absent the restoration of the SEVIS records, the Plaintiffs would not be accruing unlawful presence.

*Ratsantiboon v. Noem*, No. 25-CV-01315, 2025 WL 1118645, at *3 (D. Minn. Apr. 15, 2025) (same); *Hinge v. Lyons*, No. 25-1097, 2025 WL 1134966, at *6 (D.D.C. Apr. 15, 2025) (same); *Liu*, 2025 WL 1233892, at *10 (same).

The Court is aware of the public filings in other SEVIS cases that ICE announced a new policy generally applicable to F-1 nonimmigrant students and their SEVIS records. *See Liu*, 2025 WL 1233892, at *2. As a result of this new policy, the Court held a telephone conference on April 30, 2025 to determine whether Plaintiffs' concerns were now moot. During the conference, Defendants took the position that the policy was not final, and thus it was not clear the effect the policy would have on the Plaintiffs in this case.[12] As such, Plaintiffs concerns are not moot, and they still face a real threat of irreparable harm.

## C.   Balance of Harms and Public Interest

The third and fourth preliminary injunction requirements—that the threatened injury to the movant outweighs any harm to the non-movant and that an injunction is not adverse to the public interest—merge when, as here, the government is the party opposing the motion. *Koe v. Noggle*, 688 F. Supp. 3d 1321, 1358 (N.D. Ga. 2023) (citing *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020)). "The third element" of that analysis "looks to the competing claims of injury,

---

[12] At a previous hearing Defendants suggested that policies do not confer the same rights as law and regulations do. The Court appreciates that Defendants did not rely on this new policy to argue otherwise.

requiring the court to consider the effect on each party of the granting or the withholding of the requested relief." *De La Fuente v. Merrill*, 214 F. Supp. 3d 1241, 1249 (M.D. Ala. 2016) (quoting *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 24 (2008)) (internal quotations omitted).

For the reasons set forth above, Plaintiffs have satisfied both factors. First, the balance of harms weigh in Plaintiffs' favor. Plaintiffs stand to lose their lawful status, access to education, and future career prospects. By contrast, the temporary nature of the requested relief poses minimal harm to Defendants. Defendants assert that SEVIS does not control or even necessarily reflect whether a student has lawful nonimmigrant status. (Doc. 16 at 2). If that is so, then restoring Plaintiffs to the status quo before their SEVIS records were terminated has no effect on the Executive's "control over immigration," Defendants' only stated harm. (*Id.* (citing *El Rescate Legal Servs., Inc. v. Exec. Off. of Immigr. Review*, 959 F.2d 742, 750 (9th Cir. 1992)). Considering the record evidence as discussed in the previous sections of this Order, the Court determines that the imminent risk of irreparable harm to Plaintiffs flowing from the termination of their SEVIS records outweigh any harm Defendants will experience from the preliminary injunction.

Plaintiffs have repeatedly emphasized that they are not seeking to limit the Executive's power; instead, they are asking Defendants to exercise that power in accordance with their own laws and regulations. And the Court agrees that there

31

is substantial public interest in ensuring government agencies abide by federal laws even when they are pursuing their prerogatives. *See Kansas v. U.S. Dep't of Labor*, 749 F. Supp. 3d 1363, 1380 (S.D. Ga. Aug. 26, 2024) (citing *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022)); *see also Florida v. Dep't of Health and Hum. Servs.*, 19 F.4th 1271, 1315 (11th Cir. 2021) (Lagoa, J., dissenting) ("[T]here is no public interest in the perpetuation of unlawful agency action. To the contrary, there is substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016))).

Lastly, the Court addresses Defendants' argument that Plaintiffs are "not seeking a prohibitory injunction to preserve the status quo," but are "instead seek[ing] a mandatory injunction to order DHS to reverse its termination of Plaintiff's SEVIS record." (Doc. 16 at 2). Courts have long held that the status quo for the purposes of considering a temporary restraining order or preliminary injunction refers to the last peaceable uncontested status existing between the parties before the dispute developed. *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) ("If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, by the issuance of a mandatory injunction, or by allowing the parties to take

proposed action that the court finds will minimize the irreparable injury."
(citations omitted));[13] *see also Nutra Health, Inc. v. HD Holdings Atlanta, Inc.*, No.
1:19-cv-05199-RDC, 2021 WL 5029427, at *2 (N.D. Ga. June 29, 2021) (citing *O
Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir.
2004) for the proposition that "[s]tatus quo does not mean the situation existing at
the moment the lawsuit is filed, but the last peaceable uncontested status existing
between the parties before the dispute developed.").

Accordingly, the Court concludes that all four factors favor granting
Plaintiffs' request for a preliminary injunction.

## D.    Security

Finally, the Court exercises its discretion to waive the bond requirement set
forth in Rule 65(c) of the Federal Rules of Civil Procedure. *BellSouth Telecomms. Inc.
v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005);
*Mama Bears of Forsyth Cnty. v. McCall*, 642 F. Supp. 3d 1338, 1359–61 (N.D. Ga.
2022).

---

[13] The Eleventh Circuit has adopted as binding precedent all of the decisions of the
former Fifth Circuit handed down prior to the close of business on September 30,
1981. *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

## Conclusion

Based on the foregoing, it is **ORDERED** that Plaintiffs' Motion for Temporary Restraining Order and Amended Motion for Temporary Restraining Order (Docs. 4, 19) is **GRANTED** and the TRO is converted into a preliminary injunction.

The Court finds that Plaintiffs are likely to succeed on the merits as to their claims that Defendants violated the APA by acting arbitrary, capriciously, and not in accordance with law by terminating Plaintiffs' SEVIS records. Furthermore, Plaintiffs have demonstrated a substantial threat of irreparable harm. The Court also finds that the balance of harms and the public interest in ensuring Defendants follow the law weigh in favor of injunctive relief.

The Court previously ordered that "Defendants shall reinstate Plaintiffs' student status and SEVIS authorization, retroactive to March 31, 2025." (Doc. 23 at 15). In order to comply, "ICE manually entered a system change comment stating the following: Status changed per court order and ICE direction. Retroactive to March 31, 2025." (Doc. 29 at 1). To maintain Plaintiffs' status quo as lawful nonimmigrants while this case is pending, Defendants are enjoined from unlawfully terminating Plaintiffs' SEVIS records or reversing the reinstatement of Plaintiffs' SEVIS records absent further Court order. To avoid any confusion, the Court notes that this Order does not enjoin Defendants from taking lawful action

34

that could change Plaintiffs' status; the Court only enjoins Defendants from the

unlawful termination of Plaintiffs' SEVIS records.

      **SO ORDERED** this 2nd day of May, 2025.

                             _____

                             Victoria Marie Calvert
                             United States District Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

AARON OLAF ORTEGA GONZALEZ,

               Plaintiff,

    v.

KRISTI NOEM, Secretary of the Department
of Homeland Security; U.S. DEPARTMENT
OF HOMELAND SECURITY; TODD LYONS,
Acting Director of Immigration and Customs
Enforcement ("ICE"); and U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT,

               Defendants.
_____

Case No. 6:25-cv-00622-MC

OPINION AND ORDER

JANE DOE,

               Plaintiff,

    v.

KRISTI NOEM, Secretary of the Department
of Homeland Security; U.S. DEPARTMENT
OF HOMELAND SECURITY; TODD LYONS,
Acting Director of Immigration and Customs
Enforcement ("ICE"); and U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT,

               Defendants.
_____

Case No. 6:25-cv-00632-MC

OPINION AND ORDER

1 – OPINION AND ORDER

MCSHANE, Judge:

Plaintiffs Aaron Olaf Ortega Gonzalez and Jane Doe are international students pursuing graduate degrees at Oregon State University and the University of Oregon, respectively. Plaintiffs allege that Defendants Department of Homeland Security (DHS) and Immigration and Customs Enforcement (ICE) arbitrarily terminated their records in the Student Exchange Visitor Information System (SEVIS), effectively terminating their F-1 student status. Plaintiffs move for preliminary injunctions. Because Plaintiffs have shown that they are likely to suffer irreparable harm absent an injunction, Plaintiffs' motions for preliminary injunction (Case No. 6:25-cv-00622, ECF No. 19 and Case No. 6:25-cv-00632, ECF No. 16) are GRANTED.

## F-1 VISAS AND STUDENT STATUS[1]

The Immigration and Nationality Act allows noncitizens to study in the United States at government-approved academic institutions as F-1 nonimmigrant students. 8 U.S.C. § 1101(a)(15)(F); 8 C.F.R. § 214.1(a)(2). Only academic institutions that have obtained formal approval from DHS may sponsor F-1 students. *See* C.F.R. § 214.3. Each school that sponsors F-1 students has a Designated School Official (DSO) who monitors, advises, and oversees the students. Noncitizen students must apply for a F-1 visa with the United States Department of State. That visa permits entry into the country but does not govern how long a student may stay in the United States.

When students enter the country with an F-1 visa, they are granted "F-1 student status" and they are permitted to remain in the United States for the duration of status so long as they

---

[1] The following tracks, with some alterations, both the content and language of the thorough overview provided in *Madan B. K. v. Noem*, Case No: 1:25-cv-419, 2025 WL 1171572, at *5 (W.D. Mich. Apr. 23, 2025).

2 – OPINION AND ORDER

comply with the rules of the program. 8 C.F.R. § 214.2(f). Generally, students must maintain a full course of study and may only pursue authorized employment, often research or teaching. *Id.* "Duration of status" is defined, in general, as "the time during which an F–1 student is pursuing a full course of study at an educational institution certified by SEVP for attendance by foreign students, or engaging in authorized practical training following completion of studies." 8 C.F.R. § 214.2(f)(5)(i). F-1 students may participate in two kinds of practical training: Curricular Practical Training and Optional Practical Training. 8 C.F.R. § 214.2(f)(10).

The Student and Exchange Visitor Program (SEVP), part of the Department of Homeland Security (DHS), administers the F-1 student program and tracks student information. *See generally* 8 U.S.C. § 1372 (requiring program to collect information). This information is housed in the Student and Exchange Visitor Information System (SEVIS), an internet-based database.

Termination of F-1 student status in SEVIS is governed by the SEVP regulations. Students may fail to maintain status by not complying with the regulatory program requirements of 8 C.F.R. 214.2(f). DSOs at universities must report to SEVP, via SEVIS, when a student fails to maintain status. 8 C.F.R. § 214.3(g)(2).

F-1 students must also abide by the requirements for "maintenance of status" set forth in 8 C.F.R. § 214.1. This includes "obedience to all laws of United States jurisdictions which prohibit the commission of crimes of violence and for which a sentence of more than one year imprisonment may be imposed." 8 C.F.R. § 214.1(g). "A nonimmigrant's conviction in a jurisdiction in the United States for a crime of violence for which a sentence of more than one year imprisonment may be imposed (regardless of whether such sentence is in fact imposed) constitutes a failure to maintain status." *Id.*

3 – OPINION AND ORDER

Further, an agency may terminate a student's F-1 status under 8 C.F.R. § 214.1(d), when (1) a previously granted waiver is revoked, (2) a private bill for permanent resident status is introduced, or (3) after "notification in the Federal Register, on the basis of national security, diplomatic, or public safety reasons." 8 C.F.R. § 214.1(d).

## PROCEDURAL AND FACTUAL BACKGROUND

Mr. Ortega Gonzalez is a wildlife and conservation scientist who has been pursuing his Ph.D. at Oregon State University. Compl. ¶ 2, ECF No. 1 ("Ortega Gonzalez Compl."). [2] He is a Mexican citizen. *Id.* Mr. Ortega Gonzalez completed his undergraduate studies in Mexico and began working in wildlife habitat conservation. *Id.* at ¶ 29. He worked with Sul Ross State University in Alpine, Texas, and was encouraged to pursue his master's degree there. *Id.* at ¶ 30. He applied for an F-1 visa,[3] was approved, and was admitted to the United States in July 2021. *Id.* Mr. Ortega Gonzalez completed his master's in May 2024 and applied to the Ph.D. program at Oregon State University. *Id.* at ¶ 31. In August 2024, he was admitted to the United States[4] as a F-1 nonimmigrant student with OSU. *Id.* Mr. Ortega Gonzalez's doctoral research focuses on the restoration of livestock ranchlands in Oregon that have been impacted by wildfires. *Id.* at ¶ 33. Mr. Ortega Gonzalez also works as a research assistant. *Id.* at ¶ 34. This work is his sole source of income. *Id.*

---

[2] Unless otherwise specified, ECF Nos. in this Opinion & Order refer to the corresponding docket numbers in case 6:25-cv-00622-MC.

[3] In his visa application, Mr. Ortega Gonzalez disclosed that he had previously been denied entry to the United States on a tourist visa in 2014. Ortega Gonzalez Decl. ¶ 2, ECF No. 19-1.

[4] When a student completes their course of study at a university, they have sixty days to either leave the United States or transfer to another institution. If they transfer to another institution, as Mr. Ortega Gonzalez did here, they are authorized to remain in the United States for up to five months while awaiting matriculation at the new institution.

Ms. Doe is pursuing a M.S. in Conflict and Dispute Resolution and a M.A. in Journalism from the University of Oregon. Compl. ¶ 2, Case No. 6:25-cv-00632-MC, ECF No. 1 ("Doe Compl."). She is a citizen of the U.K. *Id.* ¶ 12. Ms. Doe completed her undergraduate studies in the United States, first at Brigham Young University, and then transferring to the University of Nevada Las Vegas in an effort to escape an abusive relationship. *Id.* at ¶ 30. Her previous partner followed her to Las Vegas and, at one point, he called the police to have her arrested. *Id.* Those charges were dismissed. *Id.*

Ms. Doe graduated from UNLV in June 2020. *Id.* at ¶ 31. Although she was approved for Optional Practical Training (OPT) – temporary employment available to F-1 students – she decided to return to the UK and began working as a probation officer with the Ministry of Justice. *Id.*

In 2022, Ms. Doe applied to the master's programs at the University of Oregon and, subsequently, for new student visas. *Id.* at ¶ 32. In the visa application, Ms. Doe did disclose her previous arrest, and she received a visa with no issues. *Id.* She was admitted to the United States in September 2022 to begin her studies. *Id.* at ¶ 33. Ms. Doe has worked as a journalism fellow with a local news outlet, as a tutor to student athletes, and as a teaching assistant in the Sociology Department. *Id.* at ¶ 3. She has also worked in the law library. *Id.*

Plaintiffs allege that on April 4, 2025, Defendants terminated Plaintiffs' F-1 student status in SEVIS with no notice or meaningful explanation. Ortega Gonzalez Compl. ¶ 3; Doe Compl. ¶ 4.

Mr. Ortega Gonzalez learned of the termination on April 7, 2025, when OSU's Office of International Services emailed him to tell him that his SEVIS record had been terminated. Ortega

5 – OPINION AND ORDER

Gonzalez Compl. ¶ 35. OSU had not been notified of the termination by Defendants – the University discovered the termination during a routine audit of the SEVP program. *Id.* The termination reason given was "individual identified in criminal records check and/or has had their VISA revoked. SEVIS record terminated." *Id.* at ¶ 36. Mr. Ortega Gonzalez has never been charged with a crime, let alone convicted. *Id.* at ¶ 37.

Ms. Doe learned of the termination on April 5, 2025, when the University of Oregon's Director of International Services emailed her to inform her that her SEVIS student status had been terminated. Doe Compl. ¶ 34. The reason given was: "OTHERWISE FAILING TO MAINTAIN STATUS – Individual identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated." *Id.* The University had not received any prior notice of the termination. *Id.* In the email, the University stated it was "obligated" to inform Ms. Doe that she had 15 days to leave the United States. Id. Ms. Doe has never been convicted of a crime, not even a traffic infraction. *Id.* at ¶ 35. While she was arrested previously, those charges were dismissed. *Id.*

When Plaintiffs' status was terminated, they lost their work authorization and could no longer continue their studies. Ortega Gonzalez Compl. ¶ 39; Doe Compl. ¶ 37. Mr. Ortega Gonzalez had to pause his research, causing him to miss important data collections. Ms. Doe was unable to attend a class trip to Washington D.C. that was related to her thesis about the intersection of conflict resolution and communication frameworks that enhance civic engagement. Doe Compl. ¶ 38.

Plaintiffs filed these lawsuits and moved for temporary restraining orders. On April 21, 2025, following a hearing, this Court granted the motions for temporary restraining orders,

6 – OPINION AND ORDER

ordering Defendants to restore Plaintiffs' SEVIS records and enjoining Defendants from

initiating removal proceedings based on that termination. Min. Proceedings, ECF No. 14.

Plaintiffs' SEVIS records were restored on April 23, 2025. Defs.' Resp. 5, ECF No. 21.

On April 25, ICE began reversing SEVIS terminations for hundreds of other similarly situated

students, due to a "policy change." *Id.*

On April 26, ICE issued a new policy providing guidance on the termination of SEVIS

records. *Id.* Per the new policy, Student Exchange and Visitor Program (SEVP) "can terminate

records for a variety of reasons, including but not limited to the following reasons:

- o Exceeded Unemployment Time
- o Failure to Comply with I-515A
- o Failure to Repay the I-901 Fee Chargeback
- o Failure to Report While on OPT
- o No Show
- o School Withdrawn
- o Violation of Change of Status Requirements
- o Change of Status Approved
- o Evidence of a Failure to Comply with the Terms of Nonimmigrant Status Exists
- o U.S. Department of State Visa Revocation (Effective Immediately)"

Defs.' Resp. Ex. A, ECF No. 21.

Because his status was restored due to the TRO, Mr. Ortega Gonzalez was able to

complete planned repairs on a damaged weather station on April 24 and 25. If he had not been

able to do this, he would have lost another week of data. Pl.'s Mot. Prelim. Inj. 4, ECF No. 19.

Ms. Doe was able to resume her studies and her work as a teaching assistant when

Defendants restored her status. However, she may not be able to graduate in June as expected

and is in the process of reworking her Master's thesis. Pl.'s Mot. Prelim. Inj. 11, Case No. 6:25-

cv-00632-MC, ECF No. 16.

Pursuant to the agreed-upon briefing schedule, Plaintiffs moved for preliminary injunctions on April 28, 2025.

## DISCUSSION

A party seeking a preliminary injunction must establish (1) that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and that (4) an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 129 S. Ct. 365, 374 (2008). When the government is a party, as here, the third and fourth factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). The Court's decision on a motion for a preliminary injunction is not a ruling on the merits. *See Sierra On–Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984).

As a preliminary matter, Defendants argue that the Court lacks jurisdiction because the case is moot. "Circumstances have changed to forestall the preliminary relief Plaintiff seeks. ICE has already restored Plaintiff's SEVIS record. And this change is part of a larger decision by ICE to restore all recently terminated individuals' SEVIS records, including those not subject to a court order. Because Plaintiff has already received the relief he seeks, there is nothing for the Court to enjoin and Plaintiff's request is moot." Defs.' Resp. 7.

However, this case falls squarely within the voluntary cessation doctrine. "A party 'cannot automatically moot a case simply by ending its unlawful conduct once sued,' else it 'could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where [it] left off, repeating this cycle until [it] achieves all [its] unlawful ends.'" *United States v. Sanchez-Gomez*, 584 U.S. 381, 386 (2018) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85,

8 – OPINION AND ORDER

91 (2013)). Voluntary cessation moots a case only if "(1) there is no reasonable expectation that the wrong will be repeated, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Barnes v. Healy*, 980 F.2d 572, 580 (9th Cir. 1992).

In response to lawsuits around the country, Defendants have changed their policy and issued new guidance regarding termination of SEVIS records. *See* Defs.' Resp. Ex. A. However, Defendants' reliance on this "new policy" does not satisfy their "heavy burden" to show mootness based on voluntary cessation. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000). As Plaintiffs argue, this new policy "is substantially the same guidance that has been in place." Pl.'s Reply 3, ECF No. 22. Nothing in the guidance prohibits the allegedly unlawful terminations. Defendants have not shown that there is no reasonable expectation that the wrong will not be repeated; rather, Defendants argue that "[w]hether ICE might . . . terminated Plaintiff's SEVIS record under this new policy presents a hypothetical dispute."[5] Defs.' Resp. 7. "A case is not easily mooted where the government is otherwise unconstrained should it later desire to reenact the offending provision." *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014) (cleaned up).

Although voluntary cessation may not moot a case, it will affect the analysis for a preliminary injunction. *Citizens for Quality Educ. San Diego v. Barrera*, 333 F. Supp. 3d 1003,

---

[5] On May 8, Defendants filed another declaration from Andre Watson, Assistant Director of the National Security Division for Homeland Security Investigations. Second Watson Decl., ECF No. 24-1. The declaration states that "ICE has no plans under its new SEVIS policy to re-terminate the plaintiff(s) SEVIS record based solely on the NCIC record that led to its initial termination." *Id.* at ¶ 6. This declaration does not change the Court's analysis. The terminations were so arbitrary and capricious that the Court finds it capable of repetition.

1028 (S.D. Cal. 2018). "Even where the defendant's voluntary cessation does not moot a claim for injunctive relief, however, we consider cessation of the alleged misconduct in determining whether the plaintiff has carried his burden of demonstrating a likelihood of irreparable harm." *Lofton v. Verizon Wireless (VAW) LLC*, 586 F. App'x 420, 421 (9th Cir. 2014).

A preliminary injunction may only be granted if it is *likely* that there will be irreparable harm. *Winter*, 555 U.S. at 22 (finding the previous Ninth Circuit standard of "possibility" too lenient). This harm cannot be speculative. *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) (citing *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988)). Plaintiffs must demonstrate that, in the absence of a preliminary injunction, they are likely to suffer irreparable harm before a decision on the merits could be made. *Id.* at 1023 (9th Cir. 2016) (citing *Winter*).

Plaintiffs argue that it is not speculative to consider this case in the broader context of Defendants' unceasing attempts to remove noncitizens from the country. While Defendants may have walked back the SEVIS terminations because of litigation around the country, they have not repudiated the prior decisions. Plaintiffs argue that under the "new policy," they continue to be at risk of Defendants arbitrarily terminating their student status without notice, subjecting them to irreparable harm.

The Court agrees. Deafening silence has been the only response by the Defendants in explaining, let alone justifying, the actions taken here. The termination of the Plaintiffs' SEVIS status presents as so arbitrary and capricious that the Court finds it impossible to trust that, absent an injunction, Defendants will not terminate Plaintiffs' student status yet again.

If their status were to be terminated again, Plaintiffs would absolutely face irreparable harm. When Mr. Ortega Gonzalez's status was terminated, he lost his work authorization and could no longer continue his research, which depends on regularly collecting data; that data is irreplaceable. Mr. Ortega Gonzalez lost his sole source of income,[6] could not continue his studies, and was "at serious risk of immediate arrest and detention for removal proceedings." Ortega Gonzalez Compl. ¶ 40. Similarly, when Ms. Doe's status was terminated, she lost her work authorization and her sole source of income. She could not continue her studies. Ms. Doe also had a limited window of time to apply for Optional Practical Training, which she could not do without an active SEVIS record. Pl's Mot. Prelim. Inj. 11, Case No: 6:25-cv-00632.

The Court's analysis of the three remaining Winter factors remains the same as in its April 23 Opinions & Orders. Op. & Order, ECF No. 18; Op. & Order, Case No. 6:25-cv-00632, ECF No. 15. Plaintiffs have a shown a likelihood of success on the merits of his Administrative Procedures Act claim (Count 2), which alleges that Defendants unlawfully terminated their F-1 student status in SEVIS.[7] On the record before the Court, where Defendants cannot explain a

---

[6] Defendants have argued that any loss of income is not irreparable harm, as Plaintiff "did represent that he's independently able to support himself in the country." Tr. 13:3-5, ECF No. 17. While it is true that a student's I-20 (Certificate of Eligibility for Nonimmigrant Student Status) must show that the student can support themselves financially, *see* 8 C.F.R. § 214.3(k), that can include, as in Mr. Ortega Gonzalez's case, tuition waivers and funding from the sponsoring institution. Ortega Gonzalez Decl. ¶ 9.

[7] Defendants argue that Plaintiffs' student status was not terminated, but that instead only their SEVIS records were terminated, citing the declaration of Andre Watson, the Assistant Director of the National Security Division for Homeland Security Investigations. Watson Decl., ECF No. 13. The Court notes that the reason given for the termination of both SEVIS records was "OTHERWISE FAILING TO MAINTAIN STATUS - Individual identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated." Doe Compl. ¶ 34; Second Atebe Decl. ¶ 10, ECF No. 19-4. The Court sees no other way to interpret this than as a termination of Plaintiffs' F-1 student status. Further, on this record, the Court does not see the

11 – OPINION AND ORDER

reason for the termination, Plaintiffs are likely to show that the termination of their F-1 student status was not in compliance with 8 C.F.R. § 214.1(d), and was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Finally, the balance of equities weighs in Plaintiffs' favor. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). The public interest also weighs in favor of allowing Mr. Ortega Gonzalez to continue his research on restoration of Oregon rangelands affected by wildfires and Ms. Doe to continue her studies to promote civic engagement, community dialogue, and social cohesion.

Defendants argue that an injunction would unduly burden the public, as the Executive Branch holds the power to administer and enforce immigration laws. Defs.' Resp. 9. However, the Court's injunction should not interfere with Defendants' ability to pursue lawful immigration enforcement actions. *See Castillo v. Barr*, 449 F. Supp. 3d 915, 923 (C.D. Cal. 2020) ("there is

---

distinction between termination of the SEVIS record and termination of the student status. DHS's own website notes:

> When an F-1/M-1 SEVIS record is terminated, the following happens:
> > Student loses all on- and/or off-campus employment authorization.
> > Student cannot re-enter the United States on the terminated SEVIS record.
> > Immigration and Customs Enforcement (ICE) agents may investigate to confirm the departure of the student.
> > Any associated F-2 or M-2 dependent records are terminated.

https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/terminate-a-student; *accord* Second Atebe Decl. ¶ 18 ("It is and has always been the understanding of OSU that all F-1 international students must have an active SEVIS record to remain in valid F-1 status."), ¶ 20 ("Even prior to the March and April 2025 SEVIS terminations, it has always been clear that once an F-1 student's record in SEVIS is terminated, regardless of the reason, that student immediately loses all on- and off-campus employment authorization based on their F-1 nonimmigrant status.").

no harm to the Government when a court prevents the Government from engaging in unlawful practices.").

Finally, the Court waives the bond requirement of Rule 65. *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009).

## **CONCLUSION**

For the reasons set forth above, Plaintiffs' Motions for Preliminary Injunction (Case No. 6:25-cv-00622-MC, ECF No. 19 and Case No. 6:25-cv-00632-MC, ECF No. 16) are GRANTED.

Defendants shall set aside and refrain from enforcing the April 2025 termination determination provided via the Student and Exchange Visitor Information System (SEVIS).

Defendants shall restore and maintain Plaintiffs' SEVIS record for the duration of the litigation absent Defendants' becoming aware of a newly discovered independent legal ground allowing removability.

Defendants shall provide notice to Plaintiffs and this Court of an intent to terminate Plaintiffs' SEVIS status 15 days prior to such termination.

IT IS SO ORDERED.

DATED this 9th day of May, 2025.

/s/ Michael McShane
Michael McShane
United States District Judge

13 – OPINION AND ORDER

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MADAN B K, GERAN GAO, PRANIL
TITARE, KUNZHE SONG, NAGA
MANIKANTA CHIGURUPATI,
AISHWARYA SHRESTHA, SRIKANTH
BOPPUDI, DHANUSH POTHUGUNTA,
HARSHIT GAZIBANDA, NAG IZAAZ
SHAIK, AVINASH KOMMULA, MADHURI
YADAV CHEKUTTY, SHANMUKHA
SRINIVAS RALI, SALAM ALAJAMI, RITA
MAWUENA KPORMEGO, GUANHUA
YAO, AJAY TIMALSINA, DONGFANG JI,
RONIT RAJESH SHETTY, SARJIB KARKI,
TSHAINA MUTAMBA, SARAH QIYU
TAY, ZHENG DONG, SHARANYA
JAVVAJI, SRUJANA PAMIDIMUKKALA,
NIKHIL GAZIBANDA, ESHIKA SINGH,
TEJA SRI KOTIPALLI, MANNRAJ SINGH,
YUMU ZHONG, and MUHAMMAD
SHAHROZ SABIR,

      Plaintiffs,

v.

KRISTI NOEM, et al.,

      Defendants.

_____/

Case No. 1:25-cv-419

HON. JANE M. BECKERING

## OPINION AND ORDER

Plaintiffs are thirty-one international students or recent graduates who, like many others across the nation, abruptly received notice from their educational institutions that the government records used to document their legal nonimmigrant status in the United States had been terminated by the Department of Homeland Security (DHS). This Court issued a Temporary Restraining Order on April 22, 2025 and now turns to Plaintiffs' request for a preliminary injunction (ECF No.

5), which has been fully briefed. The Court also conducted hearings in this matter on April 22, 2025 and May 6, 2025. Upon review of the current record and the written and oral arguments of the parties, the Court grants Plaintiffs' request for a preliminary injunction for the reasons stated on the record and more fully herein.

## I. BACKGROUND

### A. Legal Context

As previously indicated in this Court's Opinion and Order granting temporary injunctive relief (ECF No. 19 at PageID.553–555), several key terms are important to understanding the legal context of this case.

*F-1 & M-1 Visas.* Under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101(a)(15)(F)(i) and (M)(i), a noncitizen can enroll in a government-approved academic institution as an F-1 nonimmigrant student or in a vocational or other recognized nonacademic institution as an M-1 nonimmigrant student. *See* 8 C.F.R. § 214.1(a)(2) (delineating classification designations, including "F-1" and "M-1"). The United States Department of State is the entity charged with issuing F-1 and M-1 nonimmigrant visas to admitted international students. A visa, while a critical document, does not govern how long a student may stay in the United States.

*F-1 & M-1 Status.* Once students enter the United States, they are issued an I-94 Arrival/Departure Record that reflects their F-1 student or M-1 vocational *status*. They are permitted to remain in the United States for their particular duration of status ("D/S"). "Duration of status" is defined, in general, as "the time during which an F-1 student is pursuing a full course of study at an educational institution certified [] for attendance by foreign students, or engaging in authorized practical training following completion of studies[.]" 8 C.F.R. § 214.2(f)(5)(*i*).

2

F-1 students are also entitled to participate in two types of post-completion practical training programs: Curricular Practical Training ("CPT") and Optional Practical Training ("OPT"). *See id.* § 214.2(f)(10)(i) & (ii). Students may also qualify for a "24–month extension of post-completion OPT for a science, technology, engineering, or mathematics (STEM) degree." *Id.* § 214.2(f)(10)(ii)(C). In this regard, "duration of status" is defined as "the period beginning on the date that the student's application for OPT was properly filed and pending approval, including the authorized period of post-completion OPT, and ending 60 days after the OPT employment authorization expires." 8 C.F.R. § 214.2(f)(10)(D).

A student in M-1 nonimmigrant status is admitted for a "fixed time period," which is defined as "the period necessary to complete the course of study indicated [], plus practical training following completion of the course of study, plus an additional 30 days to depart the United States, but not to exceed a total period of one year." 8 C.F.R. § 214.2(m)(5).

***SEVP & SEVIS.*** The United States Immigration and Customs Enforcement ("ICE"), a subagency of DHS, is responsible for the Student and Exchange Visitor Program ("SEVP"), which keeps records on F-1 students. *See generally* 8 U.S.C. § 1372 (requiring the creation of a program to "collect … information"). SEVP manages the Student and Exchange Visitor Information System (SEVIS) system, an internet-based database used to track and document the continuing status of noncitizen students who are authorized to be in the United States to study pursuant to F-1 and M-1 student visas or other study-related visas. Institutions that obtain formal approval from DHS to sponsor F-1 and M-1 students must keep records containing certain information and documents relating to each student. *See generally* 8 C.F.R. § 214.3 (Certification and recertification of schools for enrollment of F and M nonimmigrants), and, more specifically,

§ 214.3(g)(1) (Recordkeeping and reporting requirements). A Designated School Official ("DSO") monitors, advises, and oversees the students attending that institution.

***Termination of Status***. F-1 and M-1 students fail to maintain their particular status when they do not comply with the requirements set forth in the Code of Federal Regulations in 8 C.F.R. § 214.2(f) or § 214.2(m) that govern their particular visa classification. For example, F-1 and M-1 students must maintain a full course of study. *See* §§ 214.2(f)(6) & (m)(9). DSOs must report to SEVP, via SEVIS, when a student fails to maintain status. 8 C.F.R. § 214.3(g)(2) (Reporting changes in student and school information).

The students are also subject to the general requirements for "maintenance of status" set forth in 8 C.F.R. § 214.1 that apply to several nonimmigrant classes, including F-1 and M-1 students. Pertinent to the case at bar is subsection (g), which instructs that a nonimmigrant's admission and continued stay in the United States is also conditioned on "obedience to all laws of United States jurisdictions which prohibit the commission of crimes of violence and for which a sentence of more than one year imprisonment may be imposed." 8 C.F.R. § 214.1(g). "A nonimmigrant's conviction in a jurisdiction in the United States for a crime of violence for which a sentence of more than one year imprisonment may be imposed (regardless of whether such sentence is in fact imposed) constitutes a failure to maintain status[.]" *Id.*

Last, a student's F-1 or M-1 status can also be terminated due to an agency "termination of status." In this regard, subsection (d) provides that "[w]ithin the period of initial admission or extension of stay, the nonimmigrant status of an alien shall be terminated [1] by the revocation of a waiver authorized on his or her behalf under section 212(d)(3) or (4) of the Act; [2] by the introduction of a private bill to confer permanent resident status on such alien; or, [3] pursuant to

4

notification in the Federal Register, on the basis of national security, diplomatic, or public safety reasons."  8 C.F.R. § 214.1(d).

The termination of a student's status can have a cascading effect.  For example, a student's off-campus employment authorization is "automatically terminated whenever the student fails to maintain status."  *Id.* § 214.2(f)(9)(2).  Additionally, during post-completion OPT, F-1 status is dependent upon employment.  In general, OPT students "may not accrue an aggregate of more than 90 days of unemployment during any post-completion OPT period."  *Id.* § 214.2(f)(10)(ii)(E).  Students in STEM-OPT "may not accrue an aggregate of more than 150 days of unemployment during a total OPT period."  *Id.*  Last, per current DHS guidance, a student with a terminated SEVIS record "cannot re-enter the United States," and ICE may "investigate to confirm the departure of the student."  *See* https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/terminate-a-student [https://perma.cc/5C5F-K7HN].

While a student *may* seek reinstatement of her status in SEVIS, a student is not required to do so.  More important, there are no grace periods for F-1 and M-1 students who fail to maintain status to prepare for departure.  *See* 8 C.F.R. § 214.2(f)(5)(iv) ("An F-1 student who has completed a course of study and any authorized practical training following completion of studies will be allowed an additional 60-day period to prepare for departure from the United States or to transfer in accordance with paragraph (f)(8) of this section…. However, an F-1 student who fails to maintain a full course of study without the approval of the DSO or otherwise fails to maintain status is not eligible for an additional period for departure.").  Likewise, "[a]n M-1 student who fails to maintain a full course of study or otherwise fails to maintain status is not eligible for the additional 30-day period of stay."  *Id.* § 214.2(m)(5).

**B. Factual Background**

Plaintiffs Madan B K, Geran Gao, Pranil Titare, Kunzhe Song, Naga Manikanta Chigurupati, Aishwarya Shrestha, Srikanth Boppudi, Dhanush Pothugunta, Harshit Gazibanda, Nag Izaaz Shaik, Avinash Kommula, Madhuri Yadav Chekutty, Shanmukha Srinivas Rali, Salam Alajami, Rita Mawuena Kpormego, Guanhua Yao, Ajay Timalsina, Dongfang Ji, Ronit Rajesh Shetty, Sarjib Karki, Tshaina Mutamba, Sarah Qiyu Tay, Zheng Dong, Sharanya Javvaji, Srujana Pamidimukkala, Nikhil Gazibanda, Eshika Singh, Teja Sri Kotipalli, Mannraj Singh, Yumu Zhong, and Muhammad Shahroz Sabir are F-1 and M-1 nonimmigrants either attending or recently graduated from universities or vocational programs in Michigan, as well as Illinois, Iowa, Missouri, New Hampshire, Ohio, Pennsylvania, Texas, Utah, and Wisconsin.

Plaintiffs Tay and Dong are F-1 undergraduate students (Am. Compl.[1] [ECF No. 22] ¶¶ 42–43). Plaintiff Timalsina is an M-1 vocational student (*id.* ¶ 37). Plaintiffs Titare, Shaik, Gazibanda, and Sabir are F-1 nonimmigrant students pursuing their graduate degrees (Am. Compl. ¶¶ 23, 30, & 46; Joinder [ECF No. 32] ¶ 2). Plaintiffs B K, Gao, Song, Yao, Ji, and Shetty are F-1 nonimmigrant students pursuing their doctoral degrees (Am. Compl. ¶¶ 21–22, 24, & 38–39). Plaintiffs Chigurupati, Boppudi, Chekutty, Alajami, Kpormego, Mutamba, Javvaji, Kotipalli, Eshika Singh, and Mannraj Singh are currently participating in F-1 OPT (*id.* ¶¶ 25, 28, 29, 32, 34–35, 41, 44, & 47–49). Plaintiffs Pothugunta, Shrestha, Kommula, Rali, Karki, Pamidimukkala, and Zhong are currently participating in F-1 STEM OPT (*id.* ¶¶ 26–27, 31, 33, 40, 45, & 50).

On or about March 28, 2025, SEVP began to unilaterally amend the SEVIS records of numerous F-1 and M-1 students, including Plaintiffs, to set their record designations as

---

[1] Plaintiffs refer to their Amended Complaint as a "Verified" amended complaint and promised therein the filing of supporting declarations, *see* ECF No. 22 at PageID.579 n.7; however, no declarations have been filed to date.

"terminated." *See* Andre Watson Decl. [ECF No. 10] ¶¶ 8, 10, 13, 17, 19, 22, 25, 28, 31, & 34;

Brian Childs, Ed.D. Updated Decl. [ECF No. 39] ¶ 17.[2]  Defendants assert that they "did not delete

Plaintiffs from the SEVIS database or terminate their F-1 student status" (Defs. Resp., ECF No. 8

at PageID.184), an assertion that Plaintiffs characterize as "artful paltering" (Pls. Reply, ECF No.

12 at PageID.211).

     Instead of being notified by DHS or another government agency, most Plaintiffs received

an email from their respective schools informing them that the school learned during their periodic

check of SEVIS records that the respective Plaintiff's student status had been terminated (Am.

Compl. ¶¶ 8–9).  The reason for termination, as recorded in SEVIS, was largely the same for each

Plaintiff, to wit: "OTHERWISE FAILING TO MAINTAIN STATUS: Individual identified in

criminal records check and/or has had their VISA revoked. SEVIS record has been terminated"

(Emails, Pls. Exs. B–J & O [ECF No. 1-1 at PageID.48–68, & 81]).  The schools advised Plaintiffs

to "stop working immediately" and/or consult with an attorney and/or make arrangements to leave

the country "immediately" (*id.*).

     Plaintiffs indicate that they have each had contact with the criminal justice system (e.g.,

speeding tickets and dismissed charges); however, no Plaintiff has been convicted of a crime of

violence for which a sentence of more than one year of imprisonment may be imposed (Am.

---

[2] Plaintiffs have indicated that four Plaintiffs' visas have also since been revoked.  *See* 4/9/25
Notice to Shrestha, Pls. Ex. L (ECF No. 1-1 at PageID.74–75); 4/9/25 Notice to Pothugunta, Pls.
Ex. M (ECF No. 1-1 at PageID.77); 4/1/25 Notice to Chigurupati, Pls. Ex. N (ECF No. 1-1 at
PageID.79); 4/12/25 Notice to Shaik, Pls. Ex. P (ECF No. 1-1 at PageID.83).  Plaintiffs expressly
do not challenge these visa revocations, only the termination of their F-1 student records in SEVIS
(Am. Compl. ¶ 13).  The Court notes that Defendants have identified four more Plaintiffs whose
visas have since been revoked.  *See* Watson Decl. ¶ 11 (Gao), ¶ 14 (Titare), ¶ 26 (Boppudi), and
¶ 32 (Gazibanda).

Compl. ¶¶ 21–50; Joinder ¶ 3).  Plaintiffs further allege that they have not violated any immigration laws (Am. Compl. ¶¶ 6, 21–50; Joinder ¶ 3).

### C.  Procedural Posture & Additional Post-Filing Facts

This case was initiated on April 14, 2025 against Kristi Noem, in her official capacity as DHS Secretary; Todd Lyons, in his official capacity as Acting ICE Director; and Robert Lynch, in his official capacity as Field Office Director of Detroit–ICE (ECF No. 1).  Plaintiffs, who amended their original Complaint to add more affected students (ECF Nos. 22 & 33)[3], allege four claims. Counts 1 and 4 allege that the Department's action was contrary to the Due Process Clause of the United States Constitution.  Counts 2 and 3 allege that the Department's action violated the Administrative Procedure Act because it was arbitrary, capricious, and contrary to law.  Plaintiffs seek only declaratory and injunctive relief.

On April 15, 2025, Plaintiffs filed an Emergency Ex Parte Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 5).  This Court noticed oral argument on the request for a temporary restraining order (TRO) and required a response from Defendants (Order, ECF No. 6).  On April 18, 2025, Defendants filed a response to Plaintiffs' request for a TRO (ECF No. 8), with a supporting declaration from Andre Watson, the "Senior Official within the National Security Division (NSD) for Homeland Security Investigations (HSI)" (ECF No. 10). On April 21, 2025, Plaintiffs filed a reply to Defendants' response (ECF No. 12), attaching a supporting declaration from Brian Childs, Ed.D., the Senior Director of the International Student & Scholar Services Office of Western Michigan University (WMU) (ECF No. 12-1).  On April 22, 2025, this Court heard oral argument on the request for a temporary restraining order.

---

[3] The original Complaint was filed by ten Plaintiffs (ECF No. 1).  Twenty more Plaintiffs were added via a First Amended Complaint (ECF No. 22), and one more Plaintiff via Joinder (Order, ECF No. 33).

On April 23, 2025, this Court issued a Temporary Restraining Order (ECF No. 20), for the reasons set forth in the accompanying Opinion and Order (ECF No. 19). In pertinent part, this Court required the student record termination decisions to be set aside and the records to be restored, retroactive to the date of termination (ECF No. 20). This Court further required that the student records not be terminated absent a valid ground for termination and prohibited Defendants from revoking Plaintiffs' OPT employment authorizations (*id.*). Last, this Court prohibited Defendants from arresting, detaining, or transferring Plaintiffs or initiating removal proceedings against or deporting any Plaintiff based on the termination of their student records in SEVIS (*id.*). This Court's Order required further briefing on the matter of a preliminary injunction and noticed an evidentiary hearing for May 6, 2025 (*id.*).

On April 26, 2025, ICE issued a "Broadcast Message" to "[a]ll SEVP Personnel" relevant to SEVIS records. The new policy delineates a non-exhaustive list of ten reasons that SEVP can use to terminate SEVIS records, including, in pertinent part: "Evidence of a Failure to Comply with the Terms of Nonimmigrant Status Exists" and "U.S. Department of State Visa Revocation (Effective Immediately)" (ICE Policy, ECF No. 25-1 at PageID.619–620).

On April 29, 2025, Defendants filed their response to Plaintiffs' request for a preliminary injunction (ECF No. 26). Plaintiffs filed a reply to the response (ECF No. 37).

Additionally, Plaintiffs filed two motions requesting orders to show cause. The first motion (ECF No. 23), which related to Defendants' initial compliance with the Temporary Restraining Order, was subsequently withdrawn after Plaintiffs represented that their SEVIS records were "restored by 5:00 p.m. on Friday, April 25, 2025" (ECF No. 24 at PageID.614). In their second motion (ECF No. 28, as corrected by ECF No. 31), Plaintiffs indicate that as of May 1, 2025, their

records "still indicate a period of 'Terminated' status between the time their records were originally terminated and when they were reactivated" (*id.* at PageID.649).

On May 5, 2025, Defendants filed a response to Plaintiffs' second motion (ECF No. 41) with a supporting declaration from James Hicks, the SEVP Division Chief of External Operations (Hicks Decl. [ECF No. 41-1]). Hicks attests that "for each plaintiff(s) in this case, SEVP has set their SEVIS record back to 'active'" (*id.* ¶ 3). Hicks indicates that, due to the technical limitations of the SEVIS system, the "event history for a given record cannot be deleted from the system" (*id.*). According to Hicks, SEVP added a notation to each record indicating that the student's record had been restored retroactively to the original date of the termination, as ordered by this Court, although he conceded that the notations are not viewable to end-users outside of SEVP, such as DSOs (*id.* ¶ 4).

Indeed, in an Updated Declaration from Dr. Childs also filed on May 5, 2025 (ECF No. 39), Dr. Childs indicates that the records of the affected WMU students continue to indicate an accumulation of out-of-status dates (*id.* ¶ 14 [B K–21 days], ¶ 15 [Gao–15 days], ¶ 16 [Tay–16 days], ¶ 17 [Sabir–27 days], ¶ 18 [Shetty–18 days], ¶ 19 [Eshika Singh–16 days], ¶ 20 [Mannraj Singh–16 days], and ¶ 21 [Titare–21 days]).

At the May 6, 2025 hearing, Plaintiffs relied on Dr. Child's Updated Declaration. The government did not present any evidence.

## II. ANALYSIS

### A. Motion Standard

"[T]he purpose of a preliminary injunction 'is simply to preserve the status quo.'" *Towerco 2013, LLC v. Berlin Twp. Bd. of Trs.*, 110 F.4th 870, 879–80 (6th Cir. 2024) (citation omitted). The balancing process for analyzing requests for temporary and preliminary injunctive relief is not

identical, given their different purposes and different evidentiary records, but courts consider "the same [four] factors considered in determining whether to issue a TRO or preliminary injunction." *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008). Specifically, in the Sixth Circuit, courts consider "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Ohio v. Becerra*, 87 F.4th 759, 768 (6th Cir. 2023) (quoting *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (per curiam) (en banc)).

These four factors are "not prerequisites that must be met, but are interrelated considerations that must be balanced together." *Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006) (citation omitted). "For example, the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury the movants will suffer absent the stay." *Id.* Moreover, "if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *ACLU of Kentucky v. McCreary Cnty.*, 354 F.3d 438, 445 (6th Cir. 2003) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)), aff'd sub nom. *McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844 (2005). The latter two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009) (but cautioning that the public interest is not "negligible"). Plaintiffs, the parties seeking the preliminary injunction, bear the burden of justifying the relief they seek. *See McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012) (citing *Granny Goose Foods*, 415 U.S. at 441).

Rule 65 jurisprudence in the Sixth Circuit indicates that an evidentiary hearing is "only required when there are disputed factual issues, and not when the issues are primarily questions of law." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 552–53 (6th Cir. 2007) (collecting cases). No hearing is required where the court has before it "adequate documentary evidence upon which to base an informed, albeit preliminary, conclusion" that the plaintiff would prevail on the merits. *Id.* at 553.

In granting or refusing an interlocutory injunction, the court must state "the findings and conclusions that support its action." Fed. R. Civ. P. 52(a)(2). However, "findings of fact and conclusions of law made by a district court in granting a preliminary injunction are not binding at a trial on the merits." *Towerco*, 110 F.4th at 880 (citing *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)).

Last, Federal Rule of Civil Procedure 65 instructs that "every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). The court's order "binds only the following who receive actual notice of it by personal service or otherwise: (A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)." Fed. R. Civ. P. 65(d)(2).

### B. Discussion of Relevant Factors

1. <u>Likelihood of Success on the Merits</u>

Plaintiffs' motion for injunctive relief is predicated on the merits of their claims in Counts 1 and 2. *See* Pls. Mot., ECF No. 5 at PageID.124–128. To satisfy the first factor in the injunction analysis, the "strong likelihood of success on the merits," the Sixth Circuit has held that "[i]t is

ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Stryker Emp. Co., LLC v. Abbas*, 60 F.4th 372, 385 (6th Cir. 2023) (citation omitted).

This Court previously rejected Defendants' arguments why this Court could not properly reach the merits of Plaintiffs' APA claim in Count 2, and this Court concluded that Plaintiffs had identified legal and factual bases for their APA claim that provide fair grounds for litigation and more deliberate investigation. *See* 4/23/2025 Op. & Or. (ECF No. 19 at PageID.560–565). To briefly reiterate, Plaintiffs allege in Count 2 that nothing in their "criminal histories, academic records, or any other applicable history or record provides a statutory or regulatory basis for termination of Plaintiffs' records in SEVIS, or even for determining that any of the Plaintiffs have failed to maintain their F-1 status" (Am. Compl. ¶ 83). The government agreed at oral argument on April 22, 2025 that Plaintiffs did not lose status under 8 C.F.R. § 214.1(g) for a qualifying conviction. And the current record reveals no facts supporting an agency-initiated termination of status under the three circumstances delineated in 8 C.F.R. § 214.1(d), as follows:

1) the revocation of a waiver authorized on his or her behalf under section 212(d)(3) or (4) of the Act;

2) the introduction of a private bill to confer permanent resident status on such alien; or,

3) pursuant to notification in the Federal Register, on the basis of national security, diplomatic, or public safety reasons.

8 C.F.R. § 214.1(d).

At oral argument on May 6, 2025, Defendants argued that the general authority that Congress conferred under 8 U.S.C. § 1372 to "develop and conduct a program to collect … information" about nonimmigrant students somehow provides them specific authority to terminate

13

Plaintiffs' status.  The Court finds the argument wholly unpersuasive and Defendants' reliance on § 1372 for this proposition misplaced.  As the Supreme Court has long held, "[i]t is an old and familiar rule that, where there is, in the same statute, a particular enactment, and also a general one, which, in its most comprehensive sense, would include what is embraced in the former, the particular enactment must be operative, and the general enactment must be taken to affect only such cases within its general language as are not within the provisions of the particular enactment. This rule applies wherever an act contains general provisions and also special ones upon a subject, which, standing alone, the general provisions would include."  *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 646 (2012) (quoting *United States v. Chase*, 135 U.S. 255, 260 (1890)).  *See also McKenna v. Dillon Transp., LLC*, 97 F.4th 471, 476 (6th Cir. 2024) (citing *RadLAX* for the proposition that "[t]his general-specific canon applies to statutes with conflicting provisions and statutes with 'a specific provision that is swallowed by [a] general one'").

Several other district courts have similarly resoundingly rejected the government's reliance on § 1372 as a source of authority to terminate a student's record.  *See Liu v. Noem*, No. 25-CV-133-SE, 2025 WL 1233892, at *10 (D.N.H. Apr. 29, 2025) ("[The defendants] offered no argument connecting the authority to collect information to the decision to terminate Liu's status."); *Student Doe #2 v. Kristi Noem*, No. 2:25-CV-00680-DGE, 2025 WL 1208273, at *8 (W.D. Wash. Apr. 25, 2025) ("[Section 1372] confers authority to create the SEVIS system but says nothing about termination of a student's record in the system."); *Arizona Student Doe #1 v. Trump*, No. CV-25-00174-TUC-JGZ, 2025 WL 1192826, at *6 (D. Ariz. Apr. 24, 2025) ("[W]hile ICE claims the inherent authority under 8 U.S.C. § 1372 'to terminate SEVIS records, as needed, to carry out the purposes of the program,' there does not appear to be any externally imposed limiting principle to this authority."); *Doe v. Noem*, No. 2:25-CV-00633-DGE, 2025 WL 1141279,

at *6 (W.D. Wash. Apr. 17, 2025) ("8 CFR § 214.1(d) speaks specifically to when a SEVIS record may be terminated, 8 U.S.C. § 1372 does not.").

Defendants do not supply any other new argument related to Plaintiffs' likelihood of success on the merits of Plaintiffs' APA claim, and the Court discerns no basis for a different conclusion. Hence, this first factor continues to tip in Plaintiffs' favor.[4]

2.    Irreparable Injury Without an Injunction

Turning next to the second factor, the Sixth Circuit reiterated last month that "'irreparable' means 'not fully compensable by monetary damages.'" *EOG Res., Inc. v. Lucky Land Mgmt., LLC*, No. 24-3211, ___F.4th ___, 2025 WL 1099086, at *12 (6th Cir. Apr. 14, 2025). This Court previously determined that Plaintiffs' loss of timely academic progress, whether such progress is accomplished in preparing a dissertation or gaining practical work experience, and their uncertain legal status, constitute irreparable harms that are not compensable by money damages (4/23/25 Op. & Order, ECF No. 19 at PageID.566).

Defendants argue that Plaintiffs' request for a preliminary injunction is now moot because Defendants restored the SEVIS records, and, according to Defendants, "those records will remain in an active status following the expiration of the TRO" and "for the foreseeable future" (Defs. Resp., ECF No. 26 at PageID.622, 628). Defendants opine that "Plaintiffs' claims that their SEVIS records may be altered at some time in the future for other reasons, is pure speculation" (*id.* at PageID.628). Defendants also argue that the likelihood of arrest or detention is likewise relieved due to the restoration of Plaintiffs' SEVIS records (*id.* at PageID.629). Defendants reiterated these

---

[4] Because Plaintiffs have demonstrated a sufficient likelihood of success on the merits of their APA claim, this Court, like another district court in a similar posture, will not yet reach the merits of Plaintiffs' due process claim. *See Liu v. Noem*, No. 25-CV-133-SE, 2025 WL 1233892, at *10, n.7 (D.N.H. Apr. 29, 2025) (deciding the merits of the students-plaintiffs' APA claim, only, supported issuance of a preliminary injunction).

15

same points on the record on May 6, 2025 and further emphasized that while the new ICE policy permits termination of a student's SEVIS record when the Department of State revokes the student's visa, such termination is "not mandatory."

Plaintiffs argue that their request for a preliminary injunction is *not* moot because "there is a reasonable expectation that the wrongful actions will recur and interim relief for the terminations has not completely and irrevocably eradicated the harm of the Defendant's unlawful acts" (ECF No. 37 at PageID.673). Plaintiffs opine that Defendants' actions after this Court issued the TRO on April 22, 2025 underscore the need for a preliminary injunction to maintain the status quo (*id.*).

In the Sixth Circuit, "'[t]he test for mootness is whether the relief sought would, if granted, make a difference to the legal interests of the parties.'" *Coal. for Gov't Procurement v. Fed. Prison Indus.*, 365 F.3d 435, 458 (6th Cir. 2004) (citation omitted). "[A] defendant cannot automatically moot a case simply by ending its unlawful conduct once sued." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). "Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Id.* Voluntary cessation of alleged illegal conduct will only moot a case "where there is 'no reasonable expectation that the alleged violation will recur,' and 'interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019) (quoting *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979)).

According to the Supreme Court, "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). The Sixth Circuit has likewise in-

16

structed that courts should take into account "the totality of the circumstances surrounding the voluntary cessation, including the manner in which the cessation was executed." *Speech First*, 939 F.3d at 767–68.

The "burden in showing mootness is lower when it is the government that has voluntarily ceased its conduct," and "'cessation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties' and that '[the government's] self-correction provides a secure foundation for a dismissal based on mootness so long as it appears genuine.'" *Id.* at 767 (citation omitted). When regulatory changes are implemented with "legislative-like procedures" or "formal processes," the government "need not do much more than simply represent that it would not return to the challenged policies." *Id.* In contrast, when a change is "ad hoc, discretionary, and easily reversible" or requires little in the way of formal process, "significantly more than the bare solicitude itself is necessary to show that the voluntary cessation moots the claim." *Id.*

For example, in *Speech First*, the University of Michigan was sued by a student organization challenging the University's policy prohibiting harassment and bullying as overbroad and vague. 939 F.3d at 761–62. After the plaintiff-organization filed its complaint, the University removed the challenged definitions of bullying and harassment from its policy but continued to argue in court that those definitions did not violate the First Amendment. *Id.* at 769–70. The Sixth Circuit determined that the change was not legislative, and the Sixth Circuit considered the timing of the University's change of policy "suspect" and the University's continued defense of its policy in court as indicative that the University was likely to continue in the challenged conduct. *Id.* The Sixth Circuit concluded that the district court had erred in determining that the claims challenging

the policy were moot and remanded the case back to the district court to consider the merits of the issue.  *Id.* at 761.

The Sixth Circuit reached a different conclusion in *Davis v. Colerain Township*, 51 F.4th 164 (6th Cir. 2022).  In *Davis*, the plaintiff brought a 42 U.S.C. § 1983 action against Colerain Township, alleging that its policy of precluding "disrespectful" remarks at board meetings violated the First Amendment.  *Id.* at 168.  After the lawsuit was filed, Colerain Township voluntarily changed the policy.  *Id.* at 175. When considering whether the voluntary cessation rendered the litigation moot, the Sixth Circuit noted that just before the change in policy, legal counsel had informed Colerain Township about a recent Sixth Circuit decision holding that another town's restrictions on "abusive" or "antagonistic" statements at board meetings violated the First Amendment.  *Id.*  The Sixth Circuit concluded that Colerain Township had changed its policy in light of an external factor—recent and controlling Sixth Circuit precedent—rather than with the intent to moot and thereby thwart the plaintiff's lawsuit.  *Id.*  *See also Doe*, 78 F.4th at 947 (also finding that an external factor in the form of new binding precedent from the Sixth Circuit precipitated the change in the University's policy under examination).

Here, Defendants terminated Plaintiffs' SEVIS records where apparently no qualifying reason existed, then restored Plaintiffs' records on SEVIS in response to this Court's Order, and have since broadcasted a message to employees permitting the termination of records in the future if "evidence of a failure to comply with the terms of nonimmigrant status exists."  The changes wrought by Defendants appear to squarely fall within the category of "compliance" that is ad hoc, discretionary, and/or easily reversible.  Given the totality of the circumstances in the existing record, the Court concludes that Defendants have not borne their burden of demonstrating that the challenged conduct could not reasonably be expected to recur.  Conversely, Plaintiffs have borne

their burden of persuading the Court that they cannot be assured, for the foreseeable future, that they will not suffer irreparable injury absent a preliminary injunction.

3.      Balancing of Equities & Public Interest

Last, the Court finds that granting the requested interim relief will not cause Defendants substantial harm and that the public interest will be served.  The parties did not supply the Court any new authority on these final factors, and the Court continues to adhere to the proposition that public interest militates in favor of the government adhering to regulations and preventing constitutional violations.

In sum, the Court determines that the balance of factors weighs in favor of granting preliminary injunctive relief pending the adjudication of the merits of Plaintiffs' claims.  Such relief "simply preserves the status quo" that has been in place for the several years that Plaintiffs have been in the United States as legal nonimmigrant students and employees. *See Towerco*, 110 F.4th at 879–80.

## C.  Security

Federal Rule of Civil Procedure 65(d) states that "no restraining order of preliminary injunction shall issue except upon the giving of security by the applicant ...."  FED. R. CIV. P. 65(d). "While ... the language of Rule 65(d) appears to be mandatory, and many circuits have so interpreted it, the rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security." *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (citing *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 539 (6th Cir. 1978); *Urbain v. Knapp Bos. Mfg. Co.*, 217 F.2d 810, 815-16 (6th Cir. 1954)).   In their written submissions to this Court, Defendants did not identify any purpose that requiring a security would serve.  The Court therefore continues to waive the security requirement of Rule 65(d).

## III. CONCLUSION

Accordingly, for the reasons stated on the record on May 6, 2025 and herein,

**IT IS HEREBY ORDERED**, in the Court's discretion, that Plaintiffs' request for a Preliminary Injunction (ECF No. 5) is GRANTED. A Preliminary Injunction consistent with this Opinion and Order will separately issue.

**IT IS FURTHER ORDERED** that Plaintiffs' Second Motion for an Order to Show Cause (ECF No. 28, as corrected by ECF No. 31) is DENIED.

**IT IS FURTHER ORDERED**, consistent with the Court's direction on the record on May 6, 2025, that Defendants shall file, <u>not later than May 13, 2025</u>, a Notice that

(1) confirms that each of the thirty-one Plaintiffs in this case has a notation on their SEVIS record indicating that the particular record has been restored retroactively to the original date of the termination; and

(2) addresses whether SEVP can copy the notation to a field that is visible to Plaintiffs' respective DSOs.

Dated: May 7, 2025

     /s/ Jane M. Beckering
     JANE M. BECKERING
     United States District Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MADAN B K, GERAN GAO, PRANIL
TITARE, KUNZHE SONG, NAGA
MANIKANTA CHIGURUPATI,
AISHWARYA SHRESTHA, SRIKANTH
BOPPUDI, DHANUSH POTHUGUNTA,
HARSHIT GAZIBANDA, NAG IZAAZ
SHAIK, AVINASH KOMMULA, MADHURI
YADAV CHEKUTTY, SHANMUKHA
SRINIVAS RALI, SALAM ALAJAMI, RITA
MAWUENA KPORMEGO, GUANHUA
YAO, AJAY TIMALSINA, DONGFANG JI,
RONIT RAJESH SHETTY, SARJIB KARKI,
TSHAINA MUTAMBA, SARAH QIYU
TAY, ZHENG DONG, SHARANYA
JAVVAJI, SRUJANA PAMIDIMUKKALA,
NIKHIL GAZIBANDA, ESHIKA SINGH,
TEJA SRI KOTIPALLI, MANNRAJ SINGH,
YUMU ZHONG, and MUHAMMAD
SHAHROZ SABIR,

     Plaintiffs,

v.

KRISTI NOEM, et al.,

     Defendants.

_____/

Case No. 1:25-cv-419

HON. JANE M. BECKERING

## PRELIMINARY INJUNCTION

In accordance with the Opinion and Order entered this date:

**IT IS HEREBY ORDERED** that Defendants and their officers, agents, servants,

employees, attorneys, and those in active concert or participation with them are RESTRAINED

and ENJOINED in the following manner:

1. Defendants Noem and Lyons shall not terminate Plaintiffs' F-1 and M-1 student records in Student and Exchange Visitor Information System (SEVIS) absent a valid ground for termination of nonimmigrant status as set forth in 8 C.F.R. § 214.1(d) or a failure to comply with the terms and conditions of F-1 and M-1 nonimmigrant student status as set forth in 8 C.F.R. § 214.2(f), and absent adherence to Plaintiffs' constitutional and statutory rights;

2. All Defendants are prohibited from revoking Plaintiffs' Optional Practical Training employment authorizations; and

3. All Defendants are prohibited from arresting, detaining, or transferring Plaintiffs out of the current jurisdiction in which they are located, or ordering the arrest, detention, or transfer of Plaintiffs out of the jurisdiction where they are currently located, without first providing adequate notice to both this Court and Plaintiffs' counsel as well as time to contest any such action.

**IT IS FURTHER ORDERED**, in the Court's discretion, that the security requirement of FED. R. CIV. P. 65(c) is WAIVED.

**IT IS FURTHER ORDERED** that this Preliminary Injunction shall be effective immediately and will remain in effect until further order of the Court.

**IT IS FURTHER ORDERED** that if the parties reach an agreement to modify this Order, then they should file a stipulation and proposed amended preliminary injunction for the Court's review.

Plaintiffs shall provide copies of this Preliminary Injunction to their respective educational institutions.

Dated: May 7, 2025

        /s/ Jane M. Beckering
        JANE M. BECKERING
        United States District Judge

## IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF WISCONSIN

KRISH LAL ISSERDASANI,

                        Plaintiff,

      v.

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security, the U.S.
DEPARTMENT OF HOMELAND SECURITY, and
TODD LYONS, in his official capacity as Acting
Director of U.S. Immigration and Customs
Enforcement,

                    Defendants.

OPINION AND ORDER

25-cv-283-wmc

Plaintiff Krish Lal Isserdasani filed a complaint for declaratory and injunctive relief against Kristi Noem, in her official capacity as Secretary of Homeland Security, the U.S. Department of Homeland Security ("DHS"), and Todd Lyons, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement ("ICE"), claiming that DHS and ICE unlawfully terminated records of his F-1 student visa status in the Student and Exchange Visitor System ("SEVIS") in violation of both his rights to due process and the Administrative Procedure Act ("APA"), (1) affecting his standing as a current University of Wisconsin student, as well as eligibility to be considered for a practical training position following his graduation on May 10, 2025, and (2) placing him in jeopardy of possible accelerated detention and deportation without adequate notice or opportunity to be heard.

After a telephonic hearing with counsel for all parties, the court granted plaintiff's emergency motion for a temporary restraining order on April 15, 2025, and scheduled a

preliminary injunction hearing for April 28, 2025.  (Dkt. #7.)  Finding a strong likelihood

of success on plaintiff's claim that DHS's termination of his F-1 student status on SEVIS

was not in compliance with 8 C.F.R. § 214.1(d) and was arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A), the court

extended the TRO and will now grant a preliminary injunction for the reasons set forth

below.

BACKGROUND[1]

## I.  Non-Immigrant F-1 Visa Status

Under the Immigration and Nationality Act ("INA") and its implementing

regulations, international students may be admitted to the United States with a non-

immigrant F-1 visa to pursue a full course of study at an approved academic institution.  8

U.S.C. § 1101(a)(15)(F)(i).  Once a student enters the United States with an F-1 visa, the

student is granted F-1 student status and permitted to remain in the United States for the

duration of status as long as the student continues to meet the requirements established

by the regulations governing the student's visa classification in 8 C.F.R. § 214.2(f).

To be admitted in F-1 status, an applicant must present a Form I-20, issued by a

school certified by DHS's Student Exchange Visitor Program ("SEVP").   8 C.F.R.

§ 214.2(f)(1).  In particular, certified schools must issue the Form I-20 using SEVIS, the

---

[1] Unless otherwise indicated, the following facts are taken from the defendants' response to
plaintiff's proposed facts (Dkt. #16) and plaintiff's testimony at the preliminary injunction
hearing.  The court focuses on the parties' undisputed statements of fact for purposes of
deciding the motion for a preliminary injunction.

2

centralized database that DHS uses to track international students with F-1 status.[2] (Watson Decl. (dkt. #15) ¶ 3.)  SEVP is authorized to update, maintain, and terminate SEVIS records as needed to "carry out the purposes of the F-1 visa program."  (*Id*. at ¶ 4.) DHS and ICE also use SEVIS to monitor foreign students who have been lawfully admitted to the United States but violate the terms of their admission, pose a threat to national security or public safety, or are involved in criminal activity.  (*Id*. at ¶ 5.)

In addition, SEVIS is utilized by colleges and universities to assure that their international students are maintaining their F-1 status.  In order for a school to be certified by SEVP, the school must have dedicated school officials ("DSOs"), who are responsible for assisting and overseeing enrolled students holding F-1 visas.  *Kim v. Holder*, 737 F.3d 1181, 1182 n.2 (7th Cir. 2013).  DSOs must also update and maintain student records in SEVIS to reflect whether they have maintained this status.  *Id*.; *see also* 8 C.F.R. § 214.3(g) (outlining recordkeeping and reporting requirements for DSOs at certified schools).

An international student with F-1 status is granted permission to stay in the United States as long as they continue to meet the requirements of their visa classification by maintaining a full course of study or engaging in "authorized practical training following the completion of studies."  8 C.F.R. § 214.2(f)(5)(i).  Once a student has completed their course of study and any authorized practical training, they generally have 60 days to either depart the United States or transfer to another approved academic institution.  8 C.F.R. § 214.2(f)(5)(iv).

---

[2] *See* About SEVIS, Dep't of Homeland Security, https://studyinthestates.dhs.gov/site/about-sevis (last visited Apr. 29, 2025).

In addition, non-immigrant visa-holders (such as students with F-1 visas) must refrain from certain specified activity to maintain their lawful visa status, such as engaging in unauthorized employment, providing false information to DHS, or engaging in "criminal activity." 8 C.F.R. § 214.1(e)-(g). For purposes of maintaining status, criminal activity is narrowly defined as a "conviction . . . for a crime of violence for which a sentence of more than one year imprisonment may be imposed [*i.e.*, a felony offense] (regardless of whether such sentence is in fact imposed)." 8 C.F.R. § 214.1(g). In the absence of a student's conduct causing a status violation, a student's F-1 status can only be terminated under three circumstances: (1) a previously-granted waiver under 8 U.S.C. § 1182(d)(3) or (4) is revoked; (2) a private bill to confer lawful permanent residence is introduced in Congress; or (3) notification published in the Federal Register identifying national security, diplomatic, or public safety reasons for termination. 8 C.F.R. § 214.1(d).

A student who "fails to maintain a full course of study" without approval from a DSO, or otherwise "fails to maintain status," must leave the country immediately or seek reinstatement of their status. 8 C.F.R. § 214.2(f)(5)(iv). Reinstatement is discretionary, and, if denied, the student may not appeal the decision. 8 C.F.R. 214.2(f)(16)(ii); *Jie Fang v. Dir. United States Immigr. & Customs Enf't*, 935 F.3d 172, 176 (3d Cir. 2019).

## II. Plaintiff's F-1 Status

Plaintiff Krish Lal Isserdasani, a 21-year-old undergraduate student from India, has been pursuing a bachelor's degree in computer engineering at the University of Wisconsin-Madison with an F-1 student visa since 2021. He expects to graduate on May 10, 2025, and has applied for Optional Practical Training ("OPT") to gain work experience related

4

to his field of study.  Less than 30 days from his expected graduation, however, UW-Madison's International Student Services ("ISS") office informed Isserdasani by an email that his SEVIS record had been changed from "active" to "terminated" by the SEVP.  (Pl. Compl. Ex. A (dkt. #1-2) at 2.)  The email, which contains a screenshot of Isserdasani's SEVIS record, provides no reason for SEVP's termination decision, other than the following: "OTHERWISE FAILING TO MAINTAIN STATUS – Individual identified in criminal records check and/or has had their VISA revoked.  SEVIS record has been terminated."  (*Id*.)  The email states further, "A termination for this reason does not have a grace period to depart the U.S.," and "[a]ll employment benefits, including on-campus employment and any practical training you may had authorized, end immediately when a SEVIS record is terminated.  Therefore, you no longer have authorization to work in the United States."  (*Id*.)

Isserdasani acknowledges that he was arrested for disorderly conduct on November 22, 2024, after he and his friends got into a verbal argument with another group while walking home late at night from a bar.  Defendants confirm that SEVP terminated Isserdasani's SEVIS record based on this arrest.  (Watson Decl. (dkt. #15) at ¶ 8.)  However, the Dane County District Attorney declined to pursue charges after reviewing the case.  As a result, Isserdasani was never formally charged, required to appear in court,

5

or convicted of any crime, much less a crime of violence as defined by 8 C.F.R. § 214.1(g).[3] Thus, there is no evidence that Isserdasani has engaged in activity that would warrant the termination of his SEVIS records or his F-1 student visa status, which was done without the statutory or regulatory authority and without notice or an opportunity to be heard.

## III. Procedural Posture

Nevertheless, fearing that he might be arrested, detained, and summarily deported without completing his degree or engaging in a planned, post-graduate OPT as authorized by his F-1 student visa status, Isserdasani filed a complaint for declaratory and injunctive relief, asserting six claims against defendants: (1) unauthorized termination of his SEVIS records in violation of the Administrative Procedure Act ("APA"); (2) arbitrary and capricious termination of SEVIS records in violation of the APA; (3) violation of the Fifth Amendment right to procedural due process; (4) violation of procedural due process under the APA; (5) unlawful SEVIS termination in violation of *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) (the "*Accardi* doctrine"); and (6) potential unlawful detention in violation of the due process clause of the Fifth Amendment. (Dkt. #1.) Isserdasani also moved for an emergency temporary restraining order on the grounds that he had neither engaged in any specified activity defined in 8 C.F.R. § 214.1(e)-(g) nor done anything to trigger the termination of his SEVIS record. (Dkt. #5, at 13.)

---

[3] As noted above, a non-immigrant visa-holder (such as an F-1 international student) fails to maintain status if convicted of a "crime of violence for which a sentence of more than one year imprisonment may be imposed (regardless of whether such sentence is in fact imposed)." 8 C.F.R. § 214.1(g). However, the offense allegedly committed by plaintiff is a Class B misdemeanor, which carries a maximum sentence of 90 days' imprisonment. Wis. Stat. §§ 39.51, 947.01(1). Moreover, plaintiff was never convicted of *any* crime.

After a hearing with counsel for both parties on April 14, 2025, the court orally granted Isserdasani's emergency motion for a temporary restraining order. In an opinion and order issued the following day, the court confirmed that he had shown "a substantial, if not overwhelming, likelihood of success on the merits of his claim in Count 2 that DHS violated the APA when it summarily terminated his F-1 student status in SEVIS without cause." (Dkt. #7, at 9-10.) Specifically, the court found that Isserdasani was "likely to show that DHS's termination of his F-1 student status was not in compliance with 8 C.F.R. § 214.1(d) and was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A)." (*Id*. at 10.) Concluding that the balance of all other relevant factors favored Isserdasani, the court temporarily restrained defendants from terminating his SEVIS record or taking any other action, directly or indirectly, resulting in legal consequences as the result of the decision to terminate his SEVIS records, including revoking his visa or detaining him. (*Id*. at 11-12.)

At a hearing on April 28, 2025, the court extended the TRO pending this written decision on plaintiff's motion for a preliminary injunction.

OPINION

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008). "As a threshold matter, a party seeking a preliminary injunction must demonstrate (1) some likelihood of succeeding on the merits, and (2) that it has 'no adequate remedy at law' and will suffer 'irreparable harm' if preliminary relief is denied." *International Ass'n of Fire Fighters, Local 365 v. City of East Chicago*, 56 F.4th 437,

446 (7th Cir. 2022) (quoting *Cassell v. Snyders*, 990 F.3d 539, 544-45 (7th Cir. 2021)).

The showing of likelihood of success on the merits must be "strong," which "normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762-63 (7th Cir. 2020).  If the movant makes this showing, the district court must then consider two additional factors: "the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied" and "the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Id.*

After hearing testimony from plaintiff and argument from the government at the preliminary injunction hearing on April 28, 2025, the court is persuaded that the balance of factors favor a grant of preliminary injunctive relief to maintain the status quo for the duration of this lawsuit for the reasons set forth below.

### A. Likelihood of Success on the Merits

The APA governs judicial review of agency actions and waives federal sovereign immunity in some circumstances to allow for equitable relief from agency action or inaction.  5 U.S.C. § 702.  Under the APA, a court may "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion," in excess of statutory authority, or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (C)-(D).  Here, Isserdasani has presented evidence that he has maintained his lawful F-1 visa status by pursuing a full course of study and expects to receive his undergraduate degree this week.  He has further applied for OPT, in which he is also authorized to engage

8

for purposes of obtaining work experience related to his field under a valid F-1 visa. Isserdasani testified at the April 28, 2025 hearing that, without reactivation of his SEVIS record following this court's entry of a TRO, the University of Wisconsin would have maintained its position that he was required to cease his undergraduate studies. (Apr. 28, 2025 Tr. at 15-16, 19, 21.) Regardless, without maintaining an active SEVIS record, defendants do not dispute that Isserdasani could no longer apply for a new Form I-20 to extend his F-1 visa status for purposes of OPT. (*Id*. at 21, 35.)

In addition, defendants conceded at the hearing that Isserdasani's SEVIS record was terminated for a subsequently dropped, misdemeanor charge that does not begin to meet the criteria for criminal activity found in 8 C.F.R. § 214.1(g). (Apr. 28, 2025 Tr. at 5.) Similarly, the government is unable to offer any other reason set forth in 8 C.F.R. § 214.1(d) or otherwise that might justify the termination of Isserdasani's SEVIS record. Further, Isserdasani was given no notice, no opportunity to be heard, or right of appeal before defendants terminated his status without justification. (Apr. 28, 2025 Tr. at 8.) Based on this record, Isserdasani has made a strong showing that defendants summarily terminated his SEVIS record and effectively his F-1 status to continue with OPT without cause, individualized consideration, or adequate explanation. Specifically, Isserdasani has made clear showing that defendants did not comply with 8 C.F.R. § 214.1(d) when they terminated his SEVIS record and that doing so was arbitrary, capricious, an abuse of discretion, and not in accordance with the law under 5 U.S.C. § 706(2)(A). *See Student Doe v. Noem*, No. 2:25-cv-01103, 2025 WL 1134977, at *5 (E.D. Cal. Apr. 17, 2025) ("Because plaintiff offers evidence supporting the conclusion that neither reason given for

9

termination is permitted by the applicable regulations, plaintiff will also likely show that defendants' decision to terminate his SEVIS record, effectively terminating his F-1 status, was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law in violation of the APA."); *John Roe v. Noem*, No. CV-25-40, 2025 WL 1114694, at *3 (D. Mont. Apr. 15, 2025) ("Therefore, the Court finds that Plaintiffs are likely to succeed on the allegation that Defendants' termination of Plaintiffs' F-1 student status under the SEVIS is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction.").

Nevertheless, defendants argue that Isserdasani is not likely to succeed on the merits of his APA claims because (1) review under the APA is barred by the Privacy Act; and (2) the termination of SEVIS records is not a "final" agency action under the APA. These arguments are addressed briefly below.

### 1.  The Privacy Act

Defendants argue that the court lacks subject matter jurisdiction over Isserdasani's challenge to the contents of his SEVIS record under the APA because the APA's waiver of sovereign immunity under that act does not extend to such a claim. (Dkt. #14, at 15-16.) Specifically, defendants argue that the APA does not waive the United States' sovereign immunity as to Isserdasani's claims because the Privacy Act provides the exclusive means for challenging the termination of SEVIS records *and* Isserdasani lacks standing as a foreign national to invoke such a challenge. (*Id*. at 19, 21.)

The APA waives sovereign immunity for actions in federal court by "person[s] suffering legal wrong because of agency action." 5 U.S.C. § 702. This general waiver "does

10

not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought' by the plaintiff." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702.) Under the Privacy Act, agencies that maintain "a system of records" concerning individuals are required to do so "with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual." 5 U.S.C. § 552a(e)(5). The Privacy Act allows an individual to seek redress in federal court if an agency does not allow the individual to review his record, *see* § 552a(g)(1)(B), or if an agency has refused to amend a record, *see* § 552a(g)(1)(A). An individual also may challenge an agency's failure to maintain records with the accuracy, relevance, timeliness and completeness required by § 552a(e)(5), if the agency action had an "adverse" effect on him. § 552a(g)(1)(C). *See, e.g., Bassiouni v. Fed. Bureau of Investigation*, 436 F.3d 712, 718-19 (7th Cir. 2006)(involving a law professor's suit under the Privacy Act's enforcement provisions to amend or expunge records of his contacts and activities maintained by the FBI that he maintained were erroneous).

As other courts have held, however, "Congress did not intend for the Privacy Act to be an 'exclusive' source of claims or remedies for alleged mishandling of records about individuals that impliedly forbids other relief under the APA." *All. for Retired Americans v. Bessent*, No. CV 25-0313, 2025 WL 740401, at *19 (D.D.C. Mar. 7, 2025) (concluding that the availability of a Privacy Act suit for damages did not take the plaintiffs' case outside the scope of the waiver of sovereign immunity under § 702 of the APA and did not affect subject-matter jurisdiction over the plaintiffs' APA claims); *see also Madan v. Noem*, 1:25-cv-419, 2025 WL 1171572, at *5 (W.D. Mich. Apr. 23, 2025) (rejecting a similar

11

argument by defendants that the Privacy Act precludes an APA claim); *Student Doe*, 2025 WL 1134977, at *4-5 (same). Further, Isserdasani has not filed suit to challenge the accuracy, relevance, timeliness or completeness of his SEVIS record; he is expressly challenging the *decision* to list his F-1 visa status as "terminated" in SEVIS, which effectively terminated his F-1 student status to continue matriculation and graduation from the University of Wisconsin, as well as subsequent OPT, without statutory or regulatory authority.

Moreover, Isserdasani cannot avail himself of the Privacy Act to challenge this determination because it is not "'a vehicle for amending the judgments of federal officials . . . as those judgments are reflected in records maintained by federal agencies.'" *Barnett v. United States*, 195 F. Supp. 3d 4, 7 (D.D.C. 2016) (quoting *Kleiman v. Dep't of Energy*, 956 F.2d 335, 337-38 (D.C. Cir. 1992)). Thus, defendants fail to show that Isserdasani's APA claims are precluded by the Privacy Act. *See Chen v. Noem*, 1:25-cv-00733, 2025 WL 1163653, at *6 (S.D. Ind. Apr. 21, 2025) (concluding that "the Privacy Act does not explicitly or implicitly forbid Chen's claims, and the APA waives sovereign immunity against those claims for purposes of seeking injunctive relief").

## 2. Finality of Agency Action

Defendants next argue that Isserdasani cannot succeed on his APA claims because changing his SEVIS record is not a "final agency action." (Dkt. #14, at 23.) The APA "allow[s] any person 'adversely affected or aggrieved' by agency action to obtain judicial review thereof, so long as the decision challenged represents a 'final agency action' for which there is no other adequate remedy in a court." *Webster v. Doe*, 486 U.S. 592, 599

12

(1988) (quoting 5 U.S.C. §§ 701–06). For an "agency action" to be "final," 5 U.S.C. § 704, two conditions must be satisfied: "First, the action must mark the consummation of the agency's decisionmaking process -- it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation omitted). In other words, the final agency action requirement "asks whether a 'terminal event' has occurred." *Driftless Area Land Conservancy v. Rural Util. Serv.*, 74 F.4th 489, 493 (7th Cir. 2023) (quoting *Salinas v. R.R. Ret. Bd.*, 141 S. Ct. 691, 697 (2021)).

Inherent in defendants' argument is its insistence that changing a foreign student's SEVIS record to "terminated" has no impact on his F-1 status. (Dkt. #14, at 23-24.) In support, defendants cite *Yerrapareddypeddireddy v. Albence*, CV-20-01476, 2021 WL 5324894 (D. Ariz. Nov. 16, 2021), which involved two, foreign national students whose SEVIS records were terminated as a "clerical duty" because they were not pursuing a full course of study at an educational institution. Defendants contend that similarly the clerical nature of their ability to update, change, and modify SEVIS records as they wish is found in 8 U.S.C. § 1372(a)(1), which grants DHS authority to "develop and conduct" a record-keeping program for managing information about non-immigrant students in a database. (Dkt. #14, at 25.) In support, defendants offer an affidavit from Andre Watson, who is a senior official with the National Security Division for Homeland Security Investigations. (Watson Decl. (dkt. #15) at ¶ 1.) Watson explains that SEVP simply "amended" Isserdasani's SEVIS record to reflect that he had a "criminal history," with

13

apparent reference to his dropped misdemeanor ticket for disorderly conduct, "by setting the record designation to terminated." (Id. at ¶ 8.) Although Watson acknowledges that Isserdasani's SEVIS record was terminated due to this charge, which was never prosecuted, he qualifies further that SEVP "has never claimed that it had terminated [Isserdasani's] nonimmigrant status." (*Id*. at ¶¶ 7, 12.)

None of defendants' arguments are persuasive. Notably, Watson does not say that Isserdasani remains in lawful F-1 status or that SEVP would not again terminate his SEVIS record based on that charge without injunctive relief from the court. Indeed, but for the court's TRO, defendants' counsel concede they reserved the right to terminate his SEVIS record for "whatever enforcement-related reason" it wished, including his "dropped misdemeanor charge." (Apr. 28, 2025 Tr. at 5.) Thus, Isserdasani remains vulnerable to more serious consequences without any other recourse. As the court concluded at the preliminary injunction hearing on April 28, 2025, defendants' argument that changing a student's SEVIS record to "terminated" does not also have the effect of terminating their F-1 status is "semantics." (*Id*. at 30.) Other courts have also rejected the argument by defendants that a student's SEVIS record is somehow meaningless. *See Chen*, 2025 WL 1163653, at *7 (concluding that Chen had shown that his SEVIS record and his F-1 status were terminated); *see also Oruganti v. Noem*, No. 2:25-cv-00409, 2025 WL 1144560, *4 (S.D. Ohio Apr. 18, 2025) ("Defendants ultimately conceded, as they must, that termination of the SEVIS record could lead to the revocation of [plaintiff's] F-1 status, which could ultimately lead to deportation – an outcome that the Supreme Court has

14

recognized as 'a drastic measure, often amounting to lifelong banishment or exile'") (citation omitted).

Moreover, contrary to defendants' argument, plaintiff presents a notice of decision from USCIS showing that a SEVIS record *is* a manifestation of the student's status, such that when a student's SEVIS record is "terminated" the student is "without lawful immigration status" and must seek reinstatement or depart the United States.  (Lofti Decl. Ex. A (dkt. #20-1) at 3.)  Although defendants dispute that the notice of decision is reflective of actual policy or practice, the decision is consistent with the email Isserdasani received from UW-Madison ISS, which includes a screen shot of his SEVIS record, showing that his "Status" had been changed to "terminated" by SEVP for "OTHERWISE FAILING TO MAINTAIN STATUS."  (Pl. Compl. Ex. A (dkt. #1-2) at 2.)  This is also consistent with guidance from the U.S. Department of State, which further supports the conclusion that a student's SEVIS record is intended to reflect his status.  The Foreign Affairs Manual, an "authoritative source" for State Department policies and procedures that govern "the operations of the State Department, the Foreign Service and, when applicable, other federal agencies," states that "the SEVIS record is the definitive record of student or exchange visitor *status* and visa eligibility."  9 F.A.M. 402.5-4(B) (emphasis added).[4]

As for finality, defendants further admitted at the hearing on April 28, 2025 that Isserdasani cannot challenge the termination of his SEVIS record.  (Apr. 28, 2025 Tr. at 9.)  Nor did they dispute that Isserdasani suffered consequences upon the termination of

---

[4] The Foreign Affairs Manual, U.S. Department of State, is available at https://fam.stat.gov (last visited Apr. 30, 2025).

15

his SEVIS record for the stated reason of failing to maintain his F-1 status, having been advised by UW-Madison that he could no longer attend classes and no longer had work authorization.  In fact, Isserdasani was not told he could return to classes and proceed to graduate until this court entered its TRO.  (Apr. 28, 2025 Tr. at 21.)  Up until that point, Isserdasani was in fear of being picked up by immigration agents every time he left his apartment because his status had been terminated.   (*Id*. at 25.)

Based on this record, defendants do not persuasively demonstrate that when SEVP changed plaintiff's SEVIS record to "terminated" this action had no relation whatsoever to his F-1 student status.  *See Hinge v. Lyons*, No. 25-1097, 2025 WL 1134966, at *4 & n.10 (D.D.C. Apr. 15, 2025) (granting a TRO despite a similar declaration from Watson because "government counsel was unable to confirm that ICE would not interpret its SEVIS record termination and the subsequent action taken by the plaintiff's university in response to that termination, as effectively terminating the plaintiff's F-1 status and providing grounds for the plaintiff to be subject to arrest, deportation, and accruing unlawful presence.").

On this record, therefore, the court rejects defendants' argument that the termination of Isserdasani's SEVIS record and his apparent F-1 status was not a final agency action that implicates his rights and from which there are legal consequences.  *See Doe v. Noem*, No. 2:25-cv-00633, 2025 WL 1141279, at *3 (W.D. Wash. Apr. 17, 2025) (holding that termination of SEVIS record and student status was a final agency action); *Hinge*, 2025 WL 1134966, at *5 ("If the plaintiff's lawful status in the United States has been revoked, whether directly by ICE or indirectly by his university's correct

16

interpretation of the action it is required to take in response to ICE's actions, that revocation will affect the plaintiff's 'rights or obligations . . . from which legal consequences will flow.' Thus, the Court concludes that it must grant the plaintiff's request for a temporary restraining order until a further status conference is held in order to allow government counsel to address these ambiguities after conferring with the agency he represents." (omission in original) (quoting *Bennett*, 520 U.S. at 177-78)). As a result, defendants have failed to show that the termination of Isserdasani's status is not a reviewable final agency action or that he is not substantially likely to prevail on his claim that defendants terminated his status in violation of the APA, as set forth above.

## B. Irreparable Harm and Adequacy of Remedy at Law

As noted previously, Isserdasani faces possible devastating irreparable harm due to the termination of his F-1 student record in SEVIS, which but for entry of this court's TRO would prevent him from completing his four-year undergraduate degree in computer engineering from a premier academic institution in that field just a week away from his expected graduation. As multiple courts facing similar motions to enjoin the termination of students' F-1 status have recognized, the loss of timely academic progress alone is sufficient to establish irreparable harm. *Doe v. Noem*, No. 3:25-cv-00023, 2025 WL 1161386, at *6 (W.D. Va. Apr. 21, 2025); *Liu v. Noem*, No. 25-cv-133, 2025 WL 1189760, at *2 (D.N.H. Apr. 10, 2025); *see also Doe v. Noem*, No. 2:25-cv-00633, 2025 WL 1141279, at *8 (W.D. Wash. Apr. 17, 2025) (collecting cases holding that interruption of educational programs or progress, including loss of opportunity to participate in post-graduate education programs, can be irreparable harm). Similarly, plaintiff has shown that

17

he is at direct risk of having his anticipated OPT rejected but for reinstatement of his SEVIS status.

The evidence before the court further establishes that the link between Isserdasani's SEVIS record and the threat of arrest, detention, and deportation without justification has caused him to suffer mental anguish, as well as fear that is more than speculative. *E.g., Ozturk v. Trump,* No. 25-cv-10695-DJC, 2025 WL 1009445, at *1 (D. Mass. Apr. 4, 2025) ("[W]ithout prior notice of the revocation of her student visa or the grounds asserted for same, Ozturk, a graduate student in Child Study and Human Development at Tufts University, was approached and surrounded by six officers (several wearing masks and/or hoods), stripped of her cellphone and backpack, handcuffed, and taken into custody in an unmarked vehicle."). Indeed, at the hearing on April 28, 2025, defendants were unable to give the court any assurance that Isserdasani was in lawful status or that his SEVIS record -- which was reinstated only after the court issued a TRO -- would not again be terminated if additional injunctive relief were not granted. Given the amount of Isserdasani's efforts towards completing a four-year college degree, his educational expenses, and the potential consequences from a loss of status, the court concludes that Isserdasani has credibly demonstrated that he faces irreparable harm for which he has no adequate remedy at law in the absence of injunctive relief. *See Jie Fang*, 935 F.3d at 183-85.

### C.  Balancing Analysis

Where a plaintiff satisfies the threshold requirement for a preliminary injunction, courts must then weigh "the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving

18

party if it is wrongfully granted." *K.C. v. Individual Members of the Medical Licensing Bd. of Indiana*, 121 F.4th 604, 632 (7th Cir. 2024) (citations and internal quotation marks omitted). "This is a sliding scale -- the more likely [the moving party] is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Id*. at 633 (alteration in original). Part of this balancing process includes evaluating the public interest and the effects the preliminary injunction -- and its denial -- would have on nonparties. *Id.*

For reasons already stated, Isserdasani has demonstrated a strong likelihood of success on the claim that his SEVIS record and F-1 student status was wrongfully terminated in violation of agency regulations. Further, defendants' actions have threatened Isserdasani's ability to complete his undergraduate degree and have placed in jeopardy his ability to engage in OPT, which he will be unable to undertake without an active SEVIS record and valid F-1 student status, in addition to causing extreme anxiety and fear of detention. Moreover, "[t]he public has a vested interest in a federal government that follows its own regulations." *Doe*, 2025 WL 1141279, at *9.

To that end, although defendants have argued that "the public interest in enforcement of United States immigration laws is significant" (dkt. #14, at 29), they have failed to show that DHS has complied with immigration laws or regulations in this case or that Isserdasani's status was revoked due to his failure to maintain lawful status. Based on this record, therefore, Isserdasani has established that he faces irreparable harm, whereas defendants have demonstrated none, particularly in comparison. Because all relevant factors favor plaintiff, the court concludes that he is entitled to preliminary injunctive

relief. *See Liu v. Noem*, No. 25-cv-133, 2025 WL 1233892 (D.N.H. Apr. 29, 2025) (granting a preliminary injunction in favor of an international student claiming that his SEVIS record and F-1 student status were terminated by the defendants in violation of the APA).

### D. Bond

Defendants have requested that Isserdasani be required to post a bond under Fed. R. Civ. P. 65(c), which requires a party seeking preliminary injunctive relief to give "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." (Dkt. #14, at 30.) However, a district court may "waive the requirement of an injunction bond" when "the court is satisfied that there's no danger that the opposing party will incur any damages from the injunction." *Habitat Educ. Ctr. v. United States Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010) (finding "no reason to require a bond"). When pressed at the hearing on April 28, 2025, to specify the costs and damages defendants may incur as the result of an injunction issuing in this case, their counsel offered none and have not supplemented the record with any. Accordingly, Isserdasani shall not be required to post a bond pending enforcement of the preliminary injunction granted by this court.

ORDER

IT IS ORDERED that pending final adjudication of the issues in this case, plaintiff

Krish Lal Isserdasani's motion for a preliminary injunction is GRANTED as follows:

1) Defendants are enjoined from terminating plaintiff Isserdasani's F-1 student status records from the Student and Exchange Visitor Information System ("SEVIS") without further showing and approval by this court.

2) Defendants are further enjoined from directly or indirectly enforcing, implementing, or otherwise taking any action or imposing any legal consequences as the result of the decision to terminate his SEVIS records.

Entered this 7th day of May, 2025.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge