Keliang (Clay) Zhu (SBN 305509) (czhu@dehengsv.com)
Yi Yao (SBN 292563) (yyao@dehengsv.com)
**DEHENG LAW OFFICES PC**
7901 Stoneridge Drive, Suite 208
Pleasanton, CA 94588
T: 925-399-6702
F: 925-397-1976

Justin Sadowsky – Admitted Pro Hac Vice
CHINESE AMERICAN LEGAL DEFENSE ALLIANCE
4250 N Fairfax Drive #600
Arlington, VA 22203

T: 646-785-9154
E: justins@caldausa.org

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JING TAO, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>MARCO RUBIO, in his official capacity as Secretary of State, *et al.*,<br><br>Defendants. | Case No. 3:25-cv-03292-JSC<br><br>**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>The Honorable Jacqueline Scott Corley |

## TABLE OF CONTENTS

INTRODUCTION .......... 1

STATEMENT OF UNDISPUTED FACTS .......... 2

I. State and DHS enact the April 2025 NCIC policy. .......... 2

II. State and DHS revoke SEVIS status, and threatens visas, of thousands of F-1 visa holders.. 2

III. Plaintiffs are harmed by the policy. .......... 6

IV. DHS restores SEVIS in response to litigation, but State does not revoke promises to revoke visas (including Plaintiffs). .......... 9

ARGUMENT .......... 10

I. The visa termination policy constitutes final agency action. .......... 10

II. State lacks any statutory basis for the Visa Termination Policy. .......... 10

A. The revocations were not performed by the Secretary or by “the consular official.” .......... 11

B. 1201(i) does not apply to visas for those who are already present in the United States. .......... 13

III. The policy is contrary to 22 CFR 41.122(e). .......... 14

IV. The policy is arbitrary and capricious. .......... 15

V. The proper remedy is to prohibit State from revoking visas. .......... 17

CONCLUSION .......... 19

# TABLE OF AUTHORITIES

## Cases

*Al Otro Lado v. McAleenan*, 394 F. Supp. 3d 1168 (S.D. Cal. 2019) ........................................ 10

*Am. Bus Ass'n v. Slater*, 231 F.3d 1 (D.C. Cir. 2000) ............................................................. 12

*California ex rel. Becerra v. Azar*, 501 F. Supp. 3d 830 (N.D. Cal. 2020) ................................. 18

*Cath. Legal Immigr. Network v. Rubio*, 840 F. Supp. 3d 209 (S.D.N.Y. 2026) .......................... 19

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799 (2024) ..................... 18

*Doe v. Noem*, 778 F. Supp. 3d 1151 (W.D. Wash. 2025) .......................................................... 15

*Est. of Magnin v. Comm'r*, 184 F.3d 1074 (9th Cir. 1999) ........................................................ 13

*Eureka Fed. Sav. & Loan Ass'n v. Am. Cas. Co. of Reading*, 873 F.2d 229 (9th Cir. 1989) ........ 19

*F.C.C. v. Fox Television Stations*, 556 U.S. 502 (2009) ............................................................ 16

*Gale v. First Franklin Loan Servs.*, 701 F.3d 1240 (9th Cir. 2012) ........................................... 12

*Mansor v. USCIS*, 685 F. Supp. 3d 1000 (W.D. Wash. 2023) .................................................... 19

*Michigan v. E.P.A.*, 576 U.S. 743 (2015) ................................................................................. 15

*Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1 (9th Cir. 2025). .................................................. 18

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)... 15, 16

*Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337 (9th Cir. 1995) ....................................................... 19

*Nielsen v. Preap*, 586 U.S. 392 (2019), .................................................................................... 12

*Noh v. INS*, 248 F.3d 938 (9th Cir. 2001) ........................................................................... 13, 15

*PAHEI v. Noem*, 824 F. Supp. 3d 168 (D. Mass. 2026) ...................................................... 10, 18

*Patel v. Reno*, 134 F.3d 929, 933 (9th Cir. 1997) ..................................................................... 13

*Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181 (9th Cir. 2010) ................................. 16

*United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) .......... 15

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016) .......... 10

*Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 530 F.3d 925 (D.C. Cir. 2008) .......... 10

*Wong v. Dep't of State*, 789 F.2d 1380 (9th Cir. 1986) .......... 15

**Statutes**

5 U.S.C. § 706(2)(A) .......... 18

8 U.S.C. § 1101(9) .......... 12

8 U.S.C. § 1101(a)(15)(U), .......... 17

8 U.S.C. § 1182(f) .......... 11, 13

8 U.S.C. § 1201(a)(1) .......... 12

8 U.S.C. § 1201(i) .......... passim

8 U.S.C. § 1227(a)(2) .......... 11

**Regulations**

8 C.F.R. § 214.1 .......... 10

22 C.F.R. § 41.122 .......... 13

22 C.F.R. § 41.122(e) .......... 1, 14, 17

22 C.F.R. § 41.32(c), .......... 14

22 C.F.R. § 41.33(b), .......... 15

**Other Authorities**

9 Foreign Affairs Manual § 403.11-5(B) .......... 6

Statement Regarding Reactivation of SEVIS Records, *Doe v. Trump*, No. 25-cv-3140, Dkt. 47 (N.D. Cal. Apr. 25, 2025) .......... 9

Watson Bushireddy Testimony, *Bushireddy v. Lyons*, 25-cv-1102, Dkt. 68-1 (D.D.C. May 14,

2025) .................................................................................................................................. 2

Watson Patel Testimony, *Patel v. Lyons*, 25-cv-1906, Dkt. 18 (D.D.C. Apr. 29, 2025) ............. 2

## INTRODUCTION

This Court has already ruled unlawful the Government's policy initiated in April 2025, where ICE and Defendant Secretary Rubio, in his official capacity ("State"), revoked the visas and terminated the SEVIS status of thousands of students who, for some reason or another, came up in a search of the National Crime Information Center. As to ICE, that policy was set aside. But the Department of State's revocation of thousands of visas remains and has not yet been overturned, either voluntarily or by order of this or any other Court.

The Court should do so now.

The actions were without legal authority. These visa revocations were made wholesale, not by consular officials, but by rank and file State Department employees. Those employees had no authority to make en masse visa revocations. And even if they did, these officials did not comply with State's regulations for when visa revocations are permissible.

And, even if State were allowed to write on a statutory and regulatory clean slate, its actions must still be set aside as arbitrary and capricious. Cancelling visas because of charges [redacted] is not reasonable. State lacks any valid basis to depart from the well-established reasons for visa cancellation and removal set forth in 22 C.F.R. § 41.122(e), or to go beyond the reasons for expelling visaholders from this country under 8 U.S.C. § 1227. Meanwhile, the arbitrary and capricious nature of the policy is made only more plain because it applies to pending and even dropped charges or no charges at all. And the fact that State does not even have the conviction of its supposed security threat rationale to make the cancellations immediate render the policy even more arbitrary. The result is thousands of students can now remain in the United States and finish their studies, but are effectively trapped here, unable to return if they were to leave the country.

This Court should set aside State's visa cancellation policy. It should also enter a declaratory judgment stating that the policy was unlawful. And either because the visa revocations have not yet occurred, or alternatively to undo the unlawful policy, this Court should prohibit State from revoking the visas of Plaintiffs and others affected by the policy when they exit the country.

**STATEMENT OF UNDISPUTED FACTS**

**I. State and DHS enact the April 2025 NCIC policy.**

1. In early April, DHS and State enacted a joint project informally called the "student criminal alien initiative" to revoke visas and SEVIS status from thousands of foreign students here on valid F-1 visas. Watson *Patel* Testimony (*Patel v. Lyons*, 25-cv-1906, Dkt. 18 (D.D.C. Apr. 29, 2025)) at 3:14:4-18 (Exhibit A). [redacted]

2. The initiative was jointly administered by DHS and State. *See* R1 (Dkt. 195-1 (redacted); 196-1 (under seal)); *see also* Watson *Patel* Testimony (Ex. A), at 4:11-18.

3. The initiative was supposedly a follow-on project from President Trump's antisemitism Executive Order. Watson *Bushireddy* Testimony, (*Bushireddy v. Lyons*, 25-cv-1102, Dkt. 68-1 (D.D.C. May 14, 2025)), at 61:14-62-7 (Exhibit B).

**II. State and DHS revoke SEVIS status, and threatens visas, of thousands of F-1 visa holders**

4. Under the first step of the process, DHS sent "feeder" data of active SEVIS applicants to State. R1. DHS ran 1.3 million "F and M visa holders" through the National Crime Information Center, and obtained 16,000 total hits. Watson *Bushireddy* Testimony (Ex. B), 61:8-13. DHS then "checked the data against the actual records," which brought the total number of hits

down to 13,900. *Id.* 62:14-19. Then another check confirmed "6,400 individuals that had a positive NCIC record or an encounter with law enforcement officers." *Id.* Those reductions were not for things such as an encounter not leading to an arrest, or charges being dropped, or a not guilty verdict. Instead, the reduction from 16,000 to 6,400 hits involved situations where the name match was not real due to, for instance, "misspellings in names or due to misspellings in the NCIC records." *Id.* 63:20-64:25; *but see* R1 (Dkt. 195-1/196-1) (SOG Process Map).

5. DHS then took those 6,400 names and provided them to the Department of State. R1. State then took some action (what, not exactly in the record, other than "initial assessment of action," R1 (Dkt. 195-1) to filter out some subset of the 6,400 names as "Under Review-Do Not Revoke Yet." R2 (Dkt. 195-2 (redacted); 196-2 (under seal)). For context, those filtered out had some sort of law enforcement or DHS encounter, though apparently not enough for revocation without further review. The rest of the names presumably were set to have their visas revoked, either immediately or prudentially. *See* SOF ¶ 16, *below* (explaining prudential revocation).

6. State then provided the "Under Review-Do Not Revoke Yet" names to one or more "Revocation Cell Analyst[s]." R2 (Dkt. 195-2/196-2). The "Revocation Cell Analyst" would first (Step 1) categorize these names into one of three groups. The first group, Criminal Charges for Review, involved "cases with insufficient information in arrest charge, no clear nexus to public safety." *Id*. This includes [redacted] *d.* The second, "Not Guilty," applied to "cases with a final disposition of 'not guilty' or 'acquittal' for ALL charges." *Id.* The third, DHS Hit, involved "non-criminal cases with a hit related to an immigration violation." *Id.*

7. The Analyst would then (Step 2) search one or more of its databases. R2 (Dkt. 195-

2). What is to be searched is redacted. The Analyst would then write any "[n]otes," that is, a summary of "any additional details relevant to determining a basis for prudential revocation." R3 (Dkt. 195-2/196-2). This includes, by way of provided examples, [redacted]

8. The Analyst would then (Step 3) enter a "proposed action." R3 (Dkt. 195-2/196-2).

9. The first potential proposed action would be "Change to CA Revoke," that is, to "prudentially revoke a visa." R3 (Dkt. 195-2/196-2) This includes [redacted]

10. The second potential proposed action would be "Change to Pending DHS Information" for "when charge information and case review is insufficient to support a revocation." R3 (Dkt. 195-2/196-2).

11. And for "Not Guilty cases," the Analyst would "Change to No Action Available to State," but only "when the applicant has been found legally not guilty of the crime, the charges do not form a basis for prudentially revoking the visa." R4 (Dkt. 195-2/196-2). For that last category, it's not clear if there is a typo or a missing word such as "and"—as written, it suggests that an individual who is found not guilty on all (or maybe only relevant, again unclear) charges may never have their visas prudentially revoked, but the record states that individuals who have been found not guilty on all criminal charges (not just relevant ones) are sent through this very review

process rather than simply not having their visas revoked. R2 (Dkt. 195-2/196-2). That would make no sense if the result of the review process was preordained.

12. For DHS Hit cases, a separate category of what to do is provided, [redacted]

13. The Analyst would next (Step 4) add any additional relevant information or explanation of the proposed action. R4 (Dkt. 195-2/196-2).

14. Once that occurred, a team lead would (Step 5) review (and potentially amend) the Analyst's work, and then order the "revocation cell team members to prudentially revoke" the visas for those categorized as "CA Revoke." R5 (Dkt. 195-2/196-2). The team lead would also send one or more emails "to DHS with vases for more information of for no action available," and then update statuses in a spreadsheet. *Id*. Once additional information came from DHS, that information would (Step 6) be added to the spreadsheet by the Analyst, who would also (unclear if permissively or mandatorily) move individuals to either CA Revoke or No action available to

State, which would then be sent back to the team lead for either revoking the visa or informing DHS. *Id.*

15. Nothing in the record establishes that either Revocation Cell Analysts or team leads could issue immigrant or nonimmigrant visas. Nothing in the record establishes that Revocation Cell Analysts or team leads could adjudicate an individual's nationality.

16. The term "prudential visa revocation" does not appear anywhere in the United States Code or the Code of Federal Regulations. The term appears instead in the Foreign Affairs Manual, where it describes a prudential visa as such: "Although you usually may revoke a visa only if the individual is ineligible under INA 212(a), or INA 214(b), or is no longer entitled to the visa classification, the Department may revoke a visa if an ineligibility or lack of entitlement is suspected, when an individual would not meet requirements for admission, or in other situations where warranted." 9 F.A.M. § 403.11-5(B). A prudential revocation is not effectively immediately, but instead effective upon departure. Answer to Amended Complaint (Dkt. 160) ¶ 60.

**III. Plaintiffs are harmed by the policy.**

17. The plaintiffs in this case, who are bringing claims against the Department of State (like all of the Chen plaintiffs)—Jing Tao and Yifeng Wu, along with former plaintiff Wanrong (Fiona) Li—are all law-abiding students who have never been convicted of any crime, let alone one implicating public safety or national security. Tao Decl. (Dkt. 65 Ex. A) at ¶ 6 (Exhibit C); Wu Decl. (Dkt. 65 Ex. B) ¶ 11 (Exhibit D); Li Decl. (Dkt. 65 Ex. C) ¶ 12 (Exhibit E).

18. They have maintained their F-1 status, complied with the terms of their student visas, maintained academic standing, and contributed to their schools and communities. Tao Decl. (Ex. C)) ¶ 5; Wu Decl. (Ex. D) ¶ 7; Li Decl. (Ex. E) ¶ 5.

19. One of them—Wu—had charges filed against him for graffiti dismissed, while the

others have had no criminal charges filed against them. Tao Decl. (Ex. C) ¶ 6; Wu Decl. (Ex. D) ¶ 10; Li Decl. (Ex. E) ¶ 12.

20. Jing Tao is a Chinese national who came to the United States on an F-1 visa. Tao Decl. (Ex. C) ¶¶ 2-3. She began her studies as a doctoral student in the Political Science program at the University of Texas at Dallas School of Economic, Political, and Policy Sciences in the Fall of 2023. *Id.* ¶ 4. She is expected to graduate in 2028. *Id.* Since starting the program in Fall 2023, Ms. Tao has maintained continuous full-time enrollment and strong academic standing, with a current GPA of 3.8. *Id.* She received straight A's in Spring and Summer 2024 and has actively contributed to the department's academic community. *Id.* Since starting her program, she has already had a paper accepted for presentation at the Midwestern Political Science Association conference. *Id.* It is currently in the process of publication. *Id.*

21. Ms. Tao has never been charged with a crime. Tao Decl. (Ex. C) ¶ 6. Her only contact with law enforcement was in August 2024, when she became frightened of her boyfriend during a verbal altercation and called the police herself. *Id.* While the police took Ms. Tao into custody at the time as a precautionary measure, no charges were ever filed against her. *Id.*

22. Tao's SEVIS record was unlawfully terminated in April 2025. Tao Decl. (Ex. C) ¶ 7. Within days of that termination, Ms. Tao further received word that her F-1 visa was revoked. *Id.* ¶ 9; *see also* Dkt. 65 Exhibit D (Email from Guangzhou Consulate) (Apr. 10, 2025) (Exhibit F). According to the email, her visa had been revoked under 8 U.S.C. § 1201(i). *Id.*; [redacted] She was further told that this visa revocation was communicated to ICE, which "manages the Student Exchange Visitor Program and is responsible for removal proceedings. *Id.* The email warned that remaining in the U.S. "can result in fines, detention, and/or deportation." *Id.* Had Ms. Tao's SEVIS status not been restored, she would have been unable to

continue her studies, lost her funding for her doctoral program, and been left with no sources of income. Tao Decl. (Ex. C) ¶ 9. And because her visa has not been restored, she is unable to go abroad to present her research at conferences in other countries or return home to visit her parents, whom she has not seen in over two years. *Id.* ¶ 10.

23. Yifeng Wu, another Chinese national, began his undergraduate studies in social work at NYU in the Fall of 2024. Wu Decl. (Ex. D) ¶ 4. He maintained a GPA of around 3.5 in his freshman year. *Id.* ¶ 5. Mr. Wu has never been convicted of any crime, much less a crime of violence. *Id.* ¶ 10. He has one arrest due to unlawful graffiti, but the charges were dropped. *Id.*

24. Mr. Wu learned on April 8th that his SEVIS status was terminated. Wu Decl. (Ex. D) ¶ 5. Mr. Wu also learned that his visa was revoked. *Id*. His SEVIS status was restored as a result of this litigation. *Id*. ¶ 6. But his visa remains prudentially revoked. *Id*. ¶ 9. Because of his revoked visa, Mr. Wu cannot go back to Nanjing for an internship he had successfully applied for over the summer. *Id*. ¶ 11. He also cannot see his family for the duration of his studies, which will take several years, as he only recently finished his freshman year. *Id*. ¶¶ 4-5, 11.

25. Former plaintiff Ms. Wanrong Li, also a Chinese national, graduated from the University of Southern California this past spring with a Master of Science in Analytics. Li Decl. (Ex. E) ¶ 3. Her final GPA was 3.8. *Id*. She now works for ByteDance. *Id.* ¶ 4. Her role in e-commerce strategy focuses on developing and optimizing strategies for TikTok's global e-commerce business. *Id.*

26. In 2022, a neighbor called the police during a domestic dispute Ms. Li had with her boyfriend. Li Decl. (Ex. E) ¶ 11. Ms. Li was taken into protective custody at the time, but was never arrested or charged with any crime. *Id.* ¶ 11.

27. On April 6, she received an email from the U.S. Embassy in Tokyo telling her that

her visa had been revoked under 8 U.S.C. § 1201(i). Li Decl. (Ex. E) ¶ 6; Email, Dkt. 65 Ex. E (email) (Exhibit G). Her email had functionally the same text as the one sent to Ms. Ting: she was told that this visa revocation was communicated to ICE, which "manages the Student Exchange Visitor Program and is responsible for removal proceedings, and warned that remaining in the U.S. "can result in fines, detention, and/or deportation." Ex. G. Two days later, on April 8, she received notice from USC that her SEVIS status had been terminated. Li Decl. (Ex. E) ¶ 7; Email, Ex. G. This email also warned her about remaining in the U.S. *Id.*, Ex. G.

28. Despite these actions (and because of this lawsuit), Ms. Li was able to graduate shortly thereafter. Li Dec. (Ex. E) ¶ 9. She went on to work for ByteDance under SEVIS's Optional Practical Training (OPT) program. *Id*. But, like the others, her F-1 visa was not restored. *Id*. ¶ 8. Li has voluntarily dismissed her action because she has since acquired her H-1 visa. *See* Li Decl. (Dkt. 65 Ex. C) at ¶¶ 10-11.

**IV. DHS restores SEVIS in response to litigation, but State does not revoke promises to revoke visas (including Plaintiffs).**

29. The Non-State Plaintiffs in this action, and the plaintiffs in the other consolidated actions, filed for relief from the SEVIS revocations in April 2025. Dkt. 53 at 7. On April 25, 2025, during a hearing on motions for a temporary restraining order, counsel for DHS and ICE "announced that ICE had begun to reinstate SEVIS records and would develop a new policy for terminating SEVIS records going forward." *Id.* at 8. "Counsel represented that Plaintiffs' records would remain active '[u]ntil such a policy is issued.'" (*Id.* (citing Statement Regarding Reactivation of SEVIS Records, *Doe v. Trump*, 25-cv-3140, Dkt. No. 47 (N.D. Cal. Apr. 25, 2025) at ¶¶ 1, 3)[1]. ICE issued the new policy within a day. *Id.* (citing *Doe* Dkt. No. 51, Notice Regarding

[1] *Doe* has been consolidated with this case.

Policy at 2:3-4 (Apr. 30, 2025); *Doe* Dkt. No. 51-1, Broadcast Message: SEVIS Notice – Policy Regarding Termination of Record) (Apr. 26, 2025).

30. ICE and DHS then began restoring the SEVIS records of those that were terminated. *Id.* Thereafter, this Court entered a preliminary injunction enjoining ICE and DHS from reversing those SEVIS revocations, except as permitted by 8 C.F.R. §214.1-214.2, and from imposing various legal effects on affected individuals. Dkt. 53 at 20-21; *see also* Dkt. 113 (amending injunction). That injunction was not issued against State, and no visas have been restored. *See also* Dkt. 98 (declining to enter preliminary injunction against State).

## ARGUMENT

### I. The visa termination policy constitutes final agency action.

Final agency actions are those (1) which "mark the consummation of the agency's decisionmaking process"—not "of a merely tentative or interlocutory nature" and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Engineers v. Hawkes*, 578 U.S. 590, 597 (2016). When meeting this test, a decision or a policy qualifies as final agency action, even if unwritten. *See Al Otro Lado v. McAleenan*, 394 F. Supp. 3d 1168, 1206–1209 (S.D. Cal. 2019); *see also Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 530 F.3d 925, 931 (D.C. Cir. 2008) (the decision to adopt a policy is final agency action).

This Court has already held that the joint-DHS-State visa and SEVIS termination policy carried out in early April 2026 constitutes final agency action. Dkt. 53 at 15; Dkt. 142 at 6-7; *see also PAHEI v. Noem*, 824 F. Supp. 3d 168, 196 (D. Mass. 2026) (April 2025 visa termination policy constitutes final agency action of State).

### II. State lacks any statutory basis for the Visa Termination Policy.

State's only purported statutory basis for enacting the visa termination policy is 8 U.S.C. §

1201(i). 8 U.S.C. § 1201(i) states that "[a]fter the issuance of a visa or other documentation to any alien, the consular officer or the Secretary of State may at any time, in his discretion, revoke such visa or other documentation." [2]

**A. The revocations were not performed by the Secretary or by "the consular official."**

Section 1201(i) limits the authority it grants to the Secretary of State or to "the consular official." That contrasts with 8 U.S.C. § 1182(f), which permits the President, only upon the finding that "the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States," may "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restricts he may deem to be appropriate."

So while Section 1201(i) gives the Secretary of State or the consular officer who issued a visa the right to revoke that visa, it does not give the power to suspend that visa to other parties or permit the Secretary of State or consular official to delegate that power to others. It also does not give the Secretary of State or any consular official the ability to suspend classes of visas; that authority rests with the President (upon specific factual findings alone). It only allows the Secretary of State or the consular official to make individual determinations on specific visas.

Here, the visa revocation policy is in excess of statutory authority. The policy instructs ordinary State Department officials to revoke the visas. But Section 1201(i) limits its grant of

[2] To be clear, there are other grounds besides Section 1201(i) that would render an individual deportable. *See generally* 8 U.S.C. § 1227. This includes convictions for criminal offenses. *Id.* at § (a)(2). But, that is only for specific criminal offenses, such as crimes of moral turpitude, aggravated felonies, high speed flight, failure to register as a sex offender, drug possession, domestic violence, and firearms offenses. As detailed in the undisputed statement of facts, State did not limit its visa revocation process to those eligible for deportation under 8 U.S.C. § 1227(a)(2). *See also* § IV, below. So even if that section provides independent grounds for visa revocation, it cannot support State's policy. Nor have any of the State Plaintiffs been convicted of any crime, much less a crime listed in 8 U.S.C. § 1227(a)(2).

authority to “the Secretary of State” or “the consular official.” By using the word “the” before consular official, Congress limited its authority to a particular, identifiable consular officer. *See Gale v. First Franklin Loan Servs.*, 701 F.3d 1240, 1246 (9th Cir. 2012) (the word “the” is a “word of limitation” that applies only to a specific, identifiable subject). The use of the phrase the also indicates an intent for that subject’s authority to be “exclusive.” *Am. Bus Ass'n v. Slater*, 231 F.3d 1, 5 (D.C. Cir. 2000). So who the phrase “the” refers to “must have been settled” at the time Section 1201(i) applies, *Nielsen v. Preap*, 586 U.S. 392, 408 (2019), by reference to Section 1201(i)’s statutory context, *Gale*, 701 F.3d at 1246.

8 U.S.C. § 1201(a)(1) provides the context. Section 1201(a)(1) states that “a consular official may issue … a visa.” That, and the rest of Section 1201’s general use of the phrase “the” or “such” to refer to a consular officer (with only a small number of exceptions that make sense in context), indicates that “the consular official” who has the authority to revoke a visa is the consular official who issued such visa.

Further confirming that “the consular official” means the consular official who issued the visa is the statutory definition of consular official. A consular official “means any consular, diplomatic, or other officer or employee of the United States designated under regulations prescribed under authority contained in this chapter, for the purpose of issuing immigrant or nonimmigrant visas or, when used in subchapter III, for the purpose of adjudicating nationality.” 8 U.S.C. § 1101(9). Section 1201(i) is not in subchapter III. If Section 1201(i) were intended to give authority to a State employee other than the one who issued the visa (or the Secretary), then the definition of consular official would necessarily not only include those who have the authority to issue visas, but also the authority to revoke them. Otherwise, the consular official in Section 1201(i) would not be a consular official in the first place; even if that official also had the authority

to issue visas, he would not be revoking visas in his capacity of "issuing immigrant or nonimmigrant visas." Similarly, if simply any State officer had the authority to revoke a visa, then it would run contrary to the longstanding principle that in general "[n]ot even the Secretary of State has the power to review a consular official's visa decision." *Patel v. Reno*, 134 F.3d 929, 933 (9th Cir. 1997).

Meanwhile, Congress's specific limitations of authority to "the Secretary of State" or to "the consular official" means that such authority cannot be delegated to a different consular official, even by the Secretary of State.[3] Otherwise, Congress's limited authority would make no sense. Likewise, were Congress to give anyone other than the President the authority to revoke (or to refuse to issue) the visas of a class of immigrants, then the limitation of 8 U.S.C. § 1182(f) to the President would also make no sense.

Not only were the individuals who revoked the visas neither the Secretary nor the consular official who issued each visa, State has not established that they were consular officials at all. Rather, the visa revocations were made by "Revocation Cell Analyst[s]." SOF ¶ 6. And unlike ordinary consular officials, these officers' decisions were subject to review by a "team lead," SOF ¶ 14, who also had the authority to order the revocation cell analysts to revoke visas. None of this looks like how consular officials operate.

**B. 1201(i) does not apply to visas for those who are already present in the United States.**

Section 1201(i) also does not provide State with statutory authority to enact the policy

[3] It is true that *Noh v. INS*, 248 F.3d 938, 941(9th Cir. 2001), upheld a visa revocation under Section 1201(i) based on a purported delegation of authority from the Secretary to the Deputy Assistant Secretary. But in that case the parties incorrectly assumed that Section 1201(i) authority is delegable. *Id.*; *see Est. of Magnin v. Comm'r*, 184 F.3d 1074, 1077 (9th Cir. 1999) ("When a case assumes a point without discussion, the case does not bind future panels") (citations omitted).

because that section is limited to circumstances where individuals have not been admitted to the United States. *See* Dkt. 102 at 5-8. Plaintiffs are aware that this Court has already ruled to the contrary. *See* Dkt. 126 at 4-5. Plaintiffs respectfully ask this Court to reconsider this fully-briefed issue; in the alternative, Plaintiffs preserve the argument for appellate review.

**III. The policy is contrary to 22 CFR 41.122(e).**

22 C.F.R. § 41.122(e) allows for a consular official to revoke a visa under Section 221(i) in 9 instances, none of which apply here:

> (1) The alien obtains an immigrant visa or an adjustment of status to that of permanent resident;
>
> (2) The alien is ordered excluded from the United States under INA 236, as in effect prior to April 1, 1997, or removed from the United States pursuant to INA 235;
>
> (3) The alien is notified pursuant to INA 235 by an immigration officer at a port of entry that the alien appears to be inadmissible to the United States, and the alien requests and is granted permission to withdraw the application for admission;
>
> (4) A final order of deportation or removal or a final order granting voluntary departure with an alternate order of deportation or removal is entered against the alien;
>
> (5) The alien has been permitted by DHS to depart voluntarily from the United States;
>
> (6) DHS has revoked a waiver of inadmissibility granted pursuant to INA 212(d)(3)(A) in relation to the visa that was issued to the alien;
>
> (7) The visa is presented in connection with an application for admission to the United States by a person other than the alien to whom the visa was issued;
>
> (8) The visa has been physically removed from the passport in which it was issued; or
>
> (9) The visa has been issued in a combined Mexican or Canadian B–1/B–2 visa and border crossing identification card, and the immigration officer makes the determination specified in § 41.32(c) with respect to the alien's Mexican citizenship and/or residence or

> the determination specified in § 41.33(b) with respect to the alien's status as a permanent resident of Canada.

Because none of these reasons are satisfied, the cancellations are invalid. *Wong v. Dep't of State*, 789 F.2d 1380, 1385 (9th Cir. 1986). An agency is bound by its own regulations, and acting contrary to them—without first changing them—constitutes unlawful agency action. *See generally United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954); *Doe v. Noem*, 778 F. Supp. 3d 1151, 1160 (W.D. Wash. 2025) (citing cases).

In *Noh v. INS*, the Ninth Circuit found that due to the application of Section 1201(i), challenges to visa revocations are not challengeable for failure to follow the requirements of 22 C.F.R. § 41.122. 248 F.3d 938, 941 (9th Cir. 2001). But there, *Noh* was challenging an individual visa revocation decision, so Section 1201(i) and its review bar applied. Here, in contrast, as this Court already has held, Dkt. 142 at 5-7, Plaintiffs are challenging the visa revocation policy, and so Section 1201(i)'s review bar does not apply.

**IV. The policy is arbitrary and capricious.**

The APA requires "reasoned decisionmaking." *Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 52 (1983). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id*. at 43 (cleaned up). As a result, "agency action is lawful only if it rests on a consideration of the relevant factors" required by the statutory scheme. *Michigan v. E.P.A.*, 576 U.S. 743, 750 (2015) (cleaned up) (quoting *Motor Vehicles*, 463 U.S. at 43).

Because of this, "[a] rule is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of

agency expertise.'" *Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1190 (9th Cir. 2010) (quoting *Motor Vehicles*, 463 U.S. at 43). For a policy to survive an arbitrary capricious challenge, it must show that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id*. (quoting *Motor Vehicles*, 463 U.S. at 43). And when an agency changes position, it must provide "good reasons" for the shift. *See F.C.C. v. Fox Television Stations*, 556 U.S. 502, 515 (2009).

Here, State's rule fails for several reasons. The policy revokes visas for, among other things, [redacted] SOF ¶ 9. State has provided no satisfactory answer why such charges should lead to visa revocation, and for good reason—no such good reason exists. This is especially true since State did not restrict the policy to felonies. *Id.* So even misdemeanor [redacted] ead to visa revocations.

Look at Mr. Wu. Mr. Wu was charged (not convicted) of graffiti. SOF ¶ 23. Apparently, State considered this a crime of sufficient basis to prudentially revoke his visa. Given that State instructed that [redacted] would be sufficient, SOF ¶¶ 6, 9, and then further [redacted]

Making it worse, State does not require a conviction [redacted] SOF ¶ 6; *see also* SOF ¶ 19 (no charges for Ms. Tao or Ms. Li) [redacted] So do cases in which the visaholder was acquitted on the relevant charges, so long as the visaholder was found guilty on any other charge. *Id.* Indeed, even when charges are dismissed, rather than

acquitted—as happened to Mr. Wu—the policy requires visa revocation. SOF ¶ 23. There is no nonarbitrary reason for such a distinction.

So Mr. Wu's dropped graffiti charges were enough for State to prudentially revoke his visa. SOF ¶ 23. Ms. Li and Ms. Tao were not even charged with a crime, simply taken into protective custody during domestic disputes, and that was enough for State to prudentially revoke their visas. SOF ¶¶ 21, 26. Indeed, Ms. Tao was the one who herself called the police as the victim of domestic abuse. SOF ¶ 21. Congress's creation of U visas, 8 U.S.C. § 1101(a)(15)(U), indicate Congress's intent to protect victims of abuse by ***granting*** them visas, not to punish them by ***revoking*** visas.

Having departed from the reasons in 22 C.F.R. § 41.122(e), and gone well beyond the statutory reasons for expelling individuals set forth in 8 U.S.C. § 1227, State would have to provide valid, nonarbitrary or capricious reasons for such departure even were it allowed to proceed without notice and comment. And it has not. For this reason alone, the policy must be set aside.

Finally, even if the policy were otherwise nonarbitrary, the fact that it was combined with invalid SEVIS status revocation makes it arbitrary. As a result, these "prudential" visa revocations do not mean that visaholders, as supposed security threats, may not leave the country. Instead, it means that they can stay in the country for as long as they maintain status. It is only if they leave that they cannot return. But none of the supposed threats these visaholders supposedly present to the United States has anything to do with their entry or re-entry in the United States. To the extent that they are public threats, having them stay in the United States is at best neutral, and potentially worse, than allowing them to leave the country during school breaks.

## V. The proper remedy is to prohibit State from revoking visas.

### A. The Court should forbid revoking visas that have not yet been revoked under the policy.

For Plaintiffs (and most other individuals affected by State's visa revocation policy), the

"prudential" visa revocations have not yet taken place. SOF ¶ 16. Rather, State revokes a prudential visa only upon the visaholder leaving the country. *Id.*

But once the Court sets aside State's visa revocation policy, it can no longer revoke any visas under that policy, even if it has already announced an intention to do so.

Under the Administrative Procedures Act, a "reviewing court shall ... set aside agency action" that it finds to be "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A). And so "vacatur and remand is the default remedy under the APA[.]" *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025). Meanwhile, the Supreme Court "[o]ver the decades ... affirmed countless decisions that vacated agency actions ... rather than merely providing ... relief that enjoined enforcement of the rules against the specific plaintiffs." *Corner Post v. Federal Reserve Board*, 603 U.S. 799, 830–31 (2024) (Kavanaugh, J., concurring) (collecting cases).

Once a policy is set aside, an agency cannot effectuate that policy. *See California by & Through Becerra v. Azar*, 501 F. Supp. 3d 830, 843 (N.D. Cal. 2020) (a policy cannot be enforced in limited ways once set aside) That would include, in this case, revoking visas that were to be revoked in the future under the policy.

**B. In the alternative, the Court should order the restoration of the "prudentially" revoked visas.**

Even if the Court finds that State has already revoked Plaintiffs' and others' visas, the result is the same. Once a policy is set aside, the agency must also set aside actions taken based on the policy. *PAHEI*, 824 F. Supp. 3d at 200 ("An agency action must be set aside as contrary to law when it is inconsistent with regulations") (cleaned up) (stringcite omitted). That is no less true for when the action that is set aside is the revocation of a visa, or a failure to issue a visa, as a necessary consequence of setting aside a visa revocation or visa refusal policy. *See Cath. Legal Immigr. Network v. Rubio*, 840 F. Supp. 3d 209, 250–51 (S.D.N.Y. 2026) ("The judgment shall set aside

and vacate any refusal of an immigrant visa that was based solely upon the Policy, and remand those agency actions for further proceedings consistent with this Opinion and Order.”).

**C. The Court should also provide declaratory relief.**

Declaratory relief is available, as a matter of equity, under the APA. *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995). In determining whether to grant declaratory relief, the “court must weigh the competing claims of injury and the effect on each party of the granting or withholding of the requested relief.” *Id.* (cleaned up). “Declaratory relief is appropriate ‘(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.’” *Mansor v. USCIS*, 685 F. Supp. 3d 1000, 1014–15 (W.D. Wash. 2023) (quoting *Eureka Fed. S & L v. Am. Cas. Co. of Reading*, 873 F.2d 229, 231 (9th Cir. 1989).

Here, declaratory relief will guide the decisions of potentially-unreviewable consular officials when deciding in the future whether to grant or revoke the visas of Plaintiffs and others whose visas were “prudentially revoked” by the visa revocation policy. It will give those affected, including Plaintiffs, certainty regarding their ability to retain their visas if they leave the country. It will confirm, when Plaintiffs and others seek further immigration benefits, that they never overstayed or otherwise acted contrary or beyond the terms of their valid visas. And it will limit any attempt by the government to re-enact the visa termination policy at issue in this case by other means or through other officials.

**CONCLUSION**

The Court should set aside State’s visa cancellation policy. Having set it aside, it should enter a declaratory judgment stating that the policy was unlawful. And either because the visa revocations have not yet occurred, or alternatively to undo the unlawful policy, this Court should

prohibit State from revoking the visas of Plaintiffs and others affected by the policy when they exit the country.

Dated: November 20, 2026

Respectfully submitted,

CHINESE AMERICAN LEGAL DEFENSE ALLIANCE

/s/ *Justin Sadowsky*
JUSTIN SADOWSKY

*Attorney for Plaintiffs*
*Zhuoer Chen, Mengcheng Yu, Jiarong Ouyang, Gexi Guo and Jing Tao*