# EXHIBIT A

Case 1:25-cv-01096-ACR Document 18 Filed 04/29/25 Page 1 of 58


UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AKSHAR PATEL, Plaintiff,

vs. CASE NO. 1:25-cv-01096-ACR

TODD M. LYONS, Acting Director, U.S. Immigration and Customs Enforcement, Defendant.

TRANSCRIPT OF HEARING ON MOTION FOR PRELIMINARY INJUNCTION OR SUMMARY JUDGMENT

**BEFORE THE HONORABLE ANA C. REYES, DISTRICT JUDGE**

Tuesday - April 29, 2025
10:05 a.m. - 11:00 a.m.
Washington, DC

**FOR THE PLAINTIFF:**

Banias Law, LLC
BY: BRADLEY BRUCE BANIAS
602 Rutledge Avenue
Charleston, South Carolina 29403

Reddy Neumann Brown, P.C.
BY: STEVEN A. BROWN
10333 Richmond Avenue, Suite 1050
Houston, Texas 77042

**FOR THE DEFENDANT:**

U.S. Department of Justice, Civil Division
BY: JOHNNY HILLARY WALKER, III
601 D Street, NW
Washington, DC 20004

---

**SONJA L. REEVES**
**Registered Diplomate Reporter**
**Certified Realtime Reporter**
**Federal Official Court Reporter**
333 Constitution Avenue, NW
Washington, DC 20001
Transcript Produced from the Stenographic Record

(Call to Order of the Court at 10:05 a.m.)

DEPUTY CLERK: This is Civil Action 25-1096, *Akshar Patel versus Todd M. Lyons*.

Would the parties please come forward and identify themselves for the record.

MR. BANIAS: Good morning, Your Honor. Brad Banias and Steven Brown for the plaintiff.

MR. WALKER: Good morning, Your Honor. Johnny Walker with the United States Attorney's Office for the defendant. I'm joined at counsel table by Andre Watson, the assist director with Homeland Security; Macklin Everly, who is an associate legal advisor in the district court litigation section at ICE; and Annemarie Brennan-Linnan, chief of the district court litigation section at ICE.

THE COURT: What a great name you have.

First of all, can anyone tell me why today is also an important day? It's been on my calendar for a long time. Anyone? No one?

Today is the day that Rick Atkinson has released his second book in the trilogy on the American Revolution. If you haven't read his World War II trilogy, I highly recommend it. If you're at all interested in the founding of America and the constitutional system and the Revolutionary War, I highly recommend the first book.

The second book starts off in France with the King and

Marie Antoinette hanging out with Ben Franklin, and the precarious situation that the French were in because they hated England, they just lost the seven-year war and were super upset about that, so they wanted to support the U.S., but they didn't really want to be seen as supporting a bunch of rebels seeking republicanism against the monarchy.

So if you want to hear about how we got rid of the monarchy in the United States, I commend to you his second book.

With that, Mr. Walker, I have a number of questions for you about the administrative record that you filed last night.

MR. WALKER: Certainly.

THE COURT: And thank you for doing that.

First -- so the first thing I have is a Tuesday, April 1st, 2025 email at 4:58 p.m. from an Andre Watson to a Mr. Meyers. And Mr. Watson is the assistant director for the U.S. Department of Homeland Security, ICE. And he says, "In furtherance of our student criminal alien initiative, the attached letterhead," et cetera.

What is the student criminal alien initiative?

MR. WALKER: I don't know precisely what the scope of that is. I think what you see described in this record and throughout the administrative record is sort of the process that Mr. Watson described.

THE COURT: Well, there was no process, just to be clear. There was an email saying "here are the people," and an email saying "get rid of them all." So we'll go through that process, but I want to know, what is the student criminal alien initiative?

MR. WALKER: Like I said, I don't know the exact scope of what that is.

THE COURT: Well, where is it? Where can I find it?

MR. WALKER: Where is the initiative?

THE COURT: Yeah, where can I find it?

MR. WALKER: I believe that that's just a term that is being used here by Mr. Watson to refer to what was described in the declaration where ICE ran a number of students through the NCIC, passed the hits along to the Department of State, and then the Department of State passed the information back to ICE about requesting that certain of those records be terminated in SEVIS, and the records were terminated in SEVIS based on the criminal record.

THE COURT: Okay. You're from DHS?

MR. WATSON: Yes, ma'am.

THE COURT: Do you know what the student criminal alien initiative is?

MR. WATSON: Yes, ma'am.

THE COURT: What is it?

MR. WATSON: This initiative --

THE COURT: First of all, come on up. Are you an attorney?

MR. WATSON: No, ma'am.

THE COURT: Great. You survived not having to go to law school, and, yet, here you are.

Give me your name again, sir.

MR. WATSON: It's Andre Watson.

THE COURT: Oh, we met last time.

MR. WATSON: Yes, ma'am.

THE COURT: Welcome to the DC area.

MR. WATSON: Thank you.

THE COURT: First of all, where can I find the student criminal alien initiative?

MR. WATSON: This initiative is centered at DHS headquarters.

THE COURT: Is it in writing anywhere?

MR. WATSON: No, ma'am.

THE COURT: It's just out there in the world?

MR. WATSON: It's a name that was given by my staff to this specific effort to scrub records from SEVIS through NCIC to determine if there were positive criminality hits within NCIC.

THE COURT: When you say -- tell everyone what NCIC is.

MR. WATSON: National Crime Information Center.

THE COURT: It's a database of people, right?
MR. WATSON: Yes, ma'am.
THE COURT: It includes people who have been arrested but not tried, right?
MR. WATSON: Yes, ma'am.
THE COURT: It includes people who have been arrested but not convicted, right?
MR. WATSON: Yes, ma'am.
THE COURT: It includes people, I suppose, who have a ticket for reckless driving, even if those charges were not brought, right?
MR. WATSON: Yes, ma'am.
THE COURT: It includes people who are missing, missing people records, right?
MR. WATSON: Yes, ma'am.
THE COURT: So when we say the -- what did you call it again? National -- what was it again? National what?
MR. WATSON: National Security Division.
THE COURT: No, no, NCIC.
MR. WATSON: National Crime Information Center.
THE COURT: So when we say the National Crime Information Center, we don't mean that everyone in the database has committed a crime, right?
MR. WATSON: Yes, ma'am.
THE COURT: I'm right about that?

MR. WATSON: Yes, ma'am.

THE COURT: For example, it would be inappropriate to run NCIC for a bunch of names, have them pop up and terminate them based on that reason alone, right?

MR. WATSON: I'm sorry?

THE COURT: It would be inappropriate to run through the SEVIS database a number of names, have them pop up as being in the database, and then terminate them on that reason alone, right? Because it could be that they were never charged. It could be that they were just there for speeding. It could be that they were just missing persons, right?

MR. WATSON: That's fair, but it's done on a case-by-case review, and that is what my staff endeavored to do based on the positive hits that were identified. And as such, we categorized those positive hits based on the charge and any disposition. And from there, the appropriate responses were categorized in spreadsheets that were then sent to the Department of State.

THE COURT: How big of a staff did you have doing this?

MR. WATSON: Rough order of magnitude, I would put it between 10 to 20 federal employees.

THE COURT: What exactly did they do? How did they start?

MR. WATSON: I'm sorry, ma'am?

THE COURT: What exactly did these 10 to 20 people do?

MR. WATSON: These 10 to 20 people serve in various roles as analysts --

THE COURT: I don't care what they do. I mean, apparently what they did was not important enough to pull 10 to 20 federal employees to search a bunch of records for students who were in the U.S. legally.

Let's put aside what they do during their day jobs and just focus for me right now on what they did with respect to this effort. You got them together and you told them to do what?

Were you in charge of this effort, sir? You said it was your staff.

MR. WATSON: My staff supported the effort, so --

THE COURT: Who is in charge of the effort? Who is like the head honcho on this effort?

MR. WATSON: For my program office, that is acting executive associate director Robert Hammer.

THE COURT: Hammer?

MR. WATSON: Yes, ma'am.

THE COURT: Appropriate last name given what has happened, but go ahead.

MR. WATSON: So at the instruction of leadership, we, being ICE, took action --

THE COURT: Leadership at DHS?

MR. WATSON: Yes, ma'am.

THE COURT: You, ICE, took action.

MR. WATSON: To take the population of nonimmigrant students studying in the United States and run them through NCIC.

THE COURT: So name by name, everyone had to be run through this database?

MR. WATSON: Yes, ma'am.

THE COURT: How many people did you run through this database?

MR. WATSON: Just under 1.3 million.

THE COURT: Are you telling me that with all of the cost-cutting that we have going on right now, because apparently we're spending too much money on the federal government doing things like, oh, I don't know, funding cancer research, can't afford to do that, that we had -- not "we," someone had 10 to 20 federal employees spend their time going name by name in a database to see what hits they got for 1.3 million people? Is that what happened? Yes or no.

MR. WATSON: Yes, with contract support.

THE COURT: Hold on. And once you ran -- how long did that take?

MR. WATSON: I would estimate between two to three weeks.

THE COURT: Okay. Now, humor me. What were these

other people who were taken away from their jobs for two to three weeks putting names into a database to see what hits they would get, what other things would they normally be doing?

MR. WATSON: This is part of our lines of effort. So within my division annually, we are responsible for taking data from various sources to determine if in fact we have overstays or people that are out of status.

THE COURT: When was the last time that the government made an effort to take a number of employees to put all students who are here on visas through the NCIC database?

How long have you been in your office?

MR. WATSON: I've been in this role for over four years.

THE COURT: In your four years in the role, how often has that happened, for the students -- to put all the students in the U.S. here on visas through the database, NCIC database?

MR. WATSON: We do in addition to students.

THE COURT: No, no, I'm just asking about students. When was the last time that there was an initiative somewhere along the line of the student criminal alien initiative?

MR. WATSON: For specific students, I'm not aware of an effort at this magnitude.

THE COURT: Now, of the 1.3 million people that 10 to 20 federal employees spent to two to three weeks -- I just want to make sure I understand this.

If I'm one of the federal employees, I would have a list of all the students here on F-1 visas, right?

MR. WATSON: Uh-huh.

THE COURT: And I would be given, I don't know, 1,000 of the names to handle. And the first name would be Jane Smith. So I would go to the NCIC database and put in the name Jane Smith, correct?

MR. WATSON: In that instance, these were batch runs, so based on the capabilities that already exist within --

THE COURT: How many batch runs were run?

MR. WATSON: I don't have the exact number.

THE COURT: But enough for us to be spending time going through 1.3 million people, right?

MR. WATSON: Yes, ma'am.

THE COURT: And out of those 1.3 million people that 10 to 20 federal employees spent to two to three weeks tracking down in NCIC, how many of those came up as a hit in the NCIC system?

MR. WATSON: Over 16,000, and then from there, the number went down to 13,900.

THE COURT: And then what went down from there? Hold on one second. 16,000 out of 1.3 million people?

MR. WATSON: Yes, ma'am.

THE COURT: You want to tell me what percent that is?

MR. WATSON: I don't know off the top of my head.

THE COURT: All right. It's less than 1 percent. It's less than 100th of a percent.

Now, of those 16,000 people --

Sam, can you get me the right number since you're our math person?

Of those 16,000 people, what happened next?

MR. WATSON: Continued analysis to, one, validate the match between what the NCIC record was against what the SEVIS record was.

THE COURT: Because you might have a John Smith, then it would be a different John Smith?

MR. WATSON: Yes, ma'am.

THE COURT: So when we did that, how many people came out of the 16,000?

MR. WATSON: Just over 6,400.

THE COURT: So then we're down to 10,000.

MR. WATSON: Below 10,000.

THE COURT: What happened next with those 10,000?

MR. WATSON: Those were consolidated on spreadsheets based on close of business activities, and then referred to the Department of State.

THE COURT: What does "close of business activities" mean?

MR. WATSON: How many you can do in one day.

THE COURT: Oh, so batches would go to them?

MR. WATSON: Correct.
THE COURT: And then you sent that off to State?
MR. WATSON: Yes, ma'am.
THE COURT: And then what happened?
MR. WATSON: State conducted their own analysis.
THE COURT: Do you know what State did?
MR. WATSON: No, ma'am.
THE COURT: Okay. Go ahead. Do you know who you were interacting with at State?
MR. WATSON: Primarily, John Armstrong.
THE COURT: What's his role?
MR. WATSON: But in his absence, there were delegates.
THE COURT: Who is Mr. Armstrong? What's his role at the State Department?
MR. WATSON: He's the senior official for the Bureau of Consular Affairs.
THE COURT: Consular affairs, that's diplomats?
MR. WATSON: I don't know.
THE COURT: You don't know. Okay.
So then how many hits do you get back -- you don't know how many people at the State Department were running these 10,000 names, right?
MR. WATSON: Not exactly, no, but I know we referred over 6,400 to them.
THE COURT: 6,400 is the number you referred to them?

MR. WATSON: That's correct.

THE COURT: Got it. I made a mistake. You referred to State 6,400 names out of the 1.3 million?

MR. WATSON: Yes, ma'am.

THE COURT: Sam, can you tell me what percentage that is when you get it?

MS. BLOND: 0.5 percent.

THE COURT: So less than half of a percent?

MR. WATSON: Yes, ma'am.

THE COURT: How many names did State send back to you?

MR. WATSON: All of the names came back, but there were some who had revocations based on a valid visa.

THE COURT: Tell me what that means. What's a revocation based on a valid visa?

MR. WATSON: That they are in status for the purposes of the visa, but State conducted revocation.

THE COURT: You mean State took the visa away?

MR. WATSON: I think so.

THE COURT: Okay. And State didn't tell you why they did it?

MR. WATSON: I did not see the State response to say why.

THE COURT: It's just they gave you a bunch of names back -- one set of names they gave you back is these are visas we revoked, right?

Case 3:25-cv-02296-CR Document 191 Filed 04/20/25 Page 15 of 54


How long did that turnaround take, by the way? You gave them 6,000 names. When did they give you back the names?

MR. WATSON: The names came back as they completed their activities on specific spreadsheets.

THE COURT: What was the time lag for the first rolling production?

MR. WATSON: There was, I would estimate, within a weekly cadence of responses that occurred for at least three weeks.

THE COURT: So we basically have another three weeks of work at the State Department?

MR. WATSON: I believe that's accurate.

THE COURT: So they send you back a list of names of people that you had sent them, and here people who were in status, their visas were fine, but now State has revoked them, right?

MR. WATSON: There were some, yes.

THE COURT: How many of those were there?

MR. WATSON: By rough order of magnitude, over 3,000.

THE COURT: 3,000 people?

MR. WATSON: Yes, ma'am.

THE COURT: Who were in status, they were going about their days, you send a list to State, and State sends you a list of 3,000 people and we're going to revoke their visa, right?

MR. WATSON: Yes, ma'am.

THE COURT: They told you to terminate those people in SEVIS, right?

MR. WATSON: Yes, ma'am.

THE COURT: Who else did they send back?

MR. WATSON: Those with expired visas.

THE COURT: And then there were people with expired visas?

MR. WATSON: Visas that are not valid, yes, ma'am.

THE COURT: And so those people they didn't need to revoke because they were already expired and they told you to terminate in SEVIS, right?

MR. WATSON: Yes, ma'am.

THE COURT: Do you have any understanding whether State reached out to any of those individuals before sending the list back to you to say, "Hey, we're about to terminate your visa," or, "Hey, why aren't you in status, why is this expired," or, "Hey, just as a heads-up, you're about to be getting, you know, a notice that you have been terminated from SEVIS and we want you to have the opportunity to tell us why you shouldn't have your visa revoked"? Do you know if that happened?

MR. WATSON: I would defer to State on that.

THE COURT: Can you and I both agree that since you were getting these back within a week and within three weeks

total that there was no notice sent out?

MR. WATSON: I think that's a case-by-case assessment.

THE COURT: Mr. Walker, are you aware as to whether or not State sent a notice to anyone?

MR. WALKER: I'm not aware, Your Honor. I want to clarify one point on the discussion that was just had. I just wanted to clarify that when we're talking about the State Department revoking visas, we're talking about the State Department revoking a travel visa to travel into the United States, not status.

THE COURT: Okay. So they were still in status?

MR. WALKER: Yes, ma'am.

THE COURT: Even though they were still in status and validly here on status, the State Department sent them back to you and told you to terminate them in SEVIS?

MR. WALKER: Yes.

THE COURT: All right. Plaintiff's counsel, did Mr. Patel receive any notice from State that his visa was being revoked or he was about to be terminated?

MR. BANIAS: No, Your Honor. His visa was expired at the time this all happened.

THE COURT: He was in status?

MR. BANIAS: Yes, Your Honor.

THE COURT: It's okay if your visa is expired because a visa just gets you into the country. The question is whether

or not you're in status?

MR. BANIAS: Correct, Your Honor. He had legally and properly changed his status after entering the country.

THE COURT: Got it. Your represent a number of these plaintiffs, right?

MR. BANIAS: Yes, Your Honor.

THE COURT: How many do you represent about, approximately?

MR. BANIAS: Probably about 125.

THE COURT: Of those, are you aware of State sending or DHS or anyone sending them any kind of notice that these actions were about to occur?

MR. BANIAS: Not a single one.

THE COURT: So then State sends you back the list, and then what happens?

MR. WATSON: We provided instructions to -- "we" being National Security Division, working group counterthreat lead development, provided instructions to the Student Exchange Visitor Program.

THE COURT: Say that again. I wasn't listening. I apologize.

MR. WATSON: The National Security Division counterthreat lead development unit passed the list from the Department of State to the Student and Exchange Visitor Program to action termination in SEVIS.

Case 3:25-cv-03299-SAC Document 181 Filed 11/20/25 Page 19 of 54


THE COURT: So what happened was State gives it back to DHS and DHS says -- and State says terminate these people, and then you do?

MR. WATSON: Yes, ma'am.

THE COURT: I want to go through some timeline here for you so you can sort of help me out with this.

MR. WATSON: Yes, ma'am.

THE COURT: Does he have a copy of the administrative record?

MR. WALKER: It's right here in front of him.

THE COURT: Sir, the first email I see in the administrative record is from Tuesday, April 1, 2025 at 4:58 p.m. Do you see that?

MR. WATSON: Yes, ma'am.

THE COURT: And you sent it to Shane Meyers?

MR. WATSON: Yes, ma'am.

THE COURT: Who is Shane?

MR. WATSON: He is the acting principal deputy assistant secretary.

THE COURT: For?

MR. WATSON: The Department of State.

THE COURT: So you send this list to State of 735 names. This is part of the 6,000 names. This would have been one batch?

MR. WATSON: Yes, ma'am.

THE COURT: And you send this to him April 1, 2025 at 4:58 p.m.?

MR. WATSON: Yes, ma'am.

THE COURT: Okay. And then if you look down, there is an email on April 2nd, 2025 at 3:35 p.m. from someone at State to someone at DHS. Do you see that?

MR. WATSON: No, ma'am.

THE COURT: If you go to page -- at the bottom you will see AR023.

MR. WATSON: Yes, ma'am.

THE COURT: So you see that on April 2nd, 2025, 3:35 p.m., someone from State sends an email to someone from DHS.

Do you see that?

MR. WATSON: Yes, ma'am.

THE COURT: Okay. So this would be less than 24 hours after you sent your email to Mr. Meyers, right?

MR. WATSON: Appears to be the case, yes, ma'am.

THE COURT: And in your email, you said, "Here is 735 foreign students submitted for your review and any action deemed appropriate," right?

MR. WATSON: Yes, ma'am.

THE COURT: And the reason I have this email from you, this particular email, is because Mr. Patel, the plaintiff in this case, came up in this spreadsheet, right?

MR. WALKER: We have unredacted that portion.

THE COURT: And then he responds within less than 24 hours, "We have run the delta data against our systems. The first tab lists individuals with valid visas. How would you like us to prioritize revocation of these visas?"

Do you see that?

MR. WATSON: I do.

THE COURT: The second tab is, "Students without a valid visa, we request that DHS terminate SEVIS status for these individuals, as there is no valid visa for us to revoke and they are admitted under duration of status."

Do you see that?

MR. WATSON: I do.

THE COURT: So then someone at Homeland Security Investigations -- is that DHS or is that State, National Security Division?

MR. WATSON: That's DHS.

THE COURT: So someone sends back -- that's not you though, right?

MR. WATSON: That's correct.

THE COURT: So someone at State, the division chief -- who is the division chief?

Mr. Walker, why is this redacted?

MR. WALKER: We have redacted the level of certain employees. Some are not redacted, but it's just a privacy interest.

THE COURT: Well, you know I could go online and find out who the division chief is, right? You can assume I have asked my clerk to do that. So you want to just tell me the name?

MR. WALKER: I don't know that, Your Honor. It may or may not be online.

THE COURT: Who was it?

Oh, Mr. Hammer. Robert Hammer would be the person who communicated back to you.

MR. WATSON: This Exhibit 17?

THE COURT: Yeah.

MR. WATSON: Well, the division chief is not me.

THE COURT: No, no, no. I'm sorry. Someone responded to --

MR. WATSON: Yes, that is a subordinate employee within the National Security Division.

THE COURT: Okay. And that person sent back the response on April 2nd, 2025 at 3:50 p.m. Do you see that?

MR. WATSON: I do.

THE COURT: So a question goes out. We have 700 names here, because the list from April 2nd, 2025 is also the list -- the same list from the day before because it also contains Mr. Patel, right?

MR. WATSON: I believe so.

THE COURT: Thank you. So with less than 24 hours,

someone has run this list through something, and says, "We have people with a valid visa. How would you like us to prioritize revoking these visas?"

And then we have another person -- we have groups without valid visas because they are expired. And State says, "Terminate both of these," right? "Terminate the people without the valid visa from SEVIS," right?

MR. WATSON: Yes, ma'am.

THE COURT: State does not ask that the people in the first tab be terminated from SEVIS, right?

MR. WATSON: I don't see that in the instruction. I don't see that in the email.

THE COURT: All right. And then somebody, Mr. Hammer, within 15 minutes of careful thought and consideration, says, "Please terminate everyone in SEVIS," right?

MR. WATSON: Ma'am, that's not Mr. Hammer. He doesn't serve as the division chief.

THE COURT: Well, whoever. Someone at National Security Division, Homeland Security Investigations division chief -- and, Mr. Walker, I want a name of that by the time we leave today, so if someone can get on that -- sends, after careful consideration for 15 minutes, "Terminate everybody," right?

MR. WATSON: Yes, ma'am.

THE COURT: Can you and I agree that nowhere in this

entire process has anyone done an individualized determination of any of these individuals before their names were terminated in SEVIS?

MR. WATSON: When you say "individualized determination," that is --

THE COURT: I mean no one looked at Mr. Patel's case and said, "Yeah, here is somebody who should no longer be in the United States," right?

MR. WATSON: Ma'am, my team --

THE COURT: To your knowledge, no one did an individualized assessment as to whether or not Mr. Patel should be or should not be in the United States, right?

MR. WATSON: Individualized assessment of every person?

THE COURT: Yes.

MR. WATSON: Each record was scrutinized based on the criminal history.

THE COURT: Yeah, but Mr. Patel got a citation for reckless driving, which is a misdemeanor in Texas. By the way, it's also a misdemeanor in Virginia. If you go over 70 miles an hour, you actually have a criminal defense case against you. Don't ask how I know that.

And he was pulled over for, quote-unquote, "reckless driving," which just meant he was speeding, and no charges were ever brought. In fact, when I looked at his record that you

sent me in the administrative record, it said very clearly, "case dismissed," right?

MR. WATSON: Following a complaint being filed and him meeting the terms of the agreement, yes.

THE COURT: Well, can you and I both agree that if we deported every single individual in this country who has been tagged for speeding, there would be very few people left and almost all of them would not have driver's licenses?

MR. WATSON: I don't know that we have the capacity at this present time to do that, Your Honor.

THE COURT: But you and I both know that Mr. Patel is not a criminal, right? And anyone looking at the record would know that he's not a criminal, right?

In fact, Mr. Patel tells me, and I assume you have no reason to not believe him, that he had disclosed the speeding ticket at least two times to government agencies when seeking to keep in status. He was quite forthright about it, and, obviously, the government people said, "Fine. People speed. Let's all move on." They weren't tagged.

By the way, did you know that? Was there an individualized assessment with Mr. Patel where you knew or State knew that the government, the United States government had already assessed this speeding ticket and had found it not to be a reason to take him out of status?

MR. WALKER: Just to clarify, Your Honor, Mr. Patel

was not taken out of status. His SEVIS record was terminated.

THE COURT: But upon termination, the law they cite me says he has to leave the country.

MR. WALKER: Your Honor, one of the questions you wanted us to answer today was, was Mr. Patel lawfully present in the United States? Is he now and was he at the time that his SEVIS record was terminated? The answer to that is yes.

THE COURT: Did the termination require him upon termination to leave the country immediately?

MR. WALKER: It did not. He was lawfully present in the United States.

THE COURT: No, no, no. You're not answering my question. I want to know what the effect is of a termination of SEVIS. They are telling me based on the law that the actual law is he has to either leave the country immediately or get it changed somehow, which I assume is legally, through the court system.

MR. WALKER: No. Upon the termination of a record in SEVIS, he remains lawfully present in the United States.

THE COURT: So what are his obligations?

MR. WALKER: It depends on how the school reacts to the termination of the record in SEVIS. The school may require --

THE COURT: We're going to get into the merits of this later, because I know that they disagree with everything that

you're saying right now. Let's keep on the non-process process here for a bit.

Mr. Patel and 6,000 other people with 15 minutes of consideration by people after they hear from State and less than 24 hours of consideration by State, thousands of people get terminated from SEVIS, right?

MR. WATSON: Yes, ma'am.

THE COURT: Students?

MR. WATSON: Yes, ma'am.

THE COURT: Students who are in the country studying, right?

MR. WATSON: Yes, ma'am.

THE COURT: A number of them, if not thousands of them, who were legally in status and had no issue with their being in the country, right?

MR. WATSON: To the best of my knowledge.

THE COURT: To the best of your knowledge, right?

MR. WATSON: Yes.

THE COURT: Okay. Let's do a quiz today. Anyone know where the due process clause from the Fifth Amendment comes from? Anybody? Nobody knows where the due process clause or the Fifth Amendment comes from? Not my clerks? We're going to have discussions afterwards.

It comes from Article -- Chapter, Article, whatever you want to the call it, 39 of the Magna Carta. That's where

Case 8:25-cv-03290-SSC Document 181 Filed 11/20/25 Page 29 of 158


it first appeared. It appeared as the law of the land. It was amended in the 1300s to be due process, but the due process comes from the Magna Carta.

Anyone want to remind me what century the Magna Carta was in? It was in the 1200s. So when I say, or when the courts say due process is important, we're not unhinged, we're not radicals; we are literally trying to enforce a process embodied in probably the most significant document with respect to peoples' rights against tyrannical government oppression. That's what we're doing here. Okay?

I'm not on a lark questioning why students who have been here legally, who paid to be in this country by paying their universities, who have studied to try to become better people if they stay in the U.S. or when they go back to their homes or countries, people who are trying or months away from getting engineering degrees, and they are cut off with less than 24 hours of consideration and no notice whatsoever.

So, Mr. Walker, we're going to have a long discussion about that.

Mr. Watson, is there anything else -- and I may have questions for you later on. Is there anything else about the process that I should know about?

MR. WATSON: Your Honor, I would just note that with the terminations, that is a red flag, and it is a red flag to determine if the student is still in compliance with their F

and/or M visa.

THE COURT: But you didn't have to terminate people in SEVIS to do that, right? You could have sent a letter to all the universities that had these students and said, "These people have come up on a hit, you may want to check them out," because termination is -- well, all right. I understand your view. Thank you.

Mr. Watson, I will say I know that this isn't pleasant for you, because you're on the end of a bunch of questions, but I have to say I have found you both last hearing and this hearing to be very on top of what's going on and very forthright and very helpful. So thank you.

MR. WATSON: Thank you, Your Honor.

THE COURT: You can be seated. I can't promise you won't be up here again.

MR. WALKER: Your Honor, the name you asked for is Antoine Rines (ph).

THE COURT: Thank you.

Can I get the plaintiffs up here. Actually, let me do this. Let me go through these questions I had for you.

Since I'm from Kentucky, you'd probably be doing a lot better with me if your name was "Maker's Mark."

MR. WALKER: I'm also from Kentucky.

THE COURT: Where are you from?

MR. WALKER: I was born in Louisville and went to

school in Mount Washington, just outside of Louisville.

THE COURT: I lived in Louisville. What made you leave KY?

MR. WALKER: My dad got transferred down to Georgia, so we moved to Georgia, but always went back to Louisville to visit Mamma and Pappa.

THE COURT: Awesome. Was your dad in the military?

MR. WALKER: No, he works in packaging.

THE COURT: Okay. Well, always happy to see a Kentuckian. I don't understand how they called you Johnny Walker if you were born in Kentucky, but --

MR. WALKER: There is a lot of brown liquors involved.

THE COURT: So first question. In your view, is the plaintiff lawfully in the United States, assuming that I had not entered my TRO?

MR. WALKER: Yes, Your Honor. The answer to that question is yes. Based on the information currently available to ICE, Mr. Patel is lawfully present in the United States and was at the time that his SEVIS record was terminated.

THE COURT: Is plaintiff currently subject to immediate detention or removal from the United States?

MR. WALKER: No. Again, I have to provide the caveat that based on the information currently available to ICE, we don't -- it's a law enforcement agency and they are obviously sensitive about hampering their ability to enforce the law.

THE COURT: But based on everything we know in the record to date.

MR. WALKER: Based on everything ICE knows right now, he is not subject to immediate detention or removal.

THE COURT: Okay. It seems like we have gone through four. Seems like we have gone through five.

Number six, has the government identified any error in any of its recent SEVIS termination actions?

MR. WALKER: Yes, and I think this gets to the quality control effort that some of the other questions deal with and that Your Honor addressed at the prior hearing. The quality control effort that Mr. Watson was talking about was to make sure that the identity of the individual associated with the SEVIS record matched the individual associated with the NCIC hit.

THE COURT: If we have a John Smith, we need to make sure that it's the right John Smith.

MR. WALKER: Precisely. So the government has completed that process. It identified 23 false matches between the SEVIS record and the NCIC record, and it has remedied those false hits.

THE COURT: What is the government's purpose in changing a student's SEVIS record from active to terminated?

MR. WALKER: I think Mr. Watson addressed this a little bit. It is intended as an investigative red flag for

either the university or the school or some other government agency to follow up on.

THE COURT: Well, where can I go -- if I'm a student counselor and I get a termination that says Mr. Patel's SEVIS record has been terminated, where would I go to find out what it means -- what that means?

Like where would I go to know that he was still in the country lawfully and that he was still in status?

MR. WALKER: I think there are designated school officials, so the school official has a contact at ICE field offices that they can go to to follow up on those questions.

THE COURT: But there is no document? I mean, there must be a document somewhere in the world that says "here is the effect of being terminated in SEVIS."

MR. WALKER: There is the study in State's website that the plaintiff have cited a little bit that has some information about SEVIS and the effect of a termination.

THE COURT: Where is that in my papers so I can look at it and talk to you about it?

MR. WALKER: It's in their brief and there is some perma CC links to it. I know that they have sort of snipped some images from it, so if you scan their brief for that, I think you would find it.

What we have noted is what that study in State's cite says is that a termination of a SEVIS record could indicate a

Case 2:25-cv-01296-ACR Document 19-1 Filed 04/22/25 Page 33 of 45


change in status. It does not necessarily indicate a change in status. The website also notes that a termination in SEVIS is not necessarily negative. A termination in SEVIS can be done for administrative reasons that are not necessarily negative.

THE COURT: Where am I looking?

MR. WALKER: We sort of pulled these quotes in our brief. The website is mostly visible through clicking on it.

Plaintiffs have captured some images of it on page 11 of their brief. So there is this thing that provides some reasons for termination and duration of status. What we pointed out here is that this particular termination reason is associated with a termination for a violation of status, but, again, a termination of a SEVIS record is not necessarily indicative of a lack of status.

THE COURT: I didn't see, and maybe I'm wrong, but I didn't see in SEVIS where it says -- my understanding is that SEVIS just says "active" or "terminated." It doesn't say why it was terminated; is that right?

MR. WALKER: No. There is a list of drop-down items that you can select as to why it was terminated.

THE COURT: What was the drop-down item for Mr. Patel?

MR. BANIAS: Your Honor, it said "failure to maintain status, criminal hit and/or visa revocation."

THE COURT: Sounds pretty bad to me.

MR. WALKER: I acknowledge that that particular choice

that was made to describe this hit was not necessarily the right one to describe it.

THE COURT: Maybe that happened because this was a rushed process and maybe -- and this is absolutely no criticism to Mr. Watson or his group at all -- maybe a little bit more care should have been taken.

MR. WALKER: I can sort of provide -- and we don't know who actually undertook this process. It could have been a contractor. It could have been a lower-level employee. The best guess I can give, Your Honor, and this is based on no information whatsoever that I have actually obtained firsthand, the best guess that I have is that that's sort of a catchall option, and based on the SEVIS website, that is the only option that sort of has a fillable field associated with it where ICE could put in the information about the NCIC hit.

THE COURT: But a violation, it says, has no grace period.

MR. WALKER: Again, that is for a termination that is for a failure to maintain status. Mr. Patel was --

THE COURT: It says "termination for any violation of status," and you just told me that his termination said "failure to maintain status."

MR. WALKER: Yes. That was not the most descriptive option to select.

THE COURT: Mr. Walker, I have to say I'm pretty

impressed with you right now. I think have you been forthright. You have gotten me the administrative record. You're answering my questions. Thank you. So this is not directed at you. All right.

But what happens when we do things willy-nilly with very little time, and certainly with zero due process, is that mistakes happen, a wrong catchall is used, and the next thing somebody is being told or would know if they went to the website that they have no grace period and that they must either apply for reinstatement immediately or leave the U.S. immediately.

And then what happens -- now, if someone had sent, for example, Mr. Patel a letter that says, "We're going to terminate you for violation of status," Mr. Patel or his lawyers would have said, "No, no, no, I'm in status," and then this wouldn't have happened.

And the reason that I'm particularly concerned about this, Mr. Walker, aside from the utter lack of concern for human individuals who we have invited into our country and who have communities richer by being students who have contributed to our colleges and who have paid our colleges, the reason I'm concerned and particularly troubled is because those plaintiffs' lawyers, like all lawyers, have to get paid.

And so now we have got thousands of people who are having to pay plaintiffs' attorneys to have litigation, to file

briefs, to appear in court, to prepare for court, to get the information, and that's not cheap, right. And all of this could have been avoided if individuals had taken a beat, and instead of just rushing things -- and, again, I'm not criticizing Mr. Watson at all for this -- but that's not happening. And so instead we end up with -- how many cases are there now nationwide?

MR. BANIAS: I think it's about 60.

THE COURT: 60 cases, but about with hundreds of plaintiffs, right?

MR. BANIAS: There are a handful of group cases, yes, Your Honor.

THE COURT: You have 100 yourself, right?

MR. BANIAS: I have two group cases with 100 people total, yes, ma'am.

THE COURT: We're taking up court time. We're taking up government time. I imagine you have better things to do. I imagine Mr. Watson has better things to do.

All right. Is there anything that you can say right now, Mr. Walker, or anything that the government can do, so that instead of having a gazillion or 60 judges have to rule on 60 motions, that we can sort of short-circuit this and maybe start afresh?

MR. WALKER: I'm happy to get to that, Your Honor. With respect to Mr. Patel, so we filed with our brief last

night a new policy that ICE has issued with respect to terminations of records in SEVIS. It is at ECF 16-1. It's Exhibit A to our opposition to the motion for preliminary injunction.

THE COURT: One second. This is to all SEVP personnel. Who is SEVP?

MR. WALKER: It's the Student and Exchange Visitor Program.

THE COURT: This is dated April 26, 2025. So explain this to me.

MR. WALKER: This was issued over the weekend, and this provides specific guidance to SEVP personnel about when to terminate a record in SEVIS. This document does retain ICE's broad discretion, which it does always have and continues to have to terminate records at its discretion, but the specific guidance provided here, you will note these bullet points here, those do not apply to Mr. Patel.

There is the failure to comply with the terms of nonimmigrant status, which does not apply to Mr. Patel. The one I want to highlight is the visa revocation issue.

If you look at the middle paragraph here, the second of the three. "If State revokes a nonimmigrant visa effective immediately, SEVP may terminate the nonimmigrant's SEVIS record based on the visa revocation with immediate effect. As such, a revocation can serve as a basis for removability under Section

237(a)(1)(B) of the INA. SEVP should not, however, terminate a nonimmigrant's SEVIS record on this basis until it has confirmed that State has revoked the visa."

And you will recall, Your Honor, when you were looking at the administrative record with Mr. Watson, Mr. Patel fell into a class of individuals who had not had a visa revoked. He had -- I think this was sort of described at the prior hearing. Mr. Patel started his studies when he was under an H-4 visa, as the family member of an H-1 B worker.

He then traveled out of the United States and returned to the United States on a tourist visa, an H-2 visa. Those last for 45 days. While in the United States on a tourist visa, he converted to an F status. So he got the status to remain as a student in the United States under F-1.

So his tourist visa expired by its terms, and at the time that this review was conducted, he had no visa to revoke. Because he had no visa to revoke, this visa revocation basis for terminating a SEVIS record would not apply to him.

THE COURT: I don't see anything in here about a hit on the NCIC system. That's not a hit, right? That's not a basis?

MR. WALKER: That's not in here. I don't want to say -- I can't tell you that it would be outside of ICE's discretion to terminate a record based on an NCIC hit. But here what you had was a colloquy with the State Department

where they returned some information based on their visa records. They noted that Mr. Patel had no visa to revoke, but the current policy, as of this weekend, is that the visa basis for a termination of a SEVIS record has to be a revoked visa.

THE COURT: So absent a TRO, preliminary injunction, Mr. Patel, because he's here in status and has not -- does not have a visa because he's here in status legally, he would remain active absent something happening, you know, we found out that while he was here he did something actually illegal?

MR. WALKER: I have discussed this with Mr. Watson. Based on the information currently available to ICE at this time, absent a TRO or injunction, Mr. Patel would remain active in SEVIS.

THE COURT: Okay. So I guess I still don't understand. Let's say that we had Mr. Smith, his visa -- can someone have a valid visa and be in country status -- in the country in status, and so if you revoked their visa, they would still be in status?

MR. WALKER: Yes. I think, as this notes, a visa revocation can be a basis for removability, but it's two separate things. State Department revokes the travel visa, but it would require removal proceedings to eliminate the status and actually accomplish the removal.

THE COURT: So I still do not understand what happens if I'm terminated in SEVIS. What is the practical -- I mean, I

guess what I'm asking is -- this is helpful. This tells me when someone can be terminated. What I'm more interested in is, I'm a school counselor and it pops up that Mr. Patel's SEVIS record has been terminated, or Mr. Smith's.

So far the only thing I understand from you all is that it's a red flag, the person does not have to leave immediately, correct?

MR. WALKER: That's correct.

THE COURT: Okay. And then can the person go to classes?

MR. WALKER: That's up to the school. The school may see that hit and tell the individual they can't go to classes. I know that has happened in some cases, but upon follow-up by the designated school official with their ICE field office that could clarify that the person does in fact have status and can attend classes.

THE COURT: We have to assume that the person at the ICE field office actually knows what's going on.

MR. WALKER: I think that's fair to assume that the person in the ICE field office would have access to the individual's information.

THE COURT: You and I have different assessments of what's fair to assume that government officials have these days with respect to updated knowledge. We have that disagreement, that's fine.

I'm going to let you obviously talk as long as you want, but before I get to plaintiff's counsel on this effective termination issue.

MR. WALKER: I think the primary things I wanted to do, Your Honor, was talk about that policy that I have been able to describe to you and answer Your Honor's questions from the prior hearing.

THE COURT: I'm not sure I got through all of them. I think we have actually. Thank you, sir.

Look, I know that I think technically, you know, the fact that they will agree to keep Mr. Patel in active status pending some other information coming out, I suppose that -- my clerk found a Supreme Court case that said that government making something moot does not necessarily -- I mean, giving the relief does not necessarily make something moot, but I'm kind of at a loss as to what I'm still doing with respect to Mr. Patel if we have a representation from the government -- I guess I could say -- I guess I could get a representation from the government that if they are going to do anything else with Mr. Patel, he be given two weeks or 30 days notice, but other than that, I'm not sure what else to do for you.

MR. BANIAS: Your Honor, we made various arguments about why it's arbitrary and capricious.

THE COURT: I think we can all agree it was arbitrary and capricious. My question to you is, yeah, this was not

ideal by any stretch of the imagination. It still boggles my mind that we're firing tens of thousands of federal workers on no notice and then spend -- take 10 or 20 of them to run a bunch of names through a database to see if they are students if they have a speeding record.

You know what, it's not my call. But my question is with respect specifically to Mr. Patel, I mean, he's on active. He's going to remain on active, pending any new information. You know, so I'm not sure what else to do for you.

MR. BANIAS: Your Honor, we think that he's definitely subject to termination under this, quote, "new policy."

THE COURT: I can get a representation from the government that absent new information, he's not going to be terminated, and that if they plan to terminate him, he gets notice. I don't know what else I could do for you.

MR. BANIAS: Your Honor, one of our arguments is that this is ultra vires and that this new policy is even more ultra vires. If this Court rules this an ultra vires act, it protects my client because they can't go and use power they don't have again.

THE COURT: But I don't need to go that far. Look, I'm not going to wade into whether or not the policy makes sense or doesn't if I don't need to. Okay. And I'm just not going to do it. So I think if Mr. Walker and you want to come up with some language that Mr. Walker can give me or some

representation that the government will make, you know, that Mr. Patel based on the current -- Mr. Walker, come up. I think you have already said. In your understanding, based on the current record, having Mr. Patel's NCIC status here, with Mr. Watson here, your understanding, the government's position is that under the new policy he is not subject to termination based on what we know today?

MR. WALKER: I have to provide caveats to this, Your Honor. I'm going to provide the caveats. He's not subject to termination for the visa revocation purpose on that policy, and based on the information currently available to ICE at this time, he would not be terminated absent a court order. So without a court order, he won't be.

THE COURT: He can't say that he's not going to be terminated at all, because they could come up -- I'm not going to use Mr. Patel. Let's say there's a Mr. Smith who is exactly in your client's position, and Mr. Walker is saying the same thing about Mr. Smith, and the reason Mr. Walker is saying that and Mr. Watson is asking him to say that is because, you know, Mr. Smith might have killed puppies while at school and we just didn't know that, right. So that's why there is that caveat. He's never going to be able to not give you that caveat.

MR. WALKER: One additional thing I want to add, Your Honor, is that Mr. Patel is on the brink of finishing his education. I think he has his last final next week. He's

graduating on the 15th, so his interests are in the very, very immediate term.

MR. BANIAS: If I may, Your Honor.

THE COURT: He's in classes right now because I entered the TRO that he could go to classes, right?

MR. BANIAS: Yes, Your Honor.

THE COURT: He's getting an engineering degree?

MR. BANIAS: Information systems, Your Honor.

THE COURT: Ironic.

MR. BANIAS: He's also applied for postgraduate optional practical training. This is an application that will allow him to work, because he's in a STEM major, for up to three years within his field of study. That's going to go to United States Citizenship and Immigration Services.

THE COURT: We can give -- Mr. Walker, can you work with me so that I don't have to look at the entire policy, which I'm quite confident you don't want me to do in particular. Can you guys come up with some language that we will enter on the court docket about Mr. Patel specifically? And your co-counsel wants to give you a note.

MR. WALKER: I'm very happy to try that, Your Honor. I can't promise we will be able to, but we will endeavor to do that.

THE COURT: I just want to make clear for the record that I'm trying very hard to not enjoin an entire policy, and

Case 3:25-cv-00296-SCR Document 19-1 Filed 04/29/25 Page 45 of 58


I'm trying very hard to get just one person relief.

MR. WALKER: I understand.

THE COURT: That's what I'm trying to do.

MR. BANIAS: Your Honor, we are happy to work with the government to agree to language. We have been doing that for the last three weeks and we've gotten nowhere.

THE COURT: I'm telling Mr. Walker right now that based on what I have seen so far, he does not want me to issue a ruling in this case. He really does not want me to issue a ruling in this case. He really, really, really -- I'm looking at you and not Mr. Walker, and I assume Mr. Walker is paying attention to me -- does not want me to issue a ruling in this case.

MR. WALKER: Loud and clear, Your Honor.

THE COURT: I understand that your client is going to have concerns and words and what you call it and what you all say to your client is, you can add in the language that this is not binding on the government as to anybody else, that this is not conceding anything by government, and you tell your client that they want to just keep Mr. Patel in the country and happy so they can avoid me issuing a ruling which they will not like.

Okay. And contrary to the belief of a number of people, I am literate and I can actually write a long ruling that explains in detail all the issues that I see with what's happened here.

MR. WALKER: Understood.

THE COURT: You guys have a week to get that language to me. If you need more time, let me know. If there is an issue that you guys can't agree, before you file something, email my chambers. We'll have a quick call and we'll see where to go from there.

The TRO expires on Thursday. I assume, Mr. Walker, you can represent that nothing is going to happen to Mr. Patel while you two are working this out, right?

MR. WALKER: Yes, Your Honor.

THE COURT: Okay. Thank you, everyone.

(Proceedings concluded at 11:00 a.m.)

CERTIFICATE

I, Sonja L. Reeves, Federal Official Court Reporter in and for the United States District Court of the District of Columbia, do hereby certify that the foregoing transcript is a true and accurate transcript from the original stenographic record in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 29th day of April, 2025.

/s/ Sonja L. Reeves
SONJA L. REEVES, RDR-CRR
FEDERAL OFFICIAL COURT REPORTER

## /

**/s** [1] - 46:20

## 0

**0.5** [1] - 14:7

## 1

**1** [3] - 12:1, 19:12, 20:1
**1,000** [1] - 11:4
**1.3** [7] - 9:11, 9:19, 10:23, 11:13, 11:15, 11:22, 14:3
**10** [8] - 7:22, 8:1, 8:2, 8:5, 9:17, 10:23, 11:16, 42:3
**10,000** [4] - 12:16, 12:17, 12:18, 13:22
**100** [2] - 36:13, 36:14
**100th** [1] - 12:2
**10333** [1] - 1:17
**1050** [1] - 1:17
**10:05** [2] - 1:11, 2:1
**11** [1] - 33:8
**11:00** [2] - 1:11, 46:12
**1200s** [1] - 28:5
**125** [1] - 18:9
**13,900** [1] - 11:20
**1300s** [1] - 28:2
**15** [3] - 23:14, 23:22, 27:3
**15th** [1] - 44:1
**16,000** [5] - 11:19, 11:22, 12:3, 12:6, 12:14
**16-1** [1] - 37:2
**17** [1] - 22:10
**1:25-cv-01096-ACR** [1] - 1:5
**1st** [1] - 3:16

## 2

**20** [8] - 7:22, 8:1, 8:2, 8:6, 9:17, 10:24, 11:16, 42:3
**20001** [1] - 1:25
**20004** [1] - 1:21
**2025** [10] - 1:11, 3:16, 19:12, 20:1, 20:5, 20:11, 22:18, 22:21, 37:9, 46:18
**23** [1] - 31:19
**237(a)(1)(B** [1] - 38:1
**24** [5] - 20:15, 21:2, 22:25, 27:5, 28:17
**25-1096** [1] - 2:2
**26** [1] - 37:9
**29** [1] - 1:11
**29403** [1] - 1:15
**29th** [1] - 46:18
**2nd** [4] - 20:5, 20:11, 22:18, 22:21

## 3

**3,000** [3] - 15:19, 15:20, 15:24
**30** [1] - 41:20
**333** [1] - 1:24
**39** [1] - 27:25
**3:35** [2] - 20:5, 20:11
**3:50** [1] - 22:18

## 4

**45** [1] - 38:12
**4:58** [3] - 3:16, 19:13, 20:2

## 6

**6,000** [3] - 15:2, 19:23, 27:3
**6,400** [4] - 12:15, 13:24, 13:25, 14:3
**60** [4] - 36:8, 36:9, 36:21, 36:22
**601** [1] - 1:20
**602** [1] - 1:14

## 7

**70** [1] - 24:20
**700** [1] - 22:20
**735** [2] - 19:22, 20:18
**77042** [1] - 1:17

## A

**a.m** [4] - 1:11, 2:1, 46:12
**ability** [1] - 30:25
**able** [3] - 41:6, 43:22, 44:22
**above-entitled** [1] - 46:16
**absence** [1] - 13:12
**absent** [5] - 39:5, 39:8, 39:12, 42:13, 43:12
**absolutely** [1] - 34:4
**access** [1] - 40:20
**accomplish** [1] - 39:23
**accurate** [2] - 15:12, 46:15
**acknowledge** [1] - 33:25
**act** [1] - 42:18
**acting** [2] - 8:17, 19:18
**Acting** [1] - 1:6
**action** [4] - 8:24, 9:2, 18:25, 20:19
**Action** [1] - 2:2
**actions** [2] - 18:12, 31:8
**active** [7] - 31:23, 33:17, 39:8, 39:12, 41:11, 42:7, 42:8
**activities** [3] - 12:20, 12:22, 15:4
**actual** [1] - 26:14
**add** [2] - 43:23, 45:17
**addition** [1] - 10:17
**additional** [1] - 43:23
**addressed** [2] - 31:11, 31:24
**administrative** [8] - 3:11, 3:24, 19:8, 19:12, 25:1, 33:4, 35:2, 38:5
**admitted** [1] - 21:10
**advisor** [1] - 2:12
**Affairs** [1] - 13:16
**affairs** [1] - 13:17
**afford** [1] - 9:16
**afresh** [1] - 36:23
**afterwards** [1] - 27:23
**agencies** [1] - 25:16
**agency** [2] - 30:24, 32:2
**agree** [7] - 16:24, 23:25, 25:5, 41:11, 41:24, 45:5, 46:4
**agreement** [1] - 25:4
**ahead** [2] - 8:22, 13:8
**AKSHAR** [1] - 1:3
**Akshar** [1] - 2:2
**alien** [6] - 3:19, 3:21, 4:4, 4:22, 5:13, 10:20
**allow** [1] - 44:12
**almost** [1] - 25:8
**alone** [2] - 7:4, 7:8
**amended** [1] - 28:2
**Amendment** [2] - 27:20, 27:22
**America** [1] - 2:22
**American** [1] - 2:20
**ANA** [1] - 1:10
**analysis** [2] - 12:7, 13:5
**analysts** [1] - 8:3
**Andre** [3] - 2:10, 3:16, 5:7
**Annemarie** [1] - 2:13
**annually** [1] - 10:5
**answer** [4] - 26:5, 26:7, 30:16, 41:6
**answering** [2] - 26:12, 35:3
**Antoine** [1] - 29:17
**Antoinette** [1] - 3:1
**apologize** [1] - 18:21
**appear** [1] - 36:1
**appeared** [2] - 28:1
**application** [1] - 44:11
**applied** [1] - 44:10
**apply** [4] - 35:10, 37:17, 37:19, 38:18
**appropriate** [3] - 7:16, 8:21, 20:20
**April** [10] - 1:11, 3:16, 19:12, 20:1, 20:5, 20:11, 22:18, 22:21, 37:9, 46:18
**AR023** [1] - 20:9
**arbitrary** [2] - 41:23, 41:24
**area** [1] - 5:10
**arguments** [2] - 41:22, 42:16
**Armstrong** [2] - 13:10, 13:13
**arrested** [2] - 6:3, 6:6
**Article** [2] - 27:24
**aside** [2] - 8:8, 35:18
**assessed** [1] - 25:23
**assessment** [4] - 17:2, 24:11, 24:13, 25:21
**assessments** [1] - 40:22
**assist** [1] - 2:10
**assistant** [2] - 3:17, 19:19
**associate** [2] - 2:12, 8:18
**associated** [4] - 31:13, 31:14, 33:12, 34:14
**assume** [8] - 22:2, 25:14, 26:16, 40:17, 40:19, 40:23, 45:11, 46:7
**assuming** [1] - 30:14
**Atkinson** [1] - 2:19
**attached** [1] - 3:20
**attend** [1] - 40:16
**attention** [1] - 45:12
**attorney** [1] - 5:2
**Attorney's** [1] - 2:9
**attorneys** [1] - 35:25
**available** [4] - 30:17, 30:23, 39:11, 43:11
**Avenue** [3] - 1:14, 1:17, 1:24
**avoid** [1] - 45:21
**avoided** [1] - 36:3
**aware** [4] - 10:21, 17:3, 17:5, 18:10
**awesome** [1] - 30:7

## B

**bad** [1] - 33:24
**Banias** [2] - 1:13, 2:6
**BANIAS** [20] - 1:14, 2:6, 17:20, 17:23, 18:2, 18:6, 18:9, 18:13, 33:22, 36:8, 36:11, 36:14, 41:22, 42:10, 42:16, 44:3, 44:6, 44:8, 44:10, 45:4
**based** [25] - 4:17, 7:4, 7:14, 7:15, 11:9, 12:20, 14:12, 14:14, 24:16, 26:14, 30:17, 30:23, 31:1, 31:3, 34:10, 34:13, 37:24, 38:24, 39:1, 39:11, 43:2, 43:3, 43:7, 43:11, 45:8
**basis** [6] - 37:25, 38:2, 38:17, 38:21, 39:3, 39:20
**batch** [3] - 11:8, 11:10, 19:24
**batches** [1] - 12:25
**beat** [1] - 36:3
**become** [1] - 28:13
**BEFORE** [1] - 1:10
**belief** [1] - 45:22
**below** [1] - 12:17
**Ben** [1] - 3:1
**best** [4] - 27:16, 27:17, 34:10, 34:12
**better** [4] - 28:13, 29:22, 36:17, 36:18
**between** [4] - 7:22, 9:23, 12:8, 31:19
**big** [1] - 7:19
**binding** [1] - 45:18
**bit** [4] - 27:2, 31:25, 32:16, 34:5
**BLOND** [1] - 14:7
**boggles** [1] - 42:1
**book** [4] - 2:20, 2:24, 2:25, 3:9
**born** [2] - 29:25,

30:11
**bottom** [1] - 20:8
**Brad** [1] - 2:6
**BRADLEY** [1] - 1:14
**Brennan** [1] - 2:13
**Brennan-Linnan** [1] - 2:13
**brief** [5] - 32:20, 32:22, 33:7, 33:9, 36:25
**briefs** [1] - 36:1
**brink** [1] - 43:24
**broad** [1] - 37:14
**brought** [2] - 6:11, 24:25
**brown** [1] - 30:12
**Brown** [2] - 1:16, 2:7
**BROWN** [1] - 1:16
**BRUCE** [1] - 1:14
**bullet** [1] - 37:16
**bunch** [6] - 3:5, 7:3, 8:6, 14:23, 29:9, 42:4
**Bureau** [1] - 13:15
**business** [2] - 12:20, 12:22
**BY** [3] - 1:14, 1:16, 1:20

## C

**cadence** [1] - 15:8
**calendar** [1] - 2:17
**cancer** [1] - 9:15
**capabilities** [1] - 11:9
**capacity** [1] - 25:9
**capricious** [2] - 41:23, 41:25
**captured** [1] - 33:8
**care** [2] - 8:4, 34:6
**careful** [2] - 23:14, 23:22
**Carolina** [1] - 1:15
**Carta** [3] - 27:25, 28:3, 28:4
**case** [13] - 7:13, 17:2, 20:17, 20:24, 24:6, 24:21, 25:2, 41:13, 45:9, 45:10, 45:13
**CASE** [1] - 1:5
**case-by-case** [2] - 7:13, 17:2
**cases** [5] - 36:6, 36:9, 36:11, 36:14, 40:13
**catchall** [2] - 34:12, 35:7
**categorized** [2] - 7:15, 7:17
**caveat** [3] - 30:22, 43:21, 43:22
**caveats** [2] - 43:8, 43:9
**CC** [1] - 32:21
**Center** [3] - 5:25, 6:20, 6:22
**centered** [1] - 5:14
**century** [1] - 28:4
**certain** [2] - 4:16, 21:23
**certainly** [2] - 3:13, 35:6
**CERTIFICATE** [1] - 46:13
**Certified** [1] - 1:23
**certify** [1] - 46:15
**cetera** [1] - 3:20
**chambers** [1] - 46:5
**change** [2] - 33:1
**changed** [2] - 18:3, 26:16
**changing** [1] - 31:23
**Chapter** [1] - 27:24
**charge** [3] - 7:15, 8:12, 8:15
**charged** [1] - 7:9
**charges** [2] - 6:10, 24:24
**Charleston** [1] - 1:15
**cheap** [1] - 36:2
**check** [1] - 29:5
**chief** [7] - 2:13, 21:20, 21:21, 22:2, 22:12, 23:17, 23:20
**choice** [1] - 33:25
**circuit** [1] - 36:22
**citation** [1] - 24:18
**cite** [2] - 26:2, 32:24
**cited** [1] - 32:16
**Citizenship** [1] - 44:14
**Civil** [2] - 1:19, 2:2
**clarify** [4] - 17:6, 17:7, 25:25, 40:15
**class** [1] - 38:6
**classes** [5] - 40:10, 40:12, 40:16, 44:4, 44:5
**clause** [2] - 27:20, 27:21
**clear** [3] - 4:2, 44:24, 45:14
**clearly** [1] - 25:1
**clerk** [2] - 22:3, 41:13
**CLERK** [1] - 2:2
**clerks** [1] - 27:22
**clicking** [1] - 33:7
**client** [4] - 42:19, 45:15, 45:17, 45:19
**client's** [1] - 43:17
**close** [2] - 12:20, 12:22
**co** [1] - 44:20
**co-counsel** [1] - 44:20
**colleges** [2] - 35:21
**colloquy** [1] - 38:25
**Columbia** [1] - 46:15
**COLUMBIA** [1] - 1:1
**coming** [1] - 41:12
**commend** [1] - 3:8
**committed** [1] - 6:23
**communicated** [1] - 22:9
**communities** [1] - 35:20
**complaint** [1] - 25:3
**completed** [2] - 15:3, 31:19
**compliance** [1] - 28:25
**comply** [1] - 37:18
**conceding** [1] - 45:19
**concern** [1] - 35:18
**concerned** [2] - 35:17, 35:22
**concerns** [1] - 45:16
**concluded** [1] - 46:12
**conducted** [3] - 13:5, 14:16, 38:16
**Conference** [1] - 46:17
**confident** [1] - 44:17
**confirmed** [1] - 38:3
**conformance** [1] - 46:16
**consideration** [5] - 23:14, 23:22, 27:4, 27:5, 28:17
**consolidated** [1] - 12:19
**Constitution** [1] - 1:24
**constitutional** [1] - 2:23
**Consular** [2] - 13:16, 13:17
**contact** [1] - 32:10
**contains** [1] - 22:22
**continued** [1] - 12:7
**continues** [1] - 37:14
**contract** [1] - 9:20
**contractor** [1] - 34:9
**contrary** [1] - 45:22
**contributed** [1] - 35:20
**control** [2] - 31:10, 31:12
**converted** [1] - 38:13
**convicted** [1] - 6:7
**copy** [1] - 19:8
**correct** [6] - 11:7, 13:1, 14:1, 21:19, 40:7, 40:8
**Correct** [1] - 18:2
**cost** [1] - 9:13
**cost-cutting** [1] - 9:13
**counsel** [4] - 2:10, 17:17, 41:2, 44:20
**counselor** [2] - 32:4, 40:3
**counterthreat** [2] - 18:17, 18:23
**countries** [1] - 28:15
**country** [14] - 17:25, 18:3, 25:6, 26:3, 26:9, 26:15, 27:10, 27:15, 28:12, 32:8, 35:19, 39:16, 39:17, 45:20
**COURT** [198] - 1:1, 2:15, 3:14, 4:1, 4:8, 4:10, 4:19, 4:21, 4:24, 5:1, 5:4, 5:8, 5:10, 5:12, 5:16, 5:18, 5:23, 6:1, 6:3, 6:6, 6:9, 6:13, 6:16, 6:19, 6:21, 6:25, 7:2, 7:6, 7:19, 7:23, 8:1, 8:4, 8:15, 8:19, 8:21, 8:25, 9:2, 9:6, 9:9, 9:12, 9:21, 9:25, 10:8, 10:14, 10:18, 10:23, 11:4, 11:10, 11:12, 11:15, 11:21, 11:24, 12:1, 12:10, 12:13, 12:16, 12:18, 12:22, 12:25, 13:2, 13:4, 13:6, 13:8, 13:11, 13:13, 13:17, 13:19, 13:25, 14:2, 14:5, 14:8, 14:10, 14:13, 14:17, 14:19, 14:23, 15:5, 15:10, 15:13, 15:18, 15:20, 15:22, 16:2, 16:5, 16:7, 16:10, 16:14, 16:24, 17:3, 17:11, 17:13, 17:17, 17:22, 17:24, 18:4, 18:7, 18:10, 18:14, 18:20, 19:1, 19:5, 19:8, 19:11, 19:15, 19:17, 19:20, 19:22, 20:1, 20:4, 20:8, 20:11, 20:15, 20:18, 20:22, 21:1, 21:7, 21:13, 21:17, 21:20, 22:1, 22:7, 22:11, 22:13, 22:17, 22:20, 22:25, 23:9, 23:13, 23:18, 23:25, 24:6, 24:10, 24:15, 24:18, 25:5, 25:11, 26:2, 26:8, 26:12, 26:20, 26:24, 27:8, 27:10, 27:13, 27:17, 27:19, 29:2, 29:14, 29:18, 29:24, 30:2, 30:7, 30:9, 30:13, 30:20, 31:1, 31:5, 31:16, 31:22, 32:3, 32:12, 32:18, 33:5, 33:15, 33:21, 33:24, 34:3, 34:16, 34:20, 34:25, 36:9, 36:13, 36:16, 37:5, 37:9, 38:19, 39:5, 39:14, 39:24, 40:9, 40:17, 40:22, 41:8, 41:24, 42:12, 42:21, 43:14, 44:4, 44:7, 44:9, 44:15, 44:24, 45:3, 45:7, 45:15, 46:2, 46:11, 46:21
**court** [9] - 2:12, 2:14, 26:16, 36:1, 36:16, 43:12, 43:13, 44:19
**Court** [6] - 1:24, 2:1, 41:13, 42:18, 46:14, 46:14
**courts** [1] - 28:6
**Crime** [3] - 5:25, 6:20, 6:21
**crime** [1] - 6:23
**criminal** [12] - 3:19, 3:21, 4:4, 4:18, 4:21, 5:13, 10:20, 24:17, 24:21, 25:12, 25:13, 33:23
**criminality** [1] - 5:21
**criticism** [1] - 34:4
**criticizing** [1] - 36:5
**CRR** [1] - 46:20
**current** [3] - 39:3, 43:2, 43:4
**Customs** [1] - 1:7
**cut** [1] - 28:16
**cutting** [1] - 9:13

## D

**dad** [2] - 30:4, 30:7
**data** [2] - 10:5, 21:2
**database** [13] - 6:1, 6:22, 7:7, 7:8, 9:7,

9:10, 9:18, 10:2, 10:10, 10:16, 11:6, 42:4
**date** [1] - 31:2
**dated** [1] - 37:9
**Dated** [1] - 46:18
**days** [4] - 15:23, 38:12, 40:23, 41:20
**DC** [4] - 1:12, 1:21, 1:25, 5:10
**deal** [1] - 31:10
**declaration** [1] - 4:13
**deemed** [1] - 20:20
**defendant** [1] - 2:9
**Defendant** [1] - 1:8
**DEFENDANT** [1] - 1:19
**defense** [1] - 24:21
**defer** [1] - 16:23
**definitely** [1] - 42:10
**degree** [1] - 44:7
**degrees** [1] - 28:16
**delegates** [1] - 13:12
**delta** [1] - 21:2
**Department** [16] - 1:19, 3:18, 4:14, 4:15, 7:18, 12:21, 13:14, 13:21, 15:11, 17:8, 17:9, 17:14, 18:24, 19:21, 38:25, 39:21
**deported** [1] - 25:6
**DEPUTY** [1] - 2:2
**deputy** [1] - 19:18
**describe** [3] - 34:1, 34:2, 41:6
**described** [4] - 3:23, 3:25, 4:12, 38:7
**descriptive** [1] - 34:23
**designated** [2] - 32:9, 40:14
**detail** [1] - 45:24
**detention** [2] - 30:21, 31:4
**determination** [2] - 24:1, 24:5
**determine** [3] - 5:21, 10:6, 28:25
**development** [2] - 18:18, 18:23
**DHS** [11] - 4:19, 5:14, 8:25, 18:11, 19:2, 20:6, 20:12, 21:8, 21:14, 21:16
**different** [2] - 12:11, 40:22
**Diplomate** [1] - 1:23
**diplomats** [1] - 13:17
**directed** [1] - 35:4
**director** [3] - 2:11, 3:17, 8:18
**Director** [1] - 1:6
**disagree** [1] - 26:25
**disagreement** [1] - 40:24
**disclosed** [1] - 25:15
**discretion** [3] - 37:14, 37:15, 38:24
**discussed** [1] - 39:10
**discussion** [2] - 17:6, 28:18
**discussions** [1] - 27:23
**dismissed** [1] - 25:2
**disposition** [1] - 7:16
**DISTRICT** [3] - 1:1, 1:1, 1:10
**District** [2] - 46:14
**district** [2] - 2:12, 2:14
**division** [7] - 10:5, 21:20, 21:21, 22:2, 22:12, 23:17, 23:19
**Division** [7] - 1:19, 6:18, 18:17, 18:22, 21:15, 22:16, 23:19
**docket** [1] - 44:19
**document** [4] - 28:8, 32:12, 32:13, 37:13
**done** [3] - 7:12, 24:1, 33:3
**down** [8] - 11:17, 11:20, 11:21, 12:16, 20:4, 30:4, 33:19, 33:21
**driver's** [1] - 25:8
**driving** [3] - 6:10, 24:19, 24:24
**drop** [2] - 33:19, 33:21
**drop-down** [2] - 33:19, 33:21
**due** [6] - 27:20, 27:21, 28:2, 28:6, 35:6
**duration** [2] - 21:10, 33:10
**during** [1] - 8:8

## E

**ECF** [1] - 37:2
**education** [1] - 43:25
**effect** [4] - 26:13, 32:14, 32:17, 37:24
**effective** [2] - 37:22, 41:2
**effort** [11] - 5:20, 8:10, 8:12, 8:14, 8:15, 8:16, 10:4, 10:9, 10:22, 31:10, 31:12
**either** [3] - 26:15, 32:1, 35:10
**eliminate** [1] - 39:22
**email** [12] - 3:16, 4:2, 4:3, 19:11, 20:5, 20:12, 20:16, 20:18, 20:22, 20:23, 23:12, 46:5
**embodied** [1] - 28:8
**employee** [2] - 22:15, 34:9
**employees** [8] - 7:22, 8:6, 9:17, 10:9, 10:24, 11:1, 11:16, 21:24
**end** [2] - 29:9, 36:6
**endeavor** [1] - 44:22
**endeavored** [1] - 7:13
**enforce** [2] - 28:7, 30:25
**enforcement** [1] - 30:24
**Enforcement** [1] - 1:7
**engineering** [2] - 28:16, 44:7
**England** [1] - 3:3
**enjoin** [1] - 44:25
**enter** [1] - 44:19
**entered** [2] - 30:15, 44:5
**entering** [1] - 18:3
**entire** [3] - 24:1, 44:16, 44:25
**entitled** [1] - 46:16
**error** [1] - 31:7
**estimate** [2] - 9:23, 15:7
**et** [1] - 3:20
**Everly** [1] - 2:11
**exact** [2] - 4:6, 11:11
**exactly** [4] - 7:23, 8:1, 13:23, 43:16
**example** [2] - 7:2, 35:13
**Exchange** [3] - 18:18, 18:24, 37:7
**executive** [1] - 8:18
**Exhibit** [2] - 22:10, 37:3
**exist** [1] - 11:9
**expired** [8] - 16:6, 16:7, 16:11, 16:18, 17:20, 17:24, 23:5, 38:15
**expires** [1] - 46:7
**explain** [1] - 37:9
**explains** [1] - 45:24

## F

**F-1** [2] - 11:2, 38:14
**fact** [5] - 10:6, 24:25, 25:14, 40:15, 41:11
**failure** [4] - 33:22, 34:19, 34:22, 37:18
**fair** [3] - 7:12, 40:19, 40:23
**false** [2] - 31:19, 31:21
**family** [1] - 38:9
**far** [3] - 40:5, 42:21, 45:8
**Federal** [1] - 46:14
**federal** [9] - 1:24, 7:22, 8:6, 9:14, 9:17, 10:24, 11:1, 11:16, 42:2
**FEDERAL** [1] - 46:21
**fell** [1] - 38:5
**few** [1] - 25:7
**field** [6] - 32:10, 34:14, 40:14, 40:18, 40:20, 44:13
**Fifth** [2] - 27:20, 27:22
**file** [2] - 35:25, 46:4
**filed** [3] - 3:11, 25:3, 36:25
**fillable** [1] - 34:14
**final** [1] - 43:25
**fine** [2] - 15:15, 40:25
**Fine** [1] - 25:18
**finishing** [1] - 43:24
**firing** [1] - 42:2
**First** [1] - 2:16
**first** [12] - 2:24, 3:15, 5:1, 5:12, 11:5, 15:5, 19:11, 21:3, 23:10, 28:1, 30:13
**firsthand** [1] - 34:11
**five** [1] - 31:6
**flag** [4] - 28:24, 31:25, 40:6
**focus** [1] - 8:9
**follow** [3] - 32:2, 32:11, 40:13
**follow-up** [1] - 40:13
**following** [1] - 25:3
**FOR** [4] - 1:1, 1:9, 1:13, 1:19
**foregoing** [1] - 46:15
**foreign** [1] - 20:19
**format** [1] - 46:16
**forthright** [3] - 25:17, 29:12, 35:2
**forward** [1] - 2:4
**founding** [1] - 2:22
**four** [3] - 10:12, 10:14, 31:6
**France** [1] - 2:25
**Franklin** [1] - 3:1
**French** [1] - 3:2
**front** [1] - 19:10
**funding** [1] - 9:15
**furtherance** [1] - 3:19

## G

**gazillion** [1] - 36:21
**Georgia** [2] - 30:4, 30:5
**given** [4] - 5:19, 8:21, 11:4, 41:20
**government** [21] - 9:15, 10:8, 25:16, 25:18, 25:22, 28:9, 31:7, 31:18, 32:1, 36:17, 36:20, 40:23, 41:13, 41:17, 41:19, 42:13, 43:1, 45:5, 45:18, 45:19
**government's** [2] - 31:22, 43:5
**grace** [2] - 34:16, 35:9
**graduating** [1] - 44:1
**Great** [1] - 5:4
**great** [1] - 2:15
**group** [4] - 18:17, 34:5, 36:11, 36:14
**groups** [1] - 23:4
**guess** [6] - 34:10, 34:12, 39:14, 40:1, 41:18
**guidance** [2] - 37:12, 37:16
**guys** [3] - 44:18, 46:2, 46:4

## H

**H-1** [1] - 38:9
**H-2** [1] - 38:11
**H-4** [1] - 38:8
**half** [1] - 14:8
**Hammer** [2] - 8:18, 22:8
**hammer** [4] - 8:19, 22:8, 23:13, 23:16
**hampering** [1] - 30:25
**handful** [1] - 36:11
**handle** [1] - 11:5
**hanging** [1] - 3:1

**happy** [5] - 30:9, 36:24, 44:21, 45:4, 45:20
**hard** [2] - 44:25, 45:1
**hated** [1] - 3:2
**head** [2] - 8:16, 11:25
**headquarters** [1] - 5:15
**heads** [1] - 16:18
**heads-up** [1] - 16:18
**hear** [2] - 3:7, 27:4
**HEARING** [1] - 1:9
**hearing** [5] - 29:10, 29:11, 31:11, 38:7, 41:7
**help** [1] - 19:6
**helpful** [2] - 29:12, 40:1
**hereby** [1] - 46:15
**highlight** [1] - 37:20
**highly** [2] - 2:21, 2:23
**HILLARY** [1] - 1:20
**history** [1] - 24:17
**hit** [10] - 11:17, 29:5, 31:15, 33:23, 34:1, 34:15, 38:19, 38:20, 38:24, 40:12
**hits** [8] - 4:14, 5:21, 7:14, 7:15, 9:18, 10:2, 13:20, 31:21
**hold** [2] - 9:21, 11:21
**Homeland** [4] - 2:11, 3:18, 21:13, 23:19
**homes** [1] - 28:15
**honcho** [1] - 8:16
**Honor** [34] - 2:6, 2:8, 17:5, 17:20, 17:23, 18:2, 18:6, 22:5, 25:10, 25:25, 26:4, 28:23, 29:13, 29:16, 30:16, 31:11, 33:22, 34:10, 36:12, 36:24, 38:4, 41:5, 41:22, 42:10, 42:16, 43:9, 43:24, 44:3, 44:6, 44:8, 44:21, 45:4, 45:14, 46:10
**Honor's** [1] - 41:6
**HONORABLE** [1] - 1:10
**hour** [1] - 24:21
**hours** [5] - 20:15, 21:2, 22:25, 27:5, 28:17
**Houston** [1] - 1:17
**human** [1] - 35:19
**humor** [1] - 9:25
**hundreds** [1] - 36:9

## I

**ICE** [18] - 2:13, 2:14, 3:18, 4:13, 4:15, 8:24, 9:2, 30:18, 30:23, 31:3, 32:10, 34:14, 37:1, 39:11, 40:14, 40:18, 40:20, 43:11
**ICE's** [2] - 37:13, 38:23
**ideal** [1] - 42:1
**identified** [3] - 7:14, 31:7, 31:19
**identify** [1] - 2:4
**identity** [1] - 31:13
**II** [1] - 2:21
**III** [1] - 1:20
**illegal** [1] - 39:9
**images** [2] - 32:22, 33:8
**imagination** [1] - 42:1
**imagine** [2] - 36:17, 36:18
**immediate** [4] - 30:21, 31:4, 37:24, 44:2
**immediately** [6] - 26:9, 26:15, 35:10, 35:11, 37:23, 40:7
**Immigration** [2] - 1:6, 44:14
**important** [3] - 2:17, 8:5, 28:6
**impressed** [1] - 35:1
**INA** [1] - 38:1
**inappropriate** [2] - 7:2, 7:6
**includes** [4] - 6:3, 6:6, 6:9, 6:13
**indicate** [2] - 32:25, 33:1
**indicative** [1] - 33:14
**individual** [4] - 25:6, 31:13, 31:14, 40:12
**individual's** [1] - 40:21
**individualized** [5] - 24:1, 24:4, 24:11, 24:13, 25:21
**individuals** [7] - 16:15, 21:3, 21:9, 24:2, 35:19, 36:3, 38:6
**information** [15] - 4:15, 30:17, 30:23, 32:17, 34:11, 34:15, 36:2, 39:1, 39:11, 40:21, 41:12, 42:8, 42:13, 43:11, 44:8
**Information** [3] - 5:25, 6:20, 6:22
**initiative** [10] - 3:19, 3:21, 4:5, 4:9, 4:22, 4:25, 5:13, 5:14, 10:19, 10:20
**INJUNCTION** [1] - 1:9
**injunction** [3] - 37:4, 39:5, 39:12
**instance** [1] - 11:8
**instead** [3] - 36:4, 36:6, 36:21
**instruction** [2] - 8:23, 23:11
**instructions** [2] - 18:16, 18:18
**intended** [1] - 31:25
**interacting** [1] - 13:9
**interest** [1] - 21:25
**interested** [2] - 2:22, 40:2
**interests** [1] - 44:1
**Investigations** [2] - 21:14, 23:19
**investigative** [1] - 31:25
**invited** [1] - 35:19
**involved** [1] - 30:12
**ironic** [1] - 44:9
**issue** [7] - 27:14, 37:20, 41:3, 45:8, 45:9, 45:12, 46:4
**issued** [2] - 37:1, 37:11
**issues** [1] - 45:24
**issuing** [1] - 45:21
**item** [1] - 33:21
**items** [1] - 33:19

## J

**Jane** [2] - 11:5, 11:7
**jobs** [2] - 8:8, 10:1
**John** [5] - 12:10, 12:11, 13:10, 31:16, 31:17
**JOHNNY** [1] - 1:20
**Johnny** [2] - 2:8, 30:10
**joined** [1] - 2:10
**JUDGE** [1] - 1:10
**judges** [1] - 36:21
**JUDGMENT** [1] - 1:10
**Judicial** [1] - 46:17
**Justice** [1] - 1:19

## K

**keep** [4] - 25:17, 27:1, 41:11, 45:20
**Kentuckian** [1] - 30:10
**Kentucky** [3] - 29:21, 29:23, 30:11
**killed** [1] - 43:20
**kind** [2] - 18:11, 41:16
**King** [1] - 2:25
**knowledge** [4] - 24:10, 27:16, 27:17, 40:24
**knows** [3] - 27:21, 31:3, 40:18
**KY** [1] - 30:3

## L

**lack** [2] - 33:14, 35:18
**lag** [1] - 15:5
**land** [1] - 28:1
**language** [5] - 42:25, 44:18, 45:5, 45:17, 46:2
**lark** [1] - 28:11
**last** [10] - 3:11, 5:8, 8:21, 10:8, 10:19, 29:10, 36:25, 38:12, 43:25, 45:6
**Law** [1] - 1:13
**law** [7] - 5:5, 26:2, 26:14, 26:15, 28:1, 30:24, 30:25
**lawfully** [6] - 26:5, 26:10, 26:19, 30:14, 30:18, 32:8
**lawyers** [3] - 35:15, 35:23
**lead** [2] - 18:17, 18:23
**leadership** [2] - 8:23, 8:25
**least** [2] - 15:8, 25:16
**leave** [7] - 23:21, 26:3, 26:9, 26:15, 30:3, 35:10, 40:6
**left** [1] - 25:7
**legal** [1] - 2:12
**legally** [6] - 8:7, 18:2, 26:16, 27:14, 28:12, 39:7
**less** [8] - 12:1, 12:2, 14:8, 20:15, 21:1, 22:25, 27:4, 28:16
**letter** [2] - 29:3, 35:13
**letterhead** [1] - 3:20
**level** [2] - 21:23, 34:9
**licenses** [1] - 25:8
**line** [1] - 10:20
**lines** [1] - 10:4
**links** [1] - 32:21
**Linnan** [1] - 2:13
**liquors** [1] - 30:12
**list** [13] - 11:2, 15:13, 15:23, 15:24, 16:16, 18:14, 18:23, 19:22, 22:21, 22:22, 23:1, 33:19
**listening** [1] - 18:20
**lists** [1] - 21:3
**literally** [1] - 28:7
**literate** [1] - 45:23
**litigation** [3] - 2:12, 2:14, 35:25
**lived** [1] - 30:2
**LLC** [1] - 1:13
**look** [6] - 20:4, 32:18, 37:21, 41:10, 42:21, 44:16
**looked** [2] - 24:6, 24:25
**looking** [4] - 25:12, 33:5, 38:4, 45:10
**loss** [1] - 41:16
**lost** [1] - 3:3
**loud** [1] - 45:14
**Louisville** [4] - 29:25, 30:1, 30:2, 30:5
**lower** [1] - 34:9
**lower-level** [1] - 34:9
**LYONS** [1] - 1:6
**Lyons** [1] - 2:3

## M

**ma'am** [48] - 4:20, 4:23, 5:3, 5:9, 5:17, 6:2, 6:5, 6:8, 6:12, 6:15, 6:24, 7:1, 7:25, 8:20, 9:1, 9:8, 11:14, 11:23, 12:12, 13:3, 13:7, 14:4, 14:9, 15:21, 16:1, 16:4, 16:9, 16:13, 17:12, 19:4, 19:7, 19:14, 19:16, 19:25, 20:3, 20:7, 20:10, 20:14, 20:17, 20:21, 23:8, 23:16, 23:24, 24:9, 27:7, 27:9, 27:12, 36:15
**Macklin** [1] - 2:11
**Magna** [3] - 27:25, 28:3, 28:4

**magnitude** [3] - 7:21, 10:22, 15:19
**maintain** [3] - 33:22, 34:19, 34:22
**major** [1] - 44:12
**Maker's** [1] - 29:22
**Mamma** [1] - 30:6
**Marie** [1] - 3:1
**Mark** [1] - 29:22
**match** [1] - 12:8
**matched** [1] - 31:14
**matches** [1] - 31:19
**math** [1] - 12:5
**matter** [1] - 46:16
**mean** [9] - 6:22, 8:4, 12:23, 14:17, 24:6, 32:12, 39:25, 41:14, 42:7
**means** [3] - 14:13, 32:6
**meant** [1] - 24:24
**meeting** [1] - 25:4
**member** [1] - 38:9
**merits** [1] - 26:24
**met** [1] - 5:8
**Meyers** [3] - 3:17, 19:15, 20:16
**middle** [1] - 37:21
**might** [2] - 12:10, 43:20
**miles** [1] - 24:20
**military** [1] - 30:7
**million** [7] - 9:11, 9:19, 10:23, 11:13, 11:15, 11:22, 14:3
**mind** [1] - 42:2
**minutes** [3] - 23:14, 23:22, 27:3
**misdemeanor** [2] - 24:19, 24:20
**missing** [3] - 6:13, 6:14, 7:11
**mistake** [1] - 14:2
**mistakes** [1] - 35:7
**monarchy** [2] - 3:6, 3:8
**money** [1] - 9:14
**months** [1] - 28:15
**moot** [2] - 41:14, 41:15
**morning** [2] - 2:6, 2:8
**most** [2] - 28:8, 34:23
**mostly** [1] - 33:7
**motion** [1] - 37:3
**MOTION** [1] - 1:9
**motions** [1] - 36:22
**Mount** [1] - 30:1
**move** [1] - 25:19
**moved** [1] - 30:5
**MR** [197] - 2:6, 2:8, 3:13, 3:22, 4:6, 4:9, 4:11, 4:20, 4:23, 4:25, 5:3, 5:7, 5:9, 5:11, 5:14, 5:17, 5:19, 5:25, 6:2, 6:5, 6:8, 6:12, 6:15, 6:18, 6:20, 6:24, 7:1, 7:5, 7:12, 7:21, 7:25, 8:2, 8:14, 8:17, 8:20, 8:23, 9:1, 9:3, 9:8, 9:11, 9:20, 9:23, 10:4, 10:12, 10:17, 10:21, 11:3, 11:8, 11:11, 11:14, 11:19, 11:23, 11:25, 12:7, 12:12, 12:15, 12:17, 12:19, 12:24, 13:1, 13:3, 13:5, 13:7, 13:10, 13:12, 13:15, 13:18, 13:23, 14:1, 14:4, 14:9, 14:11, 14:15, 14:18, 14:21, 15:3, 15:7, 15:12, 15:17, 15:19, 15:21, 16:1, 16:4, 16:6, 16:9, 16:13, 16:23, 17:2, 17:5, 17:12, 17:16, 17:20, 17:23, 18:2, 18:6, 18:9, 18:13, 18:16, 18:22, 19:4, 19:7, 19:10, 19:14, 19:16, 19:18, 19:21, 19:25, 20:3, 20:7, 20:10, 20:14, 20:17, 20:21, 20:25, 21:6, 21:12, 21:16, 21:19, 21:23, 22:5, 22:10, 22:12, 22:15, 22:19, 22:24, 23:8, 23:11, 23:16, 23:24, 24:4, 24:9, 24:13, 24:16, 25:3, 25:9, 25:25, 26:4, 26:10, 26:18, 26:21, 27:7, 27:9, 27:12, 27:16, 27:18, 28:23, 29:13, 29:16, 29:23, 29:25, 30:4, 30:8, 30:12, 30:16, 30:22, 31:3, 31:9, 31:18, 31:24, 32:9, 32:15, 32:20, 33:6, 33:19, 33:22, 33:25, 34:7, 34:18, 34:23, 36:8, 36:11, 36:14, 36:24, 37:7, 37:11, 38:22, 39:10, 39:19, 40:8, 40:11, 40:19, 41:4, 41:22, 42:10, 42:16, 43:8, 43:23, 44:3, 44:6, 44:8, 44:10, 44:21, 45:2, 45:4, 45:14, 46:1, 46:10
**MS** [1] - 14:7
**must** [2] - 32:13, 35:9

## N

**name** [14] - 2:15, 5:6, 5:19, 8:21, 9:6, 9:18, 11:5, 11:6, 22:4, 23:20, 29:16, 29:22
**names** [19] - 7:3, 7:7, 10:2, 11:5, 13:22, 14:3, 14:10, 14:11, 14:23, 14:24, 15:2, 15:3, 15:13, 19:23, 22:20, 24:2, 42:4
**National** [7] - 5:25, 6:21, 18:17, 18:22, 21:14, 22:16, 23:18
**national** [4] - 6:17, 6:18, 6:20
**nationwide** [1] - 36:7
**NCIC** [19] - 4:14, 5:20, 5:22, 5:23, 6:19, 7:3, 9:5, 10:10, 10:16, 11:6, 11:17, 12:8, 31:14, 31:20, 34:15, 38:20, 38:24, 43:4
**necessarily** [7] - 33:1, 33:3, 33:4, 33:13, 34:1, 41:14, 41:15
**need** [5] - 16:10, 31:16, 42:21, 42:23, 46:3
**negative** [2] - 33:3, 33:4
**Neumann** [1] - 1:16
**never** [2] - 7:9, 43:22
**new** [6] - 37:1, 42:8, 42:11, 42:13, 42:17, 43:6
**next** [4] - 12:6, 12:18, 35:7, 43:25
**night** [2] - 3:12, 37:1
**nilly** [1] - 35:5
**NO** [1] - 1:5
**nobody** [1] - 27:21
**non** [1] - 27:1
**non-process** [1] - 27:1
**nonimmigrant** [3] - 9:3, 37:19, 37:22
**nonimmigrant's** [2] - 37:23, 38:2
**normally** [1] - 10:3
**note** [3] - 28:23, 37:16, 44:20
**noted** [2] - 32:24, 39:2
**notes** [2] - 33:2, 39:19
**nothing** [1] - 46:8
**notice** [9] - 16:19, 17:1, 17:4, 17:18, 18:11, 28:17, 41:20, 42:3, 42:15
**nowhere** [2] - 23:25, 45:6
**number** [11] - 3:10, 4:13, 7:7, 10:9, 11:11, 11:20, 12:4, 13:25, 18:4, 27:13, 45:22
**Number** [1] - 31:7
**NW** [2] - 1:20, 1:24

## O

**obligations** [1] - 26:20
**obtained** [1] - 34:11
**obviously** [3] - 25:18, 30:24, 41:1
**occur** [1] - 18:12
**occurred** [1] - 15:8
**OF** [2] - 1:1, 1:9
**office** [5] - 8:17, 10:11, 40:14, 40:18, 40:20
**Office** [1] - 2:9
**offices** [1] - 32:11
**OFFICIAL** [1] - 46:21
**official** [3] - 13:15, 32:10, 40:14
**Official** [2] - 1:24, 46:14
**officials** [2] - 32:10, 40:23
**often** [1] - 10:14
**ON** [1] - 1:9
**once** [1] - 9:21
**one** [18] - 2:18, 11:1, 11:22, 12:7, 12:24, 14:24, 17:6, 18:13, 19:24, 24:6, 24:10, 26:4, 34:2, 37:5, 37:20, 42:16, 43:23, 45:1
**online** [2] - 22:1, 22:6
**opportunity** [1] - 16:20
**opposition** [1] - 37:3
**oppression** [1] - 28:9
**option** [3] - 34:13, 34:24
**optional** [1] - 44:11
**OR** [1] - 1:10
**order** [4] - 7:21, 15:19, 43:12, 43:13
**Order** [1] - 2:1
**original** [1] - 46:15
**outside** [2] - 30:1, 38:23
**overstays** [1] - 10:6
**own** [1] - 13:5

## P

**P.C** [1] - 1:16
**p.m** [6] - 3:16, 19:13, 20:2, 20:5, 20:12, 22:18
**packaging** [1] - 30:8
**page** [3] - 20:8, 33:8, 46:16
**paid** [3] - 28:12, 35:21, 35:23
**papers** [1] - 32:18
**Pappa** [1] - 30:6
**paragraph** [1] - 37:21
**part** [2] - 10:4, 19:23
**particular** [4] - 20:23, 33:11, 33:25, 44:18
**particularly** [2] - 35:17, 35:22
**parties** [1] - 2:4
**passed** [3] - 4:14, 4:15, 18:23
**PATEL** [1] - 1:3
**Patel** [35] - 2:3, 17:18, 20:23, 22:23, 24:11, 24:18, 25:11, 25:14, 25:21, 25:25, 26:5, 27:3, 30:18, 33:21, 34:19, 35:13, 35:14, 36:25, 37:17, 37:19, 38:5, 38:8, 39:2, 39:6, 39:12, 41:11, 41:17, 41:20, 42:7, 43:2, 43:16, 43:24, 44:19, 45:20, 46:8
**Patel's** [4] - 24:6, 32:4, 40:3, 43:4
**pay** [1] - 35:25
**paying** [2] - 28:12, 45:11
**pending** [2] - 41:12, 42:8
**people** [45] - 4:2, 6:1, 6:3, 6:6, 6:9, 6:13, 6:14, 8:1, 8:2, 9:9,

9:19, 10:1, 10:7, 10:23, 11:13, 11:15, 11:22, 12:3, 12:6, 12:13, 13:21, 15:14, 15:20, 15:24, 16:2, 16:7, 16:10, 19:2, 23:2, 23:6, 23:9, 25:7, 25:18, 27:3, 27:4, 27:5, 28:14, 28:15, 29:2, 29:5, 35:24, 36:14, 45:23
**peoples'** [1] - 28:9
**percent** [5] - 11:24, 12:1, 12:2, 14:7, 14:8
**percentage** [1] - 14:5
**period** [2] - 34:17, 35:9
**perma** [1] - 32:21
**person** [11] - 12:5, 22:8, 22:17, 23:4, 24:14, 40:6, 40:9, 40:15, 40:17, 40:20, 45:1
**personnel** [2] - 37:6, 37:12
**persons** [1] - 7:11
**ph)** [1] - 29:17
**Plaintiff** [1] - 1:4
**plaintiff** [5] - 2:7, 20:23, 30:14, 30:20, 32:16
**PLAINTIFF** [1] - 1:13
**plaintiff's** [2] - 17:17, 41:2
**plaintiffs** [4] - 18:5, 29:19, 33:8, 36:10
**plaintiffs'** [2] - 35:23, 35:25
**plan** [1] - 42:14
**pleasant** [1] - 29:8
**point** [1] - 17:6
**pointed** [1] - 33:11
**points** [1] - 37:16
**policy** [10] - 37:1, 39:3, 41:5, 42:11, 42:17, 42:22, 43:6, 43:10, 44:16, 44:25
**pop** [2] - 7:3, 7:7
**pops** [1] - 40:3
**population** [1] - 9:3
**portion** [1] - 20:25
**position** [2] - 43:5, 43:17
**positive** [3] - 5:21, 7:14, 7:15
**postgraduate** [1] - 44:10
**power** [1] - 42:19
**practical** [2] - 39:25, 44:11
**precarious** [1] - 3:2
**Precisely** [1] - 31:18
**precisely** [1] - 3:22
**preliminary** [2] - 37:3, 39:5
**PRELIMINARY** [1] - 1:9
**prepare** [1] - 36:1
**present** [5] - 25:10, 26:5, 26:10, 26:19, 30:18
**pretty** [2] - 33:24, 34:25
**primarily** [1] - 13:10
**primary** [1] - 41:4
**principal** [1] - 19:18
**prioritize** [2] - 21:4, 23:2
**privacy** [1] - 21:24
**Proceedings** [1] - 46:12
**proceedings** [1] - 39:22
**process** [17] - 3:24, 4:1, 4:4, 24:1, 27:1, 27:20, 27:21, 28:2, 28:6, 28:7, 28:22, 31:19, 34:4, 34:8, 35:6
**Produced** [1] - 1:25
**production** [1] - 15:6
**program** [1] - 8:17
**Program** [3] - 18:19, 18:24, 37:8
**promise** [2] - 29:14, 44:22
**properly** [1] - 18:3
**protects** [1] - 42:19
**provide** [4] - 30:22, 34:7, 43:8, 43:9
**provided** [3] - 18:16, 18:18, 37:16
**provides** [2] - 33:9, 37:12
**pull** [1] - 8:5
**pulled** [2] - 24:23, 33:6
**puppies** [1] - 43:20
**purpose** [2] - 31:22, 43:10
**purposes** [1] - 14:15
**put** [6] - 7:21, 8:8, 10:9, 10:15, 11:6, 34:15
**putting** [1] - 10:2

## Q

**quality** [2] - 31:9, 31:11
**questioning** [1] - 28:11
**questions** [9] - 3:10, 26:4, 28:21, 29:9, 29:20, 31:10, 32:11, 35:3, 41:6
**quick** [1] - 46:5
**quite** [2] - 25:17, 44:17
**quiz** [1] - 27:19
**quote** [2] - 24:23, 42:11
**quote-unquote** [1] - 24:23
**quotes** [1] - 33:6

## R

**radicals** [1] - 28:7
**ran** [2] - 4:13, 9:21
**RDR** [1] - 46:20
**RDR-CRR** [1] - 46:20
**reached** [1] - 16:15
**reacts** [1] - 26:21
**read** [1] - 2:21
**really** [5] - 3:5, 45:9, 45:10
**Realtime** [1] - 1:23
**reason** [9] - 7:4, 7:8, 20:22, 25:15, 25:24, 33:11, 35:17, 35:21, 43:18
**reasons** [2] - 33:4, 33:10
**rebels** [1] - 3:5
**receive** [1] - 17:18
**recent** [1] - 31:8
**reckless** [3] - 6:10, 24:19, 24:23
**recommend** [2] - 2:21, 2:24
**Record** [1] - 1:25
**record** [39] - 2:5, 3:11, 3:23, 3:24, 4:18, 12:8, 12:9, 19:9, 19:12, 24:16, 24:25, 25:1, 25:12, 26:1, 26:7, 26:18, 26:22, 30:19, 31:2, 31:14, 31:20, 31:23, 32:5, 32:25, 33:13, 35:2, 37:13, 37:23, 38:2, 38:5, 38:18, 38:24, 39:4, 40:4, 42:5, 43:4, 44:24, 46:16
**records** [8] - 4:16, 4:17, 5:20, 6:14, 8:6, 37:2, 37:15, 39:2
**red** [4] - 28:24, 31:25, 40:6
**redacted** [3] - 21:22, 21:23, 21:24
**Reddy** [1] - 1:16
**Reeves** [2] - 46:14, 46:20
**REEVES** [2] - 1:22, 46:20
**refer** [1] - 4:12
**referred** [4] - 12:20, 13:23, 13:25, 14:2
**Registered** [1] - 1:23
**regulations** [1] - 46:16
**reinstatement** [1] - 35:10
**released** [1] - 2:19
**relief** [2] - 41:15, 45:1
**remain** [4] - 38:14, 39:8, 39:12, 42:8
**remains** [1] - 26:19
**remedied** [1] - 31:20
**remind** [1] - 28:4
**removability** [2] - 37:25, 39:20
**removal** [4] - 30:21, 31:4, 39:22, 39:23
**Reporter** [4] - 1:23, 1:23, 1:24, 46:14
**REPORTER** [1] - 46:21
**represent** [3] - 18:4, 18:7, 46:8
**representation** [4] - 41:17, 41:18, 42:12, 43:1
**republicanism** [1] - 3:6
**request** [1] - 21:8
**requesting** [1] - 4:16
**require** [3] - 26:8, 26:23, 39:22
**research** [1] - 9:16
**respect** [7] - 8:9, 28:8, 36:25, 37:1, 40:24, 41:16, 42:7
**responded** [1] - 22:13
**responds** [1] - 21:1
**response** [2] - 14:21, 22:18
**responses** [2] - 7:16, 15:8
**responsible** [1] - 10:5
**retain** [1] - 37:13
**returned** [2] - 38:10, 39:1
**review** [3] - 7:13, 20:19, 38:16
**revocation** [10] - 14:14, 14:16, 21:4, 33:23, 37:20, 37:24, 37:25, 38:17, 39:20, 43:10
**revocations** [1] - 14:12
**revoke** [6] - 15:24, 16:11, 21:9, 38:16, 38:17, 39:2
**revoked** [8] - 14:25, 15:15, 16:21, 17:19, 38:3, 38:6, 39:4, 39:17
**revokes** [2] - 37:22, 39:21
**revoking** [3] - 17:8, 17:9, 23:3
**Revolution** [1] - 2:20
**Revolutionary** [1] - 2:23
**REYES** [1] - 1:10
**richer** [1] - 35:20
**Richmond** [1] - 1:17
**Rick** [1] - 2:19
**rid** [2] - 3:7, 4:3
**rights** [1] - 28:9
**Rines** [1] - 29:17
**Robert** [2] - 8:18, 22:8
**role** [4] - 10:12, 10:14, 13:11, 13:13
**roles** [1] - 8:3
**rolling** [1] - 15:6
**rough** [2] - 7:21, 15:19
**rule** [1] - 36:21
**rules** [1] - 42:18
**ruling** [5] - 45:9, 45:10, 45:12, 45:21, 45:23
**run** [9] - 7:3, 7:6, 9:4, 9:6, 9:9, 11:10, 21:2, 23:1, 42:3
**running** [1] - 13:21
**runs** [2] - 11:8, 11:10
**rushed** [1] - 34:4
**rushing** [1] - 36:4
**Rutledge** [1] - 1:14

## S

**Sam** [2] - 12:4, 14:5
**scan** [1] - 32:22
**school** [12] - 5:5, 26:21, 26:22, 30:1, 32:1, 32:9, 32:10, 40:3, 40:11, 40:14, 43:20
**scope** [2] - 3:22, 4:6

**scrub** [1] - 5:20
**scrutinized** [1] - 24:16
**search** [1] - 8:6
**seated** [1] - 29:14
**second** [7] - 2:20, 2:25, 3:8, 11:22, 21:7, 37:5, 37:21
**secretary** [1] - 19:19
**Section** [1] - 37:25
**section** [2] - 2:13, 2:14
**Security** [10] - 2:11, 3:18, 6:18, 18:17, 18:22, 21:13, 21:15, 22:16, 23:19
**see** [23] - 3:23, 9:18, 10:2, 14:21, 19:11, 19:13, 20:6, 20:9, 20:11, 20:13, 21:5, 21:11, 22:18, 23:11, 23:12, 30:9, 33:15, 33:16, 38:19, 40:12, 42:4, 45:24, 46:5
**seeking** [2] - 3:5, 25:16
**select** [2] - 33:20, 34:24
**send** [6] - 14:10, 15:13, 15:23, 16:5, 19:22, 20:1
**sending** [3] - 16:15, 18:10, 18:11
**sends** [5] - 15:23, 18:14, 20:12, 21:17, 23:21
**senior** [1] - 13:15
**sense** [1] - 42:23
**sensitive** [1] - 30:25
**sent** [12] - 7:17, 13:2, 15:14, 17:1, 17:4, 17:14, 19:15, 20:16, 22:17, 25:1, 29:3, 35:12
**separate** [1] - 39:21
**serve** [3] - 8:2, 23:17, 37:25
**Services** [1] - 44:14
**set** [1] - 14:24
**seven** [1] - 3:3
**seven-year** [1] - 3:3
**SEVIS** [46] - 4:17, 5:20, 7:7, 12:8, 16:3, 16:12, 16:20, 17:15, 18:25, 21:8, 23:7, 23:10, 23:15, 24:3, 26:1, 26:7, 26:14, 26:19, 26:22, 27:6, 29:3, 30:19, 31:8, 31:14, 31:20, 31:23, 32:4, 32:14, 32:17, 32:25, 33:2, 33:3, 33:13, 33:16, 33:17, 34:13, 37:2, 37:13, 37:23, 38:2, 38:18, 39:4, 39:13, 39:25, 40:4
**SEVP** [5] - 37:5, 37:6, 37:12, 37:23, 38:1
**Shane** [2] - 19:15, 19:17
**short** [1] - 36:22
**short-circuit** [1] - 36:22
**significant** [1] - 28:8
**single** [2] - 18:13, 25:6
**situation** [1] - 3:2
**six** [1] - 31:7
**Smith** [10] - 11:6, 11:7, 12:10, 12:11, 31:16, 31:17, 39:15, 43:16, 43:18, 43:20
**Smith's** [1] - 40:4
**snipped** [1] - 32:21
**someone** [15] - 9:17, 20:5, 20:6, 20:12, 21:13, 21:17, 21:20, 22:13, 23:1, 23:18, 23:21, 35:12, 39:16, 40:2
**somewhere** [2] - 10:19, 32:13
**SONJA** [2] - 1:22, 46:20
**Sonja** [2] - 46:14, 46:20
**sorry** [3] - 7:5, 7:25, 22:13
**sort** [9] - 3:24, 19:6, 32:21, 33:6, 34:7, 34:12, 34:14, 36:22, 38:7
**sounds** [1] - 33:24
**sources** [1] - 10:6
**South** [1] - 1:15
**specific** [5] - 5:20, 10:21, 15:4, 37:12, 37:15
**specifically** [2] - 42:7, 44:19
**speed** [1] - 25:18
**speeding** [6] - 7:10, 24:24, 25:7, 25:15, 25:23, 42:5
**spend** [2] - 9:17, 42:3
**spending** [2] - 9:14, 11:12
**spent** [2] - 10:24, 11:16
**spreadsheet** [1] - 20:24
**spreadsheets** [3] - 7:17, 12:19, 15:4
**staff** [5] - 5:19, 7:13, 7:19, 8:13, 8:14
**start** [2] - 7:24, 36:23
**started** [1] - 38:8
**starts** [1] - 2:25
**state** [2] - 13:5, 23:9
**State** [45] - 4:14, 4:15, 7:18, 12:21, 13:2, 13:6, 13:9, 13:14, 13:21, 14:3, 14:10, 14:16, 14:17, 14:19, 14:21, 15:11, 15:15, 15:23, 16:15, 16:23, 17:4, 17:7, 17:8, 17:14, 17:18, 18:10, 18:14, 18:24, 19:1, 19:2, 19:21, 19:22, 20:5, 20:12, 21:14, 21:20, 23:5, 25:22, 27:4, 27:5, 37:22, 38:3, 38:25, 39:21
**State's** [2] - 32:15, 32:24
**STATES** [1] - 1:1
**States** [20] - 2:9, 3:8, 9:4, 17:10, 24:8, 24:12, 25:22, 26:6, 26:11, 26:19, 30:14, 30:18, 30:21, 38:10, 38:11, 38:12, 38:14, 44:14, 46:14, 46:17
**status** [42] - 10:7, 14:15, 15:15, 15:22, 16:17, 17:10, 17:11, 17:13, 17:14, 17:22, 18:1, 18:3, 21:8, 21:10, 25:17, 25:24, 26:1, 27:14, 32:8, 33:1, 33:2, 33:10, 33:12, 33:14, 33:23, 34:19, 34:21, 34:22, 35:14, 35:15, 37:19, 38:13, 39:6, 39:7, 39:16, 39:17, 39:18, 39:22, 40:15, 41:11, 43:4
**stay** [1] - 28:14
**STEM** [1] - 44:12
**stenographic** [1] - 46:15
**Stenographic** [1] - 1:25
**STEVEN** [1] - 1:16
**Steven** [1] - 2:7
**still** [10] - 17:11, 17:13, 28:25, 32:7, 32:8, 39:14, 39:18, 39:24, 41:16, 42:1
**Street** [1] - 1:20
**stretch** [1] - 42:1
**student** [9] - 3:19, 3:21, 4:4, 4:21, 5:12, 10:20, 28:25, 32:3, 38:14
**Student** [3] - 18:18, 18:24, 37:7
**student's** [1] - 31:23
**Students** [1] - 21:7
**students** [17] - 4:13, 8:6, 9:4, 10:10, 10:15, 10:17, 10:18, 10:21, 11:2, 20:19, 27:8, 27:10, 28:11, 29:4, 35:20, 42:4
**studied** [1] - 28:13
**studies** [1] - 38:8
**study** [3] - 32:15, 32:24, 44:13
**studying** [2] - 9:4, 27:10
**subject** [5] - 30:20, 31:4, 42:11, 43:6, 43:9
**submitted** [1] - 20:19
**subordinate** [1] - 22:15
**Suite** [1] - 1:17
**SUMMARY** [1] - 1:10
**super** [1] - 3:3
**support** [2] - 3:4, 9:20
**supported** [1] - 8:14
**supporting** [1] - 3:5
**suppose** [2] - 6:9, 41:12
**Supreme** [1] - 41:13
**survived** [1] - 5:4
**system** [4] - 2:23, 11:18, 26:17, 38:20
**systems** [2] - 21:2, 44:8

## T

**tab** [3] - 21:3, 21:7, 23:10
**table** [1] - 2:10
**tagged** [2] - 25:7, 25:19
**team** [1] - 24:9
**technically** [1] - 41:10
**tens** [1] - 42:2
**term** [2] - 4:11, 44:2
**Terminate** [2] - 23:6, 23:22
**terminate** [18] - 7:3, 7:8, 16:2, 16:12, 16:16, 17:15, 19:2, 21:8, 23:6, 23:15, 29:2, 35:14, 37:13, 37:15, 37:23, 38:1, 38:24, 42:14
**terminated** [22] - 4:16, 4:17, 16:19, 17:19, 23:10, 24:2, 26:1, 26:7, 27:6, 30:19, 31:23, 32:5, 32:14, 33:17, 33:18, 33:20, 39:25, 40:2, 40:4, 42:14, 43:12, 43:15
**terminating** [1] - 38:18
**termination** [26] - 18:25, 26:2, 26:8, 26:9, 26:13, 26:18, 26:22, 29:6, 31:8, 32:4, 32:17, 32:25, 33:2, 33:3, 33:10, 33:11, 33:12, 33:13, 34:18, 34:20, 34:21, 39:4, 41:3, 42:11, 43:6, 43:10
**terminations** [2] - 28:24, 37:2
**terms** [3] - 25:4, 37:18, 38:15
**Texas** [2] - 1:17, 24:19
**THE** [200] - 1:1, 1:10, 1:13, 1:19, 2:15, 3:14, 4:1, 4:8, 4:10, 4:19, 4:21, 4:24, 5:1, 5:4, 5:8, 5:10, 5:12, 5:16, 5:18, 5:23, 6:1, 6:3, 6:6, 6:9, 6:13, 6:16, 6:19, 6:21, 6:25, 7:2, 7:6, 7:19, 7:23, 8:1, 8:4, 8:15, 8:19, 8:21, 8:25, 9:2, 9:6, 9:9, 9:12, 9:21, 9:25, 10:8, 10:14, 10:18, 10:23, 11:4, 11:10, 11:12, 11:15, 11:21, 11:24, 12:1, 12:10, 12:13, 12:16, 12:18, 12:22, 12:25, 13:2, 13:4, 13:6, 13:8, 13:11, 13:13, 13:17, 13:19, 13:25, 14:2, 14:5, 14:8, 14:10, 14:13, 14:17, 14:19, 14:23,

15:5, 15:10, 15:13, 15:18, 15:20, 15:22, 16:2, 16:5, 16:7, 16:10, 16:14, 16:24, 17:3, 17:11, 17:13, 17:17, 17:22, 17:24, 18:4, 18:7, 18:10, 18:14, 18:20, 19:1, 19:5, 19:8, 19:11, 19:15, 19:17, 19:20, 19:22, 20:1, 20:4, 20:8, 20:11, 20:15, 20:18, 20:22, 21:1, 21:7, 21:13, 21:17, 21:20, 22:1, 22:7, 22:11, 22:13, 22:17, 22:20, 22:25, 23:9, 23:13, 23:18, 23:25, 24:6, 24:10, 24:15, 24:18, 25:5, 25:11, 26:2, 26:8, 26:12, 26:20, 26:24, 27:8, 27:10, 27:13, 27:17, 27:19, 29:2, 29:14, 29:18, 29:24, 30:2, 30:7, 30:9, 30:13, 30:20, 31:1, 31:5, 31:16, 31:22, 32:3, 32:12, 32:18, 33:5, 33:15, 33:21, 33:24, 34:3, 34:16, 34:20, 34:25, 36:9, 36:13, 36:16, 37:5, 37:9, 38:19, 39:5, 39:14, 39:24, 40:9, 40:17, 40:22, 41:8, 41:24, 42:12, 42:21, 43:14, 44:4, 44:7, 44:9, 44:15, 44:24, 45:3, 45:7, 45:15, 46:2, 46:11

**themselves** [1] - 2:5

**thousands** [4] - 27:5, 27:13, 35:24, 42:2

**three** [10] - 9:23, 10:2, 10:24, 11:16, 15:8, 15:10, 16:25, 37:22, 44:13, 45:6

**throughout** [1] - 3:24

**Thursday** [1] - 46:7

**ticket** [3] - 6:10, 25:16, 25:23

**timeline** [1] - 19:5

**today** [6] - 2:16, 2:19, 23:21, 26:5, 27:19, 43:7

**TODD** [1] - 1:6

**Todd** [1] - 2:3

**together** [1] - 8:10

**took** [3] - 8:24, 9:2, 14:17

**top** [2] - 11:25, 29:11

**total** [2] - 17:1, 36:15

**tourist** [3] - 38:11, 38:12, 38:15

**tracking** [1] - 11:16

**training** [1] - 44:11

**transcript** [3] - 46:15, 46:15, 46:16

**Transcript** [1] - 1:25

**TRANSCRIPT** [1] - 1:9

**transferred** [1] - 30:4

**travel** [3] - 17:9, 39:21

**traveled** [1] - 38:10

**tried** [1] - 6:4

**trilogy** [2] - 2:20, 2:21

**TRO** [5] - 30:15, 39:5, 39:12, 44:5, 46:7

**troubled** [1] - 35:22

**true** [1] - 46:15

**try** [2] - 28:13, 44:21

**trying** [5] - 28:7, 28:15, 44:25, 45:1, 45:3

**Tuesday** [3] - 1:11, 3:15, 19:12

**turnaround** [1] - 15:1

**two** [9] - 9:23, 10:1, 10:24, 11:16, 25:16, 36:14, 39:20, 41:20, 46:9

**tyrannical** [1] - 28:9

## U

**U.S** [8] - 1:6, 1:19, 3:4, 3:18, 8:7, 10:16, 28:14, 35:10

**ultra** [3] - 42:17, 42:18

**under** [7] - 9:11, 21:10, 37:25, 38:8, 38:14, 42:11, 43:6

**understood** [1] - 46:1

**undertook** [1] - 34:8

**unhinged** [1] - 28:6

**unit** [1] - 18:23

**United** [20] - 2:9, 3:8, 9:4, 17:9, 24:8, 24:12, 25:22, 26:6, 26:11, 26:19, 30:14, 30:18, 30:21, 38:10, 38:11, 38:12, 38:14, 44:14, 46:14, 46:17

**UNITED** [1] - 1:1

**universities** [2] - 28:13, 29:4

**university** [1] - 32:1

**unquote** [1] - 24:23

**unredacted** [1] - 20:25

**up** [22] - 5:1, 7:3, 7:7, 11:17, 16:18, 20:24, 29:5, 29:15, 29:19, 32:2, 32:11, 36:6, 36:16, 36:17, 40:3, 40:11, 40:13, 42:25, 43:2, 43:15, 44:12, 44:18

**updated** [1] - 40:24

**upset** [1] - 3:3

**utter** [1] - 35:18

## V

**valid** [10] - 14:12, 14:14, 16:9, 21:3, 21:8, 21:9, 23:2, 23:5, 23:7, 39:16

**validate** [1] - 12:7

**validly** [1] - 17:14

**various** [3] - 8:2, 10:6, 41:22

**versus** [1] - 2:3

**view** [2] - 29:7, 30:13

**violation** [4] - 33:12, 34:16, 34:20, 35:14

**vires** [3] - 42:17, 42:18

**Virginia** [1] - 24:20

**visa** [42] - 14:12, 14:14, 14:16, 14:17, 15:24, 16:17, 16:21, 17:9, 17:18, 17:20, 17:24, 17:25, 21:8, 21:9, 23:2, 23:7, 29:1, 33:23, 37:20, 37:22, 37:24, 38:3, 38:6, 38:8, 38:11, 38:13, 38:15, 38:16, 38:17, 39:1, 39:2, 39:3, 39:4, 39:7, 39:15, 39:16, 39:17, 39:19, 39:21, 43:10

**visas** [13] - 10:10, 10:16, 11:2, 14:24, 15:15, 16:6, 16:8, 16:9, 17:8, 21:3, 21:4, 23:3, 23:5

**visible** [1] - 33:7

**visit** [1] - 30:6

**Visitor** [3] - 18:19, 18:24, 37:7

**vs** [1] - 1:5

## W

**wade** [1] - 42:22

**walker** [3] - 35:18, 42:24, 42:25

**WALKER** [57] - 1:20, 2:8, 3:13, 3:22, 4:6, 4:9, 4:11, 17:5, 17:12, 17:16, 19:10, 20:25, 21:23, 22:5, 25:25, 26:4, 26:10, 26:18, 26:21, 29:16, 29:23, 29:25, 30:4, 30:8, 30:12, 30:16, 30:22, 31:3, 31:9, 31:18, 31:24, 32:9, 32:15, 32:20, 33:6, 33:19, 33:25, 34:7, 34:18, 34:23, 36:24, 37:7, 37:11, 38:22, 39:10, 39:19, 40:8, 40:11, 40:19, 41:4, 43:8, 43:23, 44:21, 45:2, 45:14, 46:1, 46:10

**Walker** [17] - 2:8, 3:10, 17:3, 21:22, 23:20, 28:18, 30:11, 34:25, 36:20, 43:2, 43:17, 43:18, 44:15, 45:7, 45:11, 46:7

**wants** [1] - 44:20

**War** [2] - 2:21, 2:23

**war** [1] - 3:3

**Washington** [4] - 1:12, 1:21, 1:25, 30:1

**WATSON** [122] - 4:20, 4:23, 4:25, 5:3, 5:7, 5:9, 5:11, 5:14, 5:17, 5:19, 5:25, 6:2, 6:5, 6:8, 6:12, 6:15, 6:18, 6:20, 6:24, 7:1, 7:5, 7:12, 7:21, 7:25, 8:2, 8:14, 8:17, 8:20, 8:23, 9:1, 9:3, 9:8, 9:11, 9:20, 9:23, 10:4, 10:12, 10:17, 10:21, 11:3, 11:8, 11:11, 11:14, 11:19, 11:23, 11:25, 12:7, 12:12, 12:15, 12:17, 12:19, 12:24, 13:1, 13:3, 13:5, 13:7, 13:10, 13:12, 13:15, 13:18, 13:23, 14:1, 14:4, 14:9, 14:11, 14:15, 14:18, 14:21, 15:3, 15:7, 15:12, 15:17, 15:19, 15:21, 16:1, 16:4, 16:6, 16:9, 16:13, 16:23, 17:2, 18:16, 18:22, 19:4, 19:7, 19:14, 19:16, 19:18, 19:21, 19:25, 20:3, 20:7, 20:10, 20:14, 20:17, 20:21, 21:6, 21:12, 21:16, 21:19, 22:10, 22:12, 22:15, 22:19, 22:24, 23:8, 23:11, 23:16, 23:24, 24:4, 24:9, 24:13, 24:16, 25:3, 25:9, 27:7, 27:9, 27:12, 27:16, 27:18, 28:23, 29:13

**Watson** [17] - 2:10, 3:16, 3:17, 3:25, 4:12, 5:7, 28:20, 29:8, 31:12, 31:24, 34:5, 36:5, 36:18, 38:5, 39:10, 43:5, 43:19

**website** [5] - 32:15, 33:2, 33:7, 34:13, 35:9

**week** [3] - 16:25, 43:25, 46:2

**weekend** [2] - 37:11, 39:3

**weekly** [1] - 15:8

**weeks** [9] - 9:24, 10:2, 10:24, 11:16, 15:9, 15:10, 16:25, 41:20, 45:6

**Welcome** [1] - 5:10

**whatsoever** [2] - 28:17, 34:11

**willy** [1] - 35:5

**willy-nilly** [1] - 35:5

**words** [1] - 45:16

**worker** [1] - 38:9

**workers** [1] - 42:2

**works** [1] - 30:8

**World** [1] - 2:21

**world** [2] - 5:18, 32:13

**write** [1] - 45:23

**writing** [1] - 5:16

## Y

**year** [1] - 3:3

**years** [3] - 10:13, 10:14, 44:13

**yourself** [1] - 36:13

## Z

**zero** [1] - 35:6

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

\- - - - - - - - - - - - - - - - x
MANSI REDDY BUSHIREDDY,

Plaintiff,

v.

TODD M. LYONS,

Defendant.
\- - - - - - - - - - - - - - - - x

CA No: 1:25-cv-01102-SLS
Washington, D.C.
Monday, May 5, 2025
10:04 a.m.

---

TRANSCRIPT OF EVIDENTIARY HEARING
HELD BEFORE THE HONORABLE SPARKLE L. SOOKNANAN
UNITED STATES DISTRICT JUDGE

---

APPEARANCES:

For the Plaintiff:

**BRADLEY BRUCE BANIAS, ESQ.**
**BANIAS LAW, LLC**
602 Rutledge Avenue
Charleston, SC 29403
(843) 352-4272
brad@baniaslaw.com

**STEVEN A. BROWN, ESQ.**
**REDDY NEUMANN BROWN, P.C.**
10333 Richmond Avenue, Ste 1050
Houston, TX 77042
(713) 429-4793
steven@rnlawgroup.com

For the Defendant:

**HEATHER D. GRAHAM-OLIVER, ESQ.**
**JOHN CUONG TRUONG, ESQ.**
**U.S. ATTORNEY'S OFFICE FOR D.C.**
555 Fourth Street, NW
Washington, DC 20530
(202) 252-2520
heather.graham-oliver@usdoj.gov
john.truong@usdoj.gov

Court Reporter:

Lisa A. Moreira, RDR, CRR
Official Court Reporter
U.S. Courthouse, Room 6718
333 Constitution Avenue, NW
Washington, DC 20001
(202) 354-3187

P R O C E E D I N G S

THE COURTROOM DEPUTY: This is Civil Matter 25-1102, *Mansi Reddy Bushireddy v. Todd M. Lyons*.

Starting with plaintiff's counsel, please identify yourself for the record.

MR. BANIAS: Good morning, Your Honor, may it please the Court; Brad Banias and Steven Brown for the plaintiffs.

THE COURT: Good morning, Counsel.

MS. GRAHAM-OLIVER: Good morning, Your Honor, may it please the Court; Heather Graham-Oliver on behalf of the government.

THE COURT: Good morning, Counsel.

All right. We're going to start with the government. I hope everyone had a good weekend. I have read all of the many filings. Thank you for getting them done on short timelines.

So I've got a bunch of questions for you, Ms. -- is it Ms. Graham-Oliver? Is that right?

MS. GRAHAM-OLIVER: Yes, Your Honor.

THE COURT: Or is it just Oliver?

MS. GRAHAM-OLIVER: That's fine.

THE COURT: Okay. Great.

So I want to just zoom out from this case and talk about this mass termination program. I have been calling it

a mass termination program. Now I see from the administrative record that the government calls it the Student Criminal Alien Initiative, so I just want to zoom out and talk about that before we talk about the facts of this case.

So tell me about this Student Criminal Alien Initiative. How did it come about?

MS. GRAHAM-OLIVER: Your Honor, I do not know how it came about. It's not a program per se, but it's a name that was given by ICE National Security Division staff to this specific effort to scrub records from SEVIS through NCIC to determine if there were any positive hits within NCIC.

THE COURT: So, Counsel, do you have your declarant here to tell me about this if you don't know the answer to how this program came about? Does the government have witnesses here to answer my questions about the program?

MS. GRAHAM-OLIVER: Your Honor, we do not have a declarant here. I can call the agency. I do not have a declarant here, no, Your Honor.

THE COURT: Counsel, I know you were not before me last week, but I assume Mr. Carilli briefed you and you reviewed the transcript from the last proceeding about the questions that I had and my request that you show up here

today prepared to answer them or bring someone who could answer the questions. Did you review that?

MS. GRAHAM-OLIVER: Yes, Your Honor, I did. Yes.

THE COURT: And yet you're showing up here telling me you don't know the answers to the questions, and your declarant is not here.

MS. GRAHAM-OLIVER: Your Honor, I don't know how it came about; however, it's a name that was given by ICE National Security Division staff. And what happened is that they said that they scrubbed the records from SEVIS through --

THE COURT: Counsel, we have another hearing at 11:30. I'm going to give you a minute to talk to who you need to talk to, and I would like you to have people here who can answer the questions that I asked two weeks ago of the government. And then you can come back to the podium.

MS. GRAHAM-OLIVER: Yes, Your Honor.

Are there any --

THE COURT: And I will continue questioning you, but I want to make sure that someone can show up here at my next hearing to answer those questions.

MS. GRAHAM-OLIVER: I'm going to have to go out and make a phone call.

THE COURT: Sure.

(Pause)

Case 4:25-cv-03140-JSW Document 68-1 Filed 05/14/25 Page 5 of 82 

MS. GRAHAM-OLIVER: Your Honor, we have contacted the civil chief, and he is now contacting the division, the agency, to get someone to at least appear virtually in this hearing.

THE COURT: Okay. Thank you, Counsel.

Okay. So is it right, then, that you can't answer any of my questions about this Student Criminal Alien Initiative, and I should wait for agency counsel to answer those questions?

MS. GRAHAM-OLIVER: The only answer that I have for you I have specifically stated, so any other information would have to come from the agency.

THE COURT: Okay. And they're going to show up at this hearing virtually?

MS. GRAHAM-OLIVER: Yes, Your Honor.

THE COURT: Okay, thank you. And you've shared the Zoom link?

I see lots of lawyers here. I assume one of them can do it while we continue with this hearing.

THE COURTROOM DEPUTY: Your Honor, there is someone in the waiting room, James Obute.

THE COURT: No, that's for our next hearing.

MR. TRUONG: If I may, Your Honor, if Madam Deputy Clerk can email it to me, I can then email it to the witness.

THE COURT: Okay. Thank you.

Okay. So let's go back to this specific case, then, Ms. Graham-Oliver.

So based on your filings, this plaintiff's SEVIS record was reinstated on April 21st in response to the TRO that I entered on that date; is that right?

MS. GRAHAM-OLIVER: Yes, Your Honor. It was reactivated on April 25th. That's what I have.

THE COURT: On April 25th.

MS. GRAHAM-OLIVER: That's what I have, yes.

THE COURT: Okay. Let me look at your filing because...

(Pause)

MS. GRAHAM-OLIVER: ECF No. -- let's see -- 22.

THE COURT: Okay. So ECF-22 says that the student's SEVIS record was reactivated on April 21, 2025. Is that not right? Is it the 21st or the 25th?

MS. GRAHAM-OLIVER: It's the 21st, Your Honor.

THE COURT: Okay.

MS. GRAHAM-OLIVER: Sorry. I have it in my notes incorrectly.

THE COURT: Okay. And when was the record actually terminated, according to you?

MS. GRAHAM-OLIVER: So in plaintiff's exhibits, it appears that the record was terminated on or about April the

3rd, 2025.

THE COURT: Okay. And you've represented in your filing that even absent my TRO you would have reinstated this plaintiff's status on SEVIS as part of the mass correction effort that you guys undertook.

MS. GRAHAM-OLIVER: Yes, Your Honor.

THE COURT: Okay. So there's a gap in the SEVIS status because you've terminated I think on April 4th, you think on April 3rd, but either way, between April 3rd or 4th and April 21st. Does the gap in SEVIS have any implications for the plaintiff?

MS. GRAHAM-OLIVER: Your Honor, there should not be a gap in this situation. There's no gap created by the termination of the SEVIS record once it is reactivated. Once the record is restored, it is set back to the same place it was when the record was originally terminated.

THE COURT: So you retroactively reinstated the plaintiff's SEVIS record to active going back to April 4th?

MS. GRAHAM-OLIVER: Yes, Your Honor.

THE COURT: Okay.

So do you have knowledge that this plaintiff's arrest that happened on April 13, 2023, and the resulting charge, that was dismissed on August 11, 2023; is that right?

MS. GRAHAM-OLIVER: Yes, Your Honor.

THE COURT: Okay. And so being arrested and then having that charge dismissed is not a violation of someone's F-1 status, correct?

MS. GRAHAM-OLIVER: Is not a violation of someone's F-1 status?

THE COURT: If a student gets arrested --

MS. GRAHAM-OLIVER: Uh-huh.

THE COURT: -- and then those charges are dismissed, that student is not committing some violation that would change their F-1 status, correct?

MS. GRAHAM-OLIVER: Your Honor, it may not be a violation of the student's F-1 status. It is information that was entered into the SEVIS.

THE COURT: Okay. You say me, not thee. Are you saying it's possible that, when a student gets arrested and then that charge is dismissed, that somehow affects the validity of their F-1 status?

MS. GRAHAM-OLIVER: Your Honor, we are here to discuss the termination of the SEVIS --

THE COURT: Counsel, I had this with Mr. Carilli two weeks ago as well. I know why we're here, and I have questions for you. And I would like you to answer those questions.

And you might think that my questions are not relevant to the question that you think I have to decide,

but I get to ask the questions. And so I want you to listen to my question, and I want you to answer them because two weeks ago Mr. Carilli could not answer any of my questions, and I asked him to be sure that when he appeared before me today he could answer my questions. Now, he is not here because the government substituted counsel. I assume that the government has conferred, and you have reviewed the prior transcript and everything I have asked, and you're prepared to answer my questions.

I asked you that when a student gets arrested and those charges are dismissed, that's not some violation that should change their F-1 status.

You said it may not. I want you to answer that question for me yes or no, and if your answer is maybe, I want to understand in which circumstances do you think that an arrest, when the charges were dismissed, somehow changes a student's F-1 status.

MS. GRAHAM-OLIVER: Your Honor, I can only --

THE COURT: So let's start with the answer. So I'm going to ask you the question again, and is it yes or no or maybe?

MS. GRAHAM-OLIVER: Maybe.

THE COURT: Okay. So in which circumstances does someone's F-1 status change because they were arrested even though those charges then got dismissed?

MS. GRAHAM-OLIVER: Your Honor, I can't answer that question.

THE COURT: Why?

MS. GRAHAM-OLIVER: I don't know.

THE COURT: Okay. So once again, the government's showing up here two weeks later and you cannot answer the questions because you don't know the answer to the question.

MS. GRAHAM-OLIVER: I don't know the answer to that question, Your Honor.

THE COURT: Okay.

MS. GRAHAM-OLIVER: I do know that --

THE COURT: I don't want to know what you know. I'm asking you the answer to my question, Counsel.

The government conducted a mass termination program called the Student Criminal Alien Initiative that terminated thousands of students gathered across this country upending the lives of thousands of students. You showed up before me two weeks ago not able to answer my questions. Two weeks later you still can't answer them.

Okay. So do you agree that this plaintiff has not failed to maintain F-1 status? I've asked you some version of this question.

MS. GRAHAM-OLIVER: Yes.

THE COURT: And as usual the government has engaged in lots of obfuscation, but to be clear, based on

the record in this case, do you acknowledge that this plaintiff has not failed to maintain F-1 status?

MS. GRAHAM-OLIVER: Yes, Your Honor. That's correct.

THE COURT: Okay. So when I asked you a version of this question, you said based on information presently known to ICE and based on ICE's understanding of the posture of plaintiff's interactions with the State Department, so there was a lot of hedging, but I'm hearing you saying to me very clearly that this plaintiff has not failed to maintain F-1 status.

Okay. So based on the record in this case, does the government believe that this plaintiff is -- will become removable upon termination of my TRO?

MS. GRAHAM-OLIVER: I don't have the answer to that question, Your Honor.

THE COURT: Who has the answer to these questions? When did you -- when was this case transferred to you, Counsel?

MS. GRAHAM-OLIVER: In order to be removable, there has to be steps.

THE COURT: Mr. Truong, are you handling this case?

MR. TRUONG: I was going to see if I can consult with my counsel to respond to the Court's question.

THE COURT: You may have two minutes, and then we're going to keep going because I have already given you time to go call your witness who I asked you two weeks ago to have here today. I'm going to give you two minutes to consult with counsel.

MR. TRUONG: Thank you, Your Honor.

(Pause)

MS. GRAHAM-OLIVER: Your Honor, based on what we have right now, Ms. Bushireddy is not subject to removal procedures.

THE COURT: Okay. Thank you, Counsel.

Okay. So you ran some program that hit with the NCIC database that this plaintiff had an interaction with law enforcement because she was arrested, and those charges were then dismissed. You then terminated her SEVIS record.

You reinstated it because you guys went back and looked and decided none of these people should have been terminated.

Does the government plan on terminating this SEVIS record in the future based solely on that NCIC hit that she was arrested but then those charges were dismissed?

MS. GRAHAM-OLIVER: Your Honor, we have a new policy that was interacted --

THE COURT: No, I just want to know yes or no.

MS. GRAHAM-OLIVER: -- with respect to this

particular individual --

THE COURT: I want to know yes or no with respect to this individual.

You previously terminated her, according to your declarant, because she was arrested and those charges were dismissed.

You reinstated her because of my TRO, but you said you would have reinstated her anyway because you shouldn't have terminated her. So I am asking you do you plan to terminate her based on that same arrest, yes or no?

MS. GRAHAM-OLIVER: Absent any new information --

THE COURT: Yes, absent new information. I'm talking about that original -- that arrest that happened in April 2023. Because I have counsel here saying there's irreparable harm. You guys may walk out this door and terminate her again.

I'm asking you, do you plan to terminate her based solely on that April 2023 arrest?

MS. GRAHAM-OLIVER: Your Honor, we do not plan on terminating her based upon the same information again.

THE COURT: Okay. So I've looked at this new policy. My first question is, is this a final policy? Because I understand based on some filings in my cases that the government was representing in a different case that the policy was, in fact, not final.

MS. GRAHAM-OLIVER: As far as I know, Your Honor, it is a final policy, yes.

THE COURT: Okay. So this new policy seems to give ICE pretty broad discretion to modify SEVIS records, and looking at it I see that it has a nonexhaustive list of reasons for SEVIS termination. It also says that the SEVP has the inherent authority to maintain and update the information in SEVIS and, as such, to terminate SEVIS records as needed to carry out the purposes of the program.

What's the purpose of terminating a SEVIS record based solely on, you know, a finding that someone was arrested and then those charges were dismissed?

MS. GRAHAM-OLIVER: Your Honor, the entire thing is it's a flag in the record. It's a flag that goes to the school. Information is provided through SEVIS to the school. That's all it is.

THE COURT: And, Counsel, do you -- I assume you know by now that the flags, the thousands of flags, led to thousands of students across this country being kicked out of school and having their OPT training terminated. I assume you know that --

MS. GRAHAM-OLIVER: No, Your Honor.

THE COURT: -- yes?

MS. GRAHAM-OLIVER: I do not know that. In this case --

THE COURT: How many cases are you handling?

MS. GRAHAM-OLIVER: This one.

THE COURT: This is your one case.

So in this case, this flag led to this -- led to consequences for this plaintiff. Isn't that true?

MS. GRAHAM-OLIVER: There's some indication in the record that Ms. Bushireddy would not be able to continue her OPT training. However --

THE COURT: When you say there's some indication. Are you disputing that?

MS. GRAHAM-OLIVER: Yes, Your Honor.

THE COURT: Are you disputing that she was affected by this flag?

MS. GRAHAM-OLIVER: Yes, Your Honor.

THE COURT: What's your version of it? Because I'll tell you, Mr. Carilli didn't two weeks ago, so I'm trying to understand the government -- the basis for your change in position here.

MS. GRAHAM-OLIVER: So any termination of an employment basis or OPT would have to come through USCIS. That has not been done in this case.

THE COURT: Counsel --

MS. GRAHAM-OLIVER: She has not been given any -- as far as I know --

THE COURT: I find the government's position in

these cases unacceptable and shocking. I can't believe that that's your answer. Let's move on.

So the new policy says that SEVP can terminate SEVIS records for several normal administrative reasons. What's an example of an administrative reason for terminating a SEVIS record?

MS. GRAHAM-OLIVER: It would be transfer; for example, if the student transfers to another school, that would be one example.

THE COURT: Wouldn't that be something the school would update and not ICE? I'm asking -- give me an example of an administrative reason that ICE would terminate a SEVIS record.

MS. GRAHAM-OLIVER: It could be that the -- for example, her visa, if it were a -- not a prudential termination, but an immediate termination, that could be --

THE COURT: What's the difference between a prudential and an immediate termination?

MS. GRAHAM-OLIVER: A prudential termination of a visa would be travel -- termination of a travel visa; that is, if a student left the United States, they would have to go to a consulate to get a visa to return to the United States. But they are legitimately in the United States. It would just be that they would have to get a visa coming back into the country.

An immediate termination would -- of a visa would throw that student immediately into deportation proceedings.

THE COURT: So if a student's visa is revoked, either prudentially or immediately, then that would lead -- that's what you're calling an administrative reason for terminating a SEVIS record?

MS. GRAHAM-OLIVER: It could be. It could be, Your Honor, yes.

THE COURT: Okay. I asked Mr. Carilli this three times two weeks ago because I'm still like pretty floored by your narrative that a change in SEVIS is just a flag. It does nothing. It has no impact whatsoever on a student's nonimmigrant status here in the United States.

I asked him then, what is the consequence of terminating someone's record in SEVIS, if it is, in fact, not to modify their status? So tell me, what is the purpose of terminating a SEVIS record or flagging it, as you call it, if not to modify their nonimmigrant status?

Because, again, despite the fact that you don't know it, I have several cases before me, and my colleagues have even more. Students across this country have had their OPT trainings cancelled. They've been kicked out of school. They've been told that they're no longer in a valid, nonimmigrant status. They have been fearing their deportation because the government terminated all these

SEVIS records.

So what is the purpose of making the change that you did? The government went off spending hours and hours and hours terminating all these records for no reason whatsoever. What is the purpose of the SEVIS termination?

MS. GRAHAM-OLIVER: Your Honor, it could be simply to maybe follow up, do some investigation as far as what is occurring, what the information is.

THE COURT: I find that completely not credible, Counsel. We're going to move on.

So you're telling me there are no like automatic implications. It's just a flag to follow up.

The government's own website says very clearly that terminating a SEVIS record causes the following: Student loses all on and/or off campus employment authorization. What do you have to say about that? That's false?

MS. GRAHAM-OLIVER: Your Honor, that is not legally defensible, yes.

THE COURT: So your government website is wrong? Yes or no?

Don't shake your head. Answer for the record.

MS. GRAHAM-OLIVER: Yes. Yes, Your Honor.

THE COURT: So are you planning to remove that from your website? Because you've known about it for weeks

Case 4:25-cv-03140-JSW Document 68-1 Filed 05/14/25 Page 19 of 82 

because plaintiff's have been citing this in my cases since they filed this complaint. Why have you taken no action to take that down?

MS. GRAHAM-OLIVER: I don't have the authority to do that, Your Honor.

THE COURT: Have you talked to the agency about the statement and asked them why it's false?

MS. GRAHAM-OLIVER: I have not, Your Honor. they --

THE COURT: Have you looked at the statement? Were you aware of the statement?

MS. GRAHAM-OLIVER: I was aware of the statement, and they have indicated that it's not legally correct.

THE COURT: What do you mean legal -- what's the distinction between correct and legally correct? Is it correct or not?

MS. GRAHAM-OLIVER: It would have to go through US --

THE COURT: Is it correct?

MS. GRAHAM-OLIVER: It could be, Your Honor.

THE COURT: You just told me it was not correct.

MS. GRAHAM-OLIVER: It could be if, in fact, the UCIS made a determination that, in fact, the individual could no longer be employed in the United States, but there has to be a determination by UCIS for that --

THE COURT: Counsel, the website says that terminating a SEVIS record causes the following: Student loses all on and/or off campus employment authorization. Is that correct? Yes or no.

MS. GRAHAM-OLIVER: It is not entirely correct.

THE COURT: No, is it -- is it correct? Yes or no.

MS. GRAHAM-OLIVER: I cannot answer yes or no to that question, Your Honor. USCIS makes that determination.

THE COURT: Makes what determination?

MS. GRAHAM-OLIVER: Whether or not an individual -- whether or not to terminate the individual's OPT.

THE COURT: Counsel, the website says that that is the effect of terminating a SEVIS record. We are in a new world if the government is showing up now in court telling judges that a statement that's been on your own government website for I don't know how long is not correct or might not be correct.

You told me it wasn't correct. You told me it wasn't legally correct. Then I asked you for the distinction between legally correct and correct, and you said it may be correct, but your explanation for why it may be correct makes no sense to me.

MS. GRAHAM-OLIVER: In this case --

THE COURT: How long has the statement -- no, I

don't want -- I know you want to talk about this case. You need to answer the questions I'm asking you. That's how this works.

How long has this statement been on the website?

MS. GRAHAM-OLIVER: I don't know, Your Honor.

THE COURT: When is your agency colleague getting here?

MR. TRUONG: Good morning, Your Honor; this is John Truong. I received a note that said that the witness can be available by 11:00 by -- for both hearings, this one and the next one at 11:30.

THE COURT: Okay. We'll finish with this, and we'll have that witness here at 11:00. I would like that witness to tell me how long this statement has been on this website and confirm his understanding that it's -- whether it's correct or not correct, and then tell me why it's been on the website, if it's false, and what the agency plans to do about it.

MR. TRUONG: Your Honor -- if I may, Your Honor, can I get clarification on the website? Is that from the State Department website, Your Honor, or is that from Homeland Security, Your Honor? I just want to make sure that we have the same information because --

THE COURT: Counsel --

MS. GRAHAM-OLIVER: State Department.

THE COURT: -- this has been in all the filings. There are four lawyers sitting here, at least two other people out there, someone can figure this out.

MR. TRUONG: Yes, Your Honor.

THE COURT: Thank you.

All right. Counsel, so this plaintiff's visa was revoked on April the 4th. Did that happen before or after the SEVIS termination?

MS. GRAHAM-OLIVER: I'm sorry, Your Honor, please repeat the question.

THE COURT: Sure. I will repeat the question.

So according to your own filing, defendants understand from conferral with the Department of State that Ms. Bushireddy's F-1 visa was prudentially revoked on April 4, 2025, pursuant to the Immigration and Nationality Act. Did this happen before or after the SEVIS termination?

MS. GRAHAM-OLIVER: I believe it happened before the SEVIS termination, Your Honor.

THE COURT: Why was the visa revoked?

MS. GRAHAM-OLIVER: Your Honor, certain -- the administrative record indicates that there were certain names that went to the Department of State, and those names are from people who had a hit on the NCIC.

THE COURT: First of all, your administrative record, as much as I can read, is a couple of pages long.

Why was this plaintiff's visa revoked?

MS. GRAHAM-OLIVER: Because her name came up on the NCIC hit.

THE COURT: Her visa was revoked because she was arrested even though those charges were dismissed? That's why her visa was revoked? Yes or no.

MS. GRAHAM-OLIVER: That's my understanding.

THE COURT: And you think it's the government's position that a valid F-1 visa revocation can result from a student being arrested even though those charges have been revoked? Dismissed, sorry.

MS. GRAHAM-OLIVER: Your Honor, I don't know what the --

THE COURT: Well, you just told me that's why her visa was revoked.

MS. GRAHAM-OLIVER: That's my understanding.

THE COURT: Was that a valid revocation or an invalid revocation?

MS. GRAHAM-OLIVER: I don't know. It was a prudential revocation.

THE COURT: Counsel.

MS. GRAHAM-OLIVER: That's all I know.

THE COURT: So that this plaintiff's visa is currently -- it's been revoked. That has not been changed. And you're telling me that happened because you ran this

search, and it showed that she had been arrested though those charges had been dismissed. You don't know whether you validly or invalidly revoked her visa based on that?

MS. GRAHAM-OLIVER: I do not know, but it does not affect her status.

THE COURT: I don't care whether it affects her status. It does affect something. If she doesn't have a valid visa, can she reenter this country if she leaves to go home for a holiday?

MS. GRAHAM-OLIVER: If she goes home, she can't reenter without going to the consulate.

THE COURT: So what do you mean it has no impact?

MS. GRAHAM-OLIVER: On her immigrant status.

THE COURT: This student -- so she must stay here forever while she's doing her studies. She cannot go home, which she would be able to do had you not revoked her visa for what seems to me to be a totally invalid reason.

Absent a visa revocation, couldn't she go home to see her family for the holidays and come back?

MS. GRAHAM-OLIVER: Your Honor, we're not preventing her from going home.

THE COURT: Counsel -- oh, you're not preventing her from going home. You're just telling her she can't come back because you took her visa away for an invalid reason?

MS. GRAHAM-OLIVER: We're not telling her that she

can't come back either.

THE COURT: Counsel --

MS. GRAHAM-OLIVER: She has to get another visa.

THE COURT: Counsel, that is making her take another step because you did an invalid revocation. Is that not right?

MS. GRAHAM-OLIVER: I don't believe that's correct, Your Honor.

THE COURT: How is it not correct? Let's walk through this in steps.

You revoked her visa because your database showed that she had been arrested even though the charges had actually been dismissed. Was that a valid reason to revoke her visa? Because we've established it seems to not have been a valid reason to terminate her SEVIS record.

MS. GRAHAM-OLIVER: It does not affect her. All I can say, Your Honor --

THE COURT: I am not asking -- you're not answering my questions.

MS. GRAHAM-OLIVER: -- status.

THE COURT: One, you cannot speak over me. If I start to speak, I'm going to ask you to stop speaking so the court reporter can get this on the record.

MS. GRAHAM-OLIVER: Excuse me, Your Honor.

THE COURT: So we'll start again.

You told me that this plaintiff's visa was revoked because of the hit showing that she was arrested even though those charges were dismissed.

You revoked her visa because of it, and you terminated her SEVIS record. You've now reactivated her SEVIS record acknowledging to me that you would have done that even without a TRO because you shouldn't have done it to begin with.

You have not done anything to fix the visa revocation, which does have an impact on this plaintiff because if she leaves the country she cannot reenter without another visa. And you're here on behalf of the United States telling me that's okay because we're not telling her she can't leave the country, and we're not telling her she can't come back. She can go get another visa because we decided to terminate thousands of students incorrectly.

MS. GRAHAM-OLIVER: Your Honor --

THE COURT: You can sit down, Counsel.

All right. Who is arguing for plaintiff today?

MR. BANIAS: Your Honor, Brad Banias for the plaintiff.

THE COURT: Okay. Can you tell me what your understanding is of Ms. Bushireddy's visa revocation in this case.

MR. BANIAS: Your Honor, it's our understanding

that her SEVIS was terminated on April 3rd. The following day the State Department revoked her visa, on April 4th.

THE COURT: I see. So -- sorry, let me just get that right. So you -- the SEVIS record, you think, was terminated first on the 3rd, and then the visa revocation happened on the 4th, according to Ms. Graham-Oliver, for the same reason the SEVIS record was terminated because they found that she had been arrested even though those charges had been dismissed.

MR. BANIAS: Yes, Your Honor, and it appears from the record they submitted that ICE and State Department were working hand in hand. And so I don't know where the State Department was located who was doing the revocations at the behest of DHS, and so maybe they were on the same day, just time zone differences, Your Honor.

But it's our position that, as you noted, if Ms. Bushireddy leaves the country, she has to get a new visa, and that means there's wait times. And those wait times have increased exponentially in the last three months because of staffing issues, and so it's not a situation where she can leave and get a stamping in two weeks anymore.

We also have serious concerns that whether she'll have a fair chance of getting a visa because of the Doctrine of Consular Nonreviewability. If she goes and applies for a visa, no court can review that. And so they can say --

sorry, Your Honor.

THE COURT: No, go ahead.

MR. BANIAS: Well, I was going to say, we -- you know, these are agencies working hand in hand. We have no reason to think they will give her an honest shot, and with the Doctrine of Consular Nonreviewability there's literally no opportunity for us to get that reviewed.

THE COURT: Yes, this is a giant mess.

You haven't challenged the visa revocation itself, have you, Counsel?

MR. BANIAS: No, Your Honor, we have not.

THE COURT: Why?

MR. BANIAS: There's established case law that says this Court does not have jurisdiction to review it.

THE COURT: I see. So the government gets to revoke visas for totally invalid reasons, according to the lawyer here, and there's nothing we can do about it. So as it stands, even if we have the government's assurance that the SEVIS record will not be terminated, your client basically can't leave the country because she will have no assurance she can return.

MR. BANIAS: That's correct, Your Honor. It's --

THE COURT: Wow.

MR. BANIAS: It's not worth the risk for her.

THE COURT: Wow. And that's what the United

States is going to stand up in my courtroom and defend.

Counsel, I have one more question for you. Your notice of supplemental authority seems to say that the SEVIS -- this new SEVIS policy is not final. The government, at least today, is telling me that their position is that it is final. So, one, why does it help your client for the new SEVIS policy to not be final?

MR. BANIAS: Your Honor, we are just hearing different things in different courts, and that's why we pointed it out. But we think final or not, this policy -- it's just a description of why it's unlawful. ICE is trying to use this opportunity to expand its powers to terminate, not limit them. And I would just note, in our -- you know, our main merits argument here, that the government does not claim its decision was not arbitrary and capricious, the justiciability argument, which is fine.

THE COURT: I think they'd have a hard time with that argument, Counsel.

MR. BANIAS: Your Honor, I'll just note that, you know, our argument is that to terminate an F-1, you have to do it in compliance with the regulations. And every bit of this policy is extra regulatory, and they don't comply with the limited grounds that are in the regulation that allows them to do this, so we would suggest on its face this is unlawful.

Their attempt to moor it to the statute that created SEVIS is particularly unpersuasive because, if you actually look at that statute, it does give ICE the ability to terminate and revoke status, but only where a school completely stops participating in SEVP. And so it's ICE regulating the schools, not the individual students.

And as Your Honor implied earlier, ICE, up until this last month, has had no real active role in managing SEVIS. It's always been the schools that kind of deputize these officers -- school employees to manage the system, and under the current administration they've decided to take a much more active role, and we would suggest this policy is unlawful for the same reasons that the original termination was unlawful, Your Honor.

THE COURT: Well, the policy sort of post-dated your complaint.

Here's where we are, and I -- I'm going to recess in a bit and wait for the government to have their agency representative show up so that I can get answers to the questions I have about this overarching Student Criminal Alien Initiative.

But where we are now is you have a motion for a preliminary injunction. The government has reactivated your client on SEVIS; has represented to me that it's retroactive back to the date so there's no gap in her SEVIS termination;

has represented to me that it will not terminate her on SEVIS based on the same arrest incident. And so in light of that, I'm having a hard time figuring out what irreparable harm exists for a PI.

My inclination is to get an expedited briefing schedule in place to brief this case on the merits; give you a chance to amend, if you would like to amend, based on the new policy, but get a schedule in place to brief this case on the merits so I can decide it as quickly as possible.

Tell me why that's not right. Why do I need to enter a PI given the government's representations, which I'm still in a place where I'm going to believe the government's representations on the record here? And so assuming those representations are correct and hold true, like why is that not the proper course?

MR. BANIAS: Yes, Your Honor. In San Francisco the government, ICE, testified that they did not have the technological ability to make this retroactive, and so the idea that there's going to be a gap seems to be something we have to deal with. That would mean --

THE COURT: Hang on. Let's just pause because this attorney just told me that the reinstatement was retroactive. Is that not what you heard, or was I misinterpreting?

MR. BANIAS: I heard something different from

counsel in this Court than I did in San Francisco, Your Honor.

THE COURT: Okay. Well, as I said, I am still going to assume, though, when the government stands up here and tells me something, that it's correct, and if I deny your PI, it will be based on those representations. And if that turns out to be incorrect, we're going to have other issues.

But assuming that counsel made accurate representations today and I were to assume that they are correct, right -- that there is no gap and that they are promising not to terminate again based on the same arrest -- do you agree that that's enough to move forward to merits here, and that you can't show irreparable harm?

MR. BANIAS: So two points, Your Honor.

The two courts have addressed this issue head on. One in New Hampshire. One in Atlanta. They've both said this new policy being broader continues irreparable harm because now this expansive visa revocation basis, which does not distinguish between, quote, prudential and other types of visa revocations, sure seems to put her right in the cross hairs. That would be a basis they can terminate not related to her prior encounters with the law, and so both of those courts have said that's sufficient continuing irreparable harm to enter the preliminary injunction.

The second thing I would --

THE COURT: Let's take them one at a time, Counsel.

So if that, in fact, happens, the government stands up before me today and says we're not going to terminate -- we have no intention of terminating this plaintiff's SEVIS record based on our prior incorrect termination that was based on her arrest where charges were ultimately dismissed, and then they walk out this door and they go terminate her saying, well, we've got broad discretion to do whatever we want, and we revoked her visa based on the same incorrect reason, and so now we're going to just terminate her again, that would be -- that -- I've got to tell you, that would -- and we have seen a lot of things that have shocked us in the past couple of months. That would really shock me.

But I assume you can come back before me again and move for emergency relief at that point based on this new termination, right?

MR. BANIAS: Yes, Your Honor.

THE COURT: Okay. All right. So tell me your second -- sorry. Go ahead.

MR. BANIAS: Yes. I'm sorry, Your Honor.

Is that, you know, this Court does have authority under Rule 65 to convert this into summary judgment. The

agency has produced the, quote-unquote, record, so everything's in front of this Court that it needs to issue a summary judgment decision right now. And we urge the Court to do that to put an end to this because the longer it progresses, the more facts change, and I feel like with this new policy, if this Court invalidates or says we win at summary judgment because the -- there's no basis to terminate outside the regulations, that would clearly have implications for this new policy.

And so we would urge the Court to go ahead and issue summary judgment. It has everything it needs before it to do so.

THE COURT: So you would ask me to decide this case on the merits based on your original complaint challenging the termination, and you do not want to address the lawfulness or unlawfulness of this new policy at all. You just want me to decide what you originally asked me to decide.

MR. BANIAS: Your Honor, in our renewed motion for preliminary injunction, we did address the whole voluntary cessation issue, which I understand is slightly different, but, to your point, Your Honor.

THE COURT: That is different. I'm saying putting aside -- I'm talking about the merits of this case. Obviously the government came out with a new policy after

you filed your complaint.

You're saying you would want me to decide the merits of your case, which challenges the original termination and not this new policy, and that's all you want me to decide?

MR. BANIAS: Your Honor, we think that a decision noting the unlawfulness of the original termination will carry with it the necessary implications that the new policy is also unlawful.

THE COURT: Okay. So -- and you don't want to submit anything else on the merits. You think you've put in everything you want to put in, and I should -- so what I was going -- you know, we're going to hear from the witness. I'm going to go back and think about this a little more, but assume I'm not entering a PI, I was going to ask you guys to confer and figure out a way to brief this very quickly so I can decide it on the merits.

But you're saying you don't even need to do that. You've submitted everything you want to submit, and I should just treat this PI briefing as a summary judgment briefing.

MR. BANIAS: Your Honor, we -- with a witness coming up and answering more questions, Your Honor, I would be happy to do, you know, a very quick turn around on an actual summary judgment motion, I just want to point out, this Court has -- you know, the bare minimum, we've given

you what you need to make a decision on the merits. But with not knowing what their new witness is going to say here in ten minutes, I defer to the Court, Your Honor.

THE COURT: Okay. So we're going to -- we're going to recess for five minutes and come back and hear from the government's witness, and then I will let you know where I am on the preliminary injunction and next steps.

MR. BANIAS: Thank you, Your Honor.

THE COURT: Thank you, Counsel.

(Recess taken)

MS. GRAHAM-OLIVER: Your Honor, if I may?

THE COURT: Yes, Counsel.

MS. GRAHAM-OLIVER: We have identified two individuals, Mr. Hicks, who will be testifying about how long the State Department website regarding --

THE COURT: Can you speak up, Counsel. I can't hear you.

MS. GRAHAM-OLIVER: Sorry. Mr. Hicks, who will be testifying regarding the State Department website --

THE COURT: Okay.

MS. GRAHAM-OLIVER: -- and how long that has been up.

THE COURT: Okay.

MS. GRAHAM-OLIVER: And Mr. Hammer, who will be --

THE COURT: Mr. Who? Can you spell that.

MS. GRAHAM-OLIVER: H-A-M-M-E-R.

THE COURT: Okay.

MS. GRAHAM-OLIVER: -- who will be testifying about the Student Criminal Alien Initiative. So --

THE COURT: Okay. And tell me their titles, please, Counsel.

You don't know? I can ask them.

MS. GRAHAM-OLIVER: Thank you, Your Honor.

THE COURT: Okay. Are they in the waiting room?

THE COURTROOM DEPUTY: They are not at this time, Your Honor.

MS. GRAHAM-OLIVER: They are not in the waiting room as yet.

THE COURT: Okay. I thought they were going to be available at 11:00, Counsel.

MS. GRAHAM-OLIVER: Yes, we thought so as well.

THE COURT: Where is the rest of your group?

MS. GRAHAM-OLIVER: Outside making sure that they are actually -- what time they will be here. They were told to be here at 11:00. My apologies, Your Honor.

THE COURT: Okay. Can you please go find out what time they're going to be here, because at this point --

MS. GRAHAM-OLIVER: Yes.

THE COURT: There's Mr. Truong. Maybe he has the answer.

THE COURTROOM DEPUTY: Your Honor, it appears someone just logged into the Zoom. They're joining now.

Hello, Mr. Hicks, can you hear me? This is Nani, the courtroom deputy.

(Pause)

THE COURTROOM DEPUTY: Mr. Hicks, can you hear me?

MR. HICKS: I can hear you. Yes, Your Honor.

THE COURT: Good morning, Mr. Hicks. Thank you for showing up on such short notice.

Can you just tell me your title, Mr. Hicks.

MR. HICKS: Yes. I'm the division chief over external operations at the students and exchange visitor program, SEVP.

THE COURT: Okay. And so do you work for ICE or for the State Department?

MR. HICKS: I work for ICE. That's within ICE.

THE COURT: Okay. Thank you.

Ms. Graham-Oliver, you can have a seat. You don't have to stand the whole time.

So, Mr. Hicks, I understand you have information for me about the statement on the website. So on this website it says that terminating a SEVIS record causes the following: Student loses all on and/or off campus employment authorization. How long has that statement been on this government website?

MR. HICKS: It has been on there for quite a while, Your Honor. I'm sorry, I didn't go back and see when they put it on, but I believe it's been there for the last probably ten years.

THE COURT: Okay. So your guess is it's been there since like SEVIS got created, right?

MR. HICKS: I'm not sure it's been there that long because SEVIS in State came along later. My time at SEVP started in 2019. Before that I was part of the Office of the Principal Legal Advisor, and one of the portfolios I oversaw was SEVP. So I've only been familiar with SEVP since 2012, and I've only been here since 2019.

THE COURT: 2019, okay.

So as long as you've been here, that statement has been on the website.

MR. HICKS: That's what I believe to be true, yes.

THE COURT: Okay. Thank you.

And so government counsel has told me today that that statement is incorrect. Is that also your belief?

MR. HICKS: Just a little context in order to answer that appropriately.

THE COURT: Yes.

MR. HICKS: So the vast majority of terminations are done by schools. For example, last year SEVP initiated about six terminations. We don't terminate very often.

THE COURT: That's for 2024.

MR. HICKS: That was 2024, correct.

THE COURT: So six total across the country.

MR. HICKS: About -- I haven't had enough time to check, but it's a handful, yes. It's like a dozen or six, so that's correct.

THE COURT: Okay. And can I ask, what's the nature of those terminations? What were the bases for terminating those six or 12?

I'm not holding you to a number. I take your point to be it was a small number.

MR. HICKS: We typically only take action when there's some kind of an emergency. So in the last month an example of this would be we got a call from a school or we found out evidence that at a school a student was threatening to kill a teacher; that he had guns; that he had done things like this before. And in that instance we will terminate and go and immediately arrest, as we did with this student, and that person's in removal proceedings.

That's kind of -- that's a little bit over the top, but that's when we take action. People will threaten to be disruptive, threaten violence, and we usually step in then.

THE COURT: Can I --

MR. HICKS: There are other --

THE COURT: Can I just ask one clarifying question on that. Why wouldn't the school terminate in that situation? Because I understand that the school does the vast majority. So in an emergency situation like that, why does it come to you instead of the school?

MR. HICKS: They may not have gotten the tip, right? So sometimes information comes to us --

THE COURT: I see.

MR. HICKS: -- from a tip, and we will take action quickly without going through the -- let's get in touch with the school official and go that way.

THE COURT: Okay. That makes sense.

Okay. So you -- so the context is, like prior to this most recent mass termination effort, you've only terminated in a handful of cases like in emergency situations.

MR. HICKS: Correct. That's when we terminate.

Now, the other thing that happens is we do call the school if we have information that isn't sort of life-threatening or violent. We'll say, "So-and-so has been arrested under this suspicion of something, you know. Is that something you want to take action, or are going to take action on?" That might be an off-campus assault, or it might be something else that might get into student conduct.

THE COURT: Right.

MR. HICKS: And so the school -- we leave that in their hands most of the time, to take that action.

THE COURT: Yes. Okay.

MR. HICKS: And so that's why the website says what it says. The website is meant to be external facing.

THE COURT: So --

MR. HICKS: And I know --

THE COURT: Go ahead. Finish your answer.

MR. HICKS: Go ahead, Your Honor.

THE COURT: No, you finish your answer.

MR. HICKS: So the numbers I have for this year from January 20, 2025, to present, there have been about 36,000 terminations in SEVIS, and almost all of those have been done by the schools.

Now, with this initiative, we did about 5,500 ourselves, which is obviously way more than we usually do, and that was part of the initiative. But that's obviously why we're here, because you're seeing the impact. And obviously with the lawsuits, we're all seeing the impact.

THE COURT: So I'm trying to understand this statement then. So you're saying in an emergency case like the one you described, where you make a termination because a student is violent and you have very credible reasons to question the safety of others on campus, you make an emergency termination. In that case the student would lose

Case 4:25-cv-03140-JSW Document 68-1 Filed 05/14/25 Page 43 of 82


all on and/or after campus employment.

But --

MR. HICKS: Correct, but also when the school --

THE COURT: Yes, go ahead.

MR. HICKS: Go ahead. I'm sorry.

So if -- this is a website that's external facing, so the purpose is to kind of explain what the typical situation is to the student.

The typical situation is the school has taken action to terminate you, and therefore they have whatever evidence they have that they -- you're no longer going to be a student there, and that's what would trigger the loss of employment and all these other things.

THE COURT: Right.

MR. HICKS: So that's --

THE COURT: Okay.

MR. HICKS: The website addresses that. It doesn't really address the initiative that we're here about today.

THE COURT: So a SEVIS termination does, in fact, have an impact, and this website, you know, saying a student loses all on and/or off campus employment is, in fact, true when SEVIS is terminated either in an emergency situation like you have done a handful of times last year, for example, or when a school terminates.

Now, we are in some new era where the government is itself terminating and has mass terminated thousands of students, not in an emergency situation where you do an analysis on a case-by-case basis and make a record that, in fact, there's a reason to terminate a status, but you've ran some program, identified students who have interacted with law enforcement, and went ahead and just did mass terminations of, by your count, 5,500 students. You understand that it's still a termination. You're not doing some different type of termination now. You're just doing it differently, but it's still a SEVIS termination, right?

MR. HICKS: Yes, we have set their SEVIS record to terminated, correct.

THE COURT: Okay. So I don't hear you to be saying that this statement is incorrect, which government counsel told me earlier, because, in fact, a SEVIS termination does, in fact, result in the student losing all on and/or off campus employment, which is why schools were telling students you can no longer participate in, like, off campus enrollment. You can't do your OPT because that is the result of a termination. And the fact that the government decided to change how it does terminations and, in fact, terminate thousands of students without doing this individualized assessment that up until this year you started doing, like that doesn't change the effect of a

SEVIS termination.

MR. HICKS: I think -- I do have to provide the context that, you know, the loss of employment and employment authorization addresses when the school is taking this action, that when the government in this initiative terminated and I think the declarations that have been filed with various courts that -- they weren't my declarations, but I've seen it -- the SEVIS termination has been -- is in an immigration status determination. It isn't a determination that was made by an immigration judge. And so there is some confusion about exactly what needs to be done when the government is terminating your SEVIS status, if that means it has an immediate impact or not, because what the declarations have been saying is it is not a status determination.

And if the school felt whatever the conduct was -- there was an individualized assessment here to the extent that people -- as I understand it, that people went through the NCIC database. And if there were hits in the database, they said, okay, this is a person who has a hit of some sort, a criminal hit or some other hit. And that was the determination that was made in conjunction with the Department of State about these revocations; that it then came back to the SEVP, and there was a list, and we were told to terminate the names on the list. And it happened

over the course of three weeks.

So I think the statement obviously merits a little clarification, and I would, you know -- I'd be happy to address those points. But I -- you know, it is accurate if the school has taken action against you, and you're no longer a student, then you have to stop working. That was what was meant to be addressed here. It isn't -- go ahead.

THE COURT: I'm not sure, based on what I've heard you say, that the statement needs a clarification. You can't have a different SEVIS termination consequence if the school takes action or if the government takes action. Like it's just that what's happened in this Student Criminal Alien Initiative is unprecedented, and it's not something the government has ever done before, and because it wasn't really thought through, as far as I can tell, the government didn't really consider all the consequences of it, and it resulted in mass chaos across the country and upending the lives of students across this country, forcing students who most of them don't have the means to hire lawyers to file close to 100 lawsuits simply so they can go to school.

I had a plaintiff before me less than two weeks ago who was mistakenly arrested by the police officer for breaking a traffic law. When they went back and looked at the video, they realized that he did not, in fact, break the traffic law, so the Texas Department of Public Safety never

even charged him with a crime. And yet on that basis, and on that basis alone, the United States government terminated his SEVIS record. He lost his job. His wife is about to have a baby in two months and fears a long list of consequences. And that, I gather, was not the intended effect of the SEVIS system, and that's the system that all of you are standing up here defending to me today, and repeatedly have defended to me in the past couple of weeks, and you've defended over courts across this country. I find it completely shocking.

But, Mr. Hicks, I thank you for coming on short notice. That information was very helpful. I suspected that the statement had been on the website for an incredibly long time, and I thank you for your testimony.

I believe Mr. Hammer is here to -- is that Mr. Hammer on the line?

MR. HUDAK: No, Your Honor; it's Brian Hudak from the U.S. Attorney's Office.

THE COURT: Is Mr. Hammer showing up, Counsel?

MR. HUDAK: I have not received word from ICE whether Mr. Hammer is showing up or another ICE representative. ICE has not yet gotten back to me on that. I am following up with them.

THE COURT: Mr. Hudak -- and I understand we have a change in counsel. So you are aware -- I assume you

are -- I had Mr. Carilli before me on this case two weeks ago. I asked him questions about this mass termination program, which I now have a name for. He told me he did not have the answers. He then showed up before me and told me he was not instructed to answer the questions. He then clarified that he was not instructed and did not have the answers, and I was really clear that when I set this hearing I wanted him to show up like well-prepared to answer my questions or bring someone who could.

And then I had a change of counsel, and Ms. Graham-Oliver showed up and said she could not answer those questions.

And now I have been waiting for a witness to show up. I heard that that witness would show up at 11:00, and now we have no confirmation.

I understand you are handling a lot of cases right now, but we're here in all these cases because the government took action that's having a real impact on people's lives. And I am taking the time to be here, and I scheduled this hearing two weeks ago, and so I am quite surprised that the government can't answer my questions and can't produce someone who can.

MR. HUDAK: Yes, Your Honor. I mean, what we did in preparation for this hearing is we mined both the transcripts for both this hearing and the TRO hearing in

this case and in the next case that you had scheduled for 11:30. We've compiled a list of the questions based upon our mining of those transcripts as to what your questions were --

THE COURT: Uh-huh.

MR. HUDAK: -- at those hearings, and we found answers for those questions. Ms. Graham-Oliver and Mr. Truong at 11:30 are prepared to answer the questions that you had on the transcripts there.

THE COURT: Okay.

MR. HUDAK: There are additional questions --

THE COURT: Okay. Mr. Hudak, I'm just going to -- I did not ask additional questions, and I actually have here my notes from that hearing, which are the questions I started to ask Ms. Graham-Oliver, and the very first question I asked Mr. Carilli was: Mr. Carilli, can you start by telling me about the recent terminations in SEVIS that appears that there's a recent mass termination by the government? How did that mass termination effort come about?

I asked Ms. Graham-Oliver. I said: Well, now, I know the name of that based on the three pages of your administrative record. And I said: Tell me about this Student Criminal Alien Initiative. Tell me about that program. Tell me about how it came about.

And she said she could not answer that question, which is why I asked for someone from the agency to be here to tell me about that program.

MR. HUDAK: So it's my understanding that we filed notices of a supplement last night that included the *Patel* transcript where Mr. Watson testified extensively about the origins of the program and how it was implemented with the Department of State, including linking it to the email correspondence that should be in the administrative record before the Court. That's how the program came about because, as Mr. Hicks said, it's an initiative that was led by -- that was directed by his in coordination with the State Department, and that the email correspondence plays out exactly how that transpired to get to the point in time where ICE terminated approximately 5,500 SEVIS records.

THE COURT: So, Mr. Hudak, you're telling me you filed a transcript that -- of another case. Did your attorney who filed it read the transcript such that she can answer my questions?

MR. HUDAK: I am fully confident that Ms. Graham-Oliver, one of the deputy chiefs in our division, in the civil division of the U.S. Attorney's Office, has read the *Patel* transcript and is prepared to answer your questions.

THE COURT: Okay. So let's try this again because she could not answer my first question and told me that

someone from the agency would have to answer those questions. And if you're telling me I need to go read a transcript and get the answers to my questions, and that someone from the government can't answer those questions themselves, I find that to be unacceptable.

MR. HUDAK: Well, I can certainly answer your questions.

THE COURT: Okay. Let's do it then.

MR. HUDAK: Mr. Hicks is also here and raising his hand and has an ability to answer questions as well.

THE COURT: Okay. I'm happy to hear from whoever can answer those questions. Ms. Graham-Oliver told me Mr. Hicks could answer those questions about the State Department website, and Mr. Hammer would be able to answer my questions about these mass terminations. If Mr. Hicks can answer them, even better. And if you know the answers, Mr. Hudak, you can answer them, too.

So why don't I ask them, and why don't I start with Mr. Hicks since he's here from the agency. And if he doesn't know any answers to some of these questions, we can move on, and then I'll turn to you, Mr. Hudak, and see if you can answer those question. And then we'll see where we are, and maybe we don't need Mr. Hammer.

MR. HICKS: If I could just offer one quick thought, Your Honor.

THE COURT: Go ahead, Mr. Hicks.

MR. HICKS: I wanted to mention that in the last week we've turned all these people back to active in SEVIS. So you may be aware of that; you may not be --

THE COURT: No, I am aware of that, and I -- I mean, this plaintiff was turned back to active based on my TRO, and I've got a filing saying that they would have been turned back to active anyway, Mr. Hicks. It has had a huge impact on these people's lives, and it's the result of 100 of them having to pay attorneys and come to court just so they could go to school, and time by judges across this country to sit and hear these cases, and it's the result of TRO after TRO after TRO because the government terminated thousands of people, and based on what I've seen, without actually doing any real checks into whether these people should have been terminated. So let me just go back to my general questions about this.

So I have been calling it, before Mr. Carilli, this mass termination effort because that's what it looked like to me based on all the lawsuits getting filed. I have three myself. So as I now understand, it's like the Student Criminal Alien Initiative. So tell me how this came about.

Ms. Graham-Oliver said some staff attorney made up that name -- not attorney, I take that back -- some staff at ICE made up this name, Student Criminal Alien Initiative.

But tell me how it came about. What do you know about that?

MR. HICKS: Your Honor, I don't know anything about where that started, how that came about.

THE COURT: Okay. Mr. Hudak, do you know anything about how that program came about? Because that is the very first question that I asked Mr. Carilli.

And I understand in preparation you guys sat down and looked at the transcript to pull out my questions, but that is the first question I asked him all three days that he was before me two weeks ago.

MR. HUDAK: And it's my understanding, Your Honor, that this was an initiative that ICE undertook at the direction of the HSI executive director to understand what population of noncitizens that were in SEVIS had interactions with law enforcement through NCIC.

THE COURT: Okay. And so.

MR. HUDAK: And they compared the --

THE COURT: Go ahead.

MR. HUDAK: Then they compared the NCIC list with the records in SEVIS and referred those matters to the Department of State.

The State Department then did an effort to examine those records, determined whether folks' visas should be revoked, whether there was a request that SEVIS records be terminated, and that proceeded along the lines that

Mr. Watson described on Pages 4 through -- 4 through 14 of the *Patel* transcript.

THE COURT: So this match on the NCIC system is checking only whether someone had an interaction with law enforcement. It's checking that that person was arrested and nothing more.

So in all of the cases I have had, none of these law enforcement interactions actually resulted in criminal convictions, so -- is that right?

So describe to me the criteria of this NCIC match and what it is, in fact, flagging.

MR. HUDAK: Sure. So it is -- as I understand NCIC, and based upon the systems of records notices that the FBI publishes from CJIS, which is the component of the FBI that runs NCIC and other criminal -- other databases regarding interactions with criminal authorities, it's that NCIC has different ways that folks can end up in there. It can be an arrest for a misdemeanor or a felony. It can be someone that it on a warrant. It can be something involving INTERPOL. There's a lot of different ways that someone can find themselves to have an NCIC record and be in that system.

So it's my understanding what the initiative that ICE did was to compare those records against the SEVIS records and develop where there were commonalities.

THE COURT: Okay. And am I right that if someone was arrested, and those charges were either dismissed for some reason or never even brought in the first place because the person should not have been arrested, like that has no impact on someone's F-1 status in this country? Because the regulations, which I've spent a long time with, sort of set out very clear paths via which the government can terminate someone's nonimmigrant status or the student themselves become in nonimmigrant status based on certain actions.

So am I right that an arrest on its own that may have been by a mistake like I have seen does not actually lead to any change in a student's nonimmigrant status?

MR. HUDAK: I think the fact of the arrest I don't think does. The underlying conduct could. And if I could explain, Your Honor?

So the State Department, in its discretion in a completely -- in a decision that is not reviewable in district court under 8 USC 1201(i), has the discretion to terminate a nonimmigrant, any nonimmigrant -- be it F-1, a visitor, whomever -- in its discretion and have that termination be with immediate effect.

If the State Department does so based upon conduct that led to an arrest of an individual and does so with immediate effect, not prudential effect -- there are differences in the way that the State Department goes about

revoking visas of nonimmigrants who are in this country. The State Department immediately revokes a visa under 8 USC 1227(a)(1)(B). That noncitizen is subject to immediate -- to be put immediately into removal proceedings, to be issued a notice to appear before an immigration judge for removability. That is the process.

So when you say the arrest in and of itself, I think what is correct, to the best of my understanding, is that the arrest, that event, is not the triggering event necessarily. But obviously the State Department has discretion under 1201(i) to take that into consideration in conjunction with the events leading up to the arrest to make a decision on whether or not to terminate someone's visa with immediate effect. And that would have effects, potentially, on someone's ability to remain in this country lawfully and be put under removal proceedings.

Now, 1201(i) says, even though it's not reviewable in district court, if it's the only basis for removability, that that decision is subject to review in immigration courts, so before an immigration judge or the board of immigration appeals or ultimately through the petition for review process to a U.S. Court of Appeals. So there's judicial oversight of that process as well.

But I want to be very clear that there is still -- if someone gets picked up, for example, and is accused but

not yet convicted of a crime, and the State Department believes that the facts underlying that, including that the probable cause that led to the arrest is a sufficient basis to immediately revoke a nonimmigrant's visa, that is a potential way that they get put into removal proceedings and can be removed from the country.

THE COURT: Okay. And so you send the list to the State Department. So if the State Department decides to revoke a visa for reasons that would not lead to a change in their immigration status on its own, for example, the provision saying if you're, you know, criminally convicted of a crime of violence punishable by more than one year, right, you're no longer in valid status.

But putting -- if it's not that, if it's an arrest, the State Department then says, "I see you've been arrested. I'm going to revoke your visa." Then is a visa revocation a valid basis to terminate the SEVIS record in the way things have been playing out? Like are you looking to the visa revocation? Are you looking to the visa revocation as the reason to terminate the SEVIS record, or are you terminating the SEVIS record based on the arrest?

MR. HUDAK: So the way this played out, as I understand it, is that the State Department came back and there were certain folks that they -- and really, if I could line it up with three buckets of kind of nonimmigrants and

their interactions with the State Department first.

So the State Department can revoke a visa with immediate effect.

They can prudentially revoke a visa, and what that means, the best as I understand it, is that the visa is revoked when that noncitizen departs the country such that they cannot return on that visa to seek admission at a port of entry. If it's prudentially revoked, it just is -- it's good to leave, but it's not good to ever come back, so they would need to go to a consular official again to get a different visa or get another visa to seek admission into the country. So that's -- there's immediate revocation, prudential revocation, and then visa expiration. And then visa expiration, depending on the type, is not coincident to your status, immigration status, nonimmigration status in the United States.

The F-1 category, most students are admitted to the United States by CVP for the duration of their studies, but that visa, the thing that goes in the passport and has an expiration date on it, that expires in a relatively short period of time. Usually you have 90 or 120 days to travel on your visa. But most students come here -- and that period can differ. It will depend on the type of visa as far as how long that visa is in effect for.

Oftentimes students will come here and stay here.

And their visa will expire by its normal course, but they're still in status in the United States and attending school.

So those are the three buckets you have of the folks that had SEVIS records terminated as I -- to the best of my understanding. There were those that were immediately revoked, those that were prudentially revoked, and those that had expired visas, expired F-1 visas.

So it was not as -- to the best of my knowledge, it was not key -- the SEVIS termination requests were not key to visa revocation with immediate effect. It would -- the noncitizens fell into one of those three buckets; either immediate revocation, prudential revocation, or the expiration --

THE COURT: So which ones led to SEVIS terminations? All three, or one or two of those three?

MR. HUDAK: All three. So, I mean, it's my understanding that the State Department had different lists for each of those types and put a request to ICE to terminate the SEVIS records in its discretion.

THE COURT: From all three.

MR. HUDAK: Yes, basically -- they scrubbed the list. They tried to -- as Mr. Watson testified in *Patel*, there was a John Smith on the list. They tried to make sure it was the right John Smith so they weren't misaligning the records from NCIC and SEVIS. But there are folks in these

cases that have had visa terminations for both prudential revocations and where their visa had expired.

THE COURT: Yes. So I'm not sure -- I understand the three buckets, and it's helpful to understand how they revoke visas, but given that in all cases it led to SEVIS terminations, that's what I'm trying to understand how this process worked, this Student Criminal Alien Initiative.

You ran the list against NCIC. It showed anyone who had any interaction with law enforcement. You then sent that to the State Department who has the discretion to terminate people for whatever reason it wants. It terminated visas in three different buckets. And in all cases where it terminated visas, it revoked the visas, it sent those lists back to ICE, and ICE then terminated those students' visa status; is that right?

MR. HUDAK: So, again, I want to be very -- no, and I just want to make sure. So there were individuals whose SEVIS -- whose visa had expired whose SEVIS records were terminated. So it was not --

THE COURT: But it went -- can I just --

MR. HUDAK: Yes.

THE COURT: So that's before it went to the State Department for the State Department to tell you whose visa had been revoked?

MR. HUDAK: Correct. So, again, if I'm a -- let's

say I'm like a grad student, and I --

THE COURT: No, I understand. I just want to walk through and understand how this works. Stop me when you think I'm wrong.

ICE ran these lists against the NCIC. It generated a long list. How long was that list?

MR. HUDAK: Mr. Watson, who just joined us, probably has the number handy. I believe it is -- I think it was 6,400 names. Is that correct, Mr. Watson?

THE COURT: Why don't we turn to Mr. Watson since he's here. Thank you, Mr. Hudak.

Mr. Watson, thank you for coming.

MR. WATSON: Good morning, Your Honor.

THE COURT: Thank you, and thank you for joining on short notice. I'm not going to swear you in. I'm just looking for some answers to my questions that I am hoping you can provide.

So I am trying to understand the Student Criminal Alien Initiative, and I will start back at the beginning. Tell me what you know about how this mass termination effort, which is called in this email the Student Criminal Alien Initiative, how did it come about?

MR. WATSON: So, Your Honor, this initiative came about following an examination of the executive order regarding anti-semitism activities in the United States.

THE COURT: Oh.

MR. WATSON: So we went from noncitizen aliens that were within the scope of the executive order on anti-semitism, and we shifted from that focus then to F-1 and M-1 students that were currently studying in the United States. And the question was with this population of students how many of them have derogatory information known.

So the requirement was for us to run that population of students through NCIC, and we did so. So the rough order of magnitude for that population was just under 1.3 million F and M visa holders. And from that population run, Your Honor, we came up with about 16,000 records that showed a positive result in NCIC.

And from that 16,000, my division was responsible then for checking the data against the actual records. And from those checks of the 16,000, the population went down to about 13,900. And then from that population, we then brought it down to 6,400 individuals that had a positive NCIC record or an encounter with law enforcement officers.

From that 6,000 --

THE COURT: Okay.

MR. WATSON: Yes, ma'am, I'm sorry.

THE COURT: Actually, finish with the numbers, and then I'll go to my questions.

MR. WATSON: Yes, ma'am. So with that 6,400,

ma'am, we generated lists, and the lists were generated based on what I'll call productivity in the day.

So we didn't do one list for the entire 6,400. As our contract staff went through the list and compared the records against the SEVIS records and the identities, when we had a confirmed match, we then categorized that information on spreadsheets, and those spreadsheets were provided to the Department of State Bureau of Consular Affairs for action as deemed appropriate.

So --

THE COURT: Okay. Let's stop there, then, with where you send stuff to the State Department. Let me understand your process.

So 1.3 million visa holders. You matched that against this NCIC list, and that came -- you came up with 16,000 records. And then what kind of checks are your staff doing with that 16,000? Like how did you get the 16,000 down to 13,900, and then what additional checks are you doing to get it down to 6,400?

MR. WATSON: So the checks that were done on the 16,000 were to match the names and any PII, personally identifiable information. So there were instances where there were not name matches due to misspellings in names or due to misspellings in the NCIC records. So our contract staff is responsible for matching the NCIC record and the

person lists therein against the SEVIS record and the person therein.

So if we had a positive match on a name and a date of birth, then the second part to it was to see what the NCIC record had in terms of an arrest encounter. So if we could see that there was an arrest based on an encounter with the law enforcement officer whereby this student was charged, the question was then what was the charge?

So we would check the NCIC record to see what was entered by the arresting agency. So it could be a charge like shoplifting. It could be a DUI. Whatever charge we saw applicable to that student we then put in a spreadsheet.

We also looked at whether or not there was a disposition on the charge, whether or not it was a conviction, whether or not it was unknown, whether or not it was either dismissed or nolle prosse'd. All of that information, when it was available, was categorized on the spreadsheet so that anyone seeing the spreadsheet would know we have a match, this is the charge and, if the disposition was known, what the disposition was.

My staff even went one step further internally to color-code the individuals to show if there was a disposition versus one that required additional investigation versus one that did not have a disposition, meaning dismissed or nolle prosse'd that was actionable.

THE COURT: So why, if someone is arrested like one of my plaintiffs -- I'm not making this up. If someone was arrested for violating a traffic law, the officer went back, looked at the video, found out that that person, in fact, did not violate the traffic law, it was a mistake so thus never brought charges, so you're going to look that person up. It says arrested, no charges ever brought, and that person stays on your list for potential termination even though that person was mistakenly arrested or at least it's clear to you from looking at NCIC that that person never had had charges brought against them?

MR. WATSON: So, ma'am, that wasn't a mass list of terminations. It was a list of referrals for State Department consideration. That's what the list was for, and that's what we provided to the Department of State.

THE COURT: Got it. So you guys generated -- let me ask my question again.

So you guys generated a list not for termination, just to identify people who had any law enforcement interactions, and those law enforcement interactions would not actually lead to a termination of someone's F-1 status. But you generate that list, and then you refer it to the State Department because they've got a lot of discretion to revoke visas, and then they decide what they're going to do. Visas get revoked, and it comes back to you, and then you

terminate the SEVIS record, thus essentially like terminating these people's F-1 status.

That was this Student Criminal Alien Initiative in furtherance of the President's -- okay.

MR. WATSON: The list that we generated -- I'm sorry, Your Honor. Forgive me. I didn't mean to overspeak.

THE COURT: No, go ahead. You can finish.

MR. WATSON: The list that we generated for State Department consideration were those students that had a record of a positive interaction with law enforcement. It was referred to the Department of State for their consideration as it relates to their visa.

The results that were returned back to us by the Department of State as to whether or not they either revoked the visa or the visa had expired, okay, was then given to us. And based on the existence of derogatory information and the request from the Department of State, the records were terminated.

THE COURT: Okay. I now have a very clear understanding of how this Student Criminal Alien Initiative happened, and I thank you for answering those questions, Mr. Watson.

Let me ask you a question I've been asking for a long time. The government's position, which the plaintiffs clearly don't find credible, is that a SEVIS termination has

no impact whatsoever on a student's F-1 status here. What is the purpose of a SEVIS termination if it has no impact whatsoever on students' F-1 status?

MR. WATSON: It serves as a red flag and could lead to further investigation by those having access to SEVIS, and that includes academic institutions.

THE COURT: And based on what you've seen, academic institutions have, in fact, taken action based on SEVIS terminations, kicking students out of classes, terminating their OPT training programs, telling them they can't -- they can no longer go to work, correct?

MR. WATSON: Ma'am, I don't have that level of granularity as it relates to those outcomes.

THE COURT: Okay. Thank you.

Let me ask you. So everyone you got back from the State Department having their visa revoked, you did the SEVIS termination based solely on the revocation of the visa or based on, as you call it, derogatory information in that person's file, or both?

MR. WATSON: Both. But if the State Department also requested the termination, we executed on that.

THE COURT: So of the 6,000 people or so that went over to the State Department, how many requests for SEVIS terminations did you get back?

MR. WATSON: I can't give you an exact number on

the request of terminations, but I can tell you that the revocations were in excess of 3,200.

THE COURT: Okay. And did you only terminate records where the State Department requested that you do so, or did you also terminate records based on the derogatory information you found in the NCIC system?

MR. WATSON: Your Honor, we terminated records that had visas revoked or at the recommendation of the Department of State. And that rough order of magnitude was over 5,500 records that were terminated prior to the issuance of TROs.

THE COURT: So you did not terminate any records based on your own assessment. All of the terminations were done based on either a request or a recommendation from the Department of State.

MR. WATSON: I know that the records that were terminated were done under those two parameters. I cannot speak to anything outside of that, ma'am.

THE COURT: Okay. You are not aware of any terminations that occurred in cases other than where the State Department either revoked a visa or recommended termination.

MR. WATSON: That is correct, Your Honor. I'm not aware of anything beyond that.

THE COURT: Okay. Thank you, Mr. Watson. I

appreciate you being here today.

MR. WATSON: You're welcome, Your Honor.

THE COURT: Okay. Counsel, since we are well behind, we are going to adjourn in this case. I am going to ask my courtroom deputy to call the next case on the calendar. I will enter an order in this case later this afternoon.

MS. GRAHAM-OLIVER: Thank you, Your Honor.

MR. BANIAS: Thank you, Your Honor.

MR. HUDAK: Your Honor, one question, if I may?

THE COURT: Who is speaking?

MR. HUDAK: This is Brian Hudak from the U.S. Attorney's Office.

THE COURT: Yes, Mr. Hudak.

MR. HUDAK: Do you require Mr. Hicks and Mr. Watson to stay on the line and be available for the next hearing?

THE COURT: No. I am going to assume that all of their answers would be the same in this hearing, so I don't need them to stay. Thank you for checking.

MR. HUDAK: Great. Thank you, Your Honor.

THE COURT: And thank you, Mr. Hicks, as well for being here.

(Whereupon the hearing was.
adjourned at 11:58 a.m.)

**CERTIFICATE OF OFFICIAL COURT REPORTER**

I, LISA A. MOREIRA, RDR, CRR, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 5th day of May, 2025.

/s/Lisa A. Moreira, RDR, CRR
Official Court Reporter
United States Courthouse
Room 6718
333 Constitution Avenue, NW
Washington, DC 20001

**CERTIFICATE OF OFFICIAL COURT REPORTER**

I, LISA A. MOREIRA, RDR, CRR, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this ^ day of ^ , 2025.

/s/Lisa A. Moreira, RDR, CRR
Official Court Reporter
United States Courthouse
Room 6718
333 Constitution Avenue, NW
Washington, DC 20001

## /

**/s/Lisa** [2] - 70:10, 71:7

## 1

**1.3** [2] - 62:11, 63:14
**100** [2] - 46:20, 52:9
**10333** [1] - 1:16
**1050** [1] - 1:16
**10:04** [1] - 1:5
**11** [1] - 7:23
**11:00** [5] - 21:10, 21:13, 37:15, 37:20, 48:14
**11:30** [4] - 4:13, 21:11, 49:2, 49:8
**11:58** [1] - 69:25
**12** [1] - 40:9
**120** [1] - 58:21
**1201(i** [3] - 55:18, 56:11, 56:17
**1227(a)(1)(B)** [1] - 56:3
**13** [1] - 7:22
**13,900** [2] - 62:17, 63:18
**14** [1] - 54:1
**16,000** [7] - 62:12, 62:14, 62:16, 63:16, 63:17, 63:21
**1:25-cv-01102-SLS** [1] - 1:3

## 2

**20** [1] - 42:12
**20001** [3] - 1:25, 70:13, 71:9
**2012** [1] - 39:12
**2019** [3] - 39:9, 39:12, 39:13
**202** [2] - 1:21, 1:25
**2023** [4] - 7:22, 7:23, 13:14, 13:18
**2024** [2] - 40:1, 40:2
**2025** [7] - 1:4, 6:16, 7:1, 22:15, 42:12, 70:8, 71:4
**20530** [1] - 1:20
**21** [1] - 6:16
**21st** [4] - 6:5, 6:17, 6:18, 7:10
**22** [1] - 6:14
**25-1102** [1] - 2:3
**252-2520** [1] - 1:21
**25th** [3] - 6:8, 6:9, 6:17
**29403** [1] - 1:13

## 3

**3,200** [1] - 68:2
**333** [3] - 1:24, 70:12, 71:9
**352-4272** [1] - 1:13
**354-3187** [1] - 1:25
**36,000** [1] - 42:13
**3rd** [5] - 7:1, 7:9, 27:1, 27:5

## 4

**4** [3] - 22:15, 54:1
**429-4793** [1] - 1:17
**4th** [6] - 7:8, 7:9, 7:18, 22:7, 27:2, 27:6

## 5

**5** [1] - 1:4
**5,500** [4] - 42:15, 44:8, 50:15, 68:10
**555** [1] - 1:20
**5th** [1] - 70:8

## 6

**6,000** [2] - 62:20, 67:22
**6,400** [5] - 61:9, 62:18, 62:25, 63:3, 63:19
**602** [1] - 1:12
**65** [1] - 33:25
**6718** [3] - 1:24, 70:12, 71:8

## 7

**713** [1] - 1:17
**77042** [1] - 1:16

## 8

**8** [2] - 55:18, 56:2
**843** [1] - 1:13

## 9

**90** [1] - 58:21

## A

**a.m** [2] - 1:5, 69:25
**ability** [6] - 30:3, 31:18, 51:10, 56:15, 70:7, 71:4
**able** [4] - 10:18, 15:7, 24:16, 51:14
**absent** [4] - 7:3, 13:11, 13:12, 24:18
**academic** [2] - 67:6, 67:8
**access** [1] - 67:5
**according** [5] - 6:23, 13:4, 22:12, 27:6, 28:16
**accurate** [4] - 32:9, 46:4, 70:5, 71:3
**accused** [1] - 56:25
**acknowledge** [1] - 11:1
**acknowledging** [1] - 26:6
**Act** [1] - 22:15
**action** [15] - 19:2, 40:12, 40:21, 41:9, 41:22, 41:23, 42:2, 43:10, 45:5, 46:5, 46:11, 48:18, 63:9, 67:8
**actionable** [1] - 64:25
**actions** [1] - 55:9
**active** [6] - 7:18, 30:8, 30:12, 52:3, 52:6, 52:8
**activities** [1] - 61:25
**actual** [2] - 35:24, 62:15
**additional** [4] - 49:11, 49:13, 63:18, 64:23
**address** [4] - 34:15, 34:20, 43:18, 46:4
**addressed** [2] - 32:16, 46:7
**addresses** [2] - 43:17, 45:4
**adjourn** [1] - 69:4
**adjourned** [1] - 69:25
**administration** [1] - 30:11
**administrative** [9] - 3:2, 16:4, 16:5, 16:12, 17:5, 22:21, 22:24, 49:23, 50:9
**admission** [2] - 58:7, 58:11
**admitted** [1] - 58:17
**Advisor** [1] - 39:10
**Affairs** [1] - 63:9
**affect** [3] - 24:5, 24:7, 25:16
**affected** [1] - 15:13
**affects** [2] - 8:16, 24:6
**afternoon** [1] - 69:7
**agencies** [1] - 28:4
**agency** [13] - 3:20, 5:3, 5:8, 5:12, 19:6, 21:6, 21:17, 30:18, 34:1, 50:2, 51:1, 51:19, 64:10
**ago** [11] - 4:15, 8:21, 9:3, 10:18, 12:3, 15:16, 17:10, 46:22, 48:2, 48:20, 53:10
**agree** [2] - 10:20, 32:13
**ahead** [12] - 28:2, 33:22, 34:10, 42:8, 42:9, 43:4, 43:5, 44:7, 46:7, 52:1, 53:18, 66:7
**Alien** [15] - 3:3, 3:6, 5:7, 10:15, 30:21, 37:4, 46:13, 49:24, 52:22, 52:25, 60:7, 61:19, 61:22, 66:3, 66:20
**aliens** [1] - 62:2
**allows** [1] - 29:23
**almost** [1] - 42:13
**alone** [1] - 47:2
**amend** [2] - 31:7
**analysis** [1] - 44:4
**answer** [53] - 3:16, 3:17, 4:1, 4:2, 4:15, 4:21, 5:6, 5:8, 5:10, 8:22, 9:2, 9:3, 9:5, 9:9, 9:13, 9:14, 9:19, 10:1, 10:6, 10:7, 10:8, 10:13, 10:18, 10:19, 11:15, 11:17, 16:2, 18:22, 20:8, 21:2, 37:25, 39:21, 42:8, 42:10, 48:5, 48:8, 48:11, 48:21, 49:8, 50:1, 50:19, 50:23, 50:25, 51:1, 51:4, 51:6, 51:10, 51:12, 51:13, 51:14, 51:16, 51:17, 51:22
**answering** [3] - 25:19, 35:22, 66:21
**answers** [10] - 4:5, 30:19, 48:4, 48:7, 49:7, 51:3, 51:16, 51:20, 61:16, 69:19
**anti** [2] - 61:25, 62:3
**anti-semitism** [1] - 61:25
**anyway** [2] - 13:8, 52:8
**apologies** [1] - 37:20
**appeals** [1] - 56:21
**Appeals** [1] - 56:22
**appear** [2] - 5:3, 56:5
**APPEARANCES** [1] - 1:11
**appeared** [1] - 9:4
**applicable** [1] - 64:12
**applies** [1] - 27:24
**appreciate** [1] - 69:1
**appropriate** [1] - 63:9
**appropriately** [1] - 39:21
**April** [17] - 6:5, 6:8, 6:9, 6:16, 6:25, 7:8, 7:9, 7:10, 7:18, 7:22, 13:14, 13:18, 22:7, 22:14, 27:1, 27:2
**arbitrary** [1] - 29:15
**arguing** [1] - 26:19
**argument** [4] - 29:14, 29:16, 29:18, 29:20
**arrest** [21] - 7:22, 9:16, 13:10, 13:13, 13:18, 31:2, 32:12, 33:8, 40:18, 54:18, 55:10, 55:13, 55:23, 56:7, 56:9, 56:12, 57:3, 57:15, 57:21, 64:5, 64:6
**arrested** [25] - 8:1, 8:6, 8:15, 9:10, 9:24, 12:14, 12:21, 13:5, 14:12, 23:5, 23:10, 24:1, 25:12, 26:2, 27:8, 41:21, 46:22, 54:5, 55:2, 55:4, 57:16, 65:1, 65:3, 65:7, 65:9
**arresting** [1] - 64:10
**aside** [1] - 34:24
**assault** [1] - 41:23
**assessment** [3] - 44:24, 45:17, 68:13
**assume** [11] - 3:23, 5:18, 9:6, 14:17, 14:21, 32:4, 32:10, 33:17, 35:15, 47:25, 69:18
**assuming** [2] - 31:13, 32:9
**assurance** [2] - 28:18, 28:21
**Atlanta** [1] - 32:17
**attempt** [1] - 30:1
**attending** [1] - 59:2
**attorney** [4] - 31:22, 50:18, 52:23, 52:24
**Attorney's** [3] - 47:18, 50:22, 69:13
**ATTORNEY'S** [1] - 1:19
**attorneys** [1] - 52:10
**August** [1] - 7:23
**authorities** [1] - 54:16
**authority** [4] - 14:7, 19:4, 29:3, 33:24
**authorization** [4] - 18:16, 20:3, 38:24, 45:4
**automatic** [1] - 18:11

**available** [4] - 21:10, 37:15, 64:17, 69:16
**Avenue** [5] - 1:12, 1:16, 1:24, 70:12, 71:9
**aware** [7] - 19:11, 19:12, 47:25, 52:4, 52:5, 68:19, 68:24

## B

**baby** [1] - 47:4
**BANIAS** [23] - 1:11, 1:12, 2:6, 26:20, 26:25, 27:10, 28:3, 28:11, 28:13, 28:22, 28:24, 29:8, 29:19, 31:16, 31:25, 32:15, 33:20, 33:23, 34:19, 35:6, 35:21, 36:8, 69:9
**Banias** [2] - 2:7, 26:20
**bare** [1] - 35:25
**based** [42] - 6:4, 10:25, 11:6, 11:7, 11:12, 12:8, 12:20, 13:10, 13:17, 13:20, 13:23, 14:11, 24:3, 31:2, 31:7, 32:6, 32:12, 33:7, 33:8, 33:12, 33:18, 34:14, 46:8, 49:2, 49:22, 52:6, 52:14, 52:20, 54:13, 55:9, 55:22, 57:21, 63:2, 64:6, 66:16, 67:7, 67:8, 67:17, 67:18, 68:5, 68:13, 68:14
**bases** [1] - 40:8
**basis** [11] - 15:17, 15:20, 32:19, 32:22, 34:7, 44:4, 47:1, 47:2, 56:18, 57:3, 57:17
**because..** [1] - 6:12
**become** [2] - 11:13, 55:9
**BEFORE** [1] - 1:9
**begin** [1] - 26:8
**beginning** [1] - 61:19
**behalf** [2] - 2:11, 26:12
**behest** [1] - 27:14
**behind** [1] - 69:4
**belief** [1] - 39:19
**believes** [1] - 57:2
**best** [6] - 56:8, 58:5, 59:4, 59:8, 70:6, 71:3
**better** [1] - 51:16
**between** [5] - 7:9, 16:17, 19:15, 20:21, 32:20
**beyond** [1] - 68:24
**birth** [1] - 64:4
**bit** [3] - 29:21, 30:18, 40:20
**board** [1] - 56:20
**Brad** [2] - 2:7, 26:20
**brad@baniaslaw.com** [1] - 1:14
**BRADLEY** [1] - 1:11
**break** [1] - 46:24
**breaking** [1] - 46:23
**Brian** [2] - 47:17, 69:12
**brief** [3] - 31:6, 31:8, 35:16
**briefed** [1] - 3:23
**briefing** [3] - 31:5, 35:20
**bring** [2] - 4:1, 48:9
**broad** [2] - 14:4, 33:10
**broader** [1] - 32:18
**brought** [5] - 55:3, 62:18, 65:6, 65:7, 65:11
**Brown** [1] - 2:7
**BROWN** [2] - 1:15, 1:15
**BRUCE** [1] - 1:11
**buckets** [5] - 57:25, 59:3, 59:11, 60:4, 60:12
**bunch** [1] - 2:18
**Bureau** [1] - 63:8
**BUSHIREDDY** [1] - 1:2
**Bushireddy** [4] - 2:3, 12:9, 15:7, 27:17
**Bushireddy's** [2] - 22:14, 26:23

## C

**CA** [1] - 1:3
**calendar** [1] - 69:6
**campus** [9] - 18:15, 20:3, 38:23, 41:23, 42:24, 43:1, 43:22, 44:18, 44:20
**cancelled** [1] - 17:22
**cannot** [7] - 10:6, 20:8, 24:15, 25:21, 26:11, 58:7, 68:17
**capricious** [1] - 29:15
**care** [1] - 24:6
**Carilli** [10] - 3:23, 8:20, 9:3, 15:16, 17:9, 48:1, 49:16, 52:18, 53:6
**carry** [2] - 14:9, 35:8
**case** [32] - 2:24, 3:5, 6:2, 11:1, 11:12, 11:18, 11:23, 13:24, 14:25, 15:3, 15:4, 15:21, 20:24, 21:1, 26:24, 28:13, 31:6, 31:8, 34:14, 34:24, 35:3, 42:21, 42:25, 44:4, 48:1, 49:1, 50:17, 69:4, 69:5, 69:6
**case-by-case** [1] - 44:4
**cases** [14] - 13:23, 15:1, 16:1, 17:20, 19:1, 41:15, 48:16, 48:17, 52:12, 54:7, 60:1, 60:5, 60:13, 68:20
**categorized** [2] - 63:6, 64:17
**category** [1] - 58:17
**causes** [3] - 18:14, 20:2, 38:22
**certain** [4] - 22:20, 22:21, 55:9, 57:24
**certainly** [1] - 51:6
**CERTIFICATE** [2] - 70:1, 71:1
**certify** [2] - 70:4, 71:2
**cessation** [1] - 34:21
**challenged** [1] - 28:9
**challenges** [1] - 35:3
**challenging** [1] - 34:15
**chance** [2] - 27:23, 31:7
**change** [13] - 8:10, 9:12, 9:24, 15:18, 17:11, 18:2, 34:5, 44:22, 44:25, 47:25, 48:10, 55:12, 57:9
**changed** [1] - 23:24
**changes** [1] - 9:16
**chaos** [1] - 46:17
**charge** [8] - 7:23, 8:2, 8:16, 64:8, 64:10, 64:11, 64:14, 64:19
**charged** [2] - 47:1, 64:8
**charges** [19] - 8:8, 9:11, 9:16, 9:25, 12:14, 12:21, 13:5, 14:12, 23:5, 23:10, 24:2, 25:12, 26:3, 27:8, 33:8, 55:2, 65:6, 65:7, 65:11
**Charleston** [1] - 1:13
**check** [2] - 40:5, 64:9
**checking** [4] - 54:4, 54:5, 62:15, 69:20
**checks** [5] - 52:15, 62:16, 63:16, 63:18, 63:20
**chief** [2] - 5:2, 38:11
**chiefs** [1] - 50:21
**circumstances** [2] - 9:15, 9:23
**citing** [1] - 19:1
**Civil** [1] - 2:2
**civil** [2] - 5:2, 50:22
**CJIS** [1] - 54:14
**claim** [1] - 29:15
**clarification** [3] - 21:20, 46:3, 46:9
**clarified** [1] - 48:6
**clarifying** [1] - 41:1
**classes** [1] - 67:9
**clear** [6] - 10:25, 48:7, 55:7, 56:24, 65:10, 66:19
**clearly** [4] - 11:10, 18:13, 34:8, 66:25
**Clerk** [1] - 5:24
**client** [3] - 28:19, 29:6, 30:24
**close** [1] - 46:20
**code** [1] - 64:22
**coincident** [1] - 58:14
**colleague** [1] - 21:6
**colleagues** [1] - 17:20
**color** [1] - 64:22
**color-code** [1] - 64:22
**COLUMBIA** [1] - 1:1
**coming** [4] - 16:24, 35:22, 47:11, 61:12
**committing** [1] - 8:9
**commonalities** [1] - 54:25
**compare** [1] - 54:24
**compared** [3] - 53:17, 53:19, 63:4
**compiled** [1] - 49:2
**complaint** [4] - 19:2, 30:16, 34:14, 35:1
**complete** [2] - 70:6, 71:3
**completely** [4] - 18:9, 30:5, 47:10, 55:17
**compliance** [1] - 29:21
**comply** [1] - 29:22
**component** [1] - 54:14
**concerns** [1] - 27:22
**conduct** [4] - 41:24, 45:16, 55:14, 55:22
**conducted** [1] - 10:14
**confer** [1] - 35:16
**conferral** [1] - 22:13
**conferred** [1] - 9:7
**confident** [1] - 50:20
**confirm** [1] - 21:15
**confirmation** [1] - 48:15
**confirmed** [1] - 63:6
**confusion** [1] - 45:11
**conjunction** [2] - 45:22, 56:12
**consequence** [2] - 17:14, 46:10
**consequences** [3] - 15:5, 46:16, 47:5
**consider** [1] - 46:16
**consideration** [4] - 56:11, 65:14, 66:9, 66:12
**constitutes** [2] - 70:4, 71:2
**Constitution** [3] - 1:24, 70:12, 71:9
**consular** [1] - 58:10
**Consular** [3] - 27:24, 28:6, 63:8
**consulate** [2] - 16:22, 24:11
**consult** [2] - 11:24, 12:5
**contacted** [1] - 5:1
**contacting** [1] - 5:2
**context** [3] - 39:20, 41:13, 45:3
**continue** [3] - 4:19, 5:19, 15:7
**continues** [1] - 32:18
**continuing** [1] - 32:24
**contract** [2] - 63:4, 63:24
**convert** [1] - 33:25
**convicted** [2] - 57:1, 57:11
**conviction** [1] - 64:15
**convictions** [1] - 54:9
**coordination** [1] - 50:12
**correct** [38] - 8:3, 8:10, 11:4, 19:13, 19:15, 19:16, 19:19, 19:21, 20:4, 20:5, 20:6, 20:17, 20:18, 20:19, 20:20, 20:21, 20:22, 20:23, 21:16, 25:8, 25:9, 28:22, 31:14, 32:5, 32:11, 40:2, 40:6, 41:17, 43:3, 44:13, 56:8, 60:25, 61:9, 67:11, 68:23
**correction** [1] - 7:5
**correspondence** [2] - 50:9, 50:13
**counsel** [25] - 2:4,

3:22, 4:12, 5:8, 8:20, 9:6, 11:25, 12:5, 13:14, 15:22, 20:1, 20:13, 21:24, 22:6, 23:21, 24:22, 25:2, 29:2, 32:1, 32:9, 39:18, 44:16, 47:25, 48:10, 69:3
**Counsel** [20] - 2:9, 2:13, 3:14, 5:5, 10:13, 11:19, 12:11, 14:17, 18:10, 25:4, 26:18, 28:10, 29:18, 33:3, 36:9, 36:12, 36:16, 37:6, 37:15, 47:19
**count** [1] - 44:8
**country** [20] - 10:17, 14:19, 16:25, 17:21, 24:8, 26:11, 26:14, 27:17, 28:20, 40:3, 46:17, 46:18, 47:9, 52:12, 55:5, 56:1, 56:15, 57:6, 58:6, 58:12
**couple** [3] - 22:25, 33:15, 47:8
**course** [3] - 31:15, 46:1, 59:1
**COURT** [202] - 1:1, 2:9, 2:13, 2:21, 2:23, 3:14, 3:22, 4:4, 4:12, 4:19, 4:24, 5:5, 5:13, 5:16, 5:22, 6:1, 6:9, 6:11, 6:15, 6:19, 6:22, 7:2, 7:7, 7:17, 7:20, 8:1, 8:6, 8:8, 8:14, 8:20, 9:19, 9:23, 10:3, 10:5, 10:10, 10:12, 10:24, 11:5, 11:17, 11:22, 12:1, 12:11, 12:24, 13:2, 13:12, 13:21, 14:3, 14:17, 14:23, 15:1, 15:3, 15:9, 15:12, 15:15, 15:22, 15:25, 16:10, 16:17, 17:3, 17:9, 18:9, 18:20, 18:24, 19:6, 19:10, 19:14, 19:19, 19:21, 20:1, 20:6, 20:10, 20:13, 20:25, 21:6, 21:12, 21:24, 22:1, 22:5, 22:11, 22:19, 22:24, 23:4, 23:8, 23:14, 23:17, 23:21, 23:23, 24:6, 24:12, 24:14, 24:22, 25:2, 25:4, 25:9, 25:18, 25:21, 25:25, 26:18, 26:22, 27:3, 28:2, 28:8, 28:12, 28:15, 28:23, 28:25, 29:17, 30:15, 31:21, 32:3, 33:2, 33:21, 34:13, 34:23, 35:10, 36:4, 36:9, 36:12, 36:16, 36:20, 36:23, 36:25, 37:2, 37:5, 37:9, 37:14, 37:17, 37:21, 37:24, 38:8, 38:14, 38:17, 39:5, 39:13, 39:17, 39:22, 40:1, 40:3, 40:7, 40:24, 41:1, 41:8, 41:12, 41:25, 42:3, 42:6, 42:8, 42:10, 42:20, 43:4, 43:14, 43:16, 43:20, 44:14, 46:8, 47:19, 47:24, 49:5, 49:10, 49:12, 50:16, 50:24, 51:8, 51:11, 52:1, 52:5, 53:4, 53:16, 53:18, 54:3, 55:1, 57:7, 59:14, 59:20, 60:3, 60:20, 60:22, 61:2, 61:10, 61:14, 62:1, 62:21, 62:23, 63:11, 65:1, 65:16, 66:7, 66:19, 67:7, 67:14, 67:22, 68:3, 68:12, 68:19, 68:25, 69:3, 69:11, 69:14, 69:18, 69:22, 70:1, 71:1
**Court** [17] - 1:23, 1:23, 2:7, 2:11, 28:14, 32:1, 33:24, 34:2, 34:3, 34:6, 34:10, 35:25, 36:3, 50:10, 56:22, 70:11, 71:7
**court** [6] - 20:15, 25:23, 27:25, 52:10, 55:18, 56:18
**Court's** [1] - 11:25
**Courthouse** [3] - 1:24, 70:11, 71:8
**courtroom** [3] - 29:1, 38:4, 69:5
**COURTROOM** [5] - 2:2, 5:20, 37:10, 38:1, 38:6
**courts** [6] - 29:9, 32:16, 32:24, 45:7, 47:9, 56:20
**created** [3] - 7:13, 30:2, 39:6
**credible** [3] - 18:9, 42:23, 66:25
**crime** [3] - 47:1, 57:1, 57:12
**criminal** [4] - 45:21, 54:8, 54:15, 54:16
**Criminal** [15] - 3:3, 3:6, 5:7, 10:15, 30:20, 37:4, 46:12, 49:24, 52:22, 52:25, 60:7, 61:18, 61:21, 66:3, 66:20
**criminally** [1] - 57:11
**criteria** [1] - 54:10
**cross** [1] - 32:22
**CRR** [5] - 1:23, 70:3, 70:10, 71:2, 71:7
**CUONG** [1] - 1:19
**current** [1] - 30:11
**CVP** [1] - 58:18

## D

**D.C** [2] - 1:4, 1:19
**data** [1] - 62:15
**database** [4] - 12:13, 25:11, 45:19
**databases** [1] - 54:15
**date** [4] - 6:6, 30:25, 58:20, 64:3
**dated** [1] - 30:15
**Dated** [2] - 70:8, 71:4
**days** [2] - 53:9, 58:21
**DC** [4] - 1:20, 1:25, 70:13, 71:9
**deal** [1] - 31:20
**decide** [9] - 8:25, 31:9, 34:13, 34:17, 34:18, 35:2, 35:5, 35:17, 65:24
**decided** [4] - 12:17, 26:16, 30:11, 44:22
**decides** [1] - 57:8
**decision** [7] - 29:15, 34:3, 35:6, 36:1, 55:17, 56:13, 56:19
**declarant** [5] - 3:15, 3:20, 3:21, 4:6, 13:5
**declarations** [3] - 45:6, 45:7, 45:14
**deemed** [1] - 63:9
**defend** [1] - 29:1
**Defendant** [2] - 1:7, 1:18
**defendants** [1] - 22:12
**defended** [2] - 47:8, 47:9
**defending** [1] - 47:7
**defensible** [1] - 18:19
**defer** [1] - 36:3
**deny** [1] - 32:5
**Department** [50] - 11:8, 21:21, 21:25, 22:13, 22:22, 27:2, 27:11, 27:13, 36:15, 36:19, 38:15, 45:23, 46:25, 50:8, 50:13, 51:14, 53:21, 53:22, 55:16, 55:22, 55:25, 56:2, 56:10, 57:1, 57:8, 57:15, 57:23, 58:1, 58:2, 59:17, 60:10, 60:23, 63:8, 63:12, 65:14, 65:15, 65:23, 66:9, 66:11, 66:14, 66:17, 67:16, 67:20, 67:23, 68:4, 68:9, 68:15, 68:21
**departs** [1] - 58:6
**deportation** [2] - 17:2, 17:25
**deputize** [1] - 30:9
**Deputy** [1] - 5:23
**deputy** [3] - 38:4, 50:21, 69:5
**DEPUTY** [5] - 2:2, 5:20, 37:10, 38:1, 38:6
**derogatory** [4] - 62:7, 66:16, 67:18, 68:5
**describe** [1] - 54:10
**described** [2] - 42:22, 54:1
**description** [1] - 29:11
**despite** [1] - 17:19
**determination** [8] - 19:23, 19:25, 20:9, 20:10, 45:9, 45:10, 45:15, 45:22
**determine** [1] - 3:12
**determined** [1] - 53:23
**develop** [1] - 54:25
**DHS** [1] - 27:14
**differ** [1] - 58:23
**difference** [1] - 16:17
**differences** [2] - 27:15, 55:25
**different** [13] - 13:24, 29:9, 31:25, 34:21, 34:23, 44:10, 46:10, 54:17, 54:20, 58:11, 59:17, 60:12
**differently** [1] - 44:11
**directed** [1] - 50:12
**direction** [1] - 53:13
**director** [1] - 53:13
**discretion** [9] - 14:4, 33:11, 55:16, 55:18, 55:20, 56:11, 59:19, 60:10, 65:23
**discuss** [1] - 8:19
**dismissed** [21] - 7:23, 8:2, 8:9, 8:16, 9:11, 9:16, 9:25, 12:15, 12:21, 13:6, 14:12, 23:5, 23:11, 24:2, 25:13, 26:3, 27:9, 33:9, 55:2, 64:16, 64:25
**disposition** [5] - 64:14, 64:19, 64:20, 64:23, 64:24
**disputing** [2] - 15:10, 15:12
**disruptive** [1] - 40:22
**distinction** [2] - 19:15, 20:21
**distinguish** [1] - 32:20
**DISTRICT** [3] - 1:1, 1:1, 1:10
**district** [2] - 55:18, 56:18
**division** [5] - 5:2, 38:11, 50:21, 50:22, 62:14
**Division** [2] - 3:10, 4:9
**Doctrine** [2] - 27:23, 28:6
**done** [14] - 2:17, 15:21, 26:6, 26:7, 26:9, 39:24, 40:17, 42:14, 43:24, 45:11, 46:14, 63:20, 68:14, 68:17
**door** [2] - 13:15, 33:9
**down** [7] - 19:3, 26:18, 53:7, 62:16, 62:18, 63:18, 63:19
**dozen** [1] - 40:5
**due** [2] - 63:23, 63:24
**DUI** [1] - 64:11
**duration** [1] - 58:18

## E

**ECF** [1] - 6:14
**ECF-22** [1] - 6:15
**effect** [10] - 20:14, 44:25, 47:6, 55:21, 55:24, 56:14, 58:3, 58:24, 59:10
**effects** [1] - 56:14
**effort** [7] - 3:11, 7:5, 41:14, 49:19, 52:19, 53:22, 61:21
**either** [10] - 7:9, 17:4, 25:1, 43:23, 55:2, 59:11, 64:16, 66:14, 68:14, 68:21
**email** [5] - 5:24, 50:8, 50:13, 61:21
**emergency** [8] - 33:18, 40:13, 41:4, 41:15,

42:21, 42:25, 43:23, 44:3
**employed** [1] - 19:24
**employees** [1] - 30:10
**employment** [10] - 15:20, 18:15, 20:3, 38:24, 43:1, 43:13, 43:22, 44:18, 45:3, 45:4
**encounter** [3] - 62:19, 64:5, 64:6
**encounters** [1] - 32:23
**end** [2] - 34:4, 54:17
**enforcement** [11] - 12:14, 44:7, 53:15, 54:5, 54:8, 60:9, 62:19, 64:7, 65:19, 65:20, 66:10
**engaged** [1] - 10:25
**enrollment** [1] - 44:20
**enter** [3] - 31:11, 32:25, 69:6
**entered** [3] - 6:6, 8:13, 64:10
**entering** [1] - 35:15
**entire** [2] - 14:13, 63:3
**entirely** [1] - 20:5
**entry** [1] - 58:8
**era** [1] - 44:1
**ESQ** [4] - 1:11, 1:15, 1:18, 1:19
**essentially** [1] - 66:1
**established** [2] - 25:14, 28:13
**event** [2] - 56:9
**events** [1] - 56:12
**evidence** [2] - 40:15, 43:11
**EVIDENTIARY** [1] - 1:9
**exact** [1] - 67:25
**exactly** [2] - 45:11, 50:14
**examination** [1] - 61:24
**examine** [1] - 53:22
**example** [10] - 16:5, 16:8, 16:9, 16:11, 16:15, 39:24, 40:14, 43:25, 56:25, 57:10
**excess** [1] - 68:2
**exchange** [1] - 38:12
**excuse** [1] - 25:24
**executed** [1] - 67:21
**executive** [3] - 53:13, 61:24, 62:3
**exhibits** [1] - 6:24
**existence** [1] - 66:16
**exists** [1] - 31:4
**expand** [1] - 29:12
**expansive** [1] - 32:19
**expedited** [1] - 31:5
**expiration** [4] - 58:13, 58:14, 58:20, 59:13
**expire** [1] - 59:1
**expired** [5] - 59:7, 60:2, 60:18, 66:15
**expires** [1] - 58:20
**explain** [2] - 43:7, 55:15
**explanation** [1] - 20:22
**exponentially** [1] - 27:19
**extensively** [1] - 50:6
**extent** [1] - 45:17
**external** [3] - 38:12, 42:5, 43:6
**extra** [1] - 29:22

## F

**F-1** [23] - 8:3, 8:5, 8:10, 8:12, 8:17, 9:12, 9:17, 9:24, 10:21, 11:2, 11:11, 22:14, 23:9, 29:20, 55:5, 55:19, 58:17, 59:7, 62:4, 65:21, 66:2, 67:1, 67:3
**face** [1] - 29:24
**facing** [2] - 42:5, 43:6
**fact** [18] - 13:25, 17:15, 17:19, 19:22, 19:23, 33:4, 43:20, 43:22, 44:5, 44:16, 44:17, 44:21, 44:23, 46:24, 54:11, 55:13, 65:5, 67:8
**facts** [3] - 3:4, 34:5, 57:2
**failed** [3] - 10:21, 11:2, 11:10
**fair** [1] - 27:23
**false** [3] - 18:17, 19:7, 21:17
**familiar** [1] - 39:11
**family** [1] - 24:19
**far** [5] - 14:1, 15:24, 18:7, 46:15, 58:24
**FBI** [2] - 54:14
**fearing** [1] - 17:24
**fears** [1] - 47:4
**fell** [1] - 59:11
**felony** [1] - 54:18
**felt** [1] - 45:16
**figure** [2] - 22:3, 35:16
**figuring** [1] - 31:3
**file** [2] - 46:19, 67:19
**filed** [7] - 19:2, 35:1, 45:6, 50:4, 50:17, 50:18, 52:20
**filing** [4] - 6:11, 7:3, 22:12, 52:7
**filings** [4] - 2:16, 6:4, 13:23, 22:1
**final** [7] - 13:22, 13:25, 14:2, 29:4, 29:6, 29:7, 29:10
**fine** [2] - 2:22, 29:16
**finish** [5] - 21:12, 42:8, 42:10, 62:23, 66:7
**first** [9] - 13:22, 22:24, 27:5, 49:15, 50:25, 53:6, 53:9, 55:3, 58:1
**five** [1] - 36:5
**fix** [1] - 26:9
**flag** [7] - 14:14, 15:4, 15:13, 17:11, 18:12, 67:4
**flagging** [2] - 17:17, 54:11
**flags** [2] - 14:18
**floored** [1] - 17:10
**focus** [1] - 62:4
**folks** [4] - 54:17, 57:24, 59:4, 59:25
**folks'** [1] - 53:23
**follow** [2] - 18:7, 18:12
**following** [6] - 18:14, 20:2, 27:1, 38:23, 47:23, 61:24
**FOR** [2] - 1:1, 1:19
**forcing** [1] - 46:18
**foregoing** [2] - 70:4, 71:2
**forever** [1] - 24:15
**forgive** [1] - 66:6
**forward** [1] - 32:13
**four** [1] - 22:2
**Fourth** [1] - 1:20
**Francisco** [2] - 31:16, 32:1
**front** [1] - 34:2
**full** [2] - 70:5, 71:3
**fully** [1] - 50:20
**furtherance** [1] - 66:4
**future** [1] - 12:20

## G

**gap** [7] - 7:7, 7:10, 7:13, 30:25, 31:19, 32:11
**gather** [1] - 47:5
**gathered** [1] - 10:16
**general** [1] - 52:17
**generate** [1] - 65:22
**generated** [7] - 61:6, 63:1, 65:16, 65:18, 66:5, 66:8
**giant** [1] - 28:8
**given** [8] - 3:10, 4:8, 12:2, 15:23, 31:11, 35:25, 60:5, 66:15
**government** [44] - 2:12, 2:15, 3:2, 3:16, 4:16, 9:6, 9:7, 10:14, 10:24, 11:13, 12:19, 13:24, 15:17, 17:25, 18:3, 18:20, 20:15, 20:16, 28:15, 29:4, 29:14, 30:18, 30:23, 31:17, 32:4, 33:4, 34:25, 38:25, 39:18, 44:1, 44:15, 44:22, 45:5, 45:12, 46:11, 46:14, 46:15, 47:2, 48:18, 48:21, 49:19, 51:4, 52:13, 55:7
**government's** [9] - 10:5, 15:25, 18:13, 23:8, 28:18, 31:11, 31:12, 36:6, 66:24
**grad** [1] - 61:1
**Graham** [12] - 2:11, 2:19, 6:3, 27:6, 38:18, 48:11, 49:7, 49:15, 49:21, 50:20, 51:12, 52:23
**GRAHAM** [104] - 1:18, 2:10, 2:20, 2:22, 3:8, 3:19, 4:3, 4:7, 4:17, 4:22, 5:1, 5:10, 5:15, 6:7, 6:10, 6:14, 6:18, 6:20, 6:24, 7:6, 7:12, 7:19, 7:25, 8:4, 8:7, 8:11, 8:18, 9:18, 9:22, 10:1, 10:4, 10:8, 10:11, 10:23, 11:3, 11:15, 11:20, 12:8, 12:22, 12:25, 13:11, 13:19, 14:1, 14:13, 14:22, 14:24, 15:2, 15:6, 15:11, 15:14, 15:19, 15:23, 16:7, 16:14, 16:19, 17:7, 18:6, 18:18, 18:23, 19:4, 19:8, 19:12, 19:17, 19:20, 19:22, 20:5, 20:8, 20:11, 20:24, 21:5, 21:25, 22:9, 22:17, 22:20, 23:2, 23:7, 23:12, 23:16, 23:19, 23:22, 24:4, 24:10, 24:13, 24:20, 24:25, 25:3, 25:7, 25:16, 25:20, 25:24, 26:17, 36:11, 36:13, 36:18, 36:21, 36:24, 37:1, 37:3, 37:8, 37:12, 37:16, 37:18, 37:23, 69:8
**GRAHAM-OLIVER** [104] - 1:18, 2:10, 2:20, 2:22, 3:8, 3:19, 4:3, 4:7, 4:17, 4:22, 5:1, 5:10, 5:15, 6:7, 6:10, 6:14, 6:18, 6:20, 6:24, 7:6, 7:12, 7:19, 7:25, 8:4, 8:7, 8:11, 8:18, 9:18, 9:22, 10:1, 10:4, 10:8, 10:11, 10:23, 11:3, 11:15, 11:20, 12:8, 12:22, 12:25, 13:11, 13:19, 14:1, 14:13, 14:22, 14:24, 15:2, 15:6, 15:11, 15:14, 15:19, 15:23, 16:7, 16:14, 16:19, 17:7, 18:6, 18:18, 18:23, 19:4, 19:8, 19:12, 19:17, 19:20, 19:22, 20:5, 20:8, 20:11, 20:24, 21:5, 21:25, 22:9, 22:17, 22:20, 23:2, 23:7, 23:12, 23:16, 23:19, 23:22, 24:4, 24:10, 24:13, 24:20, 24:25, 25:3, 25:7, 25:16, 25:20, 25:24, 26:17, 36:11, 36:13, 36:18, 36:21, 36:24, 37:1, 37:3, 37:8, 37:12, 37:16, 37:18, 37:23, 69:8
**Graham-Oliver** [11] - 2:11, 2:19, 6:3, 27:6, 38:18, 48:11, 49:7, 49:15, 49:21, 51:12, 52:23
**granularity** [1] - 67:13
**great** [2] - 2:23, 69:21
**grounds** [1] - 29:23
**group** [1] - 37:17
**guess** [1] - 39:5
**guns** [1] - 40:16
**guys** [7] - 7:5, 12:16, 13:15, 35:15, 53:7, 65:16, 65:18

## H

**H-A-M-M-E-R** [1] - 37:1
**hairs** [1] - 32:22
**hammer** [7] - 36:24,

47:15, 47:16, 47:19, 47:21, 51:14, 51:23
**Hampshire** [1] - 32:17
**hand** [5] - 27:12, 28:4, 51:10
**handful** [3] - 40:5, 41:15, 43:24
**handling** [3] - 11:22, 15:1, 48:16
**hands** [1] - 42:2
**handy** [1] - 61:8
**hang** [1] - 31:21
**happy** [3] - 35:23, 46:3, 51:11
**hard** [2] - 29:17, 31:3
**harm** [5] - 13:15, 31:4, 32:14, 32:18, 32:25
**head** [2] - 18:22, 32:16
**hear** [9] - 35:13, 36:5, 36:17, 38:3, 38:6, 38:7, 44:14, 51:11, 52:12
**heard** [4] - 31:23, 31:25, 46:8, 48:14
**hearing** [17] - 4:12, 4:21, 5:4, 5:14, 5:19, 5:22, 11:9, 29:8, 48:7, 48:20, 48:24, 48:25, 49:14, 69:17, 69:19, 69:24
**HEARING** [1] - 1:9
**hearings** [2] - 21:10, 49:6
**HEATHER** [1] - 1:18
**Heather** [1] - 2:11
**heather.graham** [1] - 1:21
**heather.graham-oliver@usdoj.gov** [1] - 1:21
**hedging** [1] - 11:9
**HELD** [1] - 1:9
**hello** [1] - 38:3
**help** [1] - 29:6
**helpful** [2] - 47:12, 60:4
**hereby** [2] - 70:3, 71:2
**Hicks** [17] - 36:14, 36:18, 38:3, 38:6, 38:8, 38:10, 38:20, 47:11, 50:11, 51:9, 51:13, 51:15, 51:19, 52:1, 52:8, 69:15, 69:22
**HICKS** [29] - 38:7, 38:11, 38:16, 39:1, 39:7, 39:16, 39:20, 39:23, 40:2, 40:4, 40:12, 40:25, 41:6, 41:9, 41:17, 42:1, 42:4, 42:7, 42:9, 42:11, 43:3, 43:5, 43:15, 43:17, 44:12, 45:2, 51:24, 52:2, 53:2
**hire** [1] - 46:19
**hit** [8] - 12:12, 12:20, 22:23, 23:3, 26:2, 45:20, 45:21
**hits** [2] - 3:12, 45:19
**hold** [1] - 31:14
**holders** [2] - 62:11, 63:14
**holding** [1] - 40:10
**holiday** [1] - 24:9
**holidays** [1] - 24:19
**home** [6] - 24:9, 24:10, 24:15, 24:18, 24:21, 24:23
**Homeland** [1] - 21:22
**honest** [1] - 28:5
**Honor** [107] - 2:6, 2:10, 2:20, 3:8, 3:19, 3:21, 4:3, 4:7, 4:17, 5:1, 5:15, 5:20, 5:23, 6:7, 6:18, 7:6, 7:12, 7:19, 7:25, 8:11, 8:18, 9:18, 10:1, 10:9, 11:3, 11:16, 12:6, 12:8, 12:22, 13:19, 14:1, 14:13, 14:22, 15:11, 15:14, 17:8, 18:6, 18:18, 18:23, 19:5, 19:8, 19:20, 20:9, 21:5, 21:8, 21:19, 21:21, 21:22, 22:4, 22:9, 22:18, 22:20, 23:12, 24:20, 25:8, 25:17, 25:24, 26:17, 26:20, 26:25, 27:10, 27:15, 28:1, 28:11, 28:22, 29:8, 29:19, 30:7, 30:14, 31:16, 32:2, 32:15, 33:20, 33:23, 34:19, 34:22, 35:6, 35:21, 35:22, 36:3, 36:8, 36:11, 37:8, 37:11, 37:20, 38:1, 38:7, 39:2, 42:9, 47:17, 48:23, 51:25, 53:2, 53:11, 55:15, 61:13, 61:23, 62:12, 66:6, 68:7, 68:23, 69:2, 69:8, 69:9, 69:10, 69:21
**HONORABLE** [1] - 1:9
**hope** [1] - 2:15
**hoping** [1] - 61:16
**hours** [3] - 18:3, 18:4
**Houston** [1] - 1:16
**HSI** [1] - 53:13
**HUDAK** [25] - 47:17, 47:20, 48:23, 49:6, 49:11, 50:4, 50:20, 51:6, 51:9, 53:11, 53:17, 53:19, 54:12, 55:13, 57:22, 59:16, 59:21, 60:16, 60:21, 60:25, 61:7, 69:10, 69:12, 69:15, 69:21
**Hudak** [10] - 47:17, 47:24, 49:12, 50:16, 51:17, 51:21, 53:4, 61:11, 69:12, 69:14
**huge** [1] - 52:8

## I

**ICE** [26] - 3:10, 4:8, 11:7, 14:4, 16:11, 16:12, 27:11, 29:11, 30:3, 30:5, 30:7, 31:17, 38:14, 38:16, 47:20, 47:21, 47:22, 50:15, 52:25, 53:12, 54:24, 59:18, 60:14, 61:5
**ICE's** [1] - 11:7
**idea** [1] - 31:19
**identifiable** [1] - 63:22
**identified** [2] - 36:13, 44:6
**identify** [2] - 2:4, 65:19
**identities** [1] - 63:5
**immediate** [12] - 16:16, 16:18, 17:1, 45:13, 55:21, 55:24, 56:3, 56:14, 58:3, 58:12, 59:10, 59:12
**immediately** [7] - 17:2, 17:4, 40:18, 56:2, 56:4, 57:4, 59:5
**immigrant** [1] - 24:13
**immigration** [8] - 45:9, 45:10, 56:5, 56:19, 56:20, 56:21, 57:10, 58:15
**Immigration** [1] - 22:15
**impact** [12] - 17:12, 24:12, 26:10, 42:18, 42:19, 43:21, 45:13, 48:18, 52:9, 55:5, 67:1, 67:2
**implemented** [1] - 50:7
**implications** [4] - 7:10, 18:12, 34:9, 35:8
**implied** [1] - 30:7
**IN** [1] - 1:1
**incident** [1] - 31:2
**inclination** [1] - 31:5
**included** [1] - 50:5
**includes** [1] - 67:6
**including** [2] - 50:8, 57:2
**incorrect** [5] - 32:7, 33:7, 33:12, 39:19, 44:15
**incorrectly** [2] - 6:21, 26:16
**increased** [1] - 27:19
**incredibly** [1] - 47:13
**indicated** [1] - 19:13
**indicates** [1] - 22:21
**indication** [2] - 15:6, 15:9
**individual** [6] - 13:1, 13:3, 19:23, 20:11, 30:6, 55:23
**individual's** [1] - 20:12
**individualized** [2] - 44:24, 45:17
**individuals** [4] - 36:14, 60:17, 62:18, 64:22
**information** [21] - 5:11, 8:12, 11:6, 13:11, 13:12, 13:20, 14:8, 14:15, 18:8, 21:23, 38:20, 41:7, 41:19, 47:12, 62:7, 63:7, 63:22, 64:17, 66:16, 67:18, 68:6
**inherent** [1] - 14:7
**initiated** [1] - 39:24
**Initiative** [15] - 3:3, 3:7, 5:8, 10:15, 30:21, 37:4, 46:13, 49:24, 52:22, 52:25, 60:7, 61:19, 61:22, 66:3, 66:20
**initiative** [8] - 42:15, 42:17, 43:18, 45:5, 50:11, 53:12, 54:23, 61:23
**injunction** [4] - 30:23, 32:25, 34:20, 36:7
**instance** [1] - 40:17
**instances** [1] - 63:22
**instead** [1] - 41:5
**institutions** [2] - 67:6, 67:8
**instructed** [2] - 48:5, 48:6
**intended** [1] - 47:5
**intention** [1] - 33:6
**interacted** [2] - 12:23, 44:6
**interaction** [4] - 12:13, 54:4, 60:9, 66:10
**interactions** [7] - 11:8, 53:15, 54:8, 54:16, 58:1, 65:20
**internally** [1] - 64:21
**INTERPOL** [1] - 54:20
**invalid** [5] - 23:18, 24:17, 24:24, 25:5, 28:16
**invalidates** [1] - 34:6
**invalidly** [1] - 24:3
**investigation** [3] - 18:7, 64:24, 67:5
**involving** [1] - 54:19
**irreparable** [5] - 13:15, 31:3, 32:14, 32:18, 32:25
**issuance** [1] - 68:11
**issue** [4] - 32:16, 34:2, 34:11, 34:21
**issued** [1] - 56:4
**issues** [2] - 27:20, 32:8
**itself** [3] - 28:9, 44:2, 56:7

## J

**James** [1] - 5:21
**January** [1] - 42:12
**job** [1] - 47:3
**John** [3] - 21:9, 59:23, 59:24
**JOHN** [1] - 1:19
**john.truong@usdoj.gov** [1] - 1:22
**joined** [1] - 61:7
**joining** [2] - 38:2, 61:14
**judge** [3] - 45:10, 56:5, 56:20
**JUDGE** [1] - 1:10
**judges** [2] - 20:16, 52:11
**judgment** [6] - 33:25, 34:3, 34:7, 34:11, 35:20, 35:24
**judicial** [1] - 56:23
**jurisdiction** [1] - 28:14
**justiciability** [1] - 29:16

## K

**keep** [1] - 12:2
**key** [2] - 59:9, 59:10
**kicked** [2] - 14:19, 17:22
**kicking** [1] - 67:9

**kill** [1] - 40:16
**kind** [6] - 30:9, 40:13, 40:20, 43:7, 57:25, 63:16
**knowing** [1] - 36:2
**knowledge** [2] - 7:21, 59:8
**known** [4] - 11:7, 18:25, 62:7, 64:20

## L

**last** [10] - 3:23, 3:24, 27:19, 30:8, 39:3, 39:24, 40:13, 43:24, 50:5, 52:2
**LAW** [1] - 1:12
**law** [17] - 12:14, 28:13, 32:23, 44:7, 46:23, 46:25, 53:15, 54:4, 54:8, 60:9, 62:19, 64:7, 65:3, 65:5, 65:19, 65:20, 66:10
**lawfully** [1] - 56:16
**lawfulness** [1] - 34:16
**lawsuits** [3] - 42:19, 46:20, 52:20
**lawyer** [1] - 28:17
**lawyers** [3] - 5:18, 22:2, 46:19
**lead** [5] - 17:4, 55:12, 57:9, 65:21, 67:5
**leading** [1] - 56:12
**least** [4] - 5:3, 22:2, 29:5, 65:9
**leave** [5] - 26:14, 27:21, 28:20, 42:1, 58:9
**leaves** [3] - 24:8, 26:11, 27:17
**led** [8] - 14:18, 15:4, 50:11, 55:23, 57:3, 59:14, 60:5
**left** [1] - 16:21
**Legal** [1] - 39:10
**legal** [1] - 19:14
**legally** [5] - 18:19, 19:13, 19:15, 20:20, 20:21
**legitimately** [1] - 16:23
**less** [1] - 46:21
**level** [1] - 67:12
**life** [1] - 41:19
**light** [1] - 31:2
**limit** [1] - 29:13
**limited** [1] - 29:23
**line** [3] - 47:16, 57:25, 69:16
**lines** [1] - 53:25
**link** [1] - 5:17
**linking** [1] - 50:8
**LISA** [2] - 70:3, 71:2
**Lisa** [1] - 1:23
**list** [23] - 14:5, 45:24, 45:25, 47:4, 49:2, 53:19, 57:7, 59:22, 59:23, 60:8, 61:6, 63:3, 63:4, 63:15, 65:8, 65:12, 65:13, 65:14, 65:18, 65:22, 66:5, 66:8
**listen** [1] - 9:1
**lists** [6] - 59:17, 60:14, 61:5, 63:1, 64:1
**literally** [1] - 28:6
**lives** [4] - 10:17, 46:18, 48:19, 52:9
**LLC** [1] - 1:12
**located** [1] - 27:13
**logged** [1] - 38:2
**look** [3] - 6:11, 30:3, 65:6
**looked** [8] - 12:17, 13:21, 19:10, 46:23, 52:19, 53:8, 64:13, 65:4
**looking** [5] - 14:5, 57:18, 57:19, 61:16, 65:10
**lose** [1] - 42:25
**loses** [4] - 18:15, 20:3, 38:23, 43:22
**losing** [1] - 44:17
**loss** [2] - 43:12, 45:3
**lost** [1] - 47:3
**Lyons** [1] - 2:3
**LYONS** [1] - 1:6

## M

**M-1** [1] - 62:4
**ma'am** [6] - 62:22, 62:25, 63:1, 65:12, 67:12, 68:18
**Madam** [1] - 5:23
**magnitude** [2] - 62:10, 68:9
**main** [1] - 29:14
**maintain** [4] - 10:21, 11:2, 11:10, 14:7
**majority** [2] - 39:23, 41:4
**manage** [1] - 30:10
**managing** [1] - 30:8
**MANSI** [1] - 1:2
**Mansi** [1] - 2:3
**mass** [15] - 2:25, 3:1, 7:4, 10:14, 41:14, 44:2, 44:7, 46:17, 48:2, 49:18, 49:19, 51:15, 52:19, 61:20, 65:12
**match** [6] - 54:3, 54:10, 63:6, 63:21, 64:3, 64:19
**matched** [1] - 63:14
**matches** [1] - 63:23
**matching** [1] - 63:25
**Matter** [1] - 2:2
**matters** [1] - 53:20
**mean** [7] - 19:14, 24:12, 31:20, 48:23, 52:6, 59:16, 66:6
**meaning** [1] - 64:25
**means** [4] - 27:18, 45:13, 46:19, 58:5
**meant** [2] - 42:5, 46:7
**mention** [1] - 52:2
**merits** [11] - 29:14, 31:6, 31:9, 32:13, 34:14, 34:24, 35:3, 35:11, 35:17, 36:1, 46:2
**mess** [1] - 28:8
**might** [5] - 8:24, 20:17, 41:23, 41:24
**million** [2] - 62:11, 63:14
**mined** [1] - 48:24
**minimum** [1] - 35:25
**mining** [1] - 49:3
**minute** [1] - 4:13
**minutes** [4] - 12:1, 12:4, 36:3, 36:5
**misaligning** [1] - 59:24
**misdemeanor** [1] - 54:18
**misinterpreting** [1] - 31:24
**misspellings** [2] - 63:23, 63:24
**mistake** [2] - 55:11, 65:5
**mistakenly** [2] - 46:22, 65:9
**modify** [3] - 14:4, 17:16, 17:18
**Monday** [1] - 1:4
**month** [2] - 30:8, 40:13
**months** [3] - 27:19, 33:15, 47:4
**moor** [1] - 30:1
**Moreira** [3] - 1:23, 70:10, 71:7
**MOREIRA** [2] - 70:3, 71:2
**morning** [7] - 2:6, 2:9, 2:10, 2:13, 21:8, 38:8, 61:13
**most** [5] - 41:14, 42:2, 46:19, 58:17, 58:22
**motion** [3] - 30:22, 34:19, 35:24
**move** [5] - 16:2, 18:10, 32:13, 33:18, 51:21
**MR** [98] - 2:6, 5:23, 11:24, 12:6, 21:8, 21:19, 22:4, 26:20, 26:25, 27:10, 28:3, 28:11, 28:13, 28:22, 28:24, 29:8, 29:19, 31:16, 31:25, 32:15, 33:20, 33:23, 34:19, 35:6, 35:21, 36:8, 38:7, 38:11, 38:16, 39:1, 39:7, 39:16, 39:20, 39:23, 40:2, 40:4, 40:12, 40:25, 41:6, 41:9, 41:17, 42:1, 42:4, 42:7, 42:9, 42:11, 43:3, 43:5, 43:15, 43:17, 44:12, 45:2, 47:17, 47:20, 48:23, 49:6, 49:11, 50:4, 50:20, 51:6, 51:9, 51:24, 52:2, 53:2, 53:11, 53:17, 53:19, 54:12, 55:13, 57:22, 59:16, 59:21, 60:16, 60:21, 60:25, 61:7, 61:13, 61:23, 62:2, 62:22, 62:25, 63:20, 65:12, 66:5, 66:8, 67:4, 67:12, 67:20, 67:25, 68:7, 68:16, 68:23, 69:2, 69:9, 69:10, 69:12, 69:15, 69:21
**MS** [103] - 2:10, 2:20, 2:22, 3:8, 3:19, 4:3, 4:7, 4:17, 4:22, 5:1, 5:10, 5:15, 6:7, 6:10, 6:14, 6:18, 6:20, 6:24, 7:6, 7:12, 7:19, 7:25, 8:4, 8:7, 8:11, 8:18, 9:18, 9:22, 10:1, 10:4, 10:8, 10:11, 10:23, 11:3, 11:15, 11:20, 12:8, 12:22, 12:25, 13:11, 13:19, 14:1, 14:13, 14:22, 14:24, 15:2, 15:6, 15:11, 15:14, 15:19, 15:23, 16:7, 16:14, 16:19, 17:7, 18:6, 18:18, 18:23, 19:4, 19:8, 19:12, 19:17, 19:20, 19:22, 20:5, 20:8, 20:11, 20:24, 21:5, 21:25, 22:9, 22:17, 22:20, 23:2, 23:7, 23:12, 23:16, 23:19, 23:22, 24:4, 24:10, 24:13, 24:20, 24:25, 25:3, 25:7, 25:16, 25:20, 25:24, 26:17, 36:11, 36:13, 36:18, 36:21, 36:24, 37:1, 37:3, 37:8, 37:12, 37:16, 37:18, 37:23, 69:8
**must** [1] - 24:14

## N

**name** [9] - 3:9, 4:8, 23:2, 48:3, 49:22, 52:24, 52:25, 63:23, 64:3
**names** [6] - 22:22, 45:25, 61:9, 63:21, 63:23
**Nani** [1] - 38:3
**narrative** [1] - 17:11
**National** [2] - 3:10, 4:9
**Nationality** [1] - 22:15
**nature** [1] - 40:8
**NCIC** [28] - 3:12, 3:13, 12:13, 12:20, 22:23, 23:3, 45:19, 53:15, 53:19, 54:3, 54:10, 54:13, 54:15, 54:17, 54:21, 59:25, 60:8, 61:5, 62:9, 62:13, 62:19, 63:15, 63:24, 63:25, 64:5, 64:9, 65:10, 68:6
**necessarily** [1] - 56:10
**necessary** [1] - 35:8
**need** [9] - 4:14, 21:2, 31:10, 35:18, 36:1, 51:2, 51:23, 58:10, 69:20
**needed** [1] - 14:9
**needs** [4] - 34:2, 34:11, 45:11, 46:9
**NEUMANN** [1] - 1:15
**never** [4] - 46:25, 55:3, 65:6, 65:11
**New** [1] - 32:17
**new** [21] - 12:22, 13:11, 13:12, 13:21, 14:3, 16:3, 20:14, 27:17, 29:4, 29:6, 31:8, 32:18, 33:18, 34:6, 34:9, 34:16, 34:25, 35:4, 35:8, 36:2, 44:1

**next** [7] - 4:21, 5:22, 21:11, 36:7, 49:1, 69:5, 69:16
**night** [1] - 50:5
**nolle** [2] - 64:16, 64:25
**noncitizen** [3] - 56:3, 58:6, 62:2
**noncitizens** [2] - 53:14, 59:11
**none** [2] - 12:17, 54:7
**nonexhaustive** [1] - 14:5
**nonimmigrant** [8] - 17:13, 17:18, 17:24, 55:8, 55:9, 55:12, 55:19
**nonimmigrant's** [1] - 57:4
**nonimmigrants** [2] - 56:1, 57:25
**nonimmigration** [1] - 58:15
**Nonreviewability** [2] - 27:24, 28:6
**normal** [2] - 16:4, 59:1
**note** [3] - 21:9, 29:13, 29:19
**noted** [1] - 27:16
**notes** [4] - 6:20, 49:14, 70:5, 71:3
**nothing** [3] - 17:12, 28:17, 54:6
**notice** [5] - 29:3, 38:9, 47:12, 56:5, 61:15
**notices** [2] - 50:5, 54:13
**noting** [1] - 35:7
**number** [4] - 40:10, 40:11, 61:8, 67:25
**numbers** [2] - 42:11, 62:23
**NW** [4] - 1:20, 1:24, 70:12, 71:9

## O

**obfuscation** [1] - 10:25
**Obute** [1] - 5:21
**obviously** [6] - 34:25, 42:16, 42:17, 42:19, 46:2, 56:10
**occurred** [1] - 68:20
**occurring** [1] - 18:8
**OF** [4] - 1:1, 1:9, 70:1, 71:1
**off-campus** [1] - 41:23
**offer** [1] - 51:24
**OFFICE** [1] - 1:19
**Office** [4] - 39:9, 47:18, 50:22, 69:13
**officer** [3] - 46:22, 64:7, 65:3
**officers** [2] - 30:10, 62:19
**Official** [1] - 1:23
**official** [4] - 41:11, 58:10, 70:11, 71:7
**OFFICIAL** [2] - 70:1, 71:1
**often** [1] - 39:25
**oftentimes** [1] - 58:25
**Oliver** [13] - 2:11, 2:19, 2:21, 6:3, 27:6, 38:18, 48:11, 49:7, 49:15, 49:21, 50:21, 51:12, 52:23
**OLIVER** [104] - 1:18, 2:10, 2:20, 2:22, 3:8, 3:19, 4:3, 4:7, 4:17, 4:22, 5:1, 5:10, 5:15, 6:7, 6:10, 6:14, 6:18, 6:20, 6:24, 7:6, 7:12, 7:19, 7:25, 8:4, 8:7, 8:11, 8:18, 9:18, 9:22, 10:1, 10:4, 10:8, 10:11, 10:23, 11:3, 11:15, 11:20, 12:8, 12:22, 12:25, 13:11, 13:19, 14:1, 14:13, 14:22, 14:24, 15:2, 15:6, 15:11, 15:14, 15:19, 15:23, 16:7, 16:14, 16:19, 17:7, 18:6, 18:18, 18:23, 19:4, 19:8, 19:12, 19:17, 19:20, 19:22, 20:5, 20:8, 20:11, 20:24, 21:5, 21:25, 22:9, 22:17, 22:20, 23:2, 23:7, 23:12, 23:16, 23:19, 23:22, 24:4, 24:10, 24:13, 24:20, 24:25, 25:3, 25:7, 25:16, 25:20, 25:24, 26:17, 36:11, 36:13, 36:18, 36:21, 36:24, 37:1, 37:3, 37:8, 37:12, 37:16, 37:18, 37:23, 69:8
**oliver@usdoj.gov** [1] - 1:21
**once** [3] - 7:14, 7:15, 10:5
**one** [26] - 5:18, 15:2, 15:3, 16:9, 21:10, 21:11, 25:21, 29:2, 29:6, 32:17, 33:2, 39:10, 41:1, 42:22, 50:21, 51:24, 57:12, 59:11, 59:15, 63:3, 64:21, 64:23, 64:24, 65:2, 69:10
**ones** [1] - 59:14
**operations** [1] - 38:12
**opportunity** [2] - 28:7, 29:12
**OPT** [7] - 14:20, 15:8, 15:20, 17:22, 20:12, 44:20, 67:10
**order** [7] - 11:20, 39:20, 61:24, 62:3, 62:10, 68:9, 69:6
**original** [5] - 13:13, 30:13, 34:14, 35:3, 35:7
**originally** [2] - 7:16, 34:17
**origins** [1] - 50:7
**ourselves** [1] - 42:16
**outcomes** [1] - 67:13
**outside** [3] - 34:8, 37:18, 68:18
**overarching** [1] - 30:20
**oversaw** [1] - 39:11
**oversight** [1] - 56:23
**overspeak** [1] - 66:6
**own** [6] - 18:13, 20:16, 22:12, 55:10, 57:10, 68:13

## P

**P.C** [1] - 1:15
**pages** [2] - 22:25, 49:22
**Pages** [1] - 54:1
**parameters** [1] - 68:17
**part** [4] - 7:4, 39:9, 42:17, 64:4
**participate** [1] - 44:19
**participating** [1] - 30:5
**particular** [1] - 13:1
**particularly** [1] - 30:2
**passport** [1] - 58:19
**past** [2] - 33:15, 47:8
**Patel** [4] - 50:5, 50:23, 54:2, 59:22
**paths** [1] - 55:7
**Pause** [4] - 4:25, 6:13, 12:7, 38:5
**pause** [1] - 31:21
**pay** [1] - 52:10
**people** [13] - 4:14, 12:17, 22:3, 22:23, 40:21, 45:18, 52:3, 52:14, 52:15, 60:11, 65:19, 67:22
**people's** [3] - 48:19, 52:9, 66:2
**per** [1] - 3:9
**period** [2] - 58:21, 58:23
**person** [10] - 45:20, 54:5, 55:4, 64:1, 65:4, 65:7, 65:8, 65:9, 65:10
**person's** [2] - 40:19, 67:19
**personally** [1] - 63:21
**petition** [1] - 56:21
**phone** [1] - 4:23
**PI** [5] - 31:4, 31:11, 32:6, 35:15, 35:20
**picked** [1] - 56:25
**PII** [1] - 63:21
**place** [5] - 7:16, 31:6, 31:8, 31:12, 55:3
**Plaintiff** [2] - 1:3, 1:11
**plaintiff** [12] - 7:11, 10:20, 11:2, 11:10, 11:13, 12:13, 15:5, 26:10, 26:19, 26:21, 46:21, 52:6
**plaintiff's** [13] - 2:4, 6:4, 6:24, 7:4, 7:18, 7:21, 11:8, 19:1, 22:6, 23:1, 23:23, 26:1, 33:7
**plaintiffs** [3] - 2:8, 65:2, 66:24
**plan** [4] - 12:19, 13:9, 13:17, 13:19
**planning** [1] - 18:24
**plans** [1] - 21:17
**played** [1] - 57:22
**playing** [1] - 57:18
**plays** [1] - 50:13
**podium** [1] - 4:16
**point** [6] - 33:18, 34:22, 35:24, 37:22, 40:11, 50:14
**pointed** [1] - 29:10
**points** [2] - 32:15, 46:4
**police** [1] - 46:22
**policy** [21] - 12:23, 13:22, 13:25, 14:2, 14:3, 16:3, 29:4, 29:7, 29:10, 29:22, 30:12, 30:15, 31:8, 32:18, 34:6, 34:9, 34:16, 34:25, 35:4, 35:8
**population** [7] - 53:14, 62:6, 62:9, 62:10, 62:11, 62:16, 62:17
**port** [1] - 58:7
**portfolios** [1] - 39:10
**position** [6] - 15:18, 15:25, 23:9, 27:16, 29:5, 66:24
**positive** [5] - 3:12, 62:13, 62:18, 64:3, 66:10
**possible** [2] - 8:15, 31:9
**post** [1] - 30:15
**post-dated** [1] - 30:15
**posture** [1] - 11:7
**potential** [2] - 57:5, 65:8
**potentially** [1] - 56:15
**powers** [1] - 29:12
**preliminary** [4] - 30:23, 32:25, 34:20, 36:7
**preparation** [2] - 48:24, 53:7
**prepared** [5] - 4:1, 9:9, 48:8, 49:8, 50:23
**present** [1] - 42:12
**presently** [1] - 11:6
**President's** [1] - 66:4
**pretty** [2] - 14:4, 17:10
**preventing** [2] - 24:21, 24:22
**previously** [1] - 13:4
**Principal** [1] - 39:10
**probable** [1] - 57:3
**procedures** [1] - 12:10
**proceeded** [1] - 53:25
**proceeding** [1] - 3:24
**proceedings** [7] - 17:2, 40:19, 56:4, 56:16, 57:5, 70:6, 71:3
**process** [5] - 56:6, 56:22, 56:23, 60:7, 63:13
**produce** [1] - 48:22
**produced** [1] - 34:1
**productivity** [1] - 63:2
**program** [16] - 2:25, 3:1, 3:9, 3:16, 3:18, 10:15, 12:12, 14:9, 38:13, 44:6, 48:3, 49:25, 50:3, 50:7, 50:10, 53:5
**programs** [1] - 67:10
**progresses** [1] - 34:5
**promising** [1] - 32:12
**proper** [1] - 31:15
**prosse'd** [2] - 64:16, 64:25
**provide** [2] - 45:2, 61:17
**provided** [3] - 14:15, 63:8, 65:15

**provision** [1] - 57:11
**prudential** [9] - 16:15, 16:18, 16:19, 23:20, 32:20, 55:24, 58:13, 59:12, 60:1
**prudentially** [5] - 17:4, 22:14, 58:4, 58:8, 59:6
**Public** [1] - 46:25
**publishes** [1] - 54:14
**pull** [1] - 53:8
**punishable** [1] - 57:12
**purpose** [6] - 14:10, 17:16, 18:2, 18:5, 43:7, 67:2
**purposes** [1] - 14:9
**pursuant** [1] - 22:15
**put** [10] - 32:21, 34:4, 35:11, 35:12, 39:3, 56:4, 56:16, 57:5, 59:18, 64:12
**putting** [2] - 34:23, 57:14

## Q

**questioning** [1] - 4:19
**questions** [51] - 2:18, 3:17, 3:25, 4:2, 4:5, 4:15, 4:21, 5:7, 5:9, 8:22, 8:23, 8:24, 9:1, 9:3, 9:5, 9:9, 10:7, 10:19, 11:17, 21:2, 25:19, 30:20, 35:22, 48:2, 48:5, 48:9, 48:12, 48:21, 49:2, 49:3, 49:7, 49:8, 49:11, 49:13, 49:14, 50:19, 50:23, 51:2, 51:3, 51:4, 51:7, 51:10, 51:12, 51:13, 51:15, 51:20, 52:17, 53:8, 61:16, 62:24, 66:21
**quick** [2] - 35:23, 51:24
**quickly** [3] - 31:9, 35:16, 41:10
**quite** [2] - 39:1, 48:20
**quote** [2] - 32:20, 34:1
**quote-unquote** [1] - 34:1

## R

**raising** [1] - 51:9
**ran** [5] - 12:12, 23:25, 44:5, 60:8, 61:5
**RDR** [5] - 1:23, 70:3, 70:10, 71:2, 71:7
**reactivated** [5] - 6:8, 6:16, 7:14, 26:5, 30:23
**read** [5] - 2:16, 22:25, 50:18, 50:22, 51:2
**real** [3] - 30:8, 48:18, 52:15
**realized** [1] - 46:24
**really** [6] - 33:16, 43:18, 46:15, 46:16, 48:7, 57:24
**reason** [15] - 16:5, 16:12, 17:5, 18:4, 24:17, 24:24, 25:13, 25:15, 27:7, 28:5, 33:12, 44:5, 55:3, 57:20, 60:11
**reasons** [6] - 14:6, 16:4, 28:16, 30:13, 42:23, 57:9
**received** [2] - 21:9, 47:20
**recent** [3] - 41:14, 49:17, 49:18
**Recess** [1] - 36:10
**recess** [2] - 30:17, 36:5
**recommendation** [2] - 68:8, 68:14
**recommended** [1] - 68:21
**record** [56] - 2:5, 3:2, 6:5, 6:16, 6:22, 6:25, 7:14, 7:15, 7:16, 7:18, 11:1, 11:12, 12:15, 12:20, 14:10, 14:14, 15:7, 16:6, 16:13, 17:6, 17:15, 17:17, 18:14, 18:22, 20:2, 20:14, 22:21, 22:25, 25:15, 25:23, 26:5, 26:6, 27:4, 27:7, 27:11, 28:19, 31:13, 33:7, 34:1, 38:22, 44:4, 44:12, 47:3, 49:23, 50:9, 54:21, 57:17, 57:20, 57:21, 62:19, 63:25, 64:1, 64:5, 64:9, 66:1, 66:10
**records** [31] - 3:11, 4:10, 14:4, 14:9, 16:4, 18:1, 18:4, 50:15, 53:20, 53:23, 53:24, 54:13, 54:24, 54:25, 59:4, 59:19, 59:25, 60:18, 62:12, 62:15, 63:5, 63:16, 63:24, 66:17, 68:4, 68:5, 68:7, 68:10, 68:12, 68:16
**red** [1] - 67:4
**REDDY** [2] - 1:2, 1:15
**Reddy** [1] - 2:3
**reenter** [3] - 24:8, 24:11, 26:11
**refer** [1] - 65:22
**referrals** [1] - 65:13
**referred** [2] - 53:20, 66:11
**regarding** [4] - 36:15, 36:19, 54:16, 61:25
**regulating** [1] - 30:6
**regulation** [1] - 29:23
**regulations** [3] - 29:21, 34:8, 55:6
**regulatory** [1] - 29:22
**reinstated** [6] - 6:5, 7:3, 7:17, 12:16, 13:7, 13:8
**reinstatement** [1] - 31:22
**related** [1] - 32:23
**relates** [2] - 66:12, 67:13
**relatively** [1] - 58:20
**relevant** [1] - 8:25
**relief** [1] - 33:18
**remain** [1] - 56:15
**removability** [2] - 56:6, 56:18
**removable** [2] - 11:14, 11:20
**removal** [5] - 12:9, 40:19, 56:4, 56:16, 57:5
**remove** [1] - 18:24
**removed** [1] - 57:6
**renewed** [1] - 34:19
**repeat** [2] - 22:10, 22:11
**repeatedly** [1] - 47:8
**Reporter** [4] - 1:23, 1:23, 70:11, 71:7
**REPORTER** [2] - 70:1, 71:1
**reporter** [1] - 25:23
**representations** [5] - 31:11, 31:13, 31:14, 32:6, 32:10
**representative** [2] - 30:19, 47:22
**represented** [3] - 7:2, 30:24, 31:1
**representing** [1] - 13:24
**request** [6] - 3:25, 53:24, 59:18, 66:17, 68:1, 68:14
**requested** [2] - 67:21, 68:4
**requests** [2] - 59:9, 67:23
**require** [1] - 69:15
**required** [1] - 64:23
**requirement** [1] - 62:8
**respect** [2] - 12:25, 13:2
**respond** [1] - 11:25
**response** [1] - 6:5
**responsible** [2] - 62:14, 63:25
**rest** [1] - 37:17
**restored** [1] - 7:15
**result** [6] - 23:9, 44:17, 44:21, 52:9, 52:12, 62:13
**resulted** [2] - 46:17, 54:8
**resulting** [1] - 7:22
**results** [1] - 66:13
**retroactive** [3] - 30:24, 31:18, 31:23
**retroactively** [1] - 7:17
**return** [3] - 16:22, 28:21, 58:7
**returned** [1] - 66:13
**review** [5] - 4:2, 27:25, 28:14, 56:19, 56:22
**reviewable** [2] - 55:17, 56:17
**reviewed** [3] - 3:24, 9:7, 28:7
**revocation** [20] - 23:9, 23:17, 23:18, 23:20, 24:18, 25:5, 26:10, 26:23, 27:5, 28:9, 32:19, 57:17, 57:19, 57:20, 58:12, 58:13, 59:10, 59:12, 67:17
**revocations** [5] - 27:13, 32:21, 45:23, 60:2, 68:2
**revoke** [10] - 25:13, 28:16, 30:4, 57:4, 57:9, 57:16, 58:2, 58:4, 60:5, 65:24
**revoked** [29] - 17:3, 22:7, 22:14, 22:19, 23:1, 23:4, 23:6, 23:11, 23:15, 23:24, 24:3, 24:16, 25:11, 26:1, 26:4, 27:2, 33:11, 53:24, 58:6, 58:8, 59:6, 60:13, 60:24, 65:25, 66:14, 67:16, 68:8, 68:21
**revokes** [1] - 56:2
**revoking** [1] - 56:1
**Richmond** [1] - 1:16
**risk** [1] - 28:24
**role** [2] - 30:8, 30:12
**room** [3] - 5:21, 37:9, 37:13
**Room** [3] - 1:24, 70:12, 71:8
**rough** [2] - 62:10, 68:9
**Rule** [1] - 33:25
**run** [2] - 62:8, 62:12
**runs** [1] - 54:15
**Rutledge** [1] - 1:12

## S

**Safety** [1] - 46:25
**safety** [1] - 42:24
**San** [2] - 31:16, 32:1
**sat** [1] - 53:7
**saw** [1] - 64:12
**SC** [1] - 1:13
**schedule** [2] - 31:6, 31:8
**scheduled** [2] - 48:20, 49:1
**school** [26] - 14:15, 14:16, 14:20, 16:8, 16:10, 17:22, 30:4, 30:10, 40:14, 40:15, 41:2, 41:3, 41:5, 41:11, 41:19, 42:1, 43:3, 43:9, 43:25, 45:4, 45:16, 46:5, 46:11, 46:20, 52:11, 59:2
**schools** [5] - 30:6, 30:9, 39:24, 42:14, 44:18
**scope** [1] - 62:3
**scrub** [1] - 3:11
**scrubbed** [2] - 4:10, 59:21
**se** [1] - 3:9
**search** [1] - 24:1
**seat** [1] - 38:18
**second** [3] - 33:1, 33:22, 64:4
**Security** [3] - 3:10, 4:9, 21:22
**see** [16] - 3:1, 5:18, 6:14, 11:24, 14:5, 24:19, 27:3, 28:15, 39:2, 41:8, 51:21, 51:22, 57:15, 64:4, 64:6, 64:9
**seeing** [3] - 42:18, 42:19, 64:18
**seek** [2] - 58:7, 58:11
**semitism** [2] - 61:25, 62:4
**send** [2] - 57:7, 63:12
**sense** [2] - 20:23,

41:12
**sent** [2] - 60:9, 60:14
**serious** [1] - 27:22
**serves** [1] - 67:4
**set** [4] - 7:15, 44:12, 48:7, 55:6
**several** [2] - 16:4, 17:20
**SEVIS** [92] - 3:11, 4:10, 6:4, 6:16, 7:4, 7:7, 7:10, 7:14, 7:18, 8:13, 8:19, 12:15, 12:19, 14:4, 14:6, 14:8, 14:10, 14:15, 16:4, 16:6, 16:12, 17:6, 17:11, 17:15, 17:17, 18:1, 18:5, 18:14, 20:2, 20:14, 22:8, 22:16, 22:18, 25:15, 26:5, 26:6, 27:1, 27:4, 27:7, 28:19, 29:3, 29:4, 29:7, 30:2, 30:9, 30:24, 30:25, 31:2, 33:7, 38:22, 39:6, 39:8, 42:13, 43:20, 43:23, 44:11, 44:12, 44:16, 45:1, 45:8, 45:12, 46:10, 47:3, 47:6, 49:17, 50:15, 52:3, 53:14, 53:20, 53:24, 54:24, 57:17, 57:20, 57:21, 59:4, 59:9, 59:14, 59:19, 59:25, 60:5, 60:18, 63:5, 64:1, 66:1, 66:25, 67:2, 67:6, 67:9, 67:17, 67:23
**SEVP** [9] - 14:6, 16:3, 30:5, 38:13, 39:8, 39:11, 39:24, 45:24
**shake** [1] - 18:22
**shared** [1] - 5:16
**shifted** [1] - 62:4
**shock** [1] - 33:16
**shocked** [1] - 33:15
**shocking** [2] - 16:1, 47:10
**shoplifting** [1] - 64:11
**short** [5] - 2:17, 38:9, 47:11, 58:20, 61:15
**shot** [1] - 28:5
**show** [9] - 3:25, 4:20, 5:13, 30:19, 32:14, 48:8, 48:13, 48:14, 64:22
**showed** [7] - 10:18, 24:1, 25:11, 48:4, 48:11, 60:8, 62:13
**showing** [7] - 4:4, 10:6, 20:15, 26:2, 38:9, 47:19, 47:21
**simply** [2] - 18:6, 46:20
**sit** [2] - 26:18, 52:12
**sitting** [1] - 22:2
**situation** [8] - 7:13, 27:20, 41:3, 41:4, 43:8, 43:9, 43:23, 44:3
**situations** [1] - 41:16
**six** [4] - 39:25, 40:3, 40:5, 40:9
**slightly** [1] - 34:21
**small** [1] - 40:11
**Smith** [2] - 59:23, 59:24
**So-and-so** [1] - 41:20
**solely** [4] - 12:20, 13:18, 14:11, 67:17
**someone** [19] - 4:1, 4:20, 5:3, 5:21, 14:11, 22:3, 38:2, 48:9, 48:22, 50:2, 51:1, 51:4, 54:4, 54:19, 54:20, 55:1, 56:25, 65:1, 65:2
**sometimes** [1] - 41:7
**SOOKNANAN** [1] - 1:9
**sorry** [12] - 6:20, 22:9, 23:11, 27:3, 28:1, 33:22, 33:23, 36:18, 39:2, 43:5, 62:22, 66:6
**sort** [4] - 30:15, 41:19, 45:21, 55:6
**SPARKLE** [1] - 1:9
**speaking** [2] - 25:22, 69:11
**specific** [2] - 3:11, 6:2
**specifically** [1] - 5:11
**spell** [1] - 36:25
**spending** [1] - 18:3
**spent** [1] - 55:6
**spreadsheet** [3] - 64:12, 64:18
**spreadsheets** [2] - 63:7
**staff** [8] - 3:10, 4:9, 52:23, 52:24, 63:4, 63:16, 63:25, 64:21
**staffing** [1] - 27:20
**stamping** [1] - 27:21
**stand** [2] - 29:1, 38:19
**standing** [1] - 47:7
**stands** [3] - 28:18, 32:4, 33:5
**start** [7] - 2:14, 9:19, 25:22, 25:25, 49:17, 51:18, 61:19
**started** [4] - 39:9, 44:25, 49:15, 53:3
**starting** [1] - 2:4
**State** [50] - 11:8, 21:21, 21:25, 22:13, 22:22, 27:2, 27:11, 27:12, 36:15, 36:19, 38:15, 39:8, 45:23, 50:8, 50:13, 51:13, 53:21, 53:22, 55:16, 55:22, 55:25, 56:2, 56:10, 57:1, 57:8, 57:15, 57:23, 58:1, 58:2, 59:17, 60:10, 60:22, 60:23, 63:8, 63:12, 65:13, 65:15, 65:23, 66:8, 66:11, 66:14, 66:17, 67:16, 67:20, 67:23, 68:4, 68:9, 68:15, 68:21
**statement** [17] - 19:7, 19:10, 19:11, 19:12, 20:16, 20:25, 21:4, 21:14, 38:21, 38:24, 39:14, 39:19, 42:21, 44:15, 46:2, 46:9, 47:13
**STATES** [2] - 1:1, 1:10
**States** [15] - 16:21, 16:23, 17:13, 19:24, 26:13, 29:1, 47:2, 58:16, 58:18, 59:2, 61:25, 62:5, 70:11, 71:8
**status** [41] - 7:4, 7:8, 8:3, 8:5, 8:10, 8:12, 8:17, 9:12, 9:17, 9:24, 10:21, 11:2, 11:11, 17:13, 17:16, 17:18, 17:24, 24:5, 24:7, 24:13, 25:20, 30:4, 44:5, 45:9, 45:12, 45:14, 55:5, 55:8, 55:9, 55:12, 57:10, 57:13, 58:15, 59:2, 60:15, 65:21, 66:2, 67:1, 67:3
**statute** [2] - 30:1, 30:3
**stay** [4] - 24:14, 58:25, 69:16, 69:20
**stays** [1] - 65:8
**Ste** [1] - 1:16
**stenographic** [2] - 70:5, 71:3
**step** [3] - 25:5, 40:22, 64:21
**steps** [3] - 11:21, 25:10, 36:7
**STEVEN** [1] - 1:15
**Steven** [1] - 2:7
**steven@rnlawgroup.com** [1] - 1:17
**still** [8] - 10:19, 17:10, 31:12, 32:3, 44:9, 44:11, 56:24, 59:2
**stop** [4] - 25:22, 46:6, 61:3, 63:11
**stops** [1] - 30:5
**Street** [1] - 1:20
**student** [26] - 8:6, 8:9, 8:15, 9:10, 16:8, 16:21, 17:2, 18:15, 20:2, 23:10, 24:14, 38:23, 40:15, 40:19, 41:24, 42:23, 42:25, 43:8, 43:12, 43:21, 44:17, 46:6, 55:8, 61:1, 64:7, 64:12
**Student** [15] - 3:3, 3:6, 5:7, 10:15, 30:20, 37:4, 46:12, 49:24, 52:21, 52:25, 60:7, 61:18, 61:21, 66:3, 66:20
**student's** [7] - 6:16, 8:12, 9:17, 17:3, 17:12, 55:12, 67:1
**students** [22] - 10:16, 10:17, 14:19, 17:21, 26:16, 30:6, 38:12, 44:3, 44:6, 44:8, 44:19, 44:23, 46:18, 58:17, 58:22, 58:25, 62:5, 62:6, 62:9, 66:9, 67:9
**students'** [2] - 60:15, 67:3
**studies** [2] - 24:15, 58:18
**studying** [1] - 62:5
**stuff** [1] - 63:12
**subject** [3] - 12:9, 56:3, 56:19
**submit** [2] - 35:11, 35:19
**submitted** [2] - 27:11, 35:19
**substituted** [1] - 9:6
**sufficient** [2] - 32:24, 57:3
**suggest** [2] - 29:24, 30:12
**summary** [6] - 33:25, 34:3, 34:7, 34:11, 35:20, 35:24
**supplement** [1] - 50:5
**supplemental** [1] - 29:3
**surprised** [1] - 48:21
**suspected** [1] - 47:12
**suspicion** [1] - 41:21
**swear** [1] - 61:15
**system** [6] - 30:10, 47:6, 54:3, 54:22, 68:6
**systems** [1] - 54:13

**T**

**teacher** [1] - 40:16
**technological** [1] - 31:18
**ten** [2] - 36:3, 39:4
**terminate** [38] - 13:10, 13:16, 13:17, 14:8, 16:3, 16:12, 20:12, 25:15, 26:16, 29:12, 29:20, 30:4, 31:1, 32:12, 32:22, 33:6, 33:10, 33:13, 34:8, 39:25, 40:18, 41:2, 41:17, 43:10, 44:5, 44:23, 45:25, 55:7, 55:19, 56:13, 57:17, 57:20, 59:19, 60:11, 66:1, 68:3, 68:5, 68:12
**terminated** [35] - 6:23, 6:25, 7:8, 7:16, 10:16, 12:15, 12:18, 13:4, 13:9, 14:20, 17:25, 26:5, 27:1, 27:5, 27:7, 28:19, 41:15, 43:23, 44:2, 44:13, 45:6, 47:2, 50:15, 52:13, 52:16, 53:25, 59:4, 60:12, 60:13, 60:14, 60:19, 66:18, 68:7, 68:10, 68:17
**terminates** [1] - 43:25
**terminating** [19] - 12:19, 13:20, 14:10, 16:6, 17:6, 17:15, 17:17, 18:4, 18:14, 20:2, 20:14, 33:6, 38:22, 40:9, 44:2, 45:12, 57:21, 66:2, 67:10
**termination** [52] - 2:25, 3:1, 7:14, 8:19, 10:14, 11:14, 14:6, 15:19, 16:16, 16:18, 16:19, 16:20, 17:1, 18:5, 22:8, 22:16, 22:18, 30:13, 30:25, 33:8, 33:19, 34:15, 35:4, 35:7, 41:14, 42:22, 42:25, 43:20, 44:9, 44:10, 44:11, 44:17, 44:21, 45:1,

45:8, 46:10, 48:2, 49:18, 49:19, 52:19, 55:21, 59:9, 61:20, 65:8, 65:18, 65:21, 66:25, 67:2, 67:17, 67:21, 68:22
**terminations** [17] - 39:23, 39:25, 40:8, 42:13, 44:8, 44:22, 49:17, 51:15, 59:15, 60:1, 60:6, 65:13, 67:9, 67:24, 68:1, 68:13, 68:20
**terms** [1] - 64:5
**testified** [3] - 31:17, 50:6, 59:22
**testifying** [3] - 36:14, 36:19, 37:3
**testimony** [1] - 47:14
**Texas** [1] - 46:25
**THE** [207] - 1:1, 1:1, 1:9, 2:2, 2:9, 2:13, 2:21, 2:23, 3:14, 3:22, 4:4, 4:12, 4:19, 4:24, 5:5, 5:13, 5:16, 5:20, 5:22, 6:1, 6:9, 6:11, 6:15, 6:19, 6:22, 7:2, 7:7, 7:17, 7:20, 8:1, 8:6, 8:8, 8:14, 8:20, 9:19, 9:23, 10:3, 10:5, 10:10, 10:12, 10:24, 11:5, 11:17, 11:22, 12:1, 12:11, 12:24, 13:2, 13:12, 13:21, 14:3, 14:17, 14:23, 15:1, 15:3, 15:9, 15:12, 15:15, 15:22, 15:25, 16:10, 16:17, 17:3, 17:9, 18:9, 18:20, 18:24, 19:6, 19:10, 19:14, 19:19, 19:21, 20:1, 20:6, 20:10, 20:13, 20:25, 21:6, 21:12, 21:24, 22:1, 22:5, 22:11, 22:19, 22:24, 23:4, 23:8, 23:14, 23:17, 23:21, 23:23, 24:6, 24:12, 24:14, 24:22, 25:2, 25:4, 25:9, 25:18, 25:21, 25:25, 26:18, 26:22, 27:3, 28:2, 28:8, 28:12, 28:15, 28:23, 28:25, 29:17, 30:15, 31:21, 32:3, 33:2, 33:21, 34:13, 34:23, 35:10, 36:4, 36:9, 36:12, 36:16, 36:20, 36:23, 36:25, 37:2, 37:5, 37:9, 37:10, 37:14, 37:17, 37:21, 37:24, 38:1, 38:6, 38:8, 38:14, 38:17, 39:5, 39:13, 39:17, 39:22, 40:1, 40:3, 40:7, 40:24, 41:1, 41:8, 41:12, 41:25, 42:3, 42:6, 42:8, 42:10, 42:20, 43:4, 43:14, 43:16, 43:20, 44:14, 46:8, 47:19, 47:24, 49:5, 49:10, 49:12, 50:16, 50:24, 51:8, 51:11, 52:1, 52:5, 53:4, 53:16, 53:18, 54:3, 55:1, 57:7, 59:14, 59:20, 60:3, 60:20, 60:22, 61:2, 61:10, 61:14, 62:1, 62:21, 62:23, 63:11, 65:1, 65:16, 66:7, 66:19, 67:7, 67:14, 67:22, 68:3, 68:12, 68:19, 68:25, 69:3, 69:11, 69:14, 69:18, 69:22
**thee** [1] - 8:14
**themselves** [3] - 51:5, 54:21, 55:8
**therefore** [1] - 43:10
**therein** [2] - 64:1, 64:2
**they've** [5] - 17:22, 17:23, 30:11, 32:17, 65:23
**thousands** [8] - 10:16, 10:17, 14:18, 14:19, 26:16, 44:2, 44:23, 52:14
**threaten** [2] - 40:21, 40:22
**threatening** [2] - 40:16, 41:20
**three** [15] - 17:9, 27:19, 46:1, 49:22, 52:21, 53:9, 57:25, 59:3, 59:11, 59:15, 59:16, 59:20, 60:4, 60:12
**throw** [1] - 17:2
**timelines** [1] - 2:17
**tip** [2] - 41:6, 41:9
**title** [1] - 38:10
**titles** [1] - 37:5
**today** [11] - 4:1, 9:5, 12:4, 26:19, 29:5, 32:10, 33:5, 39:18, 43:19, 47:7, 69:1
**TODD** [1] - 1:6
**Todd** [1] - 2:3
**took** [2] - 24:24, 48:18
**top** [1] - 40:21
**total** [1] - 40:3
**totally** [2] - 24:17, 28:16
**touch** [1] - 41:10
**traffic** [4] - 46:23, 46:25, 65:3, 65:5
**training** [3] - 14:20, 15:8, 67:10
**trainings** [1] - 17:22
**transcript** [13] - 3:24, 9:8, 50:6, 50:17, 50:18, 50:23, 51:3, 53:8, 54:2, 70:5, 70:6, 71:3, 71:3
**TRANSCRIPT** [1] - 1:9
**transcripts** [3] - 48:25, 49:3, 49:9
**transfer** [1] - 16:7
**transferred** [1] - 11:18
**transfers** [1] - 16:8
**transpired** [1] - 50:14
**travel** [3] - 16:20, 58:21
**treat** [1] - 35:20
**tried** [2] - 59:22, 59:23
**trigger** [1] - 43:12
**triggering** [1] - 56:9
**TRO** [10] - 6:5, 7:3, 11:14, 13:7, 26:7, 48:25, 52:7, 52:13
**TROs** [1] - 68:11
**true** [8] - 15:5, 31:14, 39:16, 43:22, 70:4, 70:6, 71:2, 71:3
**Truong** [4] - 11:22, 21:9, 37:24, 49:8
**TRUONG** [7] - 1:19, 5:23, 11:24, 12:6, 21:8, 21:19, 22:4
**try** [1] - 50:24
**trying** [5] - 15:17, 29:11, 42:20, 60:6, 61:18
**turn** [3] - 35:23, 51:21, 61:10
**turned** [3] - 52:3, 52:6, 52:8
**turns** [1] - 32:7
**two** [23] - 4:15, 8:21, 9:2, 10:6, 10:18, 10:19, 12:1, 12:3, 12:4, 15:16, 17:10, 22:2, 27:21, 32:15, 32:16, 36:13, 46:21, 47:4, 48:1, 48:20, 53:10, 59:15, 68:17
**TX** [1] - 1:16
**type** [3] - 44:10, 58:14, 58:23
**types** [2] - 32:20, 59:18
**typical** [2] - 43:7, 43:9
**typically** [1] - 40:12

## U

**U.S** [6] - 1:19, 1:24, 47:18, 50:22, 56:22, 69:12
**UCIS** [2] - 19:23, 19:25
**ultimately** [2] - 33:9, 56:21
**unacceptable** [2] - 16:1, 51:5
**under** [9] - 30:11, 33:25, 41:21, 55:18, 56:2, 56:11, 56:16, 62:10, 68:17
**underlying** [2] - 55:14, 57:2
**undertook** [2] - 7:5, 53:12
**United** [15] - 16:21, 16:22, 16:23, 17:13, 19:24, 26:12, 28:25, 47:2, 58:16, 58:18, 59:2, 61:25, 62:5, 70:11, 71:8
**UNITED** [2] - 1:1, 1:10
**unknown** [1] - 64:15
**unlawful** [5] - 29:11, 29:25, 30:13, 30:14, 35:9
**unlawfulness** [2] - 34:16, 35:7
**unpersuasive** [1] - 30:2
**unprecedented** [1] - 46:13
**unquote** [1] - 34:1
**up** [39] - 3:25, 4:4, 4:20, 5:13, 10:6, 10:18, 18:7, 18:12, 20:15, 23:2, 29:1, 30:7, 30:19, 32:4, 33:5, 35:22, 36:16, 36:22, 38:9, 44:24, 47:7, 47:19, 47:21, 47:23, 48:4, 48:8, 48:11, 48:14, 52:23, 52:25, 54:17, 56:12, 56:25, 57:25, 62:12, 63:15, 65:2, 65:7
**update** [2] - 14:7, 16:11
**upending** [2] - 10:17, 46:17
**urge** [2] - 34:3, 34:10
**US** [1] - 19:18
**USC** [2] - 55:18, 56:2
**USCIS** [2] - 15:20, 20:9
**usual** [1] - 10:24

## V

**valid** [8] - 17:23, 23:9, 23:17, 24:8, 25:13, 25:15, 57:13, 57:17
**validity** [1] - 8:17
**validly** [1] - 24:3
**various** [1] - 45:7
**vast** [2] - 39:23, 41:4
**version** [3] - 10:21, 11:5, 15:15
**versus** [2] - 64:23, 64:24
**via** [1] - 55:7
**video** [2] - 46:24, 65:4
**violate** [1] - 65:5
**violating** [1] - 65:3
**violation** [5] - 8:2, 8:4, 8:9, 8:12, 9:11
**violence** [2] - 40:22, 57:12
**violent** [2] - 41:20, 42:23
**virtually** [2] - 5:3, 5:14
**visa** [74] - 16:15, 16:20, 16:22, 16:24, 17:1, 17:3, 22:6, 22:14, 22:19, 23:1, 23:4, 23:6, 23:9, 23:15, 23:23, 24:3, 24:8, 24:16, 24:18, 24:24, 25:3, 25:11, 25:14, 26:1, 26:4, 26:9, 26:12, 26:15, 26:23, 27:2, 27:5, 27:18, 27:23, 27:25, 28:9, 32:19, 32:21, 33:11, 56:2, 56:13, 57:4, 57:9, 57:16, 57:19, 58:2, 58:4, 58:5, 58:7, 58:11, 58:13, 58:14, 58:19, 58:22, 58:23, 58:24, 59:1, 59:10, 60:1, 60:2, 60:15, 60:18, 60:23, 62:11, 63:14, 66:12, 66:15, 67:16, 67:17, 68:21
**visas** [12] - 28:16, 53:23, 56:1, 59:7, 60:5, 60:12, 60:13, 65:24, 65:25, 68:8
**visitor** [2] - 38:12,

55:20
**voluntary** [1] - 34:20

## W

**wait** [4] - 5:8, 27:18, 30:18
**waiting** [4] - 5:21, 37:9, 37:12, 48:13
**walk** [4] - 13:15, 25:9, 33:9, 61:2
**wants** [1] - 60:11
**warrant** [1] - 54:19
**Washington** [5] - 1:4, 1:20, 1:25, 70:13, 71:9
**Watson** [10] - 50:6, 54:1, 59:22, 61:7, 61:9, 61:10, 61:12, 66:22, 68:25, 69:16
**WATSON** [17] - 61:13, 61:23, 62:2, 62:22, 62:25, 63:20, 65:12, 66:5, 66:8, 67:4, 67:12, 67:20, 67:25, 68:7, 68:16, 68:23, 69:2
**ways** [2] - 54:17, 54:20
**website** [24] - 18:13, 18:20, 18:25, 20:1, 20:13, 20:17, 21:4, 21:15, 21:17, 21:20, 21:21, 36:15, 36:19, 38:21, 38:22, 38:25, 39:15, 42:4, 42:5, 43:6, 43:17, 43:21, 47:13, 51:14
**week** [2] - 3:23, 52:3
**weekend** [1] - 2:15
**weeks** [17] - 4:15, 8:21, 9:3, 10:6, 10:18, 10:19, 12:3, 15:16, 17:10, 18:25, 27:21, 46:1, 46:21, 47:8, 48:1, 48:20, 53:10
**welcome** [1] - 69:2
**well-prepared** [1] - 48:8
**whatsoever** [4] - 17:12, 18:5, 67:1, 67:3
**whereby** [1] - 64:7
**whole** [2] - 34:20, 38:19
**wife** [1] - 47:3
**win** [1] - 34:6
**witness** [11] - 5:25, 12:3, 21:9, 21:13, 21:14, 35:13, 35:21, 36:2, 36:6, 48:13, 48:14
**witnesses** [1] - 3:17
**word** [1] - 47:20
**works** [2] - 21:3, 61:3
**world** [1] - 20:15
**worth** [1] - 28:24
**wow** [2] - 28:23, 28:25

## Y

**year** [5] - 39:24, 42:11, 43:24, 44:24, 57:12
**years** [1] - 39:4
**yourself** [1] - 2:5

## Z

**zone** [1] - 27:15
**zoom** [2] - 2:24, 3:3
**Zoom** [2] - 5:17, 38:2

# EXHIBIT C

Case 4:25-cv-03292-JSW Document 65 Filed 07/30/25 Page 22 of 56

Andre Y. Bates (SBN 178170) (aybates@dehengsv.com)
Steven A. Soloway (SBN 130774) (ssoloway@dehengsv.com)
Keliang (Clay) Zhu (SBN 305509) (czhu@dehengsv.com)
Yi Yao (SBN 292563) (yyao@dehengsv.com)
**DEHENG LAW OFFICES PC**
7901 Stoneridge Drive, Suite 208
Pleasanton, CA 94588
T: 925-399-6702
F: 925-397-1976

Justin Sadowsky – Admitted *Pro Hac Vice*
**CHINESE AMERICAN LEGAL DEFENSE ALLIANCE**
4250 N Fairfax Drive #600
Arlington, VA 22203
T: 646-785-9154
E: justins@caldausa.org

*Attorneys for Plaintiffs*
*Zhuoer Chen, Mengcheng Yu,*
*Jiarong Ouyang, Jing Tao, Yifeng Wu, and Wanrong Li*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ZHUOER CHEN, an individual; MENGCHENG YU, an individual; JIARONG OUYANG, an individual; JING TAO, an individual; YIFENG WU, an individual; and WANRONG LI, an individual;<br><br>Plaintiffs,<br><br>vs.<br><br>KRISTI NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security; TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; and Marco Rubio, in his official capacity as Secretary of State;<br><br>Defendants. | Case No. 3:25-cv-03292-SI<br><br>**DECLARATION OF JING TAO** |

I, Jing Tao, hereby declare as follows:

1. I am a Plaintiff in this case.

2. I am a citizen of China and I live in Dallas, Texas.

3. I am here on an F-1 visa.

4. I am currently a Ph.D. candidate in Political Science at the University of Texas at Dallas, with an expected graduation date of 2028. Since starting the program in Fall 2023, I have maintained full-time enrollment and strong academic standing, with a current GPA of 3.8. I received straight A's in Spring and Summer 2024 and have actively contributed to the department's academic community. Since starting my program, I have already had a paper accepted for presentation at the Midwest Political Science Association conference which is currently in the publication process.

5. At all times, I have complied with the terms of my F-1 visa.

6. I have never been charged with a crime. My only contact with law enforcement was in August 2024, when I became frightened of my boyfriend during a verbal altercation and called the police myself. While the police took me into custody at the time as a precautionary measure, no charges were ever filed against me.

7. My SEVIS record was unlawfully terminated in April 2025. Within days of that termination, I further received word that my F-1 visa was revoked.

8. My SEVIS status has been restored.

9. Had my SEVIS status not been restored, I would have been unable to continue my studies, lost my funding for my doctoral program, and been left with no sources of income.

10. And because my visa has not been restored, I am unable to go abroad to present my research at conferences at other countries, and have been unable to return home to visit my parents who I have not seen in over two years.

11. I respectfully and urgently request an order from the Court to restore my F-1 visa.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this Declaration is executed in Dallas, Texas on July 25, 2025

Jing Tao

# EXHIBIT D

Case 4:25-cv-03292-JSW Document 65 Filed 07/30/25 Page 26 of 56

Andre Y. Bates (SBN 178170) (aybates@dehengsv.com)
Steven A. Soloway (SBN 130774) (ssoloway@dehengsv.com)
Keliang (Clay) Zhu (SBN 305509) (czhu@dehengsv.com)
Yi Yao (SBN 292563) (yyao@dehengsv.com)
**DEHENG LAW OFFICES PC**
7901 Stoneridge Drive, Suite 208
Pleasanton, CA 94588
T: 925-399-6702
F: 925-397-1976

Justin Sadowsky – Admitted *Pro Hac Vice*
**CHINESE AMERICAN LEGAL DEFENSE ALLIANCE**
4250 N Fairfax Drive #600
Arlington, VA 22203
T: 646-785-9154
E: justins@caldausa.org

*Attorneys for Plaintiffs*
*Zhuoer Chen, Mengcheng Yu,*
*Jiarong Ouyang, Jing Tao, Yifeng Wu,*
*And Wanrong Li*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ZHUOER CHEN, an individual; MENGCHENG YU, an individual; JIARONG OUYANG, an individual; JING TAO, an individual; YIFENG WU, an individual; and WANRONG LI, an individual;<br><br>Plaintiffs,<br><br>vs.<br><br>KRISTI NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security; TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; and Marco Rubio, in his official capacity as Secretary of State; | Case No. 3:25-cv-03292-SI<br><br>**DECLARATION OF YIFENG WU** |

Defendants.

I, Yifeng Wu, hereby declare as follows:

1. I am a Plaintiff in this case.

2. I am a citizen of China and I live in New York, New York.

3. I am here on an F-1 visa.

4. I began my undergraduate studies in social work at NYU in Fall 2024.

5. After maintaining a GPA of around 3.5 during my freshman year, I learned on April 8th that my SEVIS status was terminated.

6. My SEVIS status has been restored as a result of this litigation.

7. At all times, I have complied with the terms of my F-1 visa.

8. On April 10th, I received word from the State that my F-1 visa was cancelled.

9. Although my SEVIS status was restored on April 29th, my visa has not been restored.

10. I have never been convicted of any crime, much less a crime of violence. I have one arrest due to unlawful graffiti, but the charges were dropped.

11. Because of my revoked visa, I cannot return to Nanjing for an internship I had successfully applied for over the summer. I also cannot see my family for the duration of my studies.

12. I respectfully and urgently request an order from the Court to immediately restore my F-1 visa.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this Declaration is executed in New York, New York on July 28, 2025.

Yifeng Wu

# EXHIBIT E

Andre Y. Bates (SBN 178170) (aybates@dehengsv.com)
Steven A. Soloway (SBN 130774) (ssoloway@dehengsv.com)
Keliang (Clay) Zhu (SBN 305509) (czhu@dehengsv.com)
Yi Yao (SBN 292563) (yyao@dehengsv.com)
**DeHeng Law Offices PC**
7901 Stoneridge Drive, Suite 208
Pleasanton, CA 94588
T: 925-399-6702
F: 925-397-1976

Justin Sadowsky – Admitted *Pro Hac Vice*
**Chinese American Legal Defense Alliance**
4250 N Fairfax Drive #600
Arlington, VA 22203
T: 646-785-9154
E: justins@caldausa.org

*Attorneys for Plaintiffs*
*Zhuoer Chen, Mengcheng Yu,*
*Jiarong Ouyang, Jing Tao, Yifeng Wu,*
*And Wanrong Li*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ZHUOER CHEN, an individual; MENGCHENG YU, an individual; JIARONG OUYANG, an individual; JING TAO, an individual; YIFENG WU, an individual; and WANRONG LI, an individual;<br><br>Plaintiffs,<br><br>vs.<br><br>KRISTI NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security; TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; and Marco Rubio, in his official capacity as Secretary of State; | Case No. 3:25-cv-03292-SI<br><br>**DECLARATION OF WANRONG LI** |

Defendants.

I, Wanrong Li, hereby declare as follows:

1. I am a Plaintiff in this case.

2. I am a citizen of China and I live in Los Angeles, California.

3. I graduated from the University of Southern California this past spring with a Master of Science in Analytics. My final GPA was 3.8.

4. I now work for ByteDance. My role is in e-commerce strategy, focusing on developing and optimizing strategies for TikTok's global e-commerce business.

5. At all times I have complied with the terms of my F-1 visa.

6. On April 6, I received an email from the U.S. Embassy in Tokyo telling me that my visa had been revoked under 8 U.S.C. § 1201(i). I was told that this visa revocation was communicated to ICE, which manages the Student Exchange Visitor Program and is responsible for removal proceedings. The email warned that remaining in the U.S. "can result in fines, detention, and/or deportation."

7. Two days later, on April 8, I received notice from USC that my SEVIS status had been terminated. This email also warned me about remaining in the U.S.

8. My SEVIS status was restored as a result of this litigation. But my visa remains revoked.

9. Despite these actions (and because of this lawsuit), I was able to graduate shortly thereafter. I now work for ByteDance under SEVIS's Optional Practical Training (OPT) program.

10. I am approved for an H-1B visa to start in October. But until that visa is issued, I am currently in the United States with a visa that has been purported to have been revoked under 8 U.S.C. § 1201(i). I cannot visit my family, who live in China and who I have not seen in about 8 months. My grandmother is elderly and she greatly desires to spend time with her while she can.

11. Even once my H1-B visa is granted in October, I am reasonably concerned that, absent this Court retroactively setting aside my visa cancellation, I will be deemed to have unlawfully remained in the United States, which would likely result in me being denied admission back into the country when I go to visit her family.

12. I have never been convicted of a crime. In 2022, a neighbor called the police during a domestic dispute I had with my boyfriend. I was taken into protective custody at the time but was never arrested or charged with any crime.

13. I respectfully and urgently request an order from the Court to restore my F-1 visa.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this Declaration is executed in Los Angeles, California, on July 25, 2025.

Case 4:25-cv-03292-JSW Document 65 Filed 07/30/25 Page 35 of 56

Wanrong Li

# EXHIBIT F

**U.S. Visa Revocation Notification - (F1)- TAO, JING/ E35307135**

GN Guangzhou, NIV Inquiries <GuangzhouNIVI@state.gov>

To: Tao, Jing

Thursday, April 10, 2025 at 1:02 AM

Dear applicant TAO, JING,

We are writing about an important and serious matter in reference to your nonimmigrant student (F-1) visa.

On behalf of the United States Department of State, the Bureau of Consular Affairs Visa Office hereby informs you that additional information became available after your visa was issued. As a result, your F-1 visa with expiration date 25-APR-2028 has been revoked under Section 221(i) of the United States Immigration and Nationality Act, as amended.

The Bureau of Consular Affairs Visa Office has alerted the Department of Homeland Security's Immigration and Customs Enforcement, which manages the Student Exchange Visitor Program and is responsible for removal proceedings. They may notify your designated school official about the revocation of your F-1 visa.

Remaining in the United States without a lawful immigration status can result in fines, detention, and/or deportation. It may also make you ineligible for a future U.S. visa. Please note that deportation can take place at a time that does not allow the person being deported to secure possessions or conclude affairs in the United States. Persons being deported may be sent to countries other than their countries of origin.

Given the gravity of this situation, individuals whose visa was revoked may wish to demonstrate their intent to depart the United States using the CBP Home App at https://www.cbp.gov/about/mobile-apps-directory/cbphome.

As soon as you depart the United States, you must personally present your passport to the U.S. embassy or consulate which issued your visa so your visa can be physically cancelled.

You must not attempt to use your visa as it has been revoked. If you intend to travel to the United States in the future, you must apply for another U.S. visa and a determination on your eligibility for a visa will be made at that time.

Sincerely,

Nonimmigrant Visa Unit

U.S. Consulate General Guangzhou

# EXHIBIT G

USC

Wanrong Li <wanrongl@usc.edu>

# Important Notice from the U.S. Embassy Tokyo

1 message

**Tokyo, VisaService (no email)** <TokyoVisaService@state.gov> Sun, Apr 6, 2025 at 7:10 PM
To: "WANRONGL@USC.EDU" <WANRONGL@usc.edu>, "FIONALI1007@GMAIL.COM" <FIONALI1007@gmail.com>, "WANRONL@UCI.EDU" <WANRONL@uci.edu>

**This Message Is From an External Sender**

USC detected that this message came from outside of USC.

Report Suspicious

Dear Ms. WANRONG LI,

We are writing about an important and serious matter in reference to your nonimmigrant student (F-1) visa.

On behalf of the United States Department of State, the Bureau of Consular Affairs Visa Office hereby informs you that additional information became available after your visa was issued. As a result, your F-1 visa with expiration date 03-OCT-2028 has been revoked under Section 221(i) of the United States Immigration and Nationality Act, as amended.

The Bureau of Consular Affairs Visa Office has alerted the Department of Homeland Security's Immigration and Customs Enforcement, which manages the Student Exchange Visitor Program and is responsible for removal proceedings. They may notify your designated school official about the revocation of your F-1 visa.

Remaining in the United States without a lawful immigration status can result in fines, detention, and/or deportation. It may also make you ineligible for a future U.S. visa. Please note that deportation can take place at a time that does not allow the person being deported to secure possessions or conclude affairs in the United States. Persons being deported may be sent to countries other than their countries of origin.

Given the gravity of this situation, individuals whose visa was revoked may wish to demonstrate their intent to depart the United States using the CBP Home App at https://www.cbp.gov/about/mobile-apps-directory/cbphome.

As soon as you depart the United States, you must personally present your passport to the U.S. embassy or consulate which issued your visa so your visa can be physically cancelled.

You must not attempt to use your visa as it has been revoked. If you intend to travel to the United States in the future, you must apply for another U.S. visa and a determination on your eligibility for a visa will be made at that time.

SBU -PRIVACY OR PII